B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Tyler Brandon Davis; TopDevz, LLC | Ashkan Rajaee and Nassim Rajaee |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| D. Edward Hays, Alina Mamlyuk / MARSHACK HAYS WOOD LLP 870 Roosevelt, Irvine, CA 9262 / (949) 333-7777 | N/A |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| □ Debtor □ U.S. Trustee/Bankruptcy Admin ☒ Creditor □ Other □ Trustee | ☒ Debtor □ U.S. Trustee/Bankruptcy Admin □ Creditor □ Other □ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

(1) DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2), (a)(4), (a)(6)
(2) DENIAL OF DISCHARGE §727(a)(2), (a)(3), (a)(4), AND (A)(5)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
□ 11-Recovery of money/property - §542 turnover of property
□ 12-Recovery of money/property - §547 preference
□ 13-Recovery of money/property - §548 fraudulent transfer
□ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
□ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
□ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☒4 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
□ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
□ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☒1 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☒2 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
□ 61-Dischargeability - §523(a)(5), domestic support
☒3 68-Dischargeability - §523(a)(6), willful and malicious injury
□ 63-Dischargeability - §523(a)(8), student loan
□ 64-Dischargeability - §523(a)(15), divorce or separation obligation
(other than domestic support)
☒5 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
□ 71-Injunctive relief – imposition of stay
□ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
□ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
□ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
□ 01-Determination of removed claim or cause

**Other**
□ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
□ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ 0.00 |

Other Relief Sought
for costs of suit incurred, including attorneys' fees as provided by applicable case law, statute, or agreement of the parties.

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Ashkan Rajaee and Nassim Rajaee | BANKRUPTCY CASE NO.<br>24-00617-CL7 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Southern District of California | DIVISION OFFICE<br>San Diego | NAME OF JUDGE<br>Christopher B. Latham |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>*D. Edward Hays* | | |
| DATE<br>August 9, 2024 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>D. EDWARD HAYS | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

1  D. EDWARD HAYS, #162507
   ehays@marshackhays.com
2  ALINA MAMLYUK, #284154
   amamlyuk@marshackhays.com
3  MARSHACK HAYS WOOD LLP
   870 Roosevelt
4  Irvine, California 92620
   Telephone: (949) 333-7777
5  Facsimile: (949) 333-7778

6  Attorneys for Plaintiffs,
   TYLER BRANDON DAVIS and TOPDEVZ,
7  LLC

8                  UNITED STATES BANKRUPTCY COURT

9                         SOUTHERN DIVISION

| | |
|---|---|
| 10  In re | Case No. 24-00617-CL7 |
| 11  ASHKAN RAJAEE and NASSIM RAJAEE, | Chapter 7 |
| 12          Debtors. | Adv. No. |
| 13 | COMPLAINT TO: DETERMINE DISCHARGEABILITY OF DEBT |
| 14  TYLER BRANDON DAVIS, an Individual; | PURSUANT TO 11 U.S.C. §§ 523(a)(2), (a)(4), (a)(6), AND TO DENY |
| 15  TOPDEVZ, LLC, a California Limited Liability Company and DOES 1-10, | DISCHARGE §727(a)(2), (a)(3), (a)(4), AND (A)(5) |
| 16 | |
| 17          Plaintiffs, | [STATUS CONFERENCE TO BE SET BY COURT] |
| 18  v. | |
| 19  ASHKAN RAJAEE, an Individual; and NASSIM RAJAEE, an Individual, | |
| 20          Defendants. | |
| 21 | |

22  TO THE HONORABLE CHIEF JUDGE CHRISTOPHER B. LATHAM, UNITED STATES

23  BANKRUPTCY COURT JUDGE, THE DEBTORS AND THEIR COUNSEL OF RECORD, THE

24  OFFICE OF THE UNITED STATES TRUSTEE, AND ALL INTERESTED PARTIES:

25          Plaintiffs, Tyler Brandon Davis ("Mr. Davis") and TOPDEVZ, LLC ("TopDevz" and

26  collectively with Mr. Davis ("Plaintiffs" or "Judgment Creditors"), file this Complaint against

27  Debtors, ASHKAN RAJAEE ("Mr. Rajaee") and NASSIM RAJAEE ("Mrs. Rajaee") (collectively,

28  "Defendants" or "Debtors"), and allege as follows:

## Statement of Jurisdiction and Venue

1.      The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 in that this action arises in and relates to the bankruptcy case in the United States Bankruptcy Court for the Southern District of California, entitled *In re Ashkan Rajaee and Nassim Rajaee*, Case Number 24-00617-CL7 ("Bankruptcy Case").

2.      On February 26, 2024, the Debtors commenced the Bankruptcy Case by filing a voluntary petition under Chapter 11 of Title 11 of the United States Code.

3.      On May 9, 2024, the Court entered an order granting Plaintiffs' motion and converting the Bankruptcy Case to one under Chapter 7. Christopher R. Barclay is the duly-appointed and acting Chapter 7 Trustee ("Trustee").

4.      This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I) (dischargeability of particular debts) and (b)(2)(J) (objections to discharge).

5.      To the extent any claim for relief contained in this proceeding is determined to be non-core or involve a *Stern*-claim, Plaintiffs consent to the entry of final orders and judgments by the Bankruptcy Court.

6.      Venue properly lies in the Southern District of California, in that this adversary proceeding arises in, arises under, or is related to the Bankruptcy Case which is a case under Title 11 of the United State Code as provided in 28 U.S.C. § 1409.

## Parties

7.      Plaintiff, Mr. Davis, is an individual, residing in California.

8.      Plaintiff, TopDevz, LLC, is a California Limited Liability Company in good standing.

9.      Plaintiffs allege that Defendants are individuals residing in the County of San Diego, California.

## Factual Allegations

10.      Mr. Rajaee is an entrepreneur in the technology industry.

11.      Mr. Davis and Mr. Rajaee met in 2016 at a management meeting held by a company called Surge.

12.     Mr. Rajaee provided services and consulting to Surge through his company called Mobile Monster.

13.     Mr. Davis was an investor in Surge.

14.     Sometime between their meeting in 2016 and May 9, 2017, Mr. Davis and Mr. Rajaee decided to go into business together founding a company named TopDevz, LLC, a California limited liability company.

15.     On May 9, 2017, Mr. Davis and Mr. Rajaee entered into an Operating Agreement ("Agreement") for TopDevz.

16.     In the Agreement, Mr. Rajaee was designated as TopDevz's managing member and CEO.

17.     Mr. Rajaee acted in the capacity of Manager and "tax matters preparer" for TopDevz from its inception until at least until February 2021.

18.     The Agreement required Mr. Rajaee, as Manager, to maintain accurate books and records for TopDevz.

19.     By February 2021, disputes arose between Mr. Davis and Mr. Rajaee regarding Mr. Rajaee's management of TopDevz.

20.     In February 2021, an arbitration was commenced ("Arbitration") which lasted more than two years. The parties to the Arbitration were Plaintiffs and Mr. Rajaee.

21.     In May 2023, the arbitrator, Rebecca Callahan ("Arbitrator"),[1] issued a 93-page written Final Award containing detailed factual findings ("Arbitration Award").

22.     The Arbitration Award followed 14 days of evidentiary hearings during which Mr. Davis and Mr. Rajaee testified and thousands of pages of documentary evidence were introduced and admitted into evidence. A true and correct copy of the Arbitration Award is attached as **Exhibit "1."**

23.     In August 2023, the Superior Court for the State of California, County of San Diego entered a Judgment confirming the Arbitration Award ("Judgment"). A true and correct copy of the

---

[1] Ms. Callahan is a 30-year AV-rated attorney that was a highly-respected bankruptcy litigator prior to becoming a full-time neutral.

COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND TO DENY DISCHARGE

Judgment is attached as **Exhibit "2."**

24.     Mr. Rajaee has appealed the Judgment. The appeal was pending and unresolved as of the petition date.

25.     The issues resolved by the Arbitration Award and Judgment include: (1) the respective ownership interests of Mr. Davis and Mr. Rajaee in TopDevz; (2) whether grounds existed to dissolve TopDevz and, if so, who should oversee the dissolution; (3) an accounting of amounts owed to or from TopDevz by Mr. Davis; (4) an accounting of amounts owed to or from TopDevz by Mr. Rajaee; (5) Mr. Davis's claims against Mr. Rajaee for fraud and breach of fiduciary duty; (6) Mr. Rajaee's claims against Mr. Davis for defamation, civil extortion, intentional infliction of emotional distress, intentional interference with contract, intentional interference with prospective business advantage, and breach of fiduciary duty.

26.     The Arbitration Award included specific findings that Mr. Rajaee misappropriated and diverted assets of TopDevz to accounts controlled by him in outside of the United States in direct contempt of a ruling by the Arbitrator.

27.     As manager and CEO of TopDevz, Mr. Rajaee illegally funneled millions of dollars of TopDevz's assets to companies owned and controlled by him, most of which were headquartered abroad.

28.     Mr. Rajaee also improperly used TopDevz's money to fund his lavish lifestyle.

29.     On January 6, 2022, the Arbitrator issued an order authorizing Mr. Davis to oversee the dissolution of TopDevz ("January 6 Ruling").

30.     Among other things, the January 6 Ruling designated Mr. Davis as the immediate, new managing member of TopDevz, and unequivocally provided that, "Davis and only Davis, or his designee, shall have authority to access, disburse funds from, open and close bank and other financial accounts belonging to or standing in the name of" TopDevz.

31.     The January 6 Ruling was served on Mr. Rajaee immediately after it was issued and he had actual knowledge of it and its contents.

32.     At approximately 11:00 pm on January 6, 2022, hours after being provided with a copy of the January 6 Ruling, Mr. Rajaee caused $900,000 to be wired out of TopDevz's bank

COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND TO DENY DISCHARGE

1    account and to an international account held by him.

2        33.    The following day, Debtor caused another $131,586.76 to be wired out of

3    TopDevz's bank account to an international account held by Mobile Monster, a company wholly

4    owned by Debtor according to his schedules.

5        34.    The $1,031,586.76 misappropriated by Mr. Rajaee from TopDevz on January 6 and

6    7, 2022, is referred to as the "Misappropriated Funds."

7        35.    Mr. Rajajee's embezzlement and larceny of the Misappropriated Funds in contempt

8    of the Arbitrator's order left TopDevz with insufficient funds to make its payroll.

9        36.    Less than a week later, after an emergency hearing, the Arbitrator ordered Mr.

10   Rajaee to return the Misappropriated Funds that he sent abroad on January 6 and 7, 2022.

11       37.    To date, Mr. Rajaee has failed and refused to comply and remains in contempt of the

12   Arbitrator's orders.

13       38.    In April 2022, the Arbitrator received 10 days of testimony from Mr. Rajaee and Mr.

14   Davis regarding their competing accounting claims.

15       39.    In particular, the evidence in the April 2022 hearings focused on: (a) the capital

16   contributions of Mr. Davis and Mr. Rajaee in TopDevz; (b) a reconciliation of the financial affairs

17   of TopDevz; (c) whether there were outstanding loans owed by TopDevz to Mr. Davis or Mr.

18   Rajaee; and (d) whether Mr. Davis or Mr. Rajaee was owed money by or owed to TopDevz.

19       40.    An important piece of the reconciliation was substantiation of TopDevz funds paid

20   to or for the benefit of the parties or companies owned by them.

21       41.    Despite being the managing member of TopDevz, Mr. Rajaee failed to produce

22   documents or explain the alleged business purposes behind millions of dollars in payments he made

23   to himself and to his companies.

24       42.    Mr. Rajaee further failed to adequately explain the business justification for why he

25   caused TopDevz to lease a private jet for his use after the Arbitration commenced.

26       43.    TopDevz is still receiving bills on the private jet.

27       44.    Mr. Rajaee admitted that he had stashed money owned by TopDevz in previously

28   undisclosed foreign bank accounts.

COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND TO DENY DISCHARGE

45.     Ultimately, the Arbitrator determined that Mr. Rajaee embezzled and stole $7,670,151 from TopDevz by causing unsubstantiated payments to be made to himself and companies that he owned or controlled.

46.     As the CEO and managing member of TopDevz, Mr. Rajaee owed fiduciary duties to the company and Mr. Davis.

47.     While serving as CEO, managing member, and/or member of TopDevz, Mr. Rajaee committed fraud or defalcation while acting in a fiduciary capacity, embezzlement, and/or larceny.

48.     The Arbitrator specifically found that Mr. Rajaee placed his interests ahead of all others, thereby breaching his fiduciary duties.

49.     As a result, the Arbitrator awarded damages to TopDevz in the amount of $7,670,151 and to Mr. Davis in the amount of $1,704,415.64. These amounts were confirmed in the Judgment and must be excepted from any discharge entered in the Bankruptcy Case.

50.     The Arbitrator further found that Mr. Rajaee's fraud was endemic to the relationship between him and Mr. Davis.

51.     Mr. Rajaee concealed funds by, among other things, maintaining undisclosed, offshore accounts in the name of TopDevz.

52.     Using funds misappropriated from TopDevz, Mr. Rajaee and his wife who is the Joint Debtor in the Bankruptcy Case ("Debtors") acquired at least two parcels of real property in La Jolla, California.

53.     In July 2020, Debtors purchased real property commonly described as 1020 Genter Street, Unit 102, La Jolla, CA 92037 ("Genter Street Property"). In their Amended Schedule A/B filed on July 11, 2024, the Debtors valued the Genter Street Property at $2.8 million.

54.     In November 2021, Debtors purchased 6625 Muirlands Drive, La Jolla, CA 92037 ("Muirlands Drive Property"). In their Amended Schedule A/B, filed on July 11, 2024, the Debtors valued the Muirlands Drive Property at $8.5 million.

55.     The Genter Street Property and the Muirlands Drive Property are collectively referred to as the "Properties."

56.     In March 2022, after the Arbitrator ordered the dissolution of TopDevz and ordered

Mr. Rajaee to disgorge the more than $1 million in Misappropriated Funds, the Debtors fraudulently transferred the Genter Street Property to an entity owned or controlled by the Debtors or insiders of the Debtors for no consideration and with the actual intent to hinder, delay, and defraud creditors, including Plaintiffs.

57.    Similarly, in March 2022, the Debtors fraudulently transferred their ownership of the Muirlands Drive Property for no consideration to two trusts they created with actual intent to hinder, delay, and defraud creditors, including Plaintiffs.

58.    In April 2022, multiple deeds of trust were recorded against the Muirlands Drive Property by the Debtors' relatives in favor of the Debtors' attorneys, Brown Neri, and Mr. Rajaee's father, Majid Rajaee, encumbering most, if not all, of the then-existing equity.

59.    During their initial meeting of creditors held pursuant to 11 U.S.C. § 341(a), the Debtors falsely claimed not to know the beneficiaries of the trusts and whether they were beneficiaries.

60.    When asked to produce copies of the trusts, the Debtors would not commit to doing so and instead said they wanted to discuss it with their counsel. The trusts were never produced by the Debtors.

61.    On the eve of filing the Bankruptcy Case, the Debtors caused the Properties to be transferred back to them in part to attempt to assert a homestead exemption. Because the Debtors acquired their interests in the Properties during the 1,215 days prior to bankruptcy, any allowed exemption is subject to the cap set forth in 11 U.S.C. § 522(p).

62.    The Debtors, however, did not cause the fraudulent liens to be reconveyed. As such, the equity in the Properties remain encumbered to the detriment of creditors.

63.    Only one of these $1 million deeds of trust are disclosed in Debtors' Schedule D.

64.    Prior to the Bankruptcy Case, Plaintiffs had commenced an action to avoid and recover the fraudulent transfers of the Properties ("Fraudulent Transfer Action"). In connection with the Fraudulent Transfer Action, the Plaintiffs recorded notices of pendency of action (lis pendens). The Fraudulent Transfer Action remained pending as of the petition date.

65.    After the January 6 Ruling, Mr. Rajaee undertook efforts to derail the Arbitration.

COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND TO DENY DISCHARGE

66.     First, on January 18, 2022, Mr. Rajaee filed an action in the San Diego Superior Court against Mr. Davis, seeking among other things to enjoin the Arbitration. The case was assigned number 37-2022-00001968-CU-PA-CTL.

67.     After Mr. Rajaee's motions for a temporary restraining order and preliminary injunction were denied, the case was dismissed.

68.     On March 8, 2022, Mr. Rajaee filed another action seeking to stay the Arbitration, this time seeking relief in the Sacramento Superior Court. The case was assigned number 34-2022-00316510-CU-MC-GDS.

69.     Like its sister court in San Diego, the Sacramento Superior Court denied Mr. Rajaee's attempts to circumvent the Arbitration.

70.     On February 26, 2024, the Debtors commenced this Bankruptcy Case filed their initial schedules and statements ("Schedules").

71.     On March 22, 2024, ***post-petition,*** and acting pro se, Mr. Rajaee filed two more actions against Plaintiffs in the United States District Court for the Southern District of California.

72.     In one of the actions, Case No. 24CV0550 LL DEB, Mr. Rajaee sued Mr. Davis, his attorneys, and other assisting in the dissolution of TopDevz alleging misappropriation of trade secrets ("Trade Secret Case"). The Trade Secret Case is neither well-grounded in fact nor supported by law and was filed to vexatiously and unnecessarily multiply the proceedings to cause damage to Plaintiffs.

73.     The Debtors' Schedules and Amended Schedules contain false oaths including the failure to disclose one or more assets.

74.     The Schedules filed on February 26, 2024, list Mobile Monster Database as property Debtors own valued at $400,000.

75.     In the Trade Secret Case (filed post-petition), Mr. Rajaee alleges that "Mobile Monster, Inc. . . . is a Canadian company owned 100% by Plaintiff and was founded over a decade ago in 2013."

76.     Debtor further alleges that Mobile Monster, Inc. is (and was) a very valuable company.

77. In his April 22, 2024, opposition to Plaintiffs' Motion to Appoint a Chapter 11 Trustee or, alternatively, convert case to one under Chapter 7 ("Motion to Convert"), Debtor states that "Debtor's technology company is worth tens of millions, which was valued in 2020, for the intellectual property alone at $16.15 million."

78. There is no mention of a $16.15 million asset (or asset valued anywhere close to this amount) in Debtors' Schedules.

79. In their Schedules, Debtors list a 24.375% interest in Hub Suite, Inc., valued at $3,936,563.

80. On May 1, 2024, the Debtors filed an Amended Schedule A/B along with other amended schedules ("May 2024 Amended Schedules").

81. In the May 2024 Amended Schedules, the Debtors listed 100% ownership of Mobile Monster but valued it at $0.00.

82. At the same time, in the May 2024 Amended Schedules, the Debtors list that they own intellectual property (including "a large database of managers") valued at $400,000.

83. In the May 2024 Amended Schedules, the Debtors no longer attribute the database listed above to Mobile Monster.

84. In the May 2024 Amended Schedules, the Debtors' interest and value of that interest in Hub Suite, Inc. remained unchanged.

85. On July 11, 2024, the Debtors filed a newly Amended Schedule A/B along with other amended schedules ("July 2024 Amended Schedules").

86. In the July 2024 Amended Schedules, the Debtors list their interest in Hub Suite, Inc. at 93% and valued at $14,864,754.00.

87. Although the Arbitration Award found that Mr. Rajaee held or controlled foreign bank accounts, there is only one domestic bank account disclosed in Schedule A/B. There is no disclosure of closed foreign bank accounts in Debtors' statements of financial affairs.

88. During their 341(a) meetings of creditors, Mr. Rajaee admitted that he has transferred money to Mobile Monster, Inc., and that it has transferred money back to him.

89. During their 341(a) meeting of creditors, Mr. Rajaee claimed he did not recall the

1   amounts or the approximate timing of his financial transfers with Mobile Monster, Inc.

2       90.    Although asked by Plaintiffs' counsel to produce Debtors' and Mobile Monster's

3   bank records, they would not commit to doing so and have failed to satisfactorily explain the loss or

4   dissipation of assets including the Misappropriated Funds.

5   **First Claim for Relief**

6   **Fraud**

7   **(11 U.S.C. §523(a)(2))**

8       91.    Plaintiffs incorporate by reference paragraphs 1 through 90, and realleges these

9   paragraphs as though set forth in full.

10       92.    As alleged above, the damages owed by Mr. Rajaee to Plaintiffs as set forth in the

11   Arbitration Award and Judgment constitute money obtained by false pretenses, false

12   representations, or actual fraud.

13       93.    Mr. Rajaee lacked authority to take the money belonging to TopDevz and, in doing

14   so, he acted with actual intent to defraud Plaintiffs.

15       94.    The amounts owed to Plaintiffs as set forth in the Arbitration Award and Judgment

16   must be excepted from any discharge under 11 U.S.C. § 523(a)(2).

17   **Second Claim for Relief**

18   **Fraud or Defalcation While Acting in a Fiduciary Capacity,**

19   **Embezzlement, or Larceny**

20   **(11 U.S.C. §523(a)(4))**

21       95.    Plaintiffs incorporate by reference paragraphs 1 through 94, and realleges these

22   paragraphs as though set forth in full.

23       96.    Pursuant to 11 U.S.C. §523(a)(4), debts for "fraud or defalcation while acting in a

24   fiduciary capacity," embezzlement, or larceny are excepted from discharge.

25       97.    Mr. Rajaee acted in a fiduciary capacity while in a position of Manager, "tax matters

26   preparer," CEO, and/or member of TopDevz.

27       98.    As set forth above and in the Arbitration Award, the Arbitrator found that Mr.

28   Rajaee misappropriated millions of dollars of TopDevz's money.

COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND TO DENY DISCHARGE

99.     Mr. Rajaee's actions constitute fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

100.     The Debtors have failed and refused to return such funds even after ordered to do so by the Arbitrator, the Arbitratration Award, and Judgment.

101.     The Debtors' actions in knowingly and intentionally acting in their own best interest and in failing and refusing to comply with the Arbitrator's orders have caused Plaintiffs to suffer substantial damage.

102.     The amounts owed to Plaintiffs as set forth in the Arbitration Award and Judgment must be excepted from any discharge under 11 U.S.C. § 523(a)(4).

**Third Claim for Relief**

**Willful and Malicious Injury**

**11 U.S.C. §523(a)(6)**

103.     Plaintiffs incorporate by reference paragraphs 1 through 102, and reallege these paragraphs as though set forth in full.

104.     Pursuant to 11 U.S.C. §523(a)(6), debts for the Debtor's "willful and malicious injury" to another entity or the property of another entity are nondischargeable.

105.     A malicious injury under 11 U.S.C. §523(a)(6) involves a wrongful act, done intentionally, that necessarily causes injury, and that is committed without just cause or excuse. *In re Jerich*, 238 F3d 1202, 1209 (9th Cir. 2001).

106.     Debtors intentionally deprived Plaintiffs of their funds through the misappropriation described above and by failing and refusing to return such funds that do not belong to them.

107.     Debtors' tortious conduct constitutes conversion of Plaintiffs' property.

108.     Such conversion was and is willful and malicious and not innocent or technical.

109.     As a result of Debtors' willful and malicious actions, Plaintiffs incurred damages in the amount of Judgment.

110.     Additionally, the Debtors have filed multiple lawsuits and actions against Plaintiffs that are neither well-grounded in fact nor supported by law and/or that have been undertaken with the actual intent to vexatiously and unnecessarily multiply the proceedings.

111.    Debtors' actions in filing these bad faith actions against Plaintiffs and parties associated with Plaintiffs including their attorneys have caused substantial damages including the cost of defending against such meritless actions.

112.    The amounts owed to Plaintiffs as set forth in the Arbitration Award and Judgment and all damage incurred by Plaintiffs as a result of the Debtors' bad faith litigation campaign must be excepted from any discharge under 11 U.S.C. § 523(a)(6).

**Fourth Claim for Relief**

**Fraudulent Transfers and Concealment**

**11 U.S.C. §727(a)(2)**

113.    Plaintiffs incorporate by reference paragraphs 1 through 112, and reallege these paragraphs as though set forth in full.

114.    The Debtors, with intent to hinder, delay, or defraud creditors or the Trustee, have transferred, removed, destroyed, mutilated, or concealed, or have permitted to be transferred, removed, destroyed, mutilated, or concealed property of the debtors within one year before the date of the filing of the petition.

115.    Specifically, the Debtors fraudulently transferred the legal title to and/or their equitable interests in the Properties and fraudulently encumbered the equity in the Properties through liens that were transferred for no consideration and with actual intent to hinder, delay, or defraud creditors.

116.    To the extent that the Debtors retained any equitable interests in the Properties, such interests were concealed because the recorded documents relating to the Properties fail to disclose them.

117.    As set forth in their Amended Schedule D filed on July 11, 2024, the Debtors transferred property of the estate after the date of the filing of the petition (and post-conversion) by transferring one or more liens on their alleged causes of action to their attorney of record, Allan Cate.

118.    Judgment should be entered denying discharge under 11 U.S.C. § 727(a)(2).

COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND TO DENY DISCHARGE

## Fifth Claim for Relief

## Failure to Preserve Recorded Information

## 11 U.S.C. §727(a)(3)

119.    Plaintiffs incorporate by reference paragraphs 1 through 118, and reallege these paragraphs as though set forth in full.

120.    Pursuant to 11 U.S.C. §727(a)(3), "The court shall grant the debtor a discharge, unless—the debtors have concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."

121.    Despite demand for documents and records made by the Trustee and Plaintiffs, the Debtors have failed to provide recorded information from which their financial condition or business transactions might be ascertained including the disposition of the funds misappropriated from Plaintiffs as set forth in the Arbitration Award.

122.    Judgment should be entered denying discharge under 11 U.S.C. § 727(a)(3).

## Sixth Claim for Relief

## False Oaths

## 11 U.S.C. §727(a)(4)

123.    Plaintiffs incorporate by reference paragraphs 1 through 122, and reallege these paragraphs as though set forth in full.

124.    Pursuant to 11 U.S.C. §727(a)(4), "The court shall grant the debtor a discharge, unless—the debtor knowingly and fraudulently, in or in connection with the case—made a false oath or account."

125.    Debtors have filed multiple sets of schedules and statements each of which were made under penalty of perjury and each of which contain false oaths.

126.    In making these false oaths, the Debtors acted knowingly and fraudulently in attempting to conceal and preserve assets for their own benefit.

COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND TO DENY DISCHARGE

127.    As set forth above in specific detail, Debtor made multiple contradictory statements regarding his ownership interest and value of that ownership interest as it concerns Mobile Monster and Hub Suite, Inc.

128.    Contradictory statements were made in Schedules, in May 2024 Amended Schedules and in July 2024 Amended Schedules as well as opposition papers filed by Debtor in response to Motion to Convert.

129.    Bankruptcy schedules and statements signed under penalty of perjury constitute "oath" for purposes of 11 U.S.C. §727(a)(4)(A).

130.    Under 11 U.S.C. § 727(a)(4)(B), discharge must be denied if debtors knowingly and fraudulently present or use a false claim.

131.    In this case, the Debtors have knowingly and fraudulently scheduled alleged claims against Plaintiffs that they know are neither well-grounded in fact nor supported by law and are being raised as strategic lawsuits that are barred by public policy.

132.    Under 11 U.S.C. § 727(a)(4)(D), discharge shall be denied if debtors knowingly and fraudulently withhold from an officer of the estate entitled to possession under this title of any recorded information including books, records, and papers relating to the debtors' property or financial affairs.

133.    In this case, the Debtors have failed and refused to provide to the Trustee all recorded information including books and records relating to their financial affairs and transactions including the whereabouts or disposition of the millions of dollars of funds misappropriated from TopDevz.

134.    Judgment should be entered denying discharge under 11 U.S.C. § 727(a)(4).

## Seventh Claim for Relief

## Failure to Explain Loss of Assets

## 11 U.S.C. §727(a)(5)

135.    Plaintiffs incorporate by reference paragraphs 1 through 134, and reallege these paragraphs as though set forth in full.

136.    Pursuant to 11 U.S.C. §727(a)(5), "The court shall grant the debtor a discharge, unless—the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."

137.    Debtors have filed multiple sets of schedules and statements each of which fail to satisfactorily explain the dissipation of assets including the funds misappropriated from TopDevz.

138.    Debtors have further failed to produce documents and recorded information that would evidence the disposition of their assets including the funds misappropriated from TopDevz.

139.    Judgment should be entered denying discharge under 11 U.S.C. § 727(a)(5).

## Prayer

WHEREFORE, Plaintiffs pray that the Court enter Judgment that:

**ON THE FIRST CLAIM FOR RELIEF**

1.    All amounts owed to Plaintiffs, in an amount to be determined at trial, be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2);

**ON THE SECOND CLAIM FOR RELIEF**

2.    All amounts owed to Plaintiffs, in an amount to be determined at trial, be excepted from discharge pursuant to 11 U.S.C. § 523(a)(4);

**ON THE THIRD CLAIM FOR RELIEF**

3.    All amounts owed to Plaintiffs, in an amount to be determined at trial, be excepted from discharge pursuant to 11 U.S.C. § 523(a)(6);

**ON THE FOURTH CLAIM FOR RELIEF**

4.    That Judgment be entered denying discharge pursuant to 11 U.S.C. § 727(a)(2);

**ON THE FIFTH CLAIM FOR RELIEF**

5.    That Judgment be entered denying discharge pursuant to 11 U.S.C. § 727(a)(3);

**ON THE SIXTH CLAIM FOR RELIEF**

6.    That Judgment be entered denying discharge pursuant to 11 U.S.C. § 727(a)(4);

1    **ON THE SEVENTH CLAIM FOR RELIEF**

2    That Judgment be entered denying discharge pursuant to 11 U.S.C. § 727(a)(5);

3    **ON ALL CLAIMS FOR RELIEF**

4    7.    For costs of suit incurred, including attorneys' fees as provided by applicable case

5    law, statute, or agreement of the parties; and

6    8.    For such other relief as the Court deems just and proper.

7

8    DATED: August 9, 2024                    MARSHACK HAYS WOOD LLP

9                                             By: */s/ D. Edward Hays*
10                                                 D. EDWARD HAYS
                                                   ALINA MAMLYUK
11                                                 Attorneys for Plaintiffs,
                                                   TYLER BRANDON DAVIS and TOPDEVZ,
12                                                 LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT AND TO DENY DISCHARGE

Exhibit "1"

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
### International Arbitral Tribunal

In the Matter of the Arbitration Between:

Ashkan Rajaee and TopDevz, LLC, a California Limited Liability Company,

Claimants and Counter-Respondents,

- vs -

Tyler B. Davis,

Respondent and Counter-Claimant

ICDR Case No. 01-21-0001-9983

FINAL AWARD

I

EXHIBIT 1, Page 17

**Counsel for Claimant and Counter-Respondent Ashkan Rajaee**
Jordan Matthews, Esq.
Weinberg Gonser LLP
10866 Wilshire Boulevard, Suite 1650
Los Angeles, CA 90024
*[February 2021 to Early January 2022]*

Connor Lynch, Esq.
4470 W. Sunset Boulevard, Box No. 90096
Los Angeles, CA 90027
*[January 2022]*

Ethan J. Brown, Esq.
Geoffrey Neri, Esq.
Tim G. Lamoureux, Esq.
Kete Barnes, Esq.
Brown Neri Smith & Khan LLP
11601 Wilshire Boulevard, Suite 2080
Los Angeles, CA 90025
*[January 2022 to September 2022]*

Ashkan Rajaee, self-represented
*[September 2022 Forward]*

**Counsel for Respondent and Counter-Claimant Tyler Davis**
Scott R. Carpenter, Esq.
Cummins & White LLP
2424 S.E. Bristol Street, Suite 300
Newport Beach, CA 92660
*[Entire Case]*

**Counsel for Claimant and Counter-Respondent TopDevz LLC**
Same as Ashkan Rajaee
*[August 2021 to September 2022]*

J. Douglas Kirk, Esq.
Kirk & Toberty
2201 Dupont Drive, Suite 820
Irvine, CA 92612
*[September 2022 Forward]*

**Dates of Arbitration Hearings:**

| Session One | Session Two | Session Three |
|---|---|---|
| December 1, 2021 | April 4, 2022 | March 20, 2023 |
| December 2, 2021 | April 5, 2022 | |
| December 13, 2021 | April 6, 2022 | |
| | April 7, 2022 | |
| | April 11, 2022 | |
| | April 12, 2022 | |
| | April 13, 2022 | |
| | April 14, 2022 | |
| | April 21, 2022 | |
| | April 22, 2022 | |

**Arbitrator:**
Rebecca Callahan
Callahan Dispute Resolution
5120 Campus Drive
Newport Beach, CA 92660

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | Introductory Statement | 1 |
| 2. | Arbitral Jurisdiction | 4 |
| 3. | Background Facts Pertinent to the Award | 6 |
| 4. | Proceedings and Decision on the Petition for Dissolution [Evidentiary Hearing Proceedings Conducted December 1, 2 and 13, 2021, and Emergency Hearing Conducted January 13, 2022 – Order Nos. 4, 5 and 6 Incorporated Herein] | 12 |
|  | A. Introductory Statement | 12 |
|  | B. Ruling on the Petition and Factual Determinations Made With Respect to the Petition | 13 |
|  | (1) Davis has the right to dissolve the LLC because he holds a majority of the Percentage Interests in the LLC. | 13 |
|  | (2) Even if Davis is not the Majority Member, protective dissolution would be in order because management of the LLC is deadlocked and subject to internal dissension | 18 |
|  | (3) Order No. 4 | 19 |
|  | (4) Post-Script to Order No. 4 – Order No. 5 and Factual Determinations Made With Respect Thereto | 22 |
|  | (5) Post-Script to Order No. 4 – Order No. 6 | 24 |
| 5. | Proceedings and Decision on the Final Accounting for the LLC [Evidentiary Hearing Proceedings Conducted April 4 through 7, 2022, April 11 through 14, 2022, ad April 21 and 22, 2022 – Order No. 16 and Partial Final Award] | 25 |

|  | Page |
|---|---|
| A. Introductory Statement | 25 |
| B. Burden of Proof | 28 |
| C. Ruling on the Final Accounting for the LLC and Factual Determinations Made With Respect to the Final Accounting | 30 |
| (1) Rajaee's Failed Accounting | 30 |
| (2) Rajaee Failed to Substantiate that the Millions of Dollars Paid to Himself and His Companies Were for Legitimate Business Expenses of the LLC | 34 |
| (a) Introductory Statement | 34 |
| (b) The Evidence Showed that the Amount Rajaee Needed to Substantiate was $7,670,151 | 37 |
| (c) Rajaee Failed to Provide Sufficient Evidence that the Millions of Dollars Paid to or for the Benefit of Himself and His Companies Were for Legitimate Business Expenses of the LLC | 40 |
| (d) Rajaee Failed to Establish any Loan Indebtedness Owed to Him by the LLC | 46 |
| (3) Davis' Contributions, Distributions and Advances Were Not Disputed | 46 |
| (4) Davis' Final Accounting and Partial Final Award in Favor of the LLC Against Rajaee | 47 |

ii

|  |  | Page |
|---|---|---|
| 6. | Davis is Entitled to an Award of Compensatory Damages on His Breach of Fiduciary Duty and Fraud Counterclaims Against Rajaee | 51 |
|  | A. Introductory Statement | 51 |
|  | B. Breach of Fiduciary Duty Counterclaim (Second Claim for Relief) | 52 |
|  | C. Misrepresentation and Fraud Counterclaim (Third Claim for Relief) | 53 |
| 7. | Rajaee's Claims Against Davis Are Denied Because Rajaee Failed to Carry His Burden of Proof on Any of His Asserted Claims | 54 |
|  | A. Introductory Statement | 54 |
|  | B. Rajaee's Claim Against Davis for Defamation Per Se | 55 |
|  | C. Rajaee's Claim Against Davis for Civil Extortion | 56 |
|  | D. Rajaee's Claim Against Davis for Intentional Infliction of Emotional Distress | 56 |
|  | E. Rajaee's Claim Against Davis for Intentional Interference with Contract | 57 |
|  | F. Rajaee's Claim Against Davis for Intentional Interference with Prospective Business Advantage | 57 |
|  | G. Rajaee's Claim Against Davis for Breach of Fiduciary Duty | 58 |
|  | H. The LLC's Claim Against Davis for Breach of Fiduciary Duty | 58 |
| 8. | Davis is Entitled to an Award of His Attorney's Fees and Cost as the Prevailing Party in this Arbitration | 59 |
|  | A. Introductory Statement | 59 |

iii

| | Page |
|---|---|
| B. Davis is the Prevailing Party in this Arbitration and is Entitled to Reimbursement of His Attorney's Fees and Costs | 60 |
| C. Davis is Entitled to an Award of $717,498.64 as Reasonable Attorney's Fees and Costs in this Arbitration | 61 |
| 9.  Final Award | 64 |
| A. Dissolution of the LLC | 60 |
| B. Compensatory Award in Favor of the LLC for Rajaee's Violation of Order Nos. 4 and 5 | 65 |
| C. Final Accounting and Surcharge Liability Assessed Against Rajaee in Favor of the LLC | 65 |
| D. Compensatory Damages Award in Favor of Davis on Davis's Tort Counterclaims | 67 |
| E. Denial of Rajaee's Claims in Their Entirety for Lack of Evidence | 67 |
| F. Award of Attorney's Fees and Costs to Davis as the Prevailing Party in this Arbitration | 67 |
| G. Miscellaneous | 67 |

EXHIBIT 1, Page 22

The undersigned Arbitrator (the *"Arbitrator"*), having been designated in accordance with the Operating Agreement for TopDevz LLC, dated May 9, 2017, (*"Agreement"*),[1] having been duly sworn, and having examined and considered the submissions, proofs, allegations, evidence, and arguments of the parties, and having issued a Partial Final Award dated June 21, 2022, hereby finds, concludes and issues this Final Award (*"Award"*) as follows:

### 1.    Introductory Statement

The Arbitrator conducted fourteen (14) days of evidentiary hearing proceedings (the *"Hearing"*), as described in Order Nos. 4, 16 and 21. The Hearing was conducted via video conference using the Zoom.us platform. The first set of evidentiary hearing proceedings occurred in December 2021 with respect to the petition for dissolution (*"Petition"*) filed by respondent Tyler Davis (*"Davis"*) with respect to his first counterclaim for relief in this matter. The second set evidentiary hearing proceedings occurred in April 2022 with respect to the final accounting aspects of the Petition and Davis' first counterclaim for relief. The third set of evidentiary hearing proceedings occurred in March 2023 with respect to the parties' tort claims and counterclaims and their respective claims for compensatory damages.[2]

When this matter was originally scheduled for evidentiary hearing, Davis' counterclaim for accounting was to be heard and decided in conjunction with the parties' respective tort claims and counterclaims for alleged breach of fiduciary duty, slander, extortion, etc. At that time, the agreed-upon hearing time estimate for all claims and counterclaims was eight (8) days, and was scheduled, by agreement of the parties, through their respective counsel, for April 4 to 7, 2022 and April 11 to 14, 2022. See *Order No. 2.*

---

[1]  *Davis Exhibit 2.*

[2]  When originally scheduled, the evidentiary hearing proceedings with respect to the Bifurcated Issues was reserved for four days – March 20 and 21, 2023, and March 27 and 28, 2023 - with the caveat that the evidence admitted during the prior proceedings conducted in December 2021 and April 2022, as well as the factual findings set forth in the Partial Final Award issued on June 21, 2023, was part of the evidentiary record.

1

Claimant Ashkan Rajaee (*"Rajaee"*) changed counsel in January 2022, and his new counsel requested a continuance in order to be able to prepare to present Rajaee's case in chief on his tort claims against Davis. Given the exigencies associated with (a) having ordered the dissolution of TopDevz LLC (*"the LLC"*) pursuant to Order No. 4, and (b) having been faced with Rajaee's violation of the dissolution order, his refusal to provide Davis with a final accounting for the LLC during his tenure as Managing Member, and his defalcation of approximately $1.1 million in LLC funds (as discussed in Order No. 5), the continuance request was granted with respect to the hearing on the parties' respective tort claims and counterclaims – to be scheduled for a later time. However, the evidentiary hearing with regard to the narrow financial issues raised with respect to the final accounting for the LLC (*"the Bifurcated Issues"*) remained in place. By agreement of the parties, through their respective counsel, the hearing time for the Bifurcated Issues was shortened to five (5) days (April 4 to 7, 2022 and April 11, 2022). *See Order No. 6.* Ultimately, due largely to Rajaee's late production of voluminous exhibits during the course of the Hearing and Rajaee's insistence on presenting evidence on a myriad of matters concerning (a) the transactions and events leading Rajaee and Davis to enter into a business relationship through the formation of the LLC, (b) Rajaee's operation of the LLC, (c) the transactions and events leading to the demise of the parties' relationship in February 2001, and (d) Rajaee's operation of the LLC after problems arose in his relationship with Davis, an additional five (5) days of hearing time was necessary to complete the parties' respective presentations of their evidence.[3] See *Order No. 16.*

During the Hearing, testimony was presented by multiple witnesses, thousands of pages of documentary evidence were introduced and admitted into evidence, and oral arguments by counsel were offered and received at the start and end of each set of hearing proceedings. Appearing at the Hearing for claimant and counter-respondent Rajaee were Jordan Matthews, of Weinberg Gonser LLP (December 1, 2 and 13, 2021), and Ethan J. Brown, Geoffrey Neri, Tim G. Lamoureux and Kete Barnes, of Brown Neri Smith & Khan LLP (April 4 to 7, April 11 to 14, and April 21 to 22, 2022), and Rajaee *in propria persona* (March 20, 2023).[4] Appearing at the Hearing for respondent and counter-claimant Davis was Scott R. Carpenter, of Cummins & White LLP. The LCC was

---

[3]    In other words, the Hearing with regard to the final accounting of the LLC morphed into evidence taking that was relevant and material to that parties' various tort claims and counterclaims.

[4]    Mr. Matthews withdrew from the case in early January 2022, and was replaced by Connor Lynch. Brown Neri Smith & Khan LLP substituted in for Mr. Lynch on or about January 25, 2022.

2

represented by the same counsel as Rajaee up until September 2022, at which time, J. Douglas Kirk, of Kirk & Toberty, appeared as counsel for the LLC.

All witnesses were duly sworn, and oral testimony and documentary evidence was presented, as described in Order No. 16 – Hearing Report and Order (*"Order No. 16"*) and Order No. 21 – Hearing Report and Order (*"Order No. 21"*).[5] The exhibits offered and admitted into evidence as of the conclusion of the Hearing are as set forth in Order Nos. 16 and 21.

At the conclusion of the evidentiary hearing proceedings described above, the parties and counsel represented to the Arbitrator that they had no further evidence to offer pertinent to the dissolution and final accounting of the LLC or the parties' respective tort claims and counterclaims.[6]

In addition to the evidence and argument presented at the Hearing, the parties submitted opening and closing briefs, which have been reviewed and considered by the Arbitrator.[7] The parties also submitted opening and closing oral arguments.[8] Having

---

[5]    In view of Rajaee's circumstance of being self-represented in the evidentiary hearing proceedings conducted with respect to the parties' respective tort claims and counterclaims, Rajaee was given the oath and then allowed to make statements during the course of the proceedings. As reflected in Order No. 21, Rajaee was allowed the opportunity to cross-examine Davis and his damages expert (Michael S. Hawes), and Davis's counsel opted to not cross-examine Rajaee concerning his statements. *See Order No. 21.*

[6]    On or about December 15, 2022, counsel for the LLC submitted and served a notice of dismissal with prejudice of the derivative claim for breach of fiduciary duty against Davis (Eighth Claim for Relief), which the LLC's counsel confirmed during the March 20, 2023, hearing proceedings. Additionally, on or about February 21, 2023, Davis submitted and served a withdrawal of his Fourth Claim for Relief seeking constructive trust and injunctive relief against Rajaee, as well as his request for punitive damages, which Davis's counsel confirmed during the March 20, 2023, hearing.

[7]    Rajaee did not submit an opening or closing brief in connection with the Hearing on the parties' respective tort claims and counterclaims conducted on March 10, 2023. However, Rajaee's prior counsel did submit extensive briefing on Rajaee's behalf in connection with the earlier evidentiary hearing proceedings.

[8]    In addition to submitting closing briefs with respect to the evidentiary hearing proceedings conducted regarding the Bifurcated Issues, the parties' counsel requested an opportunity to make oral closing arguments. That request was accommodated, and closing oral argument was conducted via video conference on Monday, May 9, 2022, at 2:30 p.m. Pacific Time. Ethan J. Brown, of Brown Neri Smith & Khan LLP, appeared on behalf of Rajaee and the LLC. Scott R. Carpenter, of Cummins & White LLP, appeared on behalf of Davis.

3

reviewed and analyzed the submitted evidence, applicable law, the arguments of the parties' counsel, and the arguments of Rajaee (appearing *in propria persona*) at the March 20, 2023 hearing, it is the Arbitrator's determination that the submitted claims, counterclaims and issues are ready for final determination.

This Award is based upon those facts found by the Arbitrator to be true and necessary to the determination of the claims, counterclaims, affirmative defenses and issues submitted in this matter, as well as the inferences drawn from the evidence presented by the parties. To the extent that this Award may differ from any party's argument or position, that is the result of determinations made by the Arbitrator with respect to witness credibility, burden of proof considerations, the weight given to the evidence, and the inferences drawn from the evidence. This Award refers to certain exhibits, testimony and argument, but does not and could not make reference to every item of evidence, every cited authority, or every argument advanced. Failure to mention other testimony, exhibits or arguments is not intended and should not be construed as a lack of consideration by the Arbitrator of such matters.

This Award represents the culmination of the Arbitrator's determinations on all claims, counterclaims, affirmative defenses and issues submitted in this matter after hearing all evidence that the parties had to offer, and after reviewing and considering the parties' evidence and arguments. This Award concludes the arbitration of the parties' respective claims, counterclaims and affirmative defenses as submitted for determination in this matter.

### 2.    Arbitral Jurisdiction

On May 9, 2017, Rajaee and Davis entered into the Agreement. It is undisputed that the Agreement governs the relationship between Rajaee and Davis as members of the LLC. The validity and enforceability of the Agreement were not disputed in this matter. To the contrary, both parties have relied on various provisions of the Agreement in support of their respective claims, counterclaims and arguments in this arbitration.

Included in the Agreement is a section providing for binding arbitration of disputes that might thereafter arise between the parties. Paragraph 11.2 of the Agreement provides as follows:

Any action to enforce or interpret this Agreement, or to resolve disputes with respect to this Agreement between the Company and a Member, or between or among the Members, will be settled by arbitration in accordance with the rules of the American Arbitration Association.

4

Arbitration will be the exclusive dispute resolution process in the state of California, but arbitration will be a nonexclusive process elsewhere. Any party may commence arbitration by sending a written demand for arbitration to the other parties. The demand will set forth the nature of the matter to be resolved by arbitration. The Manager will select the place of arbitration. The substantive law of the state of California will be applied by the arbitrator to the resolution of the dispute. The parties will share equally all initial costs of arbitration. The prevailing party will be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration. All decisions of the arbitrator will be final, binding, and conclusive on all parties. Judgment may be entered on any such decision in accordance with applicable law in any court having jurisdiction of it. The arbitrator (if permitted under applicable law) or the court may issue a writ of execution to enforce the arbitrator's decision.

*Davis Exhibit 2, ¶ 11.2.*

This matter concerned disputes between Rajaee and Davis regarding their respective rights and obligations under the Agreement and as members of the LLC. This matter also concerned a dispute between Rajaee and Davis concerning the dissolution and wind-up of the LLC, as well as the LLC's breach of fiduciary duty claim against Davis.

Rajaee voluntarily submitted his claims and disputes with Davis to arbitration by filing a demand for arbitration with the American Arbitration Association (*"the AAA"*) on or about February 23, 2021. Thereafter, Davis voluntarily appeared in the arbitration without objection, and filed an answering statement, with affirmative defenses, and a counterclaim, which included the first counterclaim for dissolution and final accounting of the LLC. The LLC voluntarily appeared in this arbitration, initially represented by the same counsel as Rajaee and later represented by independent counsel. Rajaee filed an answer to the counterclaim with denials and affirmative defenses, and did not contest the jurisdiction of this tribunal over any of the submitted disputes.

Under California law, arbitrators have authority to make orders which provide for equitable relief. *Mercuro v. Superior Court*, 96 Cal. App. 4th 167, 177-178 (2002). California case law has recognized that limited liability company dissolution disputes may be arbitrated. *See Malek Media Group LLC v. AXQG Corp.*, 58 Cal. App. 5th 817 (2020) (case involving irreconcilable differences between members and various breaches of the parties' operating agreement).

5

Based upon the foregoing, as well as the appearances and submissions made by Rajaee, Davis and the LLC parties during the course of the Hearing proceedings, and the matters submitted to the Arbitrator during the course of this arbitration, all without objection to the Arbitrator's jurisdiction until *after* she ruled on the Petition through Order No. 4, it is the Arbitrator's determination that the parties' respective claims, counterclaims, affirmative defenses and requests for relief, are subject to and were submitted voluntarily to binding arbitration before the undersigned Arbitrator.[9]

### 3. Background Facts Pertinent to this Final Award

The background facts pertinent to this Final Award are as follows:

1.    When Rajaee and Davis decided to go into business together, they had limited experience working together through their respective relationships with a company called Surge. Rajaee provided services and consulting to Surge through Mobile Monster. Davis was an investor in Surge. They met through a Surge management meeting in 2016. Their common thread was that they both parted ways with Surge, and ended up suing Surge for different reasons, and being represented by the same attorney in those litigation matters. *2021 RT 410-420 and 423-424.*[10]

2.    When Rajaee and Davis decided to go into business together, they engaged an attorney to formalize their business relationship. *RT 428.* That relationship took the form of a limited liability company (the LLC) as the vehicle through which they would engage in a software development and consulting business, with a governing operating agreement that they both signed as co-members (the Agreement). *Davis Exhibit 2.*

---

[9]    In his opposition to the Petition, Rajaee did not object to the jurisdiction of this tribunal to decide the matter. To the contrary, Rajaee totally engaged on all issues and submitted both evidence, briefing and argument. Even after lodging his objection to the Arbitrator's jurisdiction – *post-issuance* of Order No. 4 – Rajaee participated full heartedly in the evidentiary proceedings on the Bifurcated Issues by (a) consuming more than half of the hearing time, (b) engaging an expert to offer her financial analysis and opinion regarding the even-up accounting between Rajaee and the LLC, and (c) offering dozens of exhibits into evidence. *See Order No. 16.*

[10]    There are two sets of reporter transcripts in this matter, both of which start with page 1. The reporter transcripts for the December 2021 hearing proceedings on the Petition will be referred to as "2021 RT." The reporter transcripts for the April 2022 hearing proceedings on the accounting will be referred to "2022 RT."

6

3.    The Agreement is an integrated agreement and expressly provides that its terms can only be modified or amended "by a written instrument executed by all of the parties." *Davis Exhibit 2, ¶¶ 13.1 and 13.11.* Both Rajaee and Davis testified that no such written instrument exists. *2021 RT 199-200 and 239.*

4.    With respect to Rajaee's and Davis's initial capital contributions and ownership interests in the LLC, the Agreement states that their respective capital contributions are "TBD", and Exhibit B to the Agreement was left blank. *Davis Exhibit 2.* However, absent an agreement to the contrary – which was not shown to exist in this case – the terms of the Agreement provide for voting rights and the allocation of profit and losses to follow the capital contributions of the LLC's members. *Davis Exhibit 2, ¶¶ 4.1, 5.2, 5.3, 5.4 and 7.1.*

5.    Rajaee testified that it was his requirement that Davis be responsible for capitalizing the LLC venture because he wanted to "de-risk" himself – i.e., he did not want to be at risk in the new venture. *2021 RT 421.* Rajaee and Davis agreed that the capital investment in the LLC would be $750,000. *Id.* Davis invested the initial $750,000 to start the LLC. *2021 RT 233-234.* That capital investment is recognized in the LLC's tax returns. *Davis Exhibits 8, 9, 10 and 11.* This was consistent with Rajaee's testimony that he expected Davis to contribute all of the capital because he did not want to be at risk in the new LLC venture. Additionally, Rajaee testified that he perceived himself as "bringing all the value to the company" through his knowledge about how to generate leads and close deals. *2021 RT 421-422.* Rajaee acknowledged that he was not going to be contributing uncompensated sweat equity to the LLC; that it was agreed at the outset that he would be paid a guaranteed salary of $200,000.00 per year. *2021 RT 422.* The LLC has paid Rajaee for his services, as reflected on the LLC's profit and loss statements, tax returns and bank statements. *Davis Exhibits 3, 4, 5, 6, 7, 8, 9, 10, 11 and 21.*

6.    A "capital call" for $76,000 was made by Rajaee in November 2020, and Rajaee and Davis contributed approximately $38,760 and $37,240, respectively, to the LLC. *Rajaee Exhibit 65, Davis Exhibits 11 and 21.* While these contributions were recognized on the LLC's 2020 tax return as capital contributions, there was no change to the capital structure of the LLC in terms of the K-1s for Davis and Rajaee. *Davis Exhibit 11.* Davis was still reported as having a 100% capital interest in the LLC, and Rajaee was still reported as having a 0% capital interest in the LLC. *Id.*

7

7. For tax years 2017, 2018, 2019 and 2020, the LLC's tax returns, as filed with the IRS, have reported that Davis owns 100% of the capital in the LLC. *Davis Exhibits 8, 9 10 and 11.* Those returns were prepared by an accounting firm selected by Rajaee, and were prepared under his direction as the "tax matters partner."

8. Rajaee testified that he never paid "attention to all of the details" in the tax returns; that he just looked at the line items for "how much revenue we did, how much expenses we had, how much taxes we have to pay," and that "[e]verything else is handled by [the accountant] in consulting with them." *2021 RT 93.* As pertains to how profits and losses were allocated between Rajaee and Davis, Rajaee testified that he has no understanding of why his profit share allocation went from 0% to 6.5% in 2017 and from 6.5% to 51% in 2018; that he does not recall having any discussions with the accountant or Davis about that; that he "put full trust in [the accountant] to account for everything," and simply "followed [the accountant's] advice on where the numbers landed." *2021 RT 81-90.* Davis testified that other than the email exchange in February 2020, discussed in Section 4(A), below, he never discussed the capital structure of the LLC with Rajaee or the LLC's accountant. *2021 RT 236-237.* No one from the LLC's accounting firm – Lavine, Lofgren, Morris & Engelberg LLP (*"the CPA Firm"*) – was called to testify in the proceedings on the Petition.

9. Rajaee testified that he covered a number of the LLC's operating expenses through charges put on his personal American Express card and through monies paid to or for the benefit of the LLC. To the extent that such expenditures or contributions were in fact made and were not reimbursed, they were not treated as capital contributions according to the LLC's tax returns. *Davis Exhibits 8, 9, 10 and 11.* In this regard, the profit and loss statements and LLC bank statements show that large sums of money have routinely been transferred out of the LLC to Rajaee or Mobile Monster. *Davis Exhibits 3, 4, 5, 6, 7 and 21.* Rajaee contends that he has "loaned" money to the LLC for which he has not been repaid. Rajaee's testimony about the amount of the LLC's alleged loan indebtedness varied between $700,000 and $1,700,000. *RT 111-116.* Whether such loan indebtedness in fact exists is a matter to be decided at another time – the accounting. The only relevance here is that it shows that, consistent with Rajaee's stated initial position that he did not want to be at risk in the LLC venture, he has viewed any infusions of cash to help fund the LLC's operations as loans – not capital – and maintained that position in the proceedings on the Petition.

10. The Agreement specifically recognizes Rajaee and Davis as the "Initial Members" of the LLC. *Davis Exhibit 2, ¶ 1.24.*

8

11.     The Agreement defines a "Membership Interest" as "a Member's entire interest and rights in the Company, collectively, including the Member's Economic Interest, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company." *Davis Exhibit 2, ¶ 1.34.*

12.     Under the terms of the Agreement, Rajaee was designated as the LLC's Manager. *Davis Exhibit 2. ¶ 2.9.* Rajaee has acted in the capacity of Manager and "tax matters partner" of the LLC since its inception, and is currently acting in those capacities with regard to the transactions he has entered into and decisions he has made for the LLC since the parties' disputes arose in February 2021.[11]

13.     The Agreement requires the Manager to maintain accurate books and records for the LLC. *Davis Exhibit 2, ¶ 6.3.*

14.     Rajaee testified that there have been lapses in the LLC's accounting as relates to the way expenses charged on Rajaee's personal American Express card or advanced by Mobile Monster have been booked in the LLC's records such that the LLC's accountants have told him that it is not possible to tell, by looking at the LLC's books and records, what the particular expenses of the LLC are; that the transactions are "all overlapping;" and that it is not possible to produce an accurate balance sheet based upon the data maintained in the LLC's accounting records. *2021 RT 121.* Moreover, a cursory review of the profit and loss statements in comparison to the LLC's bank statements suggests that the two do not tic-and-tie. For example, the "guaranteed" payments to Rajaee through October 2021 total approximately $671,000 according to the profit and loss statements, but the debits for withdrawals and transfers made to Rajaee, according to the LLC's bank statements, total approximately $2,800,000. *Davis Exhibits 3, 4, 5, 6, 7 and 21.* For another example, the LLC's bank statements for February 2021 shows a $447,723.80 transfer to Rajaee coded as "Loan Payoff Balance to AR," but Rajaee testified that he is unable to produce a balance sheet for the LLC; that

---

[11]     *E.g.,* having the LLC lease a jet purchased by Rajaee through his wholly-owned company (RemotePreneurs); having the LLC enter into a charge or debit card relationship with a company in which Rajaee has a 95% interest (SpendHub); and giving himself a $175,000 raise in guaranteed salary *after* Davis filed a lawsuit seeking to dissolve the LLC. *2021 RT 156, 160-164, and 170-171.* Whether such transactions and decision making constitute "self-dealing" and/or "mismanagement" of the LLC are matters to be decided at another time - the evidentiary hearing on the merits of the parties' respective damages claims and counterclaims. The only relevance here is that it explains the reason for the deep divide and discord that exists between Rajaee and Davis. Davis believes that the transactions were improper because they were done without his advance approval. Rajaee believes that the challenged actions / decisions qualify as "ordinary course" transactions. *2021 RT 191.*

9

he is only just now working with the LLC's accountants to try to create an accounting with regard to what monies he advanced to the LLC that have not been reimbursed; and that he believes he is still owed over $1,000,000. *2021 RT 115-121.*

15.     The Agreement requires that the books of the LLC "be closed and examined" at the end of each fiscal year, and that the LLC's certified public accountant issue an annual statement "reflecting the financial condition of the Company and its Profits or Losses." Such annual reports are to "be given to all Members," and are to include "[a] balance sheet and income statement, and a statement of changes in the financial position of the Company" and "[a] statement showing the Capital Account of each Member as of the close of the fiscal year and the distributions, if any, made to each Member during the fiscal year." *Davis Exhibit 2, ¶ 6.4.*

16.     While the LLC has engaged an outside accounting firm since its inception, the LLC does not maintain a balance sheet and no annual reports have ever been prepared or issued to the LLC's members. *2021 RT 117-118 and 191-192.*

17.     Article V of the Agreement sets forth the terms related to management of the LLC, and provides for the business to be managed by Rajaee as its designated / named Manager. *Davis Exhibit 2, ¶¶ 5.1 and 5.4.*

18.     Notwithstanding the Manager's broad authority to run the day-to-day affairs of the LLC, the Agreement prohibits the Manager from taking certain actions without the consent of a "Majority of Members." *Davis Exhibit 2, ¶ 5.4.* "Majority of Members" is defined as "a Member or Members whose Percentage Interests represent more than 50 percent of the Percentage Interests of all Members." *Davis Exhibit 2, ¶ 1.28.* "Percentage Interest" is defined as "a fraction, expressed as a percentage, the numerator of which is the total of a Member's Capital Account and denominator of which is the total of all Capital Accounts of all Members." *Davis Exhibit 2, ¶ 1.39.*

19.     The LLC is a staffing services business that generates revenue by providing software developers to work on software development projects for LLC clients. According to Rajaee, the main way in which the LLC finds its clients is through leads generated by Mobile Monster, Inc., a Canadian company owned 100% by Rajaee (***"Mobile Monster"***). *2021 RT 111, 134.* Mobile Monster also employs staff and several groups of contractors that work to service the LLC's customers. "All of that payroll, all of those contractor payments, all of the travel expenses, all of the client visits that we do or marketing gets captured inside of Mobile Monster, and then Mobile Monster gets reimbursed from [the LLC] for the expenses it is incurring." *Id.*

10

20.    Up until February 2021 – when the disputes arose between Rajaee and Davis – Rajaee generally consulted with Davis on all matters and the LLC operated on a consensus basis between the two members. *2021 RT 187-189.*

21.    After the "blow up" telephone conversation between Davis and Rajaee on February 8 or 9, 2021, Rajaee had Davis removed from the LLC's bank account and has not communicated with Davis, except through counsel. *2021 RT 208; Davis Exhibit 19.* In this regard, Rajaee testified that "any questions that I need to answer that relate to my communications with [Davis] I find kind of a waste of time, because I don't talk to him. I've only talked to him, if I had to, through counsel." *2021 RT 165.* Rajaee testified that he has not spoken to Davis since February 2021. *2021 RT 72.*

22.    Outside of this arbitration, at the time of the hearing on the Petition, there were four separate court proceedings pending that relate to the disputes in this arbitration: one initiated by Davis against Rajaee,[12] one initiated by Mobile Monster against Davis,[13] one initiated by Rajaee against a former employee of the LLC (Siarra Wood),[14] and one initiated by two former employees of the LLC against Rajaee.[15] *Order No. 2, ¶ 2.4; Davis Request for Judicial Notice.*

23.    After Order No. 4 was issued, several more lawsuits were threatened or initiated by Rajaee. For example, Jennifer Glaser testified that Rajaee has threatened to sue her and the CPA Firm. *2022 RT 660.* For another example, during the course of the proceedings in this arbitration, the Arbitrator has been made aware of (a) an action filed on behalf of Rajaee in the San Diego Superior Court, which is commonly referred to as *Rajaee v. Davis,* Case No. 37-2022-00001968, in which Rajaee has petitioned the court for an order vacating Order No. 4, and (b) a cross-action filed in the Sacramento Action, in which Rajaee has petitioned the court for an order enjoining this arbitration. For a final set of examples, Rajaee testified that he hired a law firm (Fox Rothschild) to send

---

[12]    *Tyler Davis v. Ashkan Mirfakhr-Rajaee, et al.,* Superior Court of the State of California, County of Sacramento, Case No. 34-2021-00301817 (**"the Sacramento Action"**).

[13]    *Mobile Monster v. Tyler Davis,* Superior Court of the State of California, County of Sacramento, Case No. 34-2021-00301817.

[14]    *Ashkan Rajaee v. Siarra Wood,* Superior Court of the State of California, County of San Diego, Case No. 37-2021-00008947.

[15]    *Sarah Blanchette and Siarra Wood v. Ashkan Rajaee,* Superior Court of Justice, Ontario (CANADA), Case No. CV-21-00086316-000.

11

letters to the LLC employees working with Davis on the windup of the LLC, *2022 RT 535-536,* and Davis testified that Joshua Lintz, the former CEO of the LLC who agreed to stay on and help with the windup, quit "after being threatened by [Rajaee] and his legal counsel." *2022 RT 55.*

**4.    Proceedings and Decision on the Petition for Dissolution [Evidentiary Hearing Proceedings Conducted December 1, 2 and 13, 2021, and Emergency Hearing Conducted January 13, 2022 – Order Nos. 4 and 5 Incorporated Herein]**

**A.    Introductory Statement**

Pursuant to the applicable Commercial Arbitration Rules of the AAA, amended and effective October 1, 2013, and by request and submission of the parties,[16] a hearing was held on December 1, 2 and 13, 2021 for the purpose of hearing and deciding a threshold issue: namely, whether grounds or cause existed for ordering dissolution of the LLC, as requested by Davis in his Petition. Appearing at the hearing on the Petition were Scott R. Carpenter, of Cummins & White LLP, appearing on behalf of Davis, and Jordan Mathews, of Weinberg Gonser LLP, appearing on behalf of Rajaee. Also present during the course of the hearing were Davis and Rajaee. The hearing proceedings were recorded and transcribed by a certified court reporter. By agreement of the parties, through their respective counsel, the transcript of the aforementioned proceedings is part of the record in this arbitration.

The parties agreed, through their respective counsel, to an evidentiary hearing where Davis and Rajaee would be allowed to testify in favor and against dissolution, respectively, and be subjected to cross-examination by the other side.

In advance of the Hearing, both Davis and Rajaee provided briefs on the issues to be addressed at the Hearing. Additionally, the parties submitted declarations with exhibits. At the Hearing, the parties submitted hearing exhibits in the form of documentary and electronic (video) evidence. The parties also submitted testimonial evidence from Rajaee, Davis and Michael S. Hawes (*"Hawes"*), a certified public accountant who provided opinion testimony on behalf of Davis. The parties' counsel made opening statements and closing arguments at the Hearing and then concluded the matter with closing briefs. The record of the proceedings concerning Davis's Petition was concluded on January 4, 2022, with the submission of the reporter's transcript for the third day of hearing (December 13, 2022).

---

[16] See *Order No. 2, § I, ¶ 5.*

12

The issues raised by the Petition were essentially two-fold: 1. Does Davis have the right to dissolve the LLC without Rajaee's consent? 2. If not, do grounds exist to order an involuntary dissolution over Rajaee's objection? While the parties' respective underlying claims and counterclaims contain numerous recriminations, it was not necessary to reach the merits of those claims in order to decide the narrow issues raised by the Petition. Ultimately, on the underlying damages claims and counterclaims, one party will be declared "right" and the other declared "wrong," but in the meantime and thereafter must Rajaee and Davis continue to do business together in the LLC? For the reasons discussed below, the answer to that question is "no."

> **B.   Ruling on the Petition and Factual Determinations Made With Respect to the Petition**
>
> > **(1)   Davis has the right to dissolve the LLC because he holds a majority of the Percentage Interests in the LLC.**

The operating agreement of a limited liability company governs, among other things, (a) "[r]elations among the members as members and between the members and the limited liability company"; and (b) "[t]he rights and duties under [the Act] of a person in the capacity as manager." Cal. Corp. Code § 17701.10(a)(1), (a)(2). Dissolution is a remedy that is authorized by Corporations Code section 17707.01.

Under paragraph 9.1 of the Agreement, the LLC will be dissolved on "[t]he written agreement of a Majority of Members to dissolve the Company." Davis claims to have made the election / decision to dissolve the LLC through his filing of a complaint for dissolution in the Sacramento Superior Court ("the State Court Action") and through his counterclaim for dissolution in this arbitration, as well as his filing of the Petition. The question is whether or not Davis holds more than 50% of the Percentage Interests in the LLC, and has the right to dissolve the LLC without Rajaee's consent and over his objection. The evidence in this matter supports a determination of "yes." Davis has the right to dissolve the LLC without Rajaee's consent and over his objection because (a) Davis holds a majority of the Percentage Interests in the LLC, as defined by the Agreement, and (b) the Agreement provides that the LLC may be dissolved by agreement of the "Majority of Members."

While the LLC's record keeping appears to have been less than perfect, two things are clear: (1) only Davis contributed capital to the start-up of the LLC, and (2) the LLC's outside accountants have reported on capital structure of the LLC on the LLC's annual tax returns for 2017, 2018, 2019 and 2020, which returns were signed under

13

penalty of perjury by Rajaee in his capacity as the LLC's "tax matters partner." All of the returns, without exception, state that Davis has a 100% capital interest in the LLC.[17] Under the definition of "Majority of Members" as set forth in paragraph 1.28 of the Agreement, Davis alone qualifies as the majority member of the LLC, even if capital investment credit were given to Rajaee for the $38,760 he contributed to the LLC in November 2020.

    With the exception of the $76,000 Rajaee and Davis put into the LLC in November 2020 pursuant to a "capital call" by Rajaee to cover the LLC's operating expenses, Rajaee has never described any of the monies he advanced or loaned to the LLC as capital investments.[18] In this regard, Rajaee testified that when the LLC was formed in 2017, it was his requirement that Davis be responsible for capitalizing the venture because he did not want to be at risk in the new venture. *2021 RT 421*. The profit and loss statements created by the LLC's outside accounting firm show that more than $5,000,000 has been paid in "Consultant Reimbursement Expenses," which supports the inference that any advances Rajaee (or Mobile Monster) may have made to or for the benefit of the LLC were intended and treated as advances to be repaid by the LLC and not as capital Rajaee invested in the LLC. Moreover, Rajaee's claim in these proceedings that he believes he advanced or loaned over $1,000,000 to the LLC that has not been repaid further confirms that Rajaee has never intended that any "contributions" he may have made to cover the LLC's operating expenses were to be treated as a capital investment.

    Rajaee testified that he had an understanding with Davis from the outset that he would own 51% of the LLC and Davis would own 49% of the LLC, irrespective of their respective capital contributions, because that is what he needed to qualify for a visa to live and work in the United States. *RT 103*. Assuming for sake of argument that those discussions did in fact occur, the alleged agreement or understanding is inconsistent with the terms of the Agreement Rajaee and Davis signed to memorialize the terms of

---

[17]    Rajaee pointed to the fact that he was allocated 51% of the profits in three of the LLC's tax returns as somehow being proof of an agreement between himself and Davis to the effect that he would have an ownership interest in the LLC that did not match his capital contributions to the LLC. While such an agreement is certainly possible. There was no evidence of such an agreement being reached between Davis and Rajaee to modify Article IV of the Agreement in this regard.

[18]    Schedule M-2 of the 2020 tax return recognized the $76,000 contribution as a capital contribution, and the K-1's for Rajaee and Davis recognized their contributions of $38,760 and $37,240, respectively. However, the capital interest percentages did not change as reflected on the K-1's. *Davis Exhibit 11*.

14

their business relationship in creating the LLC, and both agree that the Agreement has never been modified by a writing signed by both of them. *2021 RT 199-200 and 239.*

Rajaee pointed to a February 24, 2020 email exchange that started with Rajaee's assistant – Vania Hernandez – writing to the LLC's accountant – Jennifer Glaser (*"Glaser"*) – stating that Rajaee was "in need of a document that states TopDevz length in business as well as his ownership percentage" and that "[t]he document needs to be in LLME letterhead with your signature on it." *Rajaee Exhibit 5.* When Glaser asked what the letter was going to be used for, Rajaee responded that he was "buying a house." Glaser wrote back and asked if there was an updated operating agreement showing him as a 51% owner because she did not have documentation to support that statement. Rajaee then looped Davis in on the email chain and asked him to confirm ownership in the LLC as 51% to him and 49% to Davis. Davis responded "This is correct." Id.

As between Rajaee and Davis, there was insufficient evidence from which an inference could be drawn that Davis and Rajaee intended the email to constitute a written instrument signed by both parties, modifying the Agreement so as to specify the parties' respective ownership percentages that were previously left blank on Exhibit B. This is due in part to the fact that approximately 18 months after the February 24, 2020, email exchange - on September 13, 2021 - Glaser and her firm prepared the LLC's tax return for 2020 with Rajaee signing as the "tax matters partner" for the LLC. Again, the LLC's tax return reported Davis as having a 100% of the capital interest in the LLC and Rajaee as having a 0% capital interest in the LLC. *Davis Exhibit 11.* Like all of the other tax returns for the LLC, Rajaee signed the LLC's 2020 tax return as its "tax matters partner." Id. The reasonable inference to be drawn from this evidence is that Davis's "confirmation" email (a) was a friendly accommodation to Rajaee made in the context of Rajaee's effort to purchase a home in the United States,[19] (b) does not rise to the level of constituting an agreement between Rajaee and Davis regarding the capital structure of the LLC, and (c) appears to have *not* been something that the LLC's accountant or Rajaee (as the LLC's tax matters partner) relied upon in reporting the LLC's capital structure to the IRS in 2021 for calendar year 2020 because the stated capital accounts of Rajaee and Davis remained the same as in prior years. *Davis Exhibit 11.* The preparation of the 2020 tax return, as well as all prior tax returns, was done under Rajaee's direction as the LLC's "tax matters partner."

---

[19] Rajaee testified that he relied on the 51/49 discussions contained in the February 2020 email exchange in entering into the LLC with Davis. That testimony was not credible because Rajaee entered into the Agreement three years before the February 2020 email exchange, and there was no evidence that Rajaee did anything to his detriment after February 2020. To the contrary, the evidence showed that since February 2020, millions of dollars have flowed *out* of the LLC to Rajaee and his companies (Mobile Monster, SpendHub and Remote Preneurs), including over $490,000 paid out to Rajaee in July 2021. *Davis Exhibit 21.*

15

Rajaee also pointed to the fact that he was allocated 51% of the profits on the LLC's tax returns as proof of his 51% ownership stake in the LLC. The problem with Rajaee's position and testimony is that the evidence concerning the allocation of profits and losses to Rajaee was inconsistent. For example:

      (1)    Rajaee's share of profit and loss at the beginning of 2017 was shown as "0.0000000%," but his profit and loss allocation at the end of 2017 was shown as "6.5383824%." *Davis Exhibit 8.*

      (2)    Rajaee's share of profit at the beginning of 2018 was shown as "6.5383824%," but his profit allocation at the end of 2018 was shown as "51.0000000%." Rajaee's share of loss at the beginning of 2018 was shown as "6.5383824%," but his loss allocation at the end of 2018 was shown as "0.0000000%." *Davis Exhibit 9.*

      (3)    Rajaee's share of profit at the beginning and end of 2019 was shown as "51.0000000%." Rajaee's share of loss at the beginning and end of 2019 was shown as "0.0000000%." *Davis Exhibit 10.*

      (4)    Rajaee's share of profit at the beginning and end of 2020 was shown as "51.0000000%." Rajaee's share of loss at the beginning of 2020 was shown as "0.0000000%," but at the end of 2020 it was shown as "51.0000000%." *Davis Exhibit 11.*

      The fact that Rajaee was allocated profits and losses of the LLC does not change the fact that (a) the Agreement required profits and losses to be allocated based upon members' capital account, *Davis Exhibit 2, ¶ 4.1,* and (b) Rajaee made only a small capital contribution in 2020, as discussed above. *Davis Exhibit 11.* In both the December 2021 and April 2022 evidentiary hearing proceedings, Rajaee *argued* that he had a 51% stake in the LLC and was entitled to 51% of the LLC's ownership and profits. However, that issue was determined against him during the December 2021 proceedings, as set forth in paragraph 4 of Section 3(B), above. As was the case in December 2021, during the April 2022 proceedings, Rajaee did not produce evidence of an agreement signed off on by himself and Davis, agreeing to vary the terms of the Agreement. The fact that Rajaee and Davis may have agreed to a 51 / 49 profit split for tax reporting purposes when they were dividing losses or minimal profits ($240) is not enough evidence from which it can be inferred that Rajaee and Davis were willing to split profits on a 51 / 49 basis if there had been millions of dollars in the bank at the end of the year, especially since it was and still is the factual determination in this matter that only Davis put

16

money into the LLC that actually stayed in the LLC, as discussed in Section 3(B), above, and Section 4(E), below.

Rajaee himself testified that he never paid "attention to all of the details" in the LLC's tax returns and did not recall having any discussions with the accountant or Davis about the 2017 or 2018 changes in Rajaee's profit share allocation from 0% to 6.5% to 51%. *RT 89-93 and 193.* The suggested inference was that Rajaee's profit and loss allocations were changed without his knowledge or input, and that these changes were made by the accountants without the approval of the LLC's "tax matters partner." The LLC's outside accountant who prepared the LLC's tax returns[20] did not testify during the December 2021 proceedings. Glaser did testify during the April 2022 proceedings, and did not corroborate Rajaee's testimony that the LLC's tax returns were prepared without his knowledge or input. To the contrary, concerning the amendment to the 2017 tax return, Glaser testified that she discussed it with Rajaee, *2022 RT 610,* and the evidence showed that Rajaee signed the e-file authorizations for the LLC's tax returns, all of which included the attestation that he had reviewed them and believed them to be accurate. *Exhibits 811, 812 and 813.*

In final analysis, the only evidence of a capital contribution by Rajaee to the LLC is the $38,760 he contributed in November 2020.[21] Under the terms of the Agreement, Rajaee's Percentage Interest in the LLC is only 4.692% ($38,760 ÷ ($750,000 + $76,000) = .04692). As such, Davis holds the majority of Percentage Interests in the LLC and controls the vote of the Majority of Members. Accordingly, it is hereby determined that Davis owns 95.308% of the capital interest in the LLC and is the Majority Member with

---

[20] During the April 2022 proceedings, Glaser testified that she was "in close contact with [Attorney Jordan Matthews] in the latter part of 2021, and had been instructed (a) not to give information directly to Davis, and (b) to only communicate with Davis through Mr. Matthews. *2022 RT 650- 651.* Glaser also testified that in late 2021, she gave documents to Rajaee's counsel that she did not provide to Davis, and wrote a letter to Mr. Matthews on December 9, 2021, on topics he dictated concerning the LLC that was not shared with Davis until the April 2022 proceedings. *2022 RT 653-654; Exhibit 295.* It thus appears that Rajaee made a calculated decision to not call Glaser as a witness during the December 2021 proceedings in an effort to control the narrative concerning the LLC's financial affairs. When Glaser eventually testified during the April 2022 proceedings, she did not corroborate Rajaee's testimony that the LLC's tax returns were prepared without his knowledge or input. To the contrary, concerning the amendment to the 2017 tax return, Glaser testified that she discussed it with Rajaee, *2022 RT 610,* and the evidence showed that Rajaee signed the e-file authorizations for the LLC's tax returns, all of which included the attestation that he had reviewed them and believed them to be accurate. *Exhibits 811, 812 and 813.*

[21] During the April 2022 proceedings, Glaser testified that she was not aware of any capital contributions to the LLC other than Davis' initial contribution of $750,000 and the small capital call in November 2020. *2022 RT 644.*

17

regard to decisions that are subject to the vote of the Members or a "Majority of Members." Accordingly, Davis thus has the right, under paragraph 9.1 of the Agreement, to dissolve the LLC without Rajaee's consent and over his objection. That was the basis for Order No. 4, as discussed in Section 4(B)(3) and as confirmed in Section 9, below. Davis also has the right to exercise all other voting rights given to the "Majority of Members," including removal of the Manager.

> **(2) Even if Davis is not the Majority Member, protective dissolution would be in order because management of the LLC is deadlocked and subject to internal dissension.**

Deadlock and internal dissension are grounds for dissolution under Corporations Code section 17707.03(b)(4). To obtain a decree of dissolution, the alleged dissension must be sufficient to prevent the further successful operation of the company to the advantage of its members. *Fuimaono v. Samoan Congregational Christian Church of Oceanside*, 66 Cal. App. 3d 80, 84 (1977); *see also BeUo v. Panorama Optics, Inc.*, 33. Cal. App. 4th 1096, 1105 (1995) (dissension evidenced by "completely different views as to the operation of the company"); *Buss v. J.O. Martin Co.*, 241 Cal. App. 2d 123, 136 (1966) (dissension shown where parties "hold contrary and opposing views on nearly all phases of the conduct of the business").

The irreparable deterioration of the relationship of Rajaee and Davis is evidenced by, among other things, (a) the aggressive claims and counterclaims that have been asserted in this arbitration and in the various companion court proceedings described in footnotes 12, 13, 14 and 15, (b) the fact that Rajaee and Davis have not spoken to each other since February 2021, and (c) the fact that Rajaee has instructed Davis to only speak to him through his attorney.

The discord and dissension within the relationship of Rajaee and Davis as co-members of the LLC is evidenced by their completely different views as to what qualifies as an "ordinary course" business expense within Rajaee's sole decision making authority and discretion as the LLC's Manager and what types of decisions are subject to approval by Davis. See, *Footnote 11*. As evidenced by the expenditures made by Rajaee since February 2021, the delta on these differing views is several hundred thousand dollars flowing out of the LLC to companies owned by Rajaee. *Id.*

18

### (3)    Order No. 4

Based upon the determinations made with regard to the Petition, as set forth in Sections 3 and 4(B)(1) and (2), above, the Petition was granted and Order No. 4 was issued on January 6, 2022, for good cause shown. Order No. 4 provides, in pertinent part, as follows, and is incorporated into this Final Award by this reference:

"1.    Davis owns 95.308% of the capital interest in the LLC, and Rajaee owns 4.692% of the capital interest in the LLXC. Davis thus owns the majority of the Percentage Interests in the LLC for voting purposes and has the right to elect to dissolve the LLC without the consent and over the objection of Rajaee.

2.    Protective dissolution of the LLC under Corporations Code section 17707.03(b)(4) is in order because management of the LLC is deadlocked and subject to internal dissension.

3.    Based upon Davis' request that the LLC be dissolved and the finding of deadlock and internal dissension within the management of the LLC, the LLC shall be dissolved pursuant to paragraph 9.1 of the Agreement and Corporations Code sections 17707.01(a) and 17707.03(b)(4). In accordance with paragraph 9.2 of the Agreement, the LLC will engage in no further business other than that necessary to wind up the business and affairs of the LLC. Davis, and only Davis or his designee, shall be responsible for managing, overseeing, and completing the dissolution of the LLC, and only Davis, or his designee, shall have the authority to take those actions necessary to accomplish the dissolution of the LLC.

4.    In accordance with paragraph 9.2 of the Agreement, Davis, is the Member of the LLC responsible for winding up the affairs of the LLC, and will give notice of the commencement of winding up by mail to all known creditors and claimants of the LLC. After paying or adequately providing for the payment of all known debts of the LLC (except debts owing to members), the remaining assets of the LLC will be distributed or applied in the following order:

19

(a)     To pay the expenses of liquidation;

(b)     To the establishment of reasonable reserves for contingent liabilities or obligations of the LLC. On the determination that reserves are no longer necessary, they will be distributed as provided in this order and paragraph 9.2 of the Agreement;

(c)     To repay outstanding loans to members, if any, which is among the issues to be determined in the accounting in this arbitration, in accordance with paragraph 9.2(c) of the Agreement; and

(d)     To the members with positive capital account balances, as provided in Article IV, paragraph 4.16 of the Agreement.

5.     Davis and only Davis, or his designee, shall have authority to access, disburse funds from, open and close bank and other financial accounts belonging to or standing in the name of the LLC. If any such action requires the signature of Rajaee on a consent, certificate, filing or other document, Rajaee shall provide such signature within three (3) business days of being advised by Davis, or his designee, that such signature is required.

6.     Based upon Davis' request that Rajaee be removed as Manager of the LLC, Rajaee shall be removed as Manager of the LLC, and only Davis or his designee shall replace Rajaee as Manager of the LLC. If this removal and/or replacement requires the signature of Rajaee on a consent, certificate, filing or other document, Rajaee shall provide such signature within three (3) business days of being advised by Davis, or his designee, that such signature is required.

7.     Rajaee is hereby ordered to provide a full and complete accounting of the LLC's finances from the date of its inception in 2017 through the date of this order. That accounting needs to track every dollar in and every dollar out with backup, especially as pertains to (a) monies withdrawn, transferred or otherwise paid as expenses of the LLC, and (b) monies advanced or loaned to the LLC by Rajaee.

20

8.      Rajaee is ordered to turn over to Davis or his designee the original books and records of the LLC, including any electronically stored information and all and paper records such as invoices, contracts, receipts, checks, bank statements, etc.

9.      Rajaee is ordered to fully cooperate in providing access to Davis or his designee with respect to all of the books and records of the LLC maintained by or in the custody of Lavine, Lofgren, Morris & Engelberg LLP.

10.     From the date of this order forward, unless and until modified or instructed otherwise by a court of competent jurisdiction, Rajaee shall not make or cause to be made any disbursements, transfers or withdrawals from any accounts standing in the name of the LLC without the signature approval of Davis, or his designee. Specifically, Rajaee shall not incur any debt in the name of the LLC without the signature approval of Davis or his designee.

11.     From the date of this order forward, unless and until modified or instructed otherwise by a court of competent jurisdiction, Rajaee shall not make or enter into any contracts or commitments on behalf of or in the name of the LLC without the signature approval of Davis, or his designee.

12.     Rajaee is ordered to cooperate in collecting any outstanding receivables owed to the LLC, and is ordered to turnover any and all collections to Davis, or his designee, for deposit into an account maintained by and in the name of the LLC."

21

### (4)    Post-Script to Order No. 4 – Order No. 5 and Factual Determinations Made With Respect Thereto

On or about January 10, 2021, the Arbitrator was presented with an emergency motion to enforce Order No. 4. The impetus for the emergency motion was the fact that within hours of issuing Order No. 4, Rajaee had caused $900,000 to be wired to himself from the LLC's bank account[22] and $131,586.76 to be wired to an international account,[23] thereby leaving the LLC with insufficient funds to make payroll for its W2 and 1099 employees or to pay the expenses associated with the winding up of the LLC's business and affairs. The total amount Rajaee took from the LLC's Wells Fargo Bank Account (Account No. 1756821128) in violation of the Arbitrator's Order No. 4 was $1,031,586.76.

"Opposition" was filed with regard to the emergency motion, but those papers did not address the issue of Rajaee's direct violation of Order No. 4. Rather, the opposition talked about a demand Weinberg Gonser had received from Davis for the return of funds transferred to it by the LCC as a retainer, and about the perceived need on the part of Weinberg Gonser to cease representing Rajaee if it could no longer concurrently represent the LLC. In any event, the violation of Order No. 4 through the emptying of the LLC's bank account was not disputed.

On or about January 13, 2022, a duly noticed hearing on Davis's emergency motion was convened via video conference. Scott R. Carpenter, of Cummins & White LLP, appeared on behalf of Davis, and Jordan Matthews, of Weinberg Gonser LLP, appeared on behalf of Rajaee. The hearing proceedings were recorded and transcribed by a certified court reporter. The transcript of the proceedings on the emergency motion is part of the record in this arbitration.

As noted above, while opposition was submitted in response to the emergency motion on behalf of Rajaee, that opposition did not address the substantive issues raised by the Motion: most notably, what happened to the monies Rajaee caused to be transferred out of the LLC's bank account at Wells Fargo after Order No. 4 was issued? Significantly, Rajaee did not provide a declaration denying that he caused the

---

[22]    During the April 2022 evidentiary proceedings, Rajaee admitted that he took these funds; that he transferred the funds into an account in Canada; and that the account into which the $900,000 was deposited is not one held in the name of the LLC. *2022 RT 480-481.*

[23]    During the April 2022 evidentiary proceedings, Rajaee admitted that he wired these funds to Mobile Monster. *2022 RT 482-483.*

22

aforementioned monies to be transferred out of the LLC's bank account, and he did not appear at the Hearing to address, explain or otherwise respond to that circumstance. Additionally, according to Davis' counsel, Davis' efforts to obtain cooperation from Rajaee and the LLC's outside accounting firm with regard to turnover of the LLC's books and records and administrative access to its electronic records were frustrated at every turn by the lack of response from anyone. Neither Rajaee nor his counsel denied or disputed the offer of proof made by Davis' counsel concerning the lack of turnover of the LLC's books and records to Davis or the lack of cooperation forthcoming from Rajaee. Significantly, no challenge or argument was raised by Rajaee disputing the Arbitrator's jurisdiction over the claims and issues submitted via the Petition.

Having considered the papers the parties submitted with regard to the emergency, as well as the arguments made by the parties' respective counsel at the January 13, 2022, hearing, emergency relief was granted and Order No. 5 – Order on Emergency Motion to Enforce Order No. 4 (*"Order No. 5"*) was issued for good cause shown. Order No. 5 was marked as *Exhibit 804* in the April 2022 hearing proceedings. Order No. 5 provides, in pertinent part, as follows, and is incorporated into this Final Award by this reference:

> "1.    Rajaee violated Order No. 4 when he transferred funds out of the LLC's account at Wells Fargo Bank, Account Number 1756821128, on January 6 and January 7, 2022, because Davis, and only Davis or his designee, had the authority to access, disburse funds from, open and close bank and other financial accounts belonging to or standing in the name of the LLC from approximately 2:00 p.m. on January 6, 2022, forward. Rajaee is hereby ordered to immediately return and/or replenish to the LLC, care of Davis, the $900,000.00 he transferred to himself at approximately 11:00 p.m. on January 6, 2022, as well as the $131,586.76, transferred out as an "international money transfer debit" on January 7, 2022.

> 2.    Rajaee's power and authority to act as the Manager and "tax matters partner" of the LLC ended as of approximately 2:00 p.m. on January 6, 2022. Only Davis or his designee has authority to act as Manager of the LLC, and may do so without Rajaee's consent and over his objection. Rajaee is hereby enjoined and restrained from accessing any LLC bank or financial accounts, transferring any funds from any LLC bank or financial accounts, or transacting business of any sort for or on behalf of the LLC without Davis's signature approval.

23

3.      Rajaee is hereby ordered to immediately return to the LLC, care of Davis, any and all documents, data, and/or tangible property removed or taken from the LLC since January 6, 2022, by Rajaee or any persons or entities under Rajaee's control who have acted on behalf of Rajaee. Rajaee, and his agents and representatives, are enjoined and restrained from accessing and/or removing any business records of the LLC without the signature consent of Davis or his designee, including but not limited to any electronically stored information and all and paper records such as invoices, contracts, receipts, checks, bank statements, and customer lists, customer data, vendor lists, vendor data, contractor lists, contractor data, accounts receivable documents and accounts payable records.

4.      Nothing in this Order No. 5 is intended or shall be construed as superseding Order No. 4. Order No. 4 remains in full force and effect."

*See Order No. 5 [Exhibit 804].*

#### (5)      Post-Script to Order No. 4 – Order No. 6

As ordered by Order No. 4, and as duly noticed, a case management conference was convened via video conference January 21, 2022. Participating in the hearing were Connor Lynch, of Lynch LLP, appearing on behalf of Rajaee,[24] and Scott R. Carpenter, of Cummins & White LLP, appearing on behalf of Davis. At the time of the case management conference, this matter was set for a two-week evidentiary hearing on the balance of the parties' respective claims, counterclaims and affirmative defenses starting April 4, 2022. The parties' claims and counterclaims were essentially damages claims based on alleged tortious wrongdoing by the other.[25]

---

[24] On January 14, 2022, a Notice of Substitution of Counsel was submitted advising that Connor Lynch, of Lynch LLP, was substituting in place of Jordan Matthews, of Weinberg Gonser LLP, as attorneys for Claimant in this arbitration.

[25] In his second amended demand dated August 4, 2021, Rajaee asserted eight claims for relief seeking compensatory and punitive damages from Davis: defamation *per se* (First Cause of Action), civil extortion (Second Cause of Action), intentional infliction of emotional distress (Third Cause of Action), intentional interference with contract (Fourth Cause of Action), intentional interference with prospective economic advantage (Fifth Cause of Action), negligent interference with prospective economic advantage (Sixth Cause of Action), breach of fiduciary duty of care (Seventh Cause of Action), and a derivative claim for the LLC for breach of fiduciary duty (Eighth Cause of Action).

In his response to Rajaee's second amended demand, described above, Davis submitted and served a counterclaim, dated August 18, 2021, in which he asserted claims seeking compensatory and

24

When the evidentiary hearing was originally scheduled, it was assumed that, if dissolution was ordered, the accounting proceedings would be conducted in tandem with the hearing on the merits of the parties' respective tort claims and counterclaims. However, without Rajaee's cooperation and compliance with Order Nos. 4 and 5, the Arbitrator determined that that was not feasible. Accordingly, in accordance with AAA Rule R-32, the Arbitrator determined that it would expedite the resolution of the disputes in this matter if the LLC's final accounting and the even-up of accounts between Rajaee and Davis, as members of the LLC, was completed before turning to the determination of the merits of the parties' respective tort claims and counterclaims.

Pursuant to AAA Rule R-32(b), the determination of the remaining issues raised by Davis' Petition and first counterclaim was ordered bifurcated for determination "through evidentiary proceedings to be conducted on April 4 through 7, 2022 and April 11, 2022 (if needed) ("the Bifurcated Proceedings")." *See Order No. 6 [Exhibit 642].* These hearing dates were among the dates previously ordered, by agreement of the parties and their counsel, for the merits hearing in this matter. *See Order No. 2.* Order No. 6 was marked as *Exhibit 642* during the April 2022 hearing proceedings and is incorporated herein by this reference.

By agreement of the parties, through their respective counsel, an evidentiary hearing on the balance of the parties' tort claims and counterclaims was set for August 15 to 18, 2022, and August 22, 2022. *See Order No. 6 [Exhibit 642].*

5. **Proceedings and Decision on the Final Accounting for the LLC [Evidentiary Hearing Proceedings Conducted April 4 through 7, 2022, April 11 through 14, 2022, and April 21 and 22, 2022 – Partial Final Award]**

A. **Introductory Statement**

On April 4, 2022, a duly noticed hearing on the final accounting for the LLC was convened via video conference and continued thereafter on April 5 through 7, 2022, April 11 through , 2022, and April 21 and 22, 2022. Scott R. Carpenter, of Cummins & White LLP, appeared on behalf of Davis, and Ethan Brown, Geoffrey Neri, Tim Lamoreux, and Kete Barnes, of Brown Neri Smith & Khan LLP, appeared on behalf of Rajaee. The

---

punitive damages, as well as the imposition of a constructive trust, as against Rajaee, in addition to his First Cause of Action seeking dissolution and accounting of the LLC, based on allegations of breach of fiduciary duty and fraud by Rajaee.

25

hearing proceedings were recorded and transcribed by a certified court reporter. By agreement of the parties, through their respective counsel, the transcript of the proceedings on the final accounting is part of the record in this arbitration.

The issues raised for determination were quite narrow and, pursuant to Order No. 6, were specified in paragraph 1.9 as follows:

"Among the matters to be determined through the Bifurcated Proceedings are:

(a)    the reconciliation and final accounting of financial affairs of the LLC relative to the matters set forth in paragraph 4 of Order No. 4,

(b)    to determine whether there are any outstanding loans owed by the LLC to Rajaee or Davis,

(c)    to determine whether any surcharges should be assessed against Davis or Rajaee, and

(d)    to determine what, if anything, Davis or Rajaee is owed by or owes back to the LLC based upon the final reconciliation of the LLC's books and records and their respective capital accounts."

*Exhibit 642, p. 5 (emphasis added).*

In addition to the defined matters for determination, described above, paragraph 1.11 of Order No. 6 instructed the parties to "focus particular attention on substantiating [documentation showing the specific business expenses of the LLC that were paid through the transfer] the purpose of the transfers / withdrawals / payments out of the LLC as reflected in the LLC's bank statements[26] .... – and specifically including substantiation / explanation – for any transfers from the LLC to the following:

---

[26]  Paragraph 1.11 referenced Exhibit 21 – the bank statements for the LLC's operating account at Wells Fargo Bank – because that was the only bank account that had been identified as of the close of the December 2021 hearing proceedings on the Petition. Later, in connection with the April 2022 hearing proceedings, Rajaee produced documents related to two LLC bank accounts he opened in 2017 with Canadian banks. Davis testified that he was unaware of the existence of these accounts before the production of these hearing exhibits. *2022 RT 43.*

(a)     Tyler Davis,

(b)     Ashkan Rajaee,

(c)     Mobile Monster

(d)     SpendHub,

(e)     Remotepreneurs,

(f)     Lone Mountain Aircraft, and

(g)     Any transfer(s) to a person or entity not described above where the cumulative total is more than $50,000."

*Exhibit 642, pp. 5-6 (emphasis added).*

In advance of the start of the proceedings on the final accounting, the Arbitrator received extensive submissions from the parties, all of which she read in advance of the start of the evidentiary hearing proceedings. Those submissions included the following:

(a)     Expert report by Michael Hawes, CPA, forensic accountant designated by Davis.

(b)     Expert report by Becky O'Malley, certified fraud examiner, designated by Rajaee.

(c)     Opening brief submitted on behalf of Davis.

(d)     Opening brief submitted on behalf of Rajaee.

(e)     Pocket brief submitted on behalf of Davis with regard to legal authorities concerning the legal standard to be applied where records are unavailable or incomplete.

(f)     Pocket brief submitted on behalf of Rajaee with regard to legal authorities concerning the legal standard to be applied where records are unavailable or incomplete.

27

(g)     Reply pocket brief submitted on behalf of Davis with regard to legal authorities concerning the legal standard to be applied where records are unavailable or incomplete.

(h)     Reply pocket brief submitted on behalf of Rajaee with regard to legal authorities concerning the legal standard to be applied where records are unavailable or incomplete.

In advance of the proceedings on the final accounting, counsel for Rajaee also submitted declarations by Rajaee and Kete Barnes offered in support of Rajaee's opening brief. Since this was not a matter where the parties agreed to submit direct testimony via declaration, and since counsel for Davis objected, the declarations were not read or considered. Both witnesses appeared throughout the proceedings and were thus available to testify if they chose to do so. In this regard, counsel for Rajaee acknowledged that the declarations and exhibits attached to the declaration were "duplicative" of what would be covered during live testimony. *2022 RT 7.*

During the course of the proceedings on the final accounting, the parties were afforded extensive hearing time – April 4 through 7, 2022, April 11 through 14, 2022, April 21 and 22, 2022, and May 9, 2022 (for closing oral arguments) – during which they presented their respective testimonial and documentary evidence, as well as the oral opening statements and oral closing arguments of counsel. Additionally, the Arbitrator was provided with opening and closing briefs by both parties. All of the above evidence, argument, briefing and related materials were reviewed and considered by the Arbitrator.

### B.     Burden of Proof

The LLC is a member-managed limited liability company where, up until January 6, 2022, Rajaee was the Manager and Tax Matters Partner – roles / titles that were given to Rajaee under the terms of the Agreement, and ones that he accepted and performed from May 2017 through January 6, 2022.

In a member-managed limited liability company, the manager-member owes the company and the other members the duties of loyalty and care. *Cal. Corp. Code. § 17704.09(a), (b) and (c).*

28

Rajaee's duty to account flows from the duty of loyalty. The duty of loyalty requires the manager-member to account to the limited liability company and hold as trustee for it any property, profit, or benefit derived by the manager-member in the conduct and winding up of the activities of the company or derived from use of the company property. *Cal. Corp. Code. § 17704.09(b)(1).*

In his capacity as trustee of the limited liability company's property, the manager-member "is held to something stricter than the morals of the marketplace." *Feresi v. The Livery, LLC,* 232 Cal. App. 4th 419, 426 (2014). Like any other trustee, a manager-member is obligated to render an account of his dealings with the company's property by satisfactory evidence.[27] Any doubt arising from a trustee's failure to keep proper records to substantiate the bona fides of his self-dealing transactions must be resolved against the manager-member in his capacity as the trustee of the company's property. See, e.g., *Purdy v. Johnson,* 174 Cal. 521, 527 (1917) (Any transaction whereby the trustee receives a benefit from the trust is presumed to be improper and the burden is on the trustee to demonstrate the bona fides of the transaction.)

As set forth in Section 4(B)(3), above, Rajaee was ordered to provide an accounting of the LLC's finances through the end of his tenure as Manager of the LLC (January 6, 2022). *Order No. 4, ¶ 7* (as quoted in Section 4(B)(3), above). Rajaee's accounting obligation was twofold: 1. at a minimum, to produce a balance sheet and profit and loss statement for year-end 2021 with supporting backup and schedules, and 2. specifically, to substantiate that the millions of dollars paid out to or for the benefit of Rajaee or his companies were for legitimate business expenses of the LLC. The first point is discussed in Section 5(C), below. The second point is discussed in Section 5(D), below.

---

[27] This is at odds with Rajaee's view of his authority as the Manager of the LLC, as was made apparent during the December 2021 proceedings. As discussed in Section 4(B) and footnote 11, one of the points of departure and points of disagreement between Rajaee and Davis that led to this dispute is Rajaee's belief that if an expense can fit within the rubric of "marketing," "customer relations" or "pursuing new business," it qualifies as an ordinary business expense that is within his complete discretion regardless of amount. *2021 RT 191.*

29

## C. Ruling on the Final Accounting for the LLC and Factual Determinations Made With Respect to the Final Accounting

### (1) Rajaee's Failed Accounting

Rajaee did not offer any type of accounting or financial statements for the LLC. Whether his failure is the result of neglect or intent is a matter for another day when the balance of the parties' respective damages claims are heard. For now, the consequence of Rajaee's failure to account results in the inference that Rajaee cannot account because (a) he failed to keep proper records for the LLC, Mobile Monster, SpendHub or RemotePreneurs and himself, and (b) the finances of the LLC are so "overlapping" and intertwined with Rajaee's personal finances and the finances of Rajaee's companies, it is not possible to do so. Both inferences are consistent with Rajaee's prior testimony in December 2021. *2021 RT 121.*

Instead of providing an accounting for the LLC as of the end of his tenure as Manager of the LLC, Rajaee focused his attention and much of his evidence presentation time on seeking to *relitigate* the rulings and determinations made with respect to the Petition, as discussed in Section 3, above. During the December 2021 evidentiary hearing proceedings on the Petition, Rajaee testified under oath that he did not contribute anything to capitalize the LLC; that he was adverse to doing so because he was trying to "de-risk" himself; and that his deal with Davis was that Davis would capitalize the LLC with an initial cash contribution of $750,000. The evidence throughout the proceedings has been undisputed that Davis contributed $750,000 to the LLC, and did so as requested and in the manner requested by Rajaee. As noted in Section 3(B), this testimony is consistent with what Rajaee told the IRS on the tax returns he signed as the LLC's tax matters partner for 2017, 2018, 2019 and 2020. *Davis Exhibits 8, 9, 10 and 11 (2017, 2018, 2019 and 2020 LLC tax returns), and Exhibits 811, 812 and 813 (e-file signature authorizations for the LLC's 2018, 2019 and 2020 tax returns).*

During the April 2022 evidentiary hearing proceedings, Rajaee *changed his story completely,* and testified that he matched Davis' capital contributions to the LLC through alleged contributions made by Mobile Monster in October 2017. The parties' respective capital contributions were determined pursuant to Order No. 4. The undersigned Arbitrator did consider Rajaee's new evidence, but it did not ring true, especially when contrasted with Rajaee's prior testimony under oath.

30

As an *alternative* to receiving capital contribution credit, Rajaee argued that he should receive "offset credit" for Mobile Monster's alleged advances to the LLC in October 2017. As discussed hereinbelow, that argument is rejected because it is not supported by the evidence.

Rajaee's "proof" of Mobile Monster's advances to the LLC was offered primarily through O'Malley – Rajaee's forensics expert – who relied on (a) general ledger entries in the LLC's books showing receipt of three payments in October 2017 from Mobile Monster totaling $755,837, *Exhibit 201, p. 19,* and (b) a newly discovered bank statement for a bank account Rajaee opened for the LLC in Canada at BMO Harris (account ending in 8497). The statements for the 8497 account show receipt of two wire transfer payments (one in the amount of $249,985 and one in the amount of $214,985). *Exhibit 245, p. 12.*[28] Rajaee testified that the LLC had a second Canadian bank account at BMO Harris (account ending in 7970), for which he could not find or retrieve the bank statements, and that the third advance by Mobile Monster was deposited into that account. *2022 RT 1780-1781; Exhibit 666.* Rajaee also introduced into evidence the bank statements for two bank accounts Mobile Monster maintained at BMO Harris in Canada (accounts ending in 144 and 702) to show the three outgoing wire transfers from Mobile Monster's accounts in October 2017 (*Exhibits 213 and 214*[29]), as well as a wire transfer "confirmation of wires" letter, dated April 11, 2022, from BMO Wealth Management to Mobile Monster. *Exhibit 666.*

The conclusion that Mobile Monster advanced funds to the LLC for which it was not repaid can only be reached if one limits his or her review to October 2017. Such a limited review of the evidence is not in order in this case because the transactions and dealings between the LLC and Mobile Monster span a much broader time frame. A broader review of the evidence shows that while Mobile Monster may have transferred $755,837 into the LLC in October 2017, the money did not stay in the LLC. Between August 2017 and April 2019, according to Mobile Monster's bank statements (*Exhibits*

---

[28] *Exhibit 245* is a partial set of statements starting in May 2017 and ending with March 2018. This is significant because there are numerous wire transfer transactions into Mobile Monster's BMO Harris accounts from the LLC that occurred after March 2018.

[29] *Exhibits 213 and 214* are partial sets of statements starting in May 2017 and ending with March 2021. This is significant because there have been numerous payment transactions to Mobile Monster from the LLC's operating account at Wells Fargo since March 2021. Without the Mobile Monster bank statements for the balance of calendar year 2021, it is not possible to see if there is still another active LLC account besides the Wells Fargo account. Notably, these account statements are all in Rajaee's control.

31

*213 and 214),* Mobile Monster received $1,173,626 in transfers from the LLC, meaning that whatever monies Mobile Monster may have transferred to the LLC in October 2017 were fully replenished by the incoming wire transfers from the LLC reflected in Mobile Monster's bank statements for the 144 and 702 accounts:

| Wire Transfer Date | Transfer Amount | BMO Account No. | Comment |
|---|---|---|---|
| Aug 29 2017 | 29,543.41 | 702 | No MM Invoice |
| Aug 25 2017 | 37,676.83 | 702 | MM Invoice Nos 194 ($12,734.70), 196 ($12,736.96) and 197 ($12,205.17) |
| Sep 1 2017 | 44,365.31[30] | 702 | MM Invoice No. 195 |
| Nov 7 2017 | 59,133.67 | 702 | MM Invoice Nos. 198 ($40,746.15) and 199 ($18,387.52) |
| Dec 1 2017 | 75,000.00 | 144 | MM Invoice No. 202 |
| Dec 8 2017 | 276,900.00 | 144 | MM Invoice No. 207 |
| Dec 29 2017 | 78,705.45 | 702 | No MM Invoice |
| Jan 19 2018 | 23,100 | 144 | MM Invoice No. 208 |
| Mar 26 2018 | 276,957.73[31] | 702 | MM Invoice No. 209 |
| Aug 7 2018 | 47,052.04 | 702 | MM Invoice No. 220 |
| Mar 29 2019 | 151,648.08 | 702 | MM Invoice No. 243 |
| Apr 12 2019 | 73,543.49 | 702 | MM Invoice No. 246 |
| **TOTAL** | **$1,173,626.01** | | |

*Exhibit 213, pp. 47, 49, 73, 79, 81, 85, 87 and 88, Exhibit 214, pp. 68 and 70, and Exhibit 224, Bates Number 4152, 4154, 4155, 4156, 4157, 4159, 4162, 4163, 4164, 4173, 4193 and 4196.*

---

[30]    An outgoing transfer in this amount is reflected in the LLC's BMO Account number 8497. *Exhibit 245, p. 10.*

[31]    An outgoing transfer in this amount is reflected in the LLC's BMO Account number 8497. *Exhibit 245, p. 26.* Rajaee acknowledged that this was an outgoing transfer to Mobile Monster. *2022 RT 930-931.*

32

Rajaee testified that the Mobile Monster deposits of $755,837 were "erroneously" booked as sales revenue on the LLC's books. Given the evidence and findings discussed above, this issue is a moot point, especially since Rajaee – as the LLC's Manager – was responsible for maintaining the LLC's books and records and the inferences being drawn against him in that regard. However, given that Rajaee was the only one involved in generating sales for the LLC in 2017, it begs credulity that Rajaee would not notice a $750,000 error when gross sales for the year were only about $890,000. *Davis Exhibits 3 and 8*. If the $755,837 had been backed out of the profit and loss statement and tax return for 2017, the LLC would have reported only about $140,000 in sales with over $1.3 million in expenses, and there would be unexplained issues concerning (a) the monies the flowed into the LLC's Canadian bank accounts at BMO Harris, and (b) the monies that flowed from the LLC to Mobile Monster from an account or accounts other than the Wells Fargo operating account. As the person responsible for generating the LLC's sales in 2017, it is not credible that Rajaee would not have known what the LLC's true sales figure was for 2017 and would not have noticed a high six-figure error, if indeed there was an error.

In final analysis, Rajaee's testimony about Mobile Monster putting money into the LLC as a capital contribution or as unreimbursed advances is not credible because it is dependent on believing Rajaee's new story, which is at odds with his prior testimony and the records he has produced. Rajaee is one of the least credible witnesses the undersigned Arbitrator has ever heard testify, not just because Rajaee gave inconsistent testimony, but because he did so without acknowledging the contradiction and his seeming indifference to the oath he took, promising to answer truthfully all questions posed to him in the arbitration. Instead, over the course of the December 2021 and April 2022 Hearing proceedings, Rajaee testified as if the truth was something that he could change from day to day depending on his then current need, objective, whim or state of mind.

33

(2) **Rajaee Failed to Substantiate that the Millions of Dollars Paid to Himself and His Companies Were for Legitimate Business Expenses of the LLC**

(a) **Introductory Statement**

The accounting concerns the monies paid by the LLC to or for the benefit of Davis, Rajaee and their respective companies. It does not concern an accounting of what the LLC paid directly to its W-2 employees and the software developer contractors, which accounts for roughly 70% of the LLC's annual expenses, on average, as reported in the profit and loss statements prepared under Rajaee's direction and given to Davis, because those transactions were not questioned by Davis. *Davis Exhibits 3, 4, 5, 6 and 7.*

| Year | Consultant Expense | Payroll Wages & Taxes | Gross Sales | Percentage of Gross Sales |
|------|-------------------|----------------------|-------------|---------------------------|
| 2017 | 894,374 | 129,571 | 897,253 | 114% |
| 2018 | 2,430,281 | 401,078 | 3,730,376 | 76% |
| 2019 | 5,178,822 | 339,941 | 7,880,396 | 70% |
| 2020 | 2,674,249 | 152,401 | 4,309,844 | 66% |
| 2021 | 6,311,178 | 440,380 | 9,988,447 | 68% |

*Id.*

The even-up accounting also does not concern the expenses the LLC paid directly to outside third parties for such things as business and health insurance, bank charges, accountant fees, etc., which totaled less than $1,000,000 for the 4-1/2 year period of May 2017 through December 2021, because those transactions were not questioned by Davis. *Exhibits 3, 4, 5, 6 and 7.*

The focus of the even-up accounting was on what happened to the other Ten Million in revenue. To the extent monies were paid to Davis, as discussed in Section 4(E), below, the evidence showed that those payments were modest ($250,000) and undisputed. To the extent that monies were paid to or for the benefit of Rajaee or his companies beyond the agreed upon guaranteed salary ($933,300.00)[32] and the July

---

[32] This figure is based upon $200,000 per full calendar year in 2018, 2019, 2020 and 2021, and 6.6 months for calendar year 2017 (May to December). See *Exhibit 801.*

34

2019 distribution of $50,000, the questions to be answered were "What was the business purpose or need?" and "What records exist to substantiate the business nature and amount of each transfer out of the LLC's operating account at Wells Fargo to Rajaee or one of his companies?" Despite the blizzard of paper produced by Rajaee during the course of the April 2022 hearing proceedings, Rajaee did not produce any records that substantiated or explained:

    (a)    the approximate $2.6 million in non-itemized "expenses" billed to the LLC by Mobile Monster for "reimbursement,"[33]

    (b)    the approximate $1 million transferred to Mobile Monster that was not supported by any invoices or other documentation,[34]

---

[33]   See, e.g., *Exhibit 224, pp. 004166, 004171, 004175, 004177, 004178, 004180, 004188, 004189, 004190, 004192, 004194, 004198, 004200, 004215, 004220, 004229, 004227, 004225, 004223, 004231, 004232, 004234, 004235, 004237, 004238, 004239, 004241, 004243, 004247, 004248, and 004250.* The foregoing invoices total a little over $2.6 million. The foregoing Mobile Monster invoice analysis does not include the Mobile Monster invoices that tie to wire transfers into Mobile Monster's accounts 702 and 144, reflected as coming from "TopDevz LLC" that are not reflected in the statements for the LLC's account at Wells Fargo. Those invoices total $991,833.66, and have not been included in the offset analysis or charges because the Mobile Monster invoices and bank statements only came to light during the course of the April 2022 proceedings and were not included in the forensic experts' opinions. See, e.g., *Exhibit 224, pp. 004152, 004154, 004155, 004153, 004156, 004157, 004159, 004162, 004163, 004164, 004173, and 004193,* and *Exhibits 213 and 214.*

[34]   An analysis of *Exhibit 629* (the spreadsheet exhibit to the Hawes opinion report showing the transfers out of the Wells Fargo account to Davis, Rajaee or one of their companies) in comparison to *Exhibit 224 (*the Mobile Monster invoices) shows that there were 13 transfers out of the LLC's account to Mobile Monster that are not supported by a Mobile Monster invoice and were not otherwise addressed or explained by Rajaee. Those transfers total almost $1.1 million and are summarized below:

| Date | Amount | Transferee |
|------|--------|------------|
| 7-16-2019 | $148,648.55 | The Bank of Montreal / Bnf=Mobile Monster |
| 8-15-2019 | $87,544.00 | The Bank of Montreal / Bnf=Mobile Monster |
| 9-13-2019 | $105,551.61 | The Bank of Montreal / Bnf=Mobile Monster |
| 11-21-2019 | $215,250.00 | The Bank of Montreal / Bnf=Mobile Monster |
| 1-21-2020 | $142,412.00 | The Bank of Montreal / Bnf=Mobile Monster |
| 2-25-2020 | $141,654.71 | The Bank of Montreal / Bnf=Mobile Monster |
| 2-25-2020 | $8,351.26 | The Bank of Montreal / Bnf=Mobile Monster |
| 6-9-2020 | $52,110.29 | The Bank of Montreal / Bnf=Mobile Monster |
| 7-10-2020 | $71,789.29 | The Bank of Montreal / Bnf=Mobile Monster |
| 2-9-2021 | $2,429.53 | The Bank of Montreal / Bnf=Mobile Monster |
| 3-3-2021 | $40,429.00 | The Bank of Montreal / Bnf=Mobile Monster |
| 3-15-2021 | $50,000.00 | The Bank of Montreal / Bnf=Mobile Monster |
| TOTAL: | $1,066,170.24 | |

35

(c)     the approximate $2.9 million transferred to Rajaee beyond (a) his guaranteed salary of $933,300 for 4.6 years of work, and (b) the $50,000 distribution matching that paid to Davis,[35]

(d)     the almost $800,000 of "expenses" charged by Mobile Monster employees to the LLC's account with SpendHub, with $250,000 being charged during the five-month period of July through November 2021,[36] and

(e)     the business purpose and details for the almost $200,000 in jet travel expenses charged or passed through to the LLC by Remotepreneurs in 2021.[37]

---

[35]   As discussed in Section 5(C)(2)(b), below, Rajaee is entitled to offset credit in the amount of $983,300.00 for his guaranteed salary (footnote 39) and matching $50,000 distribution paid in July 2019 because the evidence showed that those payments were mutually agreed to by Davis and Rajaee.

[36]   O'Malley's spreadsheet analysis of the vendors to whom Mobile Monster employees were incurring charges on the LLC's SpendHub account included all sorts of food, apparel, hotel and airline charges. See, *Exhibit 201, pp. 261-275.* No receipts or expense reports were produced to substantiate the business need or purpose for charging any of these items to the LLC. The evidence showed that $250,000 was charged to the LLC's SpendHub account in five installments of $50,000 each during the last half of 2021, which is after the discord and dissension between Rajaee and Davis had escalated to the point of this arbitration and the parties speaking to each other only through attorneys. The questions for Rajaee to answer were: "Who was traveling and eating at the expense of the LLC during this five-month time period, and for what business purpose?" Neither Rajaee nor his expert (O'Malley) answered this question.

[37]   It was established during the December 2021 proceedings that, after this arbitration and the related court litigation matters were filed, Rajaee made the unilateral decision to have the LLC lease a jet for his use and passed through to the LLC the maintenance, fuel and operation expenses charged by Lone Mountain Aircraft for that aircraft. *2021 RT 156, 160-164 and 170-171.* No evidence was offered to show why a staffing company such as the LLC needed a private jet for its Manager or how such private jet travel inured to the benefit of the LLC. All that was offered in this regard was Rajaee's testimony that the expenses associated with his private jet travel tied to marketing because it promoted *him* and his "crazy" life and what he and his team did on a day-to-day basis as a way "to get content in front of an audience on LinkedIn, and the Google Ads" so that the content "would be entertaining to watch." *2022 RT 1330-1331.* According to Rajaee, the videos he produced were responsible for landing some significant accounts for the LLC "because [the customer] remembered the plane or the Bentley or the Zoom call where one of our developers was caught having sex on Zoom ... and that was all just part of the content." *2022 RT 1331.* Rajaee, however, failed to show that any account was the result of the "marketing" efforts that focused largely on Rajaee and his lifestyle. See, *Rajaee Exhibits 51A, 52A, 53A, 54A, 55A, 56A and 57A; 2021 RT 579-594.*

36

**(b)     The Evidence Showed that the Amount Rajaee
Needed to Substantiate was $7,670,151**

Hawes' analysis of payments made to or for the benefit of Rajaee or his companies was based on the information reflected in the bank statements for the LLC's operating account at Wells Fargo,[38] and covered the period of November 2017 through January 2022, which included the $131,586 and $900,000 paid out to Mobile Monster and Rajaee, respectively, on January 6, 2022. *Exhibits 801 and 629.* O'Malley's analysis of payments made to Rajaee or his companies covered the period of May 2017 through December 2021, and thus did <u>not</u> capture or include the aforementioned January 6, 2022, payments. *Exhibit 201, Table 3.* O'Malley's analysis also did not identify the source of her cash disbursement numbers, *Exhibit 201, p.7, ¶ 10,* which varied from Hawes' totals. For example, Hawes showed that total payments out to Mobile Monster were $3,704,625. *Exhibit 801, p. 006.* O'Malley showed that total payments out to Mobile Monster were $4,454,018. *Exhibit 201, p. 8.* For another example, Hawes showed that total payments out to SpendHub were $830,052. *Exhibit 801, p. 006.* O'Malley showed that total payments out to SpendHub were $839,703. *Exhibit, p. 8.*

Because Hawes' opinion analysis tied to the statements for the LLC's operating account at Wells Fargo and included the January 6, 2022, transfers to Rajaee and Mobile Monster, whereas O'Malley's opinion analysis did not, Hawes' opinion testimony was given greater weight in deciding the issue with regard to the amount Rajaee needed to substantiate as business expenses of the LLC. That amount is $7,670,151, as summarized below:

---

[38]    The even-up accounting considered only the transactions reflected in the LLC's operating account at Wells Fargo because (a) the existence of the LLC's Canadian accounts at BMO Harris was not known to Davis before the April 2022 proceedings, and (b) the records for the LLC's accounts at BMO Harris were incomplete.

37

(a)     $2,913,460 paid to Rajaee.[39]

(b)     $3,692,586 paid to Mobile Monster.[40]

(c)     $780,655 paid to SpendHub.[41]

(d)     $49,908 paid to Remotepreneurs in 2021 for the jet the LLC leased
        in July 2021. *Exhibit 801, p 6; Exhibit 629.*

(e)     $148,140 paid to Lone Mountain for expenses related to the
        operation and maintenance of the jet owned by Remotepreneurs
        and leased to the LLC. *Exhibit 801, p 6; Exhibit 629.*

(f)     $85,402 paid to Anil Khera, a Mobile Monster expense that the LLC
        paid. Both Hawes and O'Malley agreed that it should be charged to
        Rajaee. *Exhibit 801, p 6; Exhibit 629; 2022 RT 1506.*

Putting the $85,402 payment to Anil Khera aside - since the parties' respective
experts agreed that it was not a legitimate business expense of the LLC and should thus
be charged to Rajaee - the call of the question in reconciling Rajaee's account with the
LLC is whether there is sufficient evidence to substantiate some or all of the above
transfers as payment of legitimate business expenses of the LLC.

---

[39]  In his opinion report, Hawes showed a total of $3,915,782 going to Rajaee. *Exhibit 801.* On
cross-examination, Hawes was asked to double check the information in his backup schedule – marked
as *Exhibit 629.* Hawes found a duplicate entry of $22,772, requiring a downward adjustment. Hawes also
found that an entry booked at $50,000 should have been booked at $53,750, requiring an upward
adjustment. *Exhibit 801, p 6; Exhibit 629; 2022 RT 792-796.* Hawes then credited Rajaee with $933,300
for the guaranteed salary of $200,000 per year, which Davis testified he approved, and the July 2019
member distribution of $50,000, which the evidence showed was mutually agreed to and received by
both Davis and Rajaee.

[40]  In his report, Hawes showed a total of $3,704,625 going to Mobile Monster. *Exhibit 801.* On
cross-examination, Hawes was asked to double-check the information in his backup schedule – *Exhibit
629.* Hawes found a duplicate entry of $61,436, requiring a downward adjustment. Hawes also found a
transfer out to Mobile Monster that was incorrectly booked to SpendHub in the amount of $49,397,
requiring an upward adjustment. *Exhibit 801, p 6; Exhibit 629; 2022 RT 792-796.*

[41]  In his report, Hawes showed a total of $830,052 going to SpendHub. *Exhibit 801.* On cross-
examination, Hawes was asked to double-check the information in his backup schedule – *Exhibit 629.*
Hawes found a transfer out of Mobile Monster that was incorrectly booked to SpendHub in the amount
of $49,397, requiring a downward adjustment. *Exhibit 801, p 6; Exhibit 629; 2022 RT 792-796.*

38

Both parties' experts agreed that they were not provided with the documents and information they needed or had requested. For example, O'Malley stated in her report that the ZoHo Books accounting system has a feature that ties to accounts payable supporting documentation such as invoices, bills, and receipts, but that supporting documentation was not always available for the transactions she was reviewing – namely, the support for the Mobile Monster "lumpsum invoices" and the transfers to Rajaee beyond his guaranteed salary. *Exhibit 201, pp. 12-13.* O'Malley further stated that during the course of her work, she "requested but did not receive certain documents and information that [were] relevant to [her] forensic analysis, to the extent that they exist," and that she was told that "these documents [were] not readily available." *Id. at p. 12.* With regard to her analysis of the transfers made to Mobile Monster pursuant to its invoices, O'Malley stated that the invoices had "lumpsum charges for lead generation, staff and consulting support, and expense reimbursements," and that she was told "that there is limited supporting documentation pertaining to how the invoice amounts were calculated." *Id. at p. 13.*

Hawes testified that he agreed with O'Malley regarding the missing documentation. *2022 RT 814-820.* Hawes testified that after spreadsheeting the monies transferred out of the LLC to or for the benefit of Davis, Rajaee or their respective companies, he then looked at all of the documents provided through the O'Malley report and the Hearing exhibits – "everything provided to me" – looking for "substantiation for the money going out." *2022 RT 97.* Beyond the instances where the evidence showed that monies were paid out by mutual agreement between Davis and Rajaee – e.g., the July 2019 member distributions and Rajaee's guaranteed salary – Hawes found that the bulk of the transfers out to or for the benefit of Rajaee or his companies were "non-substantiated payments." *Id. at pp. 103-114.*

The parties' experts took very different approaches to dealing with the missing documentation circumstance. Hawes held Rajaee to the standards imposed by the IRS for substantiating business expense deductions because the transactions concerned insider transactions where significant sums of money were flowing out to or for the benefit of Rajaee or his companies. *Id.* O'Malley relied on the information she found in the general ledger, Mobile Monster invoices and credit card statements while, at the same time, qualifying her analysis by noting that she was not provided with all of the documents or information she requested. Hawes questioned the reliability of O'Malley's forensic analysis given that she, admittedly, was provided with only part of the information she requested. *2022 RT 819.* The undersigned Arbitrator agrees with and adopts Hawes' criticism of O'Malley's analysis, and gave Hawes' analysis and opinion greater weight because it took into consideration (a) the fiduciary standards imposed on

39

managing members of a limited liability company, (b) the IRS requirements for substantiating business expenses for purposes of deduction from gross revenue to determine taxable income, and (c) the evidence in the case. Notably, concerning the evidence in the case, O'Malley's analysis ended as of December 31, 2021,[42] and thus did not include looking for substantiation for the $900,000 transferred to Rajaee or the $131,586.76 transferred to Mobile Monster on January 6, 2022, both of which were acknowledged/admitted by Rajaee in his April 2022 testimony. *2022 RT 481-483.*

> **(c)    Rajaee Failed to Provide Sufficient Evidence that the Millions of Dollars Paid to or for the Benefit of Himself and His Companies Were for Legitimate Business Expenses of the LLC**

As discussed in Section 5(B), above, Rajaee had the burden of proof to show that the millions of dollars paid to or for the benefit of himself and his companies by the LLC were for legitimate business expenses of the LLC. This should have been a simple accounting exercise, but Rajaee failed to do it. The following are merely examples and not an all-inclusive list:

- On December 19, 2017, three wire transfers were made to Rajaee in the amounts of $50,000, $50,000 and $53,750. What were these transfers for? Where is the documentation showing that these were reimbursement for an LLC expense paid by Rajaee – e.g., an invoice from the vendor and proof of payment by Rajaee? Rajaee produced nothing to establish the bona fides of these transfer transactions.[43]

---

[42]  *Exhibit 201, pp. 3–6, 8, 15, 16 and 25.*

[43]  According to O'Malley's analysis, these payments were booked in ZoHo Books as reimbursement to Rajaee for the JetSmarter membership. *Exhibit 201, p. 279 (Schedule 6).* However, O'Malley's analysis shows a companion invoice transaction from Mobile Monster in the amount of $113,511 related to the JetSmarter membership. There is a Mobile Monster invoice (No. 0210), dated December 21, 2017, directed to the LLC for reimbursement of the "JetSmarter Membership." *Exhibit 224, p. 004165.* The LLC's 8497 account shows an outgoing wire transfer on December 21, 2021 (recipient unknown), in the amount of $113,511.00. *Exhibit 245, p. 18.* Nothing was produced by Rajaee to show the actual amount charged by JetSmarter for the membership, or to explain why the LLC simply did not pay for the membership directly. Nothing was produced to explain why both Mobile Monster and Rajaee were being reimbursed for the JetSmarter membership or the amounts of those "reimbursements." O'Malley's forensic analysis ignored the apparent duplicate payment, and simply assumed that the $153,000 transferred out to Rajaee was valid without requiring any backup invoices from JetSmarter and without reconciling (a) the odd entries in the LLC's general ledger showing invoicing by Mobile Monster for reimbursement of a JetSmarter expense in the amount of $113,511.00 and payment to Rajaee in the amount of $153,000.00, or (b) the fact that Mobile Monster invoiced the LLC

40

- In December 2020, Mobile Monster invoiced and was paid $126,214.60 for "expense" reimbursement and "lead generation." What "expenses" were paid by Mobile Monster on behalf of the LLC. Where is the documentation showing that the charges being reimbursed were LLC expenses paid by Mobile Monster? To the extent that the invoiced amount includes a fee for "lead generation," what was the amount of that fee and how was it computed? Again, Rajaee provided no substantiation to show the bona fides of this transfer transaction.

- On November 21, 2019, a wire transfer was made to Mobile Monster in the amount of $212,250 for which there is no corresponding invoice. What was the transfer for? If it was an expense reimbursement, where is the documentation showing that Mobile Monster incurred or paid business expenses of the LLC totaling this amount? If it was repayment of an advance by Mobile Monster, where is the documentation showing unreimbursed advances owed to Mobile Monster as of this date?[44] Again, Rajaee provided no substantiation to show the bona fides of this transfer transaction.

- On July 28, 2021, a wire transfer was made to Rajaee in the amount of $447,723.80. What was that transfer for? If for reimbursement of LLC expenses paid for by Rajaee, where is the documentation showing (a) the existence of LLC business expense obligations in this amount, and (b) Rajaee's payment of those expenses? One would expect that Rajaee would know what he got such a large amount of money for, but Rajaee again provided no explanation or substantiation for this transfer transaction.

---

and appears to have received payment from the LLC from one of its Canadian accounts at BMO Harris, as discussed above.

[44] As discussed in Section 5(C), the evidence concerning Mobile Monster's bank accounts at BMO Harris show that between August 2017 and April 2019, Mobile Monster received wire transfers from the LLC totaling in excess of $1.1 million from an account *other than* the LLC's operating account at Wells Fargo.

While Rajaee produced a blizzard of paper during the course of the April 2022 proceedings,[45] with the exception of the $900,000 wired to Rajaee on January 6, 2022, which Rajaee acknowledged he simply took,[46] neither Rajaee nor his forensic expert addressed, explained or in any way substantiated a single one of the other documented transfers out of the LLC's operating account at Wells Fargo to or for the benefit of Rajaee or his companies. Instead, what Rajaee did was offer the "reverse engineering" opinion testimony of O'Malley, discussed below.

O'Malley is not a certified public accountant and is not licensed to sign off on public accounting reports or to represent taxpayers before the IRS. *2022 RT 1433-1434.* O'Malley is a certified fraud examiner whose "primary forte" is looking through forensic data for the purpose of forming conclusions about where money went. *Id.* O'Malley acknowledged that she "didn't have all of the information that [she] felt [she] needed to prepare a final accounting" for the LLC, and, with regard to the opinion analysis she provided, O'Malley testified that she was "missing quite a bit of information" when she developed her opinion, and was still missing information and did not have a complete picture of the LLC's finances as of the April 2022 hearing. *2022 RT 1433-1435.* In an effort to come up with a number that would appease (or please) Rajaee, O'Malley "reverse engineered" a reconciliation that consisted of selecting certain data from ZoHo Books,[47] analyzing various bank statements and credit card statements, and

---

[45]   While not all exhibits were offered or admitted into evidence, Rajaee's counsel presented the undersigned Arbitrator with 16 4-inch binders of proposed exhibits, consisting of tens of thousands of pages of paper, six of which binders were offered midstream during the course of the April 2021 proceedings.

[46]   Rajaee testified that he wired $1,031,586 out of the LLC account on January 6, 2022, and that he deposited $900,000 of those funds into an account in Canada that he controls and that is not in the LLC's name. *2022 RT 480-481.*

[47]   O'Malley testified that the $3.4 million in payments to Mobile Monster were recorded as "consultant reimbursement expenses" in the LLC ZoHo Books accounting system. *2022 RT 1441; Exhibit 201, p. 4.* The term "consultant reimbursement expenses" is not O'Malley's term. Rather, that was the term used in the ZoHo Books accounting database. *2022 RT 1442.* O'Malley testified that she does not know what types of expenses qualified for coding in this category; that she simply accepted the term and incorporated it into her report and opinion "as it was recorded in the general ledger." *2022 RT 1444.* O'Malley also testified that she was not provided with any documents to verify that the amount was correct or that the expense being reimbursed qualified as a business expense of the LLC; that she was told that "there is limited supporting documentation pertaining to how the [Mobile Monster] invoice amounts were calculated." *Exhibit 201, p. 13.* While O'Malley accepted on faith that the information contained in the general ledger maintained in ZoHo Books was reliable, even in the absence of any supporting evidence to substantiate the amounts and business purpose for the millions of dollars paid

42

interviewing Rajaee for information to fill in the gaps. Based upon O'Malley's postulated reconstruction, O'Malley concluded that (a) the monies paid to Rajaee and his companies were for legitimate business expenses, and (b) the LLC owes money to Rajaee. *Exhibit 201, p. 9 (Table 4).*

While the undersigned Arbitrator appreciated the professionalism and candor of O'Malley, the simple fact of the matter is that O'Malley did not substantiate as an LLC business expense a single transfer out of the LLC's Wells Fargo bank account to or for the benefit of Rajaee or his companies. Rather, what O'Malley did was *postulate* and try to create a *possible* justification for all of the monies the flowed out of the LLC to Rajaee and his companies. The undersigned arbitrator was not persuaded by O'Malley's testimony because it lacked foundation in terms of any concrete evidence. O'Malley's testimony, for the most part, was conjecture based primarily on what Rajaee told her, which she acknowledged she could not corroborate because the documents she requested were not provided to her.

O'Malley reached her opinion based upon what she described as a "reverse engineering" exercise. *2022 RT 1378.* That exercise was predicated on a number of assumptions – starting with the flawed assumption that Rajaee deserved offset credit for the $755,837 transferred into the LLC's Canadian bank accounts in October 2017.[48] It was also predicated on an "analysis" of Rajaee's credit card statements, where she treated charges as LLC expenses based purely upon what Rajaee told her or based on her research into the vendors and her subjective determination that the vendors offered the type of goods and services a software development company *might* use. - *2022 RT 1378-1385.* In this regard, O'Malley testified that she thought her approach was "better" than relying on spreadsheets prepared by Siarra Wood.[49] *2022 RT 1382.*

---

out to Rajaee and his companies in five- and six-figure transactions, the undersigned Arbitrator is not willing to take the same leap of faith.

[48]   *See* discussion in Section 5(C).

[49]   O'Malley's testimony is significant because throughout the course of the Hearing proceedings, Rajaee and his counsel repeatedly referred to Siarra Wood – a former employee of Mobile Monster who lives in Canada and left the company in early February 2021 – as the only one in the world who had the documents and information needed to substantiate and explain the amounts paid out to Rajaee and his companies. On its face, this testimony was not credible that a staff level employee of Mobile Monster would have greater access to or control over the LLC's information than that of Rajaee – the managing member and tax matters partner – even 15 months after that employee terminated her employment with Mobile Monster. Moreover, a review of the Wells Fargo bank statements and the chart analysis (*Exhibit 629*), by date, of the amounts transferred to Davis, Rajaee and their respective companies, shows that almost $3 million of the transfers to Rajaee and his companies occurred after

43

With regard to the SpendHub charges, O'Malley simply *assumed* that whatever Mobile Monster's employees charged to the LLC's SpendHub account were for legitimate expenses of the LLC.[50] *2022 RT 1389-1392; Exhibit 201, pp. 260-274 (Schedules 3 and 3A).* Again, O'Malley reached this conclusion without addressing in any way the five transfers of $50,000 each from the LLC to SpendHub during the five month period of July through November 2021. O'Malley included the transfers in her spreadsheet (Schedules 3 and 3A), but did not explain how or on what basis she determined that these payments to SpendHub were for LLC expenses, what those expenses were or why they were so high for this five-month period.

Overall, in her review and analysis, O'Malley did not adhere to any standard of accounting, nor did she hold Rajaee to any degree of accountability with respect to his position as the managing member and tax matters partners of the LLC. In final analysis, O'Malley's postulated reconstruction is nothing more than a fictionalized account of the LLC's financial dealings with Rajaee and his companies, and offered nothing in the way of substantiating a single one of the numerous, high-dollar transfers out of the LLC's Wells Fargo account to Rajaee and his companies.

Hawes – Davis' expert – is a certified public accountant who has had a 45-year career handling both international and domestic tax clients. *2022 RT 92.* Hawes testified that he represents hundreds of tax clients before the IRS each year. *Id.* Hawes took a very different approach from that of O'Malley. Because Rajaee was the tax matters partner for the LLC, as well as its Manager, Hawes started from the premise that (a) Rajaee was a fiduciary of the LLC and had an obligation to maintain adequate records, (b) the bare minimum record-keeping was that which would satisfy the IRS that the expense being reimbursed to Rajaee or his companies qualified as a business expense of the LLC for deduction purposes, and (c) substantiating documentation of some sort was required because the transactions all involved five- and six-figure expenditures being made to or for the benefit of an insider (Rajaee or his companies). Hawes opined that if Rajaee could not substantiate the business expenses he or his companies purportedly paid on behalf of the LLC, or the basis for any fee charged to the LLC for services by Mobile Monster or SpendHub, then the expenditure does not qualify

---

Ms. Wood's departure from Mobile Monster. See, *Exhibit 629.* Still, Rajaee was unable or unwilling to provide any backup documentation to substantiate the business purpose of any of those transfers.

[50] Notably, O'Malley did not flag or require substantiation for the $250,000 the LLC paid to SpendHub between July and November 2021 in five installments of $50,000 each before validating / accepting them as legitimate LLC business expenses. *See Exhibit 629 and Exhibit 201, p. 260 (Schedule 3).*

44

as a business expense of the LLC from an IRS tax deduction perspective and should thus be charged as a distribution to Rajaee. *2022 RT 116.*

Hawes testified that he requested from Rajaee's team the work papers, schedules and documentation to support the amounts charged by Mobile Monster on its invoices to the LLC, as well as the amounts purportedly paid on the LLC's behalf through SpendHub, and was "informed that there is minimal supporting documentation or none at all." *Exhibit 801, p. 004.* After reviewing all of the records provided to him, as well as the O'Malley report and schedules, Hawes opined that there was inadequate documentation to show that the monies paid to or for the benefit of Rajaee or his companies were legitimate business expenses of the LLC, and that Rajaee should thus be charged with having received a distribution in the amount of the transfers, less credit for his guaranteed salary ($200,000 per year) and the mutually agreed upon $50,000 distribution paid in July 2019. *2022 RT 109; Exhibit 801, pp. 06-008 and 039.*

Hawes opined that that the sum of $7,670,151.00 was paid to or for the benefit of Rajaee or one of his companies, and that this amount should be charged to Rajaee as a distribution which would give him a very significant negative capital account in that amount. *2022 RT 118.* Hawes opined that Rajaee's negative capital account – and resulting surcharge liability to the LLC – was $7.9 million when consideration was given to Rajaee's negative capital account as reported on the LLC's tax returns and after making some adjustments. *Exhibit 801, p. 008; 2022 RT 118.* While it was undisputed that the LLC reported to the IRS that Rajaee had a negative capital account at all times,[51] Hawes did not explain what the negative capital account figure was that he used to calculate the $7.9 million surcharge liability. Accordingly, the determination in this matter is that Rajaee's negative capital account and surcharge liability to the LLC is equal to the sum total of the unsubstantiated transfers to or for the benefit of Rajaee or his companies in the amount of $7,670,151.00; that Rajaee has a negative capital account in said amount.

---

[51] *See* LLC 2017 tax return which reported Rajaee as having a negative capital account in the amount of -$27,961 (*Exhibit 8*); LLC 2018 tax return which reported Rajaee as having a negative capital account in the amount of -$27,961 (*Exhibit 9*); LLC 2019 tax return which reported Rajaee as having a negative capital account in the amount of -$83,722 (*Exhibit 10*); and LLC 2020 tax return which reported Rajaee as having a negative capital account in the amount of -$181,081 (*Exhibit 11*).

It was Rajaee's burden of proof to demonstrate the bona fides of each payment made to or for the benefit of Rajaee or his companies as a proper business expense of the LLC. As discussed above, Rajaee failed to carry his burden of proof. The undersigned Arbitrator notes that even if the burden of proof was on Davis to establish Rajaee's self-dealing, Davis met that burden. Through the evidence presented, Davis showed that there were $7,670,151.00 in unsubstantiated transfers to or for the benefit of Rajaee or his companies. Order No. 4 (Attachment 1 hereto) required that Rajaee turn over to Davis all of the financial books and records of the LLC. Davis and his expert – Hawes – found no substantiation for the transfers in those record, and Hawes found no substantiation in the O'Malley report or any of the Hearing exhibits. The burden thus shifted back to Rajaee the burden to establish that the payments made to or for the benefit of himself or his companies were for legitimate business expenses of the LLC. If such records were not in the LLC's records, one would expect that Rajaee, Mobile Monster, SpendHub or RemotePreneurs would have the backup documentation explaining the business purpose of the expenses purportedly being paid or reimbursed to or on their behalves.

### (d) Rajaee Failed to Establish any Loan Indebtedness Owed to Him by the LLC

Rajaee introduced into evidence a Loan Agreement between the LLC (as borrower) and Rajaee (as lender) with regard to an alleged loan in the amount of $586.081.21. *Exhibit 212.* Rajaee provided no evidence of transfers or advances by him to the LLC to support the making of any loans or advances by Rajaee to the LLC. Accordingly, the alleged loan indebtedness reflected in the aforementioned Loan Agreement is not an outstanding loan owed by the LLC to Rajaee.

### (3) Davis's Contributions, Distributions and Advances and Were Not Disputed

The parties' experts agreed that Davis contributed $750,000 to the LLC. The parties' experts also agreed that in July 2019, the LLC made a distribution to Rajaee and Davis in the amount of $50,000 each. *Exhibit 801, p. 6, Exhibit 629, Exhibit 201, p. 21.* Rajaee testified that in December 2021, a $175,000 distribution was paid to Davis and himself in 2019, but was captured on the LLC's P&L as an expense so as to not report a profit for that year.[52] Both parties' experts agreed that Davis, through his company

---

[52] According to the Wells Fargo bank statement, Mobile Monster received a payment in the amount of $175,109, which amount ties to Mobile Monster Invoice No. 239, and Grigio (a company owned by Davis) received a payment in the amount of $175,000.

46

Grigio, received a $175,113 distribution in 2019 that was booked as an expense for "consulting services." *Exhibit 801, p. 6; Exhibit 629, Exhibit 201, p. 21.* Both parties' experts agreed that Davis, through his company Grigio, received a $25,000 distribution from the LLC in July 2020 that was booked as an expense payment for "consulting services." *Id.* Based upon the foregoing, it is hereby determined that the $250,113 Davis received in payments and distributions from the LLC, as discussed above, were authorized and thus legitimate because (a) Rajaee authorized and initiated the payments as Manager of the LLC, and (b) Davis received and accepted them. There is no surcharge liability resulting from these transfer transactions.

In connection with the winding up of the LLC's affairs after the issuance of Order No. 4, the evidence showed that Davis advanced $269,000 to cover the operating deficit caused by Rajaee's withdrawal of over $1 million from the LLC's operating account on January 6, 2022. The business need for that advance was established, and evidence was presented showing that the funds were actually deposited in the LLC's operating account at Wells Fargo and did not flow back out to Davis or his companies in any fashion. Davis is entitled to be repaid on this advanced in accordance with the provisions of paragraph 9.2(c) of the Agreement as an "outstanding loan[] to Member," and is entitled to accrue interest at the rate of 6% per annum in accordance with the terms of the promissory note signed by the LLC until the loan has been repaid in full. *Exhibits 803, 824, and 826.*

### (4)    Davis's Final Accounting and Partial Final Award in Favor of the LLC Against Rajaee

Davis testified that despite Rajaee's lack of cooperation and direct interference with the windup of the LLC's affairs, he was nevertheless able to gain control over the LLC's finances and affairs. With the help of Joshua Lintz, the former CEO of the LLC (hired by Rajaee in 2020), Davis was able to salvage relationships with the software developer staff and customers for purposes of finishing up work in progress and collecting on those accounts. *2022 RT 59-61.* With the help of Melissa Garcia, the LLC's bookkeeper who was working under Rajaee, Davis was able to migrate the LLC's financial data from ZoHo Books into QuickBooks. With the help of an outside accountant, Joshua Lance, Hawes and Melissa Garcia, Davis was able to get the LLC's books and records in order so as to be able to issue a balance sheet and profit and loss statement. *2022 RT 51-52; Exhibit 800 (March 15, 2022) and Exhibits 823 and 824 (March 31, 2022).* The LLC's accounting records, as migrated and updated through Davis' windup efforts, was reviewed by Hawes, who opined that they were "substantially" accurate and that the balance sheet provided by Davis was a "fair statement" of the LLC's assets and liabilities as of March 2022. *2022 RT 94-95.*

47

The LLC is not a brick-and-mortar business. It is a "virtual business" that largely exists and does business "in the cloud." There are no furniture, fixtures or equipment. The LLC is a specialized staffing company that connects software developers (who are independent contractors) with customers who have software development needs.[53] Its developers and employees all work remotely. The only real assets of the LLC are (a) cash in the bank, and (b) accounts receivable. Rajaee testified that the software developers are assets of the LLC and can be sold, *2022 RT 1800-1804,* but the fact of the matter is that the developers are not chattel and cannot be sold to / forced to work for another company. Rajaee also testified that the contracts with the staffing customers are assets, *2022 RT 1800-1804,* but the evidence showed that the companies who engaged staffing through the LLC did so on a <u>short-term</u> contract basis – i.e., for one or two week assignments. *2022 RT 62.*

The LLC has no hard assets to marshal or sell. It is a specialized staffing company that connects software developers (who are independent contractors) with LLC customers who have software development needs. Davis testified that creditors of the LLC were notified of the dissolution and winding up of the LLC, and that the only significant debts remaining to be paid are:

- the severance liability owed to Joshua Lintz pursuant to the employment contract he negotiated with Rajaee – approximately $1,044,523.87 as of March 31, 2022;

- the contingent liability of Siarra Wood related to her lawsuit against the LLC – approximately $82,812.50 per her last settlement demand;

- the contingent liability of Sara Blanchette related to her lawsuit against the LLC – approximately $44,687.50 per her last settlement demand;

- the legal fees associated with the defense of the lawsuits filed against the LLC by Siarra Wood and Sara Blanchette – approximately $53,117.58;

---

[53]    Rajaee apparently told the CPA Firm something different. Glaser testified that it was her understanding that the LLC was a *marketing company* and was the "U.S. arm of Mobile Monster," to whom Mobile Monster gave referrals. *2022 RT 572.*

48

- • lease liability for the Mercedes Benz being driven by Rajaee, which is up in July 2022 - approximately $4,077, which Davis testified he intends to pay; and

- • the ordinary course loans Davis made in January and February 2022, totaling $269,000, to cover payroll associated with the winding up of the LLC's affairs.

*Exhibit 824.*

In order to finish up the work that was in progress as of January 6, 2022, and to collect on the outstanding receivables owed by customers related to those projects, Davis contracted with TalentCrowd, a company started by Joshua Lintz after he left the LLC in early 2022.[54] For a monthly management fee of $2,500, TalentCrowd has supplied the developers to the LLC's remaining projects and has passed through the developers' fees at cost. The LLC has then invoiced the customer with a markup. Davis testified that the LLC's relationship with TalentCrowd is expected to come to an end with the last work being completed and billed by the end of May. It is estimated that the LLC will close its books with approximately $850,000.00 in receivables on its books, of which several customers have told Davis they will not pay their bills unless and until the disputes between Davis and Rajaee are resolved. *Exhibit 824; 2022 RT 1920.*

Based upon the foregoing, Davis's final accounting as set forth in Exhibits 823 and 824, and as testified to during the April 2022 Hearing proceedings, was approved, and a Partial Final Award on Davis' bifurcated First Counterclaim for dissolution and final account of the LLC was issued, which provided, in pertinent part, as follows, and is incorporated herein by this reference:

"5.2    Respondent    Tyler    B.    Davis'    final    accounting    and reconciliation of the financial affairs of TopDevz, LLC, based on the March 31, 2022, accounting – *Exhibits 823 and 824* – is hereby approved and affirmed, and TopDevz, LLC is ordered to be finally dissolved. Davis is

---

[54]  Joshua Lintz was the CEO of the LLC, hired by Rajaee pursuant to a written agreement that Rajaee negotiated and put into place. Under the terms of Mr. Lintz's contract with the LLC, he is entitled to a severance payment of equal to the sum of 12 months of his base salary, 12 months of medical benefits, past due incentive compensation and 12 months of incentive compensation, which Davis computed as an LLC liability in the amount of $1,374,523.87. *Exhibit 805, ¶ 6 and Exhibit 827.* Pursuant to the terms of Lintz's employment agreement, Lintz has no restrictions on his right to compete with or work for a competitor of the LLC should his employment be terminated. *Exhibit 805, ¶ 4.*

49

charged with both the responsibility and authority to continue with the wind-up of the LLC's affairs, including but not limited to the collection of receivables, the settlement and payment of contingent liabilities, the collection of the surcharge amount owed by Ashkan Rajaee, and making distributions of profits, if any, to members in accordance with the terms of the Agreement.

5.3     The only outstanding member loan owed by the LLC is the $269,000 loan by Tyler B. Davis. The LLC's loan indebtedness to Davis shall accrue interest at the rate of 6% per annum until paid in full.

5.4     There is no evidence of an outstanding loan owed by TopDevz, LLC to Ashkan. The validity and enforceability of the purported loan agreement between the TopDevz, LLC and Ashkan (*Exhibit 212*) is denied.

5.5     Ashkan Rajaee is hereby surcharged in the amount of Seven Million Six Hundred Seventy Thousand One Hundred Fifty-One Dollars ($7,670,151.00) for excess distributions paid to or for the benefit of Ashkan Rajaee or his companies, which sum Ashkan Rajaee is obligated and hereby ordered to pay to the TopDevz, LLC in order to bring his negative capital account to zero.

5.6     Ashkan Rajaee is hereby ordered to return to TopDevz, LLC, care of Tyler B. Davis, the $900,000.00 he is holding in a bank account in Canada.[55] Upon return of those funds, Ashkan Rajaee's surcharge liability shall be reduced by the dollar amount Ashkan Rajaee returns to the LLC.

5.7     In winding up the affairs of TopDevz, LLC, Tyler B. Davis is instructed to follow the terms of the Agreement. Distributions of profits, if any, shall be in accordance with the members' Percentage Interests, as determined by this Award in Section 3(C)(1).

---

[55]     According to testimony Rajaee gave on April 6, 2022, he "has not spent one cent of [the $900,000]." *2022 RT 503.*

50

5.8     Whether there is a prevailing party for purposes of making an award of reasonable attorney's fees and costs is reserved until the conclusion of this arbitration, and, if such an award is in order, such matters shall be included in the determination of the remaining damages claims, counterclaims and affirmative defenses.

5.9     Whether there is a prevailing party for purposes of making an award of the administrative fees of the International Centre for Dispute Resolution (ICDR) and the compensation and expenses of the arbitrator is reserved until the conclusion of this arbitration, and, if such an award is in order, shall matters shall be included in the determination of the remaining damages claims, counterclaims, and affirmative defenses.

5.10    The issuance of this Partial Final Award concludes the proceedings and determinations related to the dissolution and accounting *of the LLC, and fully and finally determines Davis' first counterclaim for* relief. Pursuant to California Code of Civil Procedure section 1283.4, this Partial Final Award includes a determination of all questions submitted by the parties to the Arbitrator concerning Davis' first counterclaim for dissolution and final accounting of the LLC, the decision of which was necessary in order to determine said controversies.

5.11    The Arbitrator expressly reserves jurisdiction to hear and determine the parties' remaining damages claims, counterclaims and affirmative defenses, which were bifurcated for later hearing and determination pursuant to Order No. 6."

## 6.    Davis is Entitled to an Award of Compensatory Damages on His Breach of Fiduciary Duty and Fraud Counterclaims Against Rajaee

### A.    Introductory Statement

In his counterclaim, Davis asserted four claims for relief: 1. Dissolution and final accounting,  2. breach of  fiduciary  duty,  3. misrepresentation  and  fraud,  and 4. constructive trust and injunction.

Davis's counter-claim for dissolution and final accounting of the LLC was resolved through the proceedings discussed in Sections 4 and 5, above.

51

On February 21, 2023, Davis served a Notice of Withdrawal in which he withdrew his claim for constructive trust and injunction, as well as his request for punitive damages.

What was left for determination in connection with the March 2023 evidentiary proceedings were Davis's counterclaims for breach of fiduciary duty and fraud.

### B.   Breach of Fiduciary Duty Counterclaim (Second Claim for Relief)

The elements of a claim of breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) breach of a fiduciary duty, and (3) damage proximately cause by the breach. *Knox v. Dean*, 205 Cal. App. 4th 417, 432-33 (2012).

As discussed in Section 3, above, the evidence showed that under the terms of the Agreement, Rajaee was designated as the LLC's Manager. *See Section 3, ¶ 12.* The evidence also showed that Rajaee accepted the position as Manager of the LLC, and acted as the Manager and "tax matters partner" of the LLC from its inception through the date of the evidentiary hearing proceedings on Davis' Petition. *Id.*

As the manager of the LLC, Rajaee owed fiduciary duties to the LLC and to its Members. *Cal. Corp. Code § 17704.09(a), (b).* Among those duties was (a) the duty to maintain proper books and records for the LLC, (b) the duty to refrain from using the LLC's revenues and other assets for his personal benefit to the detriment of the LLC, (c) the duty to substantiate the bona fides of any self-interested transactions between the LLC, on the one hand, and Rajaee or his companies, on the other, and (d) the duty to render a final accounting to Davis for the LLC as of year-end 2021. As discussed in Section 4, above, Rajaee breached all of these duties.

The damage to the LLC is that, due to Rajaee's mismanagement of the LLC's affairs, the LLC's finances were inextricably intertwined with the personal finances of Rajaee and the finances of Rajaee's various companies, for which Rajaee has been surcharged $7,670,151 as a liability Rajaee owes to the LLC for unsubstantiated transfers made to or for the benefit of Rajaee or his companies. The additional damage to the LLC was caused when Rajaee (a) improperly invaded the LLC's Wells Fargo account after Order No. 4 was issued, and (b) refused, and continues to refuse, to return the $900,000 Rajaee testified his simply took and has been holding in a bank account in Canada. *2022 RT 480-481.* Both elements of damages were addressed in the prior orders, which are included in Section 9 of this Final Award.

52

**EXHIBIT 1, Page 74**

The damage to Davis is that, as a result of Rajaee's (a) mismanagement of the LLC's affairs and (b) defalcation of the $1,031,586.76 Rajaee caused to be wired out of the LLC's Wells Fargo Bank Account (Number 1756821128) on January 6 and 7, 2022, a chain of events was put in motion that led to the dissolution and forced closure of the LLC and resulted in Davis losing his net capital investment in the LLC ($537,127)[56] and resulted in lost opportunity damages ($329,430),[57] for a total compensatory loss of $866,557. *Hawes Testimony, March 20, 2023.*

### C.    Misrepresentation and Fraud Counterclaim (Third Claim for Relief)

The gravamen of Rajaee's wrongdoing was his breach of the fiduciary duties he owed to the LLC and to Davis as the Manager and tax matters partner of the LLC. Included among those breaches were Rajaee's acts of concealment and misrepresentation concerning (a) the true state of affairs of the LLC's finances, and (b) his numerous self-dealing transactions. Those breaches have been extensively chronicled in Sections 3, 4 and 5, above. However, what bears noting in this section of the Final Award is the fact that Rajaee's fraud upon Davis was endemic to the relationship, and was put in motion from the very beginning – starting with the secret accounts Rajaee opened for the LLC in Canada and used to transfer monies between the LLC and Mobile Monster between August 2017 and April 2019, without Davis's knowledge or approval. These accounts and transfer transactions only first came to light during the course of the evidentiary hearing proceedings conducted in April 2022, and even at this late date of disclosure, Rajaee was unable or unwilling to (a) provide a complete set of bank statements, or (b) explain how these transactions – many of which were six figures - benefitted the LLC. *See Section 5(C)(1).* Davis testified that had he known of Rajaee's intentions to commingle the finances and affairs of the LLC with those of Rajaee and Mobile Monster, he never would have entered into the LLC relationship with Rajaee. Despite his many days of testimony, Rajaee had no plausible explanation for his actions or concealments.

---

[56] Davis's net capital investment in the LLC was calculated by Davis's expert – Michael S. Hawes, CPA – by adding Davis's total investments in the LLC ($787,240), minus the returns he received from the LLC in April 2019 ($175,113), July 2019 ($50,000) and July 2020 ($25,000.

[57] The lost opportunity loss was calculated by Davis's expert – Michael S. Hawes, CPA – using the Dow Jones Industrial Average to compute on a conservative basis what Davis's net capital investment in the LLC could have earned had they been invested in an investment which tracked the Dow Jones Industrial Average.

The damage to Davis is that he invested $787,240 in the LLC that he otherwise could have invested elsewhere. As a result of Rajaee's (a) mismanagement of the LLC's affairs and (b) defalcation of the $1,031,586.76 Rajaee caused to be wired out of the LLC's Wells Fargo Bank Account (Number 1756821128) on January 6 and 7, 2022, a chain of events was put in motion that led to the dissolution and forced closure of the LLC and resulted in Davis losing his net capital investment in the LLC ($537,127).[58] Davis is entitled to recover his net lost investment, plus lost opportunity damages ($329,430),[59] for a total compensatory loss of $866,557. *Hawes Testimony, March 20, 2023.*

This award is not in addition to the compensatory damages awarded on Davis's breach of fiduciary duty claim.

### 7.    Rajaee's Claims Against Davis Are Denied Because Rajaee Failed to Carry His Burden of Proof on Any of His Asserted Claims

#### A.    Introductory Statement

Rajaee's claims against Davis all sounded in tort and were set forth in his Amended Demand, dated August 4, 2021. The Amended Demand stated claims for defamation per se (first claim for relief), civil extortion (second claim for relief), intentional infliction of emotional distress (third claim for relief), intentional interference with contract (fourth claim for relief), intentional interference with prospective business advantage (fifth claim for relief), negligent interference with prospective business advantage (sixth claim for relief), and breach of fiduciary duty (seventh claim for relief).

Rajaee's Amended Demand also included an eighth claim for relief stated on behalf of the LLC against Davis for alleged breach of fiduciary duty. As discussed in Section 1, footnote 6, above, on or about December 15, 2022, counsel for the LLC submitted and served a notice of dismissal with prejudice of the Eighth Claim for Relief, and confirmed that dismissal during the March 20, 2023, hearing proceedings.

---

[58]  Davis's net capital investment in the LLC was calculated by Davis's expert – Michael S. Hawes, CPA – by adding Davis's total investments in the LLC ($787,240), minus the returns he received from the LLC in April 2019 ($175,113), July 2019 ($50,000) and July 2020 ($25,000.

[59]  The lost opportunity loss was calculated by Davis's expert – Michael S. Hawes, CPA – using the Dow Jones Industrial Average to compute on a conservative basis what Davis's net capital investment in the LLC could have earned had they been invested in an investment which tracked the Dow Jones Industrial Average.

54

This section of the Final Award addresses Rajaee's claims against Davis, all of which fail for lack of evidence. As discussed in Section 1, above, the evidentiary hearing proceedings conducted in April 2022 with respect to the final accounting on Davis' Petition for dissolution and final accounting, were significantly expanded, at Rajaee's request, to allow Rajaee to present evidence on a broad array of subjects, including (a) the transactions and events leading Rajaee and Davis to enter into a business relationship through the formation of the LLC, (b) Rajaee's operation of the LLC, (c) the transactions and events leading to the demise of the parties' relationship in February 2001, and (d) Rajaee's operation of the LLC after problems arose in his relationship with Davis. Despite the breadth of that evidence-taking and the opportunity to present additional evidence at the March 2023 evidentiary hearing proceedings, Rajaee failed to present any evidence supporting his tort claims against Davis. Rather, Rajaee's offerings were singularly focused on voicing his objections to the proceedings conducted in this arbitration.

## B.    Rajaee's Claim Against Davis for Defamation Per Se

Defamation per se occurs when a false statement is made to someone other than the plaintiff that is so inherently damaging to one's reputation, that the plaintiff need not prove that he or she suffered actual damages as a result of the statement. Statements that "tend to expose the plaintiff to public hatred, contempt, ridicule, aversion, or disgrace, and to induce an evil opinion of him in the minds of right-thinking persons and deprive him of their friendly intercourse or society" are the type of statement needed to establish a claim for defamation per se. *Jimeno v. Commonwealth Home Builders*, 47 Cal. App. 660 (1920); Cal. Civ. Code § 45; CACI No. 1702.

No where in his evidence did Rajaee identify any false statements purportedly made by Davis, nor did Rajaee identify any person(s) to whom Davis purportedly made false statements about Rajaee. The only evidence Rajaee offered about statements Davis made to others concerned Davis's efforts to marshal and administer the affairs of the LLC after dissolution was ordered pursuant to Order No. 4, and Davis's sharing of findings made in Order Nos. 4 and 5. Those statements were privileged under California Civil Code section 47. To the extent Davis may have repeated the contents of Order Nos. 4 and/or 5 to customers, vendors and/or employees of the LLC, those acts were likewise privileged. They were also necessary to countermand the actions taken by Rajaee to resist and frustrate Davis's implementation of the dissolution order, as discussed in Sections 4 and 5, above.

Rajaee's defamation claim is denied for lack of evidence.

55

### C.    Rajaee's Claim Against Davis for Civil Extortion

The lynch pin of a civil extortion claim is fear induced by the use of force or threat that results in the plaintiff giving up property to the defendant that he or she otherwise would not have parted with. *Flatley v. Mauro*, 39 Cal. App. 4th 299, 305 (2006); *Stenehjem v. Sareen*, 226 Cal. App. 4th 1404, 1414-1415 (2014); Cal. Pen. Code §§ 518-519.

During the course of the evidentiary proceedings conducted in this arbitration, there was no evidence that Davis used force or threats to obtain anything from Rajaee. To the contrary, the evidence showed that once Davis and Rajaee found themselves in disagreement about the management and affairs of the LLC in or about February 2001, Rajaee's response was to (a) lock Davis out of the LLC, (b) refuse to have any contact or communication with Davis except through attorneys, and (c) continue to use LLC monies to fund his lifestyle, including having the LLC rent a jet that was purchased by Rajaee through his wholly-owned company (RemotePreneurs) and giving himself a $175,000 raise in guaranteed salary after Davis filed the Sacramento Action seeking to dissolve the LLC.

The facts and circumstances concerning the relationship between Davis and Rajaee, as established by the evidence discussed in Sections 3, 4 and 5, above, simply do not support Rajaee's claim of extortion. Accordingly, Rajaee's extortion claim is denied for lack of evidence.

### D.    Rajaee's Claim Against Davis for Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress, the complaining party must prove (1) extreme or outrageous conduct by the defendant, (2) intent by the defendant to cause harm by his or her extreme or outrageous conduct, (3) emotional distress suffered by the plaintiff, and (4) a causal connection between defendant's conduct and plaintiff's emotional distress. *Hughes v. Pair*, 46 Cal.4th 1035, 1050-1051 (2009); CACI No. 1600.

Rajaee failed to present evidence establishing *any* of the elements for a claim of intentional infliction of emotional distress, starting with the first required element: namely, extreme or outrageous conduct by Davis. There was no evidence of such conduct by Davis. In late 2020, early 2021, Davis and Rajaee had disagreements about how Rajaee was spending the LLC's money and managing the LLC's affairs. As discussed

56

in Section 6(C), above, once Davis and Rajaee found themselves in this disagreement, Davis told Rajaee that he wanted to part ways in or about February 2001. Rajaee's response was to (a) lock Davis out of the LLC, and (b) refuse to have any contact or communication with Davis except through attorneys. Rajaee presented no evidence of any extreme or outrageous conduct by Davis directed towards him. In fact, throughout the course of the parties' relationship through the LLC, there was very little evidence of any direct dealings between the two beyond short texts and emails, none of which contained extreme or outrageous messages.

Rajaee's emotional distress claim is denied for lack of evidence.

### E.    Rajaee's Claim Against Davis for Intentional Interference with Contract

To establish a claim for intentional infliction of emotional distress, the complaining party must prove (1) the existence of a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990).

Rajaee failed to present evidence establishing *any* of the elements for a claim of intentional interference with contract, starting with the first required element: namely, the existence of a valid contract between Rajaee and a third party that was allegedly disrupted by Davis.

Rajaee's contract interference claim is denied for lack of evidence.

### F.    Rajaee's Claim Against Davis for Intentional Interference with Prospective Business Advantage

To establish a claim for intentional interference with prospective business advantage, the complaining party must prove (1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action." *Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.*, 2 Cal.5th 505, 512 (2017).

57

Rajaee failed to present evidence establishing *any* of the elements for a claim of intentional interference with contract, starting with the first required element: namely, the existence of an economic relationship between Rajaee and a third party that had the probability of producing future economic benefit to Rajaee.

Rajaee's interference with prospective business advantage claim is denied for lack of evidence.

### G.   Rajaee's Claim Against Davis for Breach of Fiduciary Duty

To establish a claim for breach of fiduciary duty, the complaining party must prove (1) the existence of a fiduciary relationship, (2) breach of a fiduciary duty, and (3) damage proximately caused by the breach. *Knox v. Dean,* 2 Cal. App. 4th 417, 432-433 (2012); CACI 4100; Cal. Civ. Code § 1573.

The parties do not dispute that, through their relationship as members of the LLC, they stood in a fiduciary relationship with one another. As discussed above, it was Rajaee – not Davis – who failed to fulfill his fiduciary duties. Rajaee failed to provide evidence of any sort of breach of duty by Davis.

Rajaee's breach of fiduciary duty claim is denied for lack of evidence.

### H.   The LLC's Claim Against Davis for Breach of Fiduciary Duty

As discussed above, the LLC voluntarily dismissed its claim against Davis for breach of fiduciary duty. However, during the course of the March 2023 evidentiary hearing proceedings and in its closing brief, the LLC requested that the turnover order directed to Rajaee concerning the $1,031,586 Rajaee caused to be wired out of the LLC's account at Wells Fargo Bank, Account Number 1756821128, on January 6 and January 7, 2022, into accounts maintained or controlled by Rajaee in Canada, be confirmed as an award in this Final Award. The LLC also requested that the surcharge liability assessed against Rajaee in the amount of $7,670,151.00 for excess distributions paid to or for the benefit of Rajaee or his companies be confirmed as a compensatory award against Rajaee in this Final Award.

58

8.   **Davis is Entitled to an Award of His Attorney's Fees and Costs as the Prevailing Party in this Arbitration**

   A.   **Introductory Statement**

   While California follows what is commonly referred to as "the American Rule," which provides that each party to a lawsuit must ordinarily pay its own attorney's fees and costs, *Trope v. Katz*, 11 Cal. 4th 274, 278 (1995), a prevailing party is entitled to recover its attorney's fees and costs when authorized by statute or contract." *Bear Creek Planning Committee v. Ferwerda*, 193 Cal. App. 4th 1178, 1185 (2011); *Cal. Civ. Code § 1717.*

   Pursuant to California Code of Civil Procedure section 1021, where parties agree to the allocation of attorney's fees and/or costs, the measure and mode of such "compensation" – or cost shifting – is as provided in the parties' agreement. Case law construing section 1021 has held that parties to a contract may validly agree that the prevailing party may be awarded attorney's fees and/or costs in litigation between themselves, whether sounding in contract or tort. *Xureb v. Marcus & Millichap, Inc.*, 3 Cal. App. 4th 1338, 1342 (1992).

   The Agreement governing Davis's and Rajaee's business relationship as members of the LLC contains a broadly stated arbitration clause requiring arbitration of "[a]ny action to enforce or interpret this Agreement, or to resolve disputes with respect to this Agreement between the Company and a Member, or between or among the Members." *Davis Exhibit 2, ¶ 11.2.* The Agreement goes on to provide that "[t]he parties will share equally all initial costs of arbitration, and that "[t]he prevailing party will be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration." *Id.*

   Based upon the wording of the parties' arbitration agreement, the award of attorney's fees and costs is mandatory – not discretionary – if there is a prevailing party.

   An award of attorney's fees and costs to the prevailing party is also in order because, at the outset of this arbitration, the parties agreed at the scheduling conference conducted on September 8, 2023, that they both were seeking an award of their attorney's fees and costs in this matter if they were the prevailing party, even though their respective claims and counterclaims sounded primarily in tort. *See* Order No. 2, § I, ¶ 2.3.

59

**B.    Davis is the Prevailing Party in this Arbitration and is Entitled to Reimbursement of His Attorney's Fees and Costs**

Davis is the prevailing party in this arbitration because he prevailed on all of his counterclaims and defeated all of Rajaee's claims, as discussed in Sections 3, 4, 5, and 7, above. As such, this Final Award thus represents a "simple, unqualified win" for Davis.

Davis was represented primarily by two counsel in this matter: Scott Carpenter, of Cummins & White, and Joseph W. Scalia. *See Exhibits 838 and 839.* According to his declaration (*Exhibit 838),* Mr. Carpenter was assisted by another attorney at his firm (Edward Farrell) and a paralegal (Shannon Thompson). In connection with the evidentiary hearing proceedings scheduled for March 2023, Davis included in his hearing exhibits declarations by Messrs. Carpenter and Scalia setting forth their respective firms' attorney's fees and costs as charged to Davis in this arbitration. *Exhibits 838 and 839.* Davis has thus submitted ample evidence through the declarations of Messrs. Carpenter and Scalia, and through the invoices attached thereto, to support Davis's contention that he incurred $785,845 in attorney's fees[60] and $14,440.55 in costs[61] in successfully prevailing in this arbitration. At the March 20, 2023, hearing, Davis testified that he has paid all of the law firms' invoices in full, and the invoices attached to the declarations corroborate such payments as having been made.

The only objection raised by Rajaee to the attorney's fees and costs set forth in the declarations of Messrs. Carpenter and Scalia was his concern/objection that those charges included legal services rendered in connection with proceedings in one or more of the related state court actions. In response to Mr. Rajaee's objection, the Arbitrator ordered Messrs. Carpenter and Scalia to submit and serve supplemental declarations detailing and culling out any time charges or costs related to the state court proceedings. Such declarations were submitted and served on or about March 31, 2023, and show the following:

---

[60]  This figure is the sum of the attorney's fees requested by Mr. Carpenter's firm ($501,311.50) and the attorney's fees requested by Mr. Scalia's firm ($284,533.50). *Exhibit 838 and 839.*

[61]  This figure is the sum of the costs requested by Mr. Carpenter's firm ($13,970.55) and the costs requested by Mr. Scalia's firm ($470). *Exhibit 838 and 839.*

       a.      Mr. Carpenter's firm's invoices attached to his original declaration included $68,548.50 in time charges and $1,849.41 in costs related to legal services rendered in connection with one or more of the related state court actions.

       b.      Mr. Scalia's firm's invoices attached to his original declaration included $11,919 in time charges and $470 in costs related to legal services rendered in connection with one or more of the related state court actions.

Mr. Rajaee's objection to the inclusion of time charges and costs for legal services rendered to Davis in connection with the related state court proceedings is sustained. Accordingly, the time charges and costs discussed in the March 31, 2023, declarations of Mr. Carpenter and Mr. Scalia are not eligible for reimbursement as attorney's fees and costs incurred in connection with this arbitration.

### C. Davis is Entitled to an Award of $717,498.64 as Reasonable Attorney's Fees and Costs in this Arbitration

The generally accepted manner for determining what qualifies as "reasonable" attorney's fees is the "lodestar" method. *Ketchum v. Moses*, 24 Cal. 4th 1122, 1131-1132 (2001). This is a method whereby a determination is made with regard to (a) what constitutes a reasonable number of hours for those activities found to be compensable, and (b) what constitutes a reasonable hourly rate.[62] The reasonable number of hours is then multiplied by the reasonable hourly rate to yield the amount of the attorney's fees to be awarded. *Id.; Lunada Biomedical v. Nunez*, 230 Cal. App. 4th 459, 486 (2014). What constitutes a reasonable attorney's fees award in a particular case is a fact-specific inquiry. In this regard, the California Supreme Court has identified a number of factors that may be considered. *PLCM Grp. v. Drexler*, 22 Cal. 4th 1084 (2000). Those factors include:

---

[62]  According to the declarations of Messrs. Carpenter and Scalia, their hourly rates are $480 to $545, for Mr. Carpenter during the life of this matter, and $435, for Mr. Scalia. Mr. Carpenter and Mr. Scalia have over 20 years of business litigation experience. The Arbitrator is familiar with the rates being charged by experienced business litigators in Southern California. Those rates range between $400 per hour and $1,000 per hour. Accordingly, the rates charged by Messrs. Carpenter and Scalia for their services in this arbitration are within range at the low end of the rate spectrum, and thus reasonable. The same is true for the attorney (Edward Farrell, class of 2008) and the paralegal (Shannon Thompson, 20+ years of experience). Mr. Farrell billed at the rate of $495 per hour and Ms. Thompson billed at the rate of $290 per hour. Both are within range of the rate spectrum for such support services.

a.    the nature of the litigation

b.    the difficulty / complexity of the case

c.    the amount in controversy

d.    the skill required to handle the case

e.    the skill actually employed in the case

f.    the attention given to the case

g.    the success or failure of the attorneys' efforts

*Id.* at 1096.

All of the above factors were in play in this arbitration:

a.    The nature of the litigation was that it involved disputes between members of a limited liability company concerning financial affairs of the company where (a) one member (Davis) had no access to the LLC's books and records, and (b) one member (Rajaee) had total control over the LLC's books and records and either reported inaccurately or failed or refused to report at all concerning the company's financial affairs and dealings. As such, the nature of the dispute was that it was essentially a forensic accounting dispute between the LLC's members.

b.    The subject matter of the dispute was difficult / challenging because it required the parties' counsel (and the Arbitrator) to delve into several areas, including the customs and practices of a software development company, the relationships between the LLC and Rajaee's various companies, and the legal and tax requirements for tracking legitimate business expenses.

c.    As discussed in Sections 4 and 5, the amounts in controversy were significant and involved tracing the millions of dollars that flowed out of the LLC to Rajaee or one of his companies.

62

d.      The skill required to handle the case (on both sides of the dispute) was high with regard to legal knowledge and trial experience.

e.      The skill actually employed in the case was high on both sides of the dispute in terms of the legal knowledge and trial experience of the members of each side's legal team.

f.      The attention given to the case was significant due in part to the expedited nature of the bifurcated proceedings concerning Davis's Petition and the exigencies created when Rajaee violated Order No. 4 and refused to cooperate in the final accounting.

g.      The efforts of Davis's legal team were successful.

Based on the foregoing, Davis is entitled to recover from Rajaee his reasonable attorney's fees and costs in the amount of $717,498.64, which figure is the sum of the difference between:

a.      the original attorney's fees requested by Mr. Carpenter of $501,311.50, less the $68,548.50 in time charges related to legal services rendered in connection with one or more of the related state court actions;

b.      the original attorney's fees requested by Mr. Scalia of $284,533.50, less the $11,919 in time charges related to legal services rendered in connection with one or more of the related state court actions;

c.      the original costs requested by Mr. Carpenter of $13,970.55, less the $1,849.41 in costs related to legal services rendered in connection with one or more of the related state court actions; and

d.      the original costs requested by Mr. Scalia of $470, less the $470 in costs related to legal services rendered in connection with one or more of the related state court actions.

63

9.    **Final Award**

    A.    **Dissolution of the LLC**

        1.    Davis owns 95.308% of the capital interest in the LLC, and Rajaee owns 4.692% of the capital interest in the LLXC. Davis thus owns the majority of the Percentage Interests in the LLC for voting purposes and has the right to elect to dissolve the LLC without the consent and over the objection of Rajaee. Through his filing of the Petition, Davis exercised his right to dissolve the LLC, and dissolution of the LLC is ordered / awarded, effective as of January 6, 2022.

        2.    Alternatively, protective dissolution of the LLC under Corporations Code section 17707.03(b)(4) is appropriate because it was demonstrated that management of the LLC was deadlocked. Based upon Davis' request that the LLC be dissolved and the finding of deadlock and internal dissension within the management of the LLC, dissolution of the LLC is ordered / awarded, effective as of January 6, 2022, pursuant to paragraph 9.1 of the Agreement and Corporations Code sections 17707.01(a) and 17707.03(b)(4).

        3.    In accordance with paragraph 9.2 of the Agreement, the LLC is not to engage in any further business other than that necessary to wind up the business and affairs of the LLC.

        4.    Davis, and only Davis or his designee, shall be responsible for managing, overseeing, and completing the dissolution of the LLC from January 6, 2022, forward, and only Davis, or his designee, shall have the authority to take those actions necessary to accomplish the dissolution of the LLC in accordance with the provisions of Order No. 4, attached hereto as Attachment 1 and incorporated into this Final Award by this reference.

        5.    Rajaee is ordered removed as Manager of the LLC, effective as of January 6, 2022, and only Davis or his designee shall replace Rajaee as Manager of the LLC.

64

## B.    Compensatory Award in Favor of the LLC for Rajaee's Violation of Order Nos. 4 and 5

1.    Rajaee violated Order No. 4 when he wrongfully and without authority transferred the sum of $1,031,586 out of the LLC's account at Wells Fargo Bank, Account Number 1756821128, on January 6 and January 7, 2022, into accounts maintained or controlled by Rajaee in Canada. Only Davis or his designee, had the authority to access, disburse funds from, open and close bank and other financial accounts belonging to or standing in the name of the LLC from approximately 2:00 p.m. on January 6, 2022, forward.

2.    Pursuant to Order No. 5, attached hereto as Attachment 2 and incorporated into this Final Award by this reference, Rajaee was ordered to immediately return and/or replenish to the LLC, care of Davis, the $900,000.00 he transferred to himself at approximately 11:00 p.m. on January 6, 2022, as well as the $131,586.76, transferred out as an "international money transfer debit" on January 7, 2022, which Rajaee admitted was wired to his company (Mobile Monster).

3.    Rajaee has failed and refused to return the sum of $1,031,586 to the LLC, as ordered. Accordingly, TopDevz LLC is entitled to a compensatory damages award against Ashkan Rajaee in the amount of $1,031,586.

## C.    Final Accounting and Surcharge Liability Assessed Against Rajaee in Favor of the LLC

1.    Respondent Tyler B. Davis' final accounting and reconciliation of the financial affairs of TopDevz, LLC, based on the March 31, 2022, accounting – *Exhibits 823 and 824* – is hereby approved and affirmed, and TopDevz, LLC is ordered to be finally dissolved.

2.    Davis is charged with both the responsibility and authority to continue with the wind-up of the LLC's affairs, including but not limited to the collection of receivables, the settlement and payment of contingent liabilities, the collection of the surcharge amount owed by Ashkan Rajaee, and making distributions of profits, if any, to members in accordance with the terms of the Agreement.

65

3.      The only outstanding member loan owed by TopDevz LLC is the $269,000 loan it received from Tyler B. Davis 2022. The LLC's loan indebtedness to Davis shall accrue interest at the rate of 6% per annum until paid in full.

4.      There is no evidence of an outstanding loan owed by TopDevz, LLC to Ashkan Rajaee. The validity and enforceability of the purported loan agreement between the TopDevz, LLC and Ashkan Rajaee (*Exhibit 212*) is denied for lack of evidence of a consideration having flowed from Ashkan Rajaee to TopDevz LLC.

5.      Ashkan Rajaee is hereby surcharged in the amount of Seven Million Six Hundred Seventy Thousand One Hundred Fifty-One Dollars (US $7,670,151.00) for excess distributions paid to or for the benefit of Ashkan Rajaee or his companies, which sum Ashkan Rajaee is obligated and hereby ordered to pay to the TopDevz, LLC in order to bring his negative capital account to zero.

6.      Ashkan Rajaee is hereby ordered to return to TopDevz, LLC, care of Tyler B. Davis, the $900,000.00 he is holding in a bank account in Canada.[63] Upon return of those funds, Ashkan Rajaee's surcharge liability shall be reduced by the dollar amount Ashkan Rajaee returns to the LLC.

7.      In winding up the affairs of TopDevz, LLC, Tyler B. Davis is instructed to follow the terms of the Agreement, as well as the orders issued in this arbitration and this Final Award. Distributions of profits, if any, shall be in accordance with the members' Percentage Interests, as determined by this Final Award.

---

[63]    According to testimony Rajaee gave on April 6, 2022, he "has not spent one cent of [the $900,000]." *2022 RT 503.*

66

### D.   Compensatory Damages Award In Favor of Davis on Davis's Tort Counterclaims

Davis is the prevailing party on his breach of fiduciary duty and misrepresentation / fraud claims against Rajaee. As such, Davis is entitled to an award of compensatory damages in the amount of Eight Hundred Sixty-Six Thousand Five Hundred Fifty-Seven Dollars (US $866,567.00).

### E.   Denial of Rajaee's Claims in Their Entirety for Lack of Evidence

Rajaee's counterclaims for defamation per se (first claim for relief), civil extortion (second claim for relief), intentional infliction of emotional distress (third claim for relief), intentional interference with contract (fourth claim for relief), intentional interference with prospective business advantage (fifth claim for relief), negligent interference with prospective business advantage (sixth claim for relief), and breach of fiduciary duty (seventh claim for relief) are denied in their entirety.

### F.   Award of Attorney's Fees and Costs to Davis as the Prevailing Party in this Arbitration

1.     Davis is the prevailing party on his counterclaims against Rajaee and on Rajaee's claims against Davis. Accordingly, Davis is entitled to an award of attorney's fees and costs in the amount of Seven Hundred Seventeen Thousand Four Hundred Ninety-Eight Dollars and Sixty-Four Cents (US $717,498.64).

2.     Additionally, the administrative fees of the International Centre for Dispute Resolution totaling US $37,950.00, and the compensation of the Arbitrator totaling US $109,625.00 shall be borne by Rajaee. Therefore, Rajaee shall reimburse Davis the sum of US $119,350.00, representing that portion of said fees in excess of the apportioned cost previously incurred by Davis.

### G.   Miscellaneous

1.     Within thirty (30) days from the date of transmittal of this Final Award to the parties, Rajaee shall pay:

a.     to the LLC, the sum of Seven Million Six Hundred Seventy Thousand One Hundred Fifty-One Dollars (US $7,670,151.00); and

67

      b.     to Davis, the sum of One Million Seven Hundred Four Thousand Four Hundred Fifteen Dollars and Sixty-Four Cents (US $1,704,415.64), which represents US $866,567.00 in compensatory damages, US $717,498.64 in attorney's fees and costs, and US $119,350.00 in arbitration administration fees and arbitration compensation.

      2.     This Final Award is in full settlement of all claims, counterclaims and requests for relief submitted in this arbitration. All claims, counterclaims and requests for relief not specifically addressed above are hereby denied in their entirety.

      3.     The issuance of this Final Award concludes the proceedings in this arbitration.

      I hereby certify that, for the purpose of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in the City of San Diego, State of California, United States of America.

Dated: 12 May 2023.

                                          Rebecca Callahan, Arbitrator

      I, the undersigned Arbitrator, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

Dated: 12 May 2023.

                                          Rebecca Callahan, Arbitrator

68

# ATTACHMENT 1

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitral Tribunal

In the Matter of the Arbitration Between:

Ashkan Rajaee and TopDevz, LLC, a California Limited Liability Company,

Claimants and Counter-Respondents,

- vs -

Tyler Davis,

Respondent and Counter-Claimant

ICDR Case No. 01-21-0001-9983

ORDER NO. 4 – ORDER ON RESPONDENT'S PETITION FOR DECREE OF DISSOLUTION

### 1. Introduction

Pursuant to the Commercial Arbitration Rules of the American Arbitration Association (AAA), as amended and effective October 1, 2013 (the "Commercial Rules"), and by request and submission of the parties, a hearing was held on December 1, 2 and 13, 2021 for the purpose of hearing and deciding a threshold issue: namely, whether grounds or cause exist for ordering dissolution of the California limited liability company known as TopDevz LLC ("the LLC"), as requested by Respondent Tyler Davis ("Davis" or "Respondent") in his petition for dissolution ("the Petition"). Appearing at the hearing on the Petition were Scott R. Carpenter, of Cummins & White LLP, appearing on behalf of Respondent, and Jordan Mathews, of Weinberg Gonser LLP, appearing on behalf of Claimant Ashkan Rajaee ("Rajaee" or "Claimant"). Also present during the course of the hearing were Davis and Rajaee. The hearing proceedings were recorded and transcribed by a certified court reporter. The transcript of those proceedings is part of the record in this arbitration.

The parties agreed, through their respective counsel, to an evidentiary hearing where Messrs. Davis and Rajaee would be allowed to testify in favor and against dissolution, respectively, and be subjected to cross-examination by the other side.

In advance of the hearing, both Davis and Rajaee provided briefs on the issues to be addressed at the hearing. Additionally, the parties submitted declarations with exhibits. At the hearing, the parties submitted hearing exhibits in the form of documentary and electronic (video) evidence. The parties also submitted testimonial evidence from Rajaee, Davis and Michael S. Hawes ("Hawes"), a certified public accountant who provided opinion testimony on

behalf of Davis. The parties' counsel made opening statements and closing arguments at the hearing and then concluded the matter with closing briefs. The record of the proceedings concerning Davis's Petition was concluded on January 4, 2022, with the submission of the reporter's transcript for the third day of hearing (December 13, 2022).

The issues raised by the Petition are essentially two-fold: 1. Does Davis have the right to dissolve the LLC without Rajaee's consent? 2. If not, do grounds exist to order an involuntary dissolution over Rajaee's objection? While the parties' respective underlying claims and counterclaims contain numerous recriminations, it is not necessary to reach the merits of those claims in order to decide the narrow issues raised by the Petition. Ultimately, on the underlying claims and counterclaims, one party will be declared "right" and the other declared "wrong," but in the meantime and thereafter must Rajaee and Davis continue to do business together in the LLC?

## 2.    Arbitral Jurisdiction

On May 9, 2017, Rajaee and Davis entered into an Operating Agreement for TopDevz, LLC ("Agreement"). It is undisputed that the Agreement governs the relationship between Rajaee and Davis as members of TopDevz, LLC ("the LLC"). The validity and enforceability of the Agreement were not disputed in this matter. To the contrary, both parties have relied on various provisions of the Agreement in support of their respective claims and counterclaims, as well as their arguments concerning the Petition.

Included in the Agreement is a section providing for binding arbitration of disputes that might thereafter arise between the parties. Paragraph 11.2 of the Agreement provides as follows:

> Any action to enforce or interpret this Agreement, or to resolve disputes with respect to this Agreement between the Company and a Member, or between or among the Members, will be settled by arbitration in accordance with the rules of the American Arbitration Association. Arbitration will be the exclusive dispute resolution process in the state of California, but arbitration will be a nonexclusive process elsewhere. Any party may commence arbitration by sending a written demand for arbitration to the other parties. The demand will set forth the nature of the matter to be resolved by arbitration. The Manager will select the place of arbitration. The substantive law of the state of California will be applied by the arbitrator to the resolution of the dispute. The parties will share equally all initial costs of arbitration. The prevailing party will be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration. All decisions of the arbitrator will be final, binding, and conclusive on all parties. Judgment may be entered on any such decision in accordance with applicable law in any court having jurisdiction of it. The arbitrator (if permitted under applicable law) or the court may issue a writ of execution to enforce the arbitrator's decision.

*Davis Exhibit 2, ¶ 11.2.*

This matter concerns disputes between Rajaee and Davis regarding their respective rights and obligations under the Agreement and as members of the LLC. But for the Agreement and their relationship as co-members of the LLC, they would owe no duties to each other, and may not have otherwise had any dealings or interactions with one another after their respective litigation cases with Surge, described in Section 3(1), below.

Rajaee and the LLC voluntarily submitted their claims and disputes with Davis to arbitration by filing a demand for arbitration with the American Arbitration Association ("the AAA") on or about February 24, 2021. Thereafter, Davis voluntarily appeared in the arbitration without objection, and filed an answering statement, with affirmative defenses, and a counterclaim. Rajaee filed an answer to the counterclaim with affirmative defenses. Thereafter, Davis filed the Petition, and the hearing on the Petition was scheduled in coordination with and by agreement of the parties, through their respective counsel.

Under California law, arbitrators have authority to make orders which provide for equitable relief. *Mercuro v. Superior Court*, 96 Cal. App. 4th 167, 177-178 (2002). California case law has recognized that limited liability company dissolution disputes may be arbitrated. *See, Malek Media Group LLC v. AXQG Corp.*, 58 Cal. App. 5th 817 (2020) (case involving irreconcilable differences between members and various breaches of the parties' operating agreement).

Based upon the foregoing, as well as the appearances and submissions made by the parties during the course of the hearing on the Petition, the proceedings leading up to the hearing on the Petition, and the matters submitted to the Arbitrator during the course of this arbitration, all without objection to the Arbitrator's jurisdiction, it is the Arbitrator's determination that the parties' respective claims, defenses and requests for relief, including the relief requested by Davis in his Petition, and Rajaee's opposition thereto, are subject to and were submitted voluntarily to binding arbitration before the undersigned arbitrator.

### 3.   Facts Pertinent to the Decision on the Petition

The facts pertinent to the decision on the Petition are as follows:

1.     When Rajaee and Davis decided to go into business together, they had limited experience working together through their respective relationships with a company called Surge. Rajaee provided services and consulting to Surge through Mobile Monster. Davis was an investor in Surge. They met through a Surge management meeting in 2016. Their common thread was that they both parted ways with Surge, and ended up suing Surge for different reasons, and being represented by the same attorney in those litigation matters. *RT 410-420 and 423-424.*

3

2.    When Rajaee and Davis decided to go into business together, they engaged an attorney to formalize their business relationship. *RT 428.* That relationship took the form of a limited liability company (the LLC) as the vehicle through which they would engage in a software development and consulting business, with a governing operating agreement that they both signed as co-members (the Agreement). *Davis Exhibit 2.*

3.    The Agreement is an integrated agreement and expressly provides that its terms can only be modified or amended "by a written instrument executed by all of the parties." *Davis Exhibit 2, ¶¶ 13.1 and 13.11.* Both Rajaee and Davis testified that no such written instrument exists. *RT 199-200 and 239.*

4.    With respect to Rajaee's and Davis's initial capital contributions and ownership interests in the LLC, the Agreement states that their respective capital contributions are "TBD", and Exhibit B to the Agreement was left blank. *Davis Exhibit 2.* However, absent an agreement to the contrary – which was not shown to exist in this case – the terms of the Agreement provide for voting rights and the allocation of profit and losses to follow the capital contributions of the LLC's members. *Davis Exhibit 2, ¶¶ 4.1, 5.2, 5.3, 5.4 and 7.1.*

5.    Rajaee testified that it was his requirement that Davis be responsible for capitalizing the LLC venture because he wanted to "de-risk" himself – i.e., he did not want to be at risk in the new venture. *RT 421.* Rajaee and Davis agreed that the capital investment in the LLC would be $750,000. *Id.* Davis invested the initial $750,000 to start the LLC. *RT 233-234.* That capital investment is recognized in the LLC's tax returns. *Davis Exhibits 8, 9, 10 and 11.* This was consistent with Rajaee's testimony that he expected Davis to contribute all of the capital because he did not want to be at risk in the new LLC venture. Additionally, Rajaee testified that he perceived himself as "bringing all the value to the company" through his knowledge about how to generate leads and close deals. *RT 421-422.* Rajaee acknowledged that he was not going to be contributing uncompensated sweat equity to the LLC; that it was agreed at the outset that he would be paid a guaranteed salary of $200,000.00 per year. *RT 422.* The LLC has paid Rajaee for his services, as reflected on the LLC's profit and loss statements, tax returns and bank statements. *Davis Exhibits 3, 4, 5, 6, 7, 8, 9, 10, 11 and 21.*

6.    A "capital call" for $76,000 was made by Rajaee in November 2020, and Rajaee and Davis contributed approximately $38,760 and $37,240, respectively, to the LLC. *Rajaee Exhibit 65, Davis Exhibits 11 and 21.* While these contributions were recognized on the LLC's 2020 tax return as capital contributions, there was no change to the capital structure of the LLC in terms of the K-1s for Davis and Rajaee. *Davis Exhibit 11.* Davis was still reported as having a 100% capital interest in the LLC, and Rajaee was still reported as having a 0% capital interest in the LLC. *Id.*

7.    For tax years 2017, 2018, 2019 and 2020, the LLC's tax returns, as filed with the IRS, have reported that Davis owns 100% of the capital in the LLC. *Davis Exhibits 8, 9 10 and 11.* Those returns were prepared by an accounting firm selected by Rajaee, and were prepared under his direction as the "tax matters partner."

4

8.      Rajaee testified that he never paid "attention to all of the details" in the tax returns; that he just looked at the line items for "how much revenue we did, how much expenses we had, how much taxes we have to pay," and that "[e]verything else is handled by [the accountant] in consulting with them." *RT 93*. As pertains to how profits and losses were allocated between Rajaee and Davis, Rajaee testified that he has no understanding of why his profit share allocation went from 0% to 6.5% in 2017 and from 6.5% to 51% in 2018; that he does not recall having any discussions with the accountant or Davis about that; that he "put full trust in [the accountant] to account for everything," and simply "followed [the accountant's] advice on where the numbers landed." *RT 81-90*. Davis testified that other than the email exchange in February 2020, discussed in Section 4(A), below, he never discussed the capital structure of the LLC with Rajaee or the LLC's accountant. *RT 236-237*. No one from the LLC's accounting firm – Lavine, Lofgren, Morris & Engelberg LLP – was called to testify in the proceedings on the Petition.

8.      Rajaee testified that he covered a number of the LLC's operating expenses through charges put on his personal American Express card and through monies paid to or for the benefit of the LLC. To the extent that such expenditures or contributions were in fact made and were not reimbursed, they were not treated as capital contributions according to the LLC's tax returns. *Davis Exhibits 8, 9, 10 and 11*. In this regard, the profit and loss statements and LLC bank statements show that large sums of money have routinely been transferred out of the LLC to Rajaee or Mobile Monster. *Davis Exhibits 3, 4, 5, 6, 7 and 21*. The bona fides of these transfers and withdrawals are matters to be decided at another time – the evidentiary hearing on the merits of the parties' respective claims and counterclaims - and do not need to be decided in making a decision on the Petition.[1]

9.      The Agreement specifically recognizes Rajaee and Davis as the "Initial Members" of the LLC. *Davis Exhibit 2, ¶ 1.24*.

10.     The Agreement defines a "Membership Interest" as "a Member's entire interest and rights in the Company, collectively, including the Member's Economic Interest, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company." *Davis Exhibit 2, ¶ 1.34*.

---

[1]  Rajaee contends that he has "loaned" money to the LLC for which he has not been repaid. Rajaee's testimony about the amount of the LLC's alleged loan indebtedness varied between $700,000 and $1,700,000. *RT 111-116*. Whether such loan indebtedness in fact exists is a matter to be decided at another time - the evidentiary hearing on the merits of the parties' respective claims and counterclaims. The only relevance here is that it shows that, consistent with Rajaee's stated initial position that he did not want to be at risk in the LLC venture, he has viewed his infusions of cash to help fund the LLC's operations as loans – not capital – and has maintained that position in these proceedings on the Petition.

5

11.    Under the terms of the Agreement, Rajaee was designated as the LLC's Manager. *Davis Exhibit 2. ¶ 2.9.* Rajaee has acted in the capacity of Manager and "tax matters partner" of the LLC since its inception, and is currently acting in those capacities with regard to the transactions he has entered into and decisions he has made for the LLC since the parties' disputes arose in February 2021.[2]

12.    The Agreement requires the Manager to maintain accurate books and records for the LLC. *Davis Exhibit 2, ¶ 6.3.*

13.    Rajaee testified that there have been lapses in the LLC's accounting as relates to the way expenses charged on Rajaee's personal American Express card or advanced by Mobile Monster have been booked in the LLC's records such that the LLC's accountants have told him that it is not possible to tell, by looking at the LLC's books and records, what the particular expenses of the LLC are; that the transactions are "all overlapping;" and that it is not possible to produce an accurate balance sheet based upon the data maintained in the LLC's accounting records. *RT 121.* Moreover, a cursory review of the profit and loss statements in comparison to the LLC's bank statements suggests that the two do not tic-and-tie. For example, the "guaranteed" payments to Rajaee through October 2021 total approximately $671,000 according to the profit and loss statements, but the debits for withdrawals and transfers made to Rajaee, according to the LLC's bank statements, total approximately $2,800,000. *Davis Exhibits 3, 4, 5, 6, 7 and 21.* For another example, the LLC's bank statements for February 2021 shows a $447,723.80 transfer to Rajaee coded as "Loan Payoff Balance to AR," but Rajaee testified that he is unable to produce a balance sheet for the LLC; that he is only just now working with the LLC's accountants to try to create an accounting with regard to what monies he advanced to the LLC that have not been reimbursed; and that he believes he is still owed over $1,000,000. *RT 115-121.*

14.    The Agreement requires that the books of the LLC "be closed and examined" at the end of each fiscal year, and that the LLC's certified public accountant issue an annual statement "reflecting the financial condition of the Company and its Profits or Losses." Such annual reports are to "be given to all Members," and are to include "[a] balance sheet and income statement, and a statement of changes in the financial position of the Company" and

---

[2]    E.g., having the LLC lease a jet purchased by Rajaee through his wholly-owned company (Remote Preneurs); having the LLC enter into a charge or debit card relationship with a company in which Rajaee has a 95% interest (SpendHub); giving himself a raise in guaranteed salary; and having the LLC enter into an office lease near his home. *RT 156, 160-164, and 170-171.* Whether such transactions and decision making constitute "self-dealing" and/or "mismanagement" of the LLC are matters to be decided at another time - the evidentiary hearing on the merits of the parties' respective claims and counterclaims. The only relevance here is that it explains the reason for the deep divide and discord that exists between Rajaee and Davis. Davis believes that the transactions were improper because they were done without his advance approval. Rajaee believes that the challenged actions / decisions qualify as "ordinary course" transactions because they were part of his marketing campaign to generate leads, close deals and build relationships for the LLC. *RT 191.*

6

"[a] statement showing the Capital Account of each Member as of the close of the fiscal year and the distributions, if any, made to each Member during the fiscal year." *Davis Exhibit 2, ¶ 6.4.*

15.    While the LLC has engaged an outside accounting firm since its inception, the LLC does not maintain a balance sheet and no annual reports have ever been prepared or issued to the LLC's members. *RT 117-118 and 191-192.*

16.    Article V of the Agreement sets forth the terms related to management of the LLC, and provides for the business to be managed by Rajaee as its designated / named Manager. *Davis Exhibit 2, ¶¶ 5.1 and 5.4.*

17.    Notwithstanding the Manager's broad authority to run the day-to-day affairs of the LLC, the Agreement prohibits the Manager from taking certain actions without the consent of a "Majority of Members." *Davis Exhibit 2, ¶ 5.4.* "Majority of Members" is defined as "a Member or Members whose Percentage Interests represent more than 50 percent of the Percentage Interests of all Members." *Davis Exhibit 2, ¶ 1.28.* "Percentage Interest" is defined as "a fraction, expressed as a percentage, the numerator of which is the total of a Member's Capital Account and denominator of which is the total of all Capital Accounts of all Members." *Davis Exhibit 2, ¶ 1.39.*

18.    The LLC is a services business that generates revenue through services provided by software developer consultants hired by the LLC to work on projects for clients. The main way in which the LLC finds its clients is through leads generated by Mobile Monster, Inc., a Canadian company owned 100% by Rajaee ("Mobile Monster"). *RT 111.* Mobile Monster also employs staff and several groups of contractors that work to service the LLC's customers. "All of that payroll, all of those contractor payments, all of the travel expenses, all of the client visits that we do or marketing gets captured inside of Mobile Monster, and then Mobile Monster gets reimbursed from [the LLC] for the expenses it is incurring." *Id.*

19.    Up until February 2021 – when the disputes arose between Rajaee and Davis – Rajaee generally consulted with Davis on all matters and the LLC operated on a consensus basis between the two members. *RT 187-189.*

20.    After the "blow up" telephone conversation between Davis and Rajaee on February 8 or 9, 2021, Rajaee had Davis removed from the LLC's bank account and has not communicated with Davis, except through counsel. *RT 208; Davis Exhibit 19.* In this regard, Rajaee testified that "any questions that I need to answer that relate to my communications with [Davis] I find kind of a waste of time, because I don't talk to him. I've only talked to him, if I had to, through counsel." *RT 165.* Rajaee testified that he has not spoken to Davis since February 2021. *RT 72.*

7

21.    In this arbitration, Rajaee and Davis are both pursuing claims against the other based on various allegations of wrongdoing – not just breach of the Agreement. In stating their respective claims, they have used such terms as "fraud," "self-dealing," "extortion," "reckless," "criminal conduct," "embezzlement," "defamation," etc. It is not necessary to resolve or reach the merits of the parties' respective claims and counterclaims in deciding the narrow issues raised by the Petition. Those claims and issues are for determination at another time: namely, the evidentiary hearing on the merits of the parties' respective claims and counterclaims.

22.    Outside of this arbitration, there are four separate court proceedings pending that relate to the disputes in this arbitration: one initiated by Davis against Rajaee,[3] one initiated by Mobile Monster against Davis,[4] one initiated by Rajaee against a former employee of the LLC (Siarra Wood),[5] and one initiated by two former employees of the LLC against Rajaee.[6] *Order No. 2, ¶ 2.4; Davis Request for Judicial Notice.*

4.    **Rulings on the Petition**

A.    **Davis has the right to dissolve the LLC because he holds a majority of the Percentage Interests in the LLC.**

The operating agreement of a limited liability company governs, among other things, (a) "[r]elations among the members as members and between the members and the limited liability company"; and (b) "[t]he rights and duties under [the Act] of a person in the capacity as manager." Cal. Corp. Code § 17701.10(a)(1), (a)(2). Dissolution is a remedy that is authorized by Corporations Code section 17707.01.

Under paragraph 9.1 of the Agreement, the LLC will be dissolved on "[t]he written agreement of a Majority of Members to dissolve the Company." Davis claims to have made the election / decision to dissolve the LLC through his filing of a complaint for dissolution in the Sacramento Superior Court ("the State Court Action") and through his counterclaim for dissolution in this arbitration, as well as his filing of the Petition. The question is whether or not Davis holds more than 50% of the Percentage Interests in the LLC, and has the right to dissolve the LLC without Rajaee's consent and over his objection. The evidence in this matter supports a determination of "yes." Davis has the right to dissolve the LLC without Rajaee's consent and

---

[3]    *Tyler Davis v. Ashkan Mirfakhr-Rajaee, et al.*, Superior Court of the State of California, County of Sacramento, Case No. 34-2021-00301817.

[4]    *Mobile Monster v. Tyler Davis*, Superior Court of the State of California, County of Sacramento, Case No. 34-2021-00301817.

[5]    *Ashkan Rajaee v. Siarra Wood*, Superior Court of the State of California, County of San Diego, Case No. 37-2021-00008947.

[6]    *Sarah Blanchette and Siarra Wood v. Ashkan Rajaee*, Superior Court of Justice, Ontario (CANADA), Case No. CV-21-00086316-000.

8

over his objection because (a) Davis holds a majority of the Percentage Interests in the LLC, as defined by the Agreement, and (b) the Agreement provides that the LLC may be dissolved by agreement of the "Majority of Members."

While the LLC's record keeping appears to have been less than perfect, two things are clear: (1) only Davis contributed capital to the start-up of the LLC, and (2) the LLC's *outside* accountants have reported on capital structure of the LLC on the LLC's annual tax returns for 2017, 2018, 2019 and 2020, which returns were signed under penalty of perjury by Rajaee in his capacity as the LLC's "tax matters partner." All of the returns, without exception, state that Davis has a 100% capital interest in the LLC.[7] Under the definition of "Majority of Members" as set forth in paragraph 1.28 of the Agreement, Davis alone qualifies as the majority member of the LLC, even if capital investment credit were given to Rajaee for the $38,760 he contributed to the LLC in November 2020.

With the exception of the $76,000 Rajaee and Davis put into the LLC in November 2020 pursuant to a "capital call" by Rajaee to cover the LLC's operating expenses, Rajaee has never described any of the monies he advanced or loaned to the LLC as capital investments.[8] In this regard, Rajaee testified that when the LLC was formed in 2017, it was his requirement that Davis be responsible for capitalizing the venture because he did not want to be at risk in the new venture. *RT 421*. The profit and loss statements created by the LLC's outside accounting firm show that more than $5,000,000 has been paid in "Consultant Reimbursement Expenses," which supports the inference that any advances Rajaee (or Mobile Monster) may have made to or for the benefit of the LLC were intended and treated as advances to be repaid by the LLC and not as capital Rajaee invested in the LLC. Moreover, Rajaee's claim in these proceedings that he believes he advanced or loaned over $1,000,000 to the LLC that has not been repaid further confirms that Rajaee has never intended that any "contributions" he may have made to cover the LLC's operating expenses were to be treated as a capital investment.

Rajaee testified that he had an understanding with Davis from the outset that he would own 51% of the LLC and Davis would own 49% of the LLC, irrespective of their respective capital contributions, because that is what he needed to qualify for a visa to live and work in the United States. *RT 103*. Assuming for sake of argument that those discussions did in fact occur, the alleged agreement or understanding is inconsistent with the terms of the Agreement

---

[7]   Rajaee pointed to the fact that he was allocated 51% of the profits in three of the LLC's tax returns as somehow being proof of an agreement between himself and Davis to the effect that he would have an ownership interest in the LLC that did not match his capital contributions to the LLC. While such an agreement is certainly possible. There was no evidence of such an agreement being reached between Davis and Rajaee to modify Article IV of the Agreement in this regard.

[8]   Schedule M-2 of the 2020 tax return recognized the $76,000 contribution as a capital contribution, and the K-1's for Rajaee and Davis recognized their contributions of $38,760 and $37,240, respectively. However, the capital interest percentages did not change as reflected on the K-1's. *Davis Exhibit 11.*

9

Rajaee and Davis signed to memorialize the terms of their business relationship in creating the LLC, and both agree that the Agreement has never been modified by a writing signed by both of them. *RT 199-200 and 239.*

Rajaee pointed to a February 24, 2020 email exchange that started with Rajaee's assistant – Vania Hernandez – writing to the LLC's accountant – Jennifer Glaser ("Glaser") – stating that Rajaee was "in need of a document that states TopDevz length in business as well as his ownership percentage" and that "[t]he document needs to be in LLME letterhead with your signature on it." *Rajaee Exhibit 5.* When Glaser asked what the letter was going to be used for, Rajaee responded that he was "buying a house." Glaser wrote back and asked if there was an updated operating agreement showing him as a 51% owner because she did not have documentation to support that statement. Rajaee then looped Davis in on the email chain and asked him to confirm ownership in the LLC as 51% to him and 49% to Davis. Davis responded "This is correct." *Id.*

As between Rajaee and Davis, there was insufficient evidence from which an inference could be drawn that Davis and Rajaee intended the email to constitute a written instrument signed by both parties, modifying the Agreement so as to specify the parties' respective ownership percentages that were previously left blank on Exhibit B. This is due in part to the fact that approximately 18 months after the February 24, 2020, email exchange - on September 13, 2021 - Glaser and her firm prepared the LLC's tax return for 2020 with Rajaee signing as the "tax matters partner" for the LLC. Again, the LLC's tax return reported Davis as having a 100% of the capital interest in the LLC and Rajaee as having a 0% capital interest in the LLC. *Exhibit 11.* Like all of the other tax returns for the LLC, Rajaee signed the LLC's 2020 tax return as its "tax matters partner." *Id.* The reasonable inference to be drawn from this evidence is that Davis's "confirmation" email (a) was a friendly accommodation to Rajaee made in the context of Rajaee's effort to purchase a home in the United States,[9] (b) does not rise to the level of constituting an agreement between Rajaee and Davis regarding the capital structure of the LLC, and (c) appears to have *not* been something that the LLC's accountant or Rajaee (as the LLC's tax matters partner) relied upon in reporting the LLC's capital structure to the IRS in 2021 for calendar year 2020 because the stated capital accounts of Rajaee and Davis remained the same as in prior years. *Davis Exhibit 11.* The preparation of the 2020 tax return, as well as all prior tax returns, was done under Rajaee's direction as the LLC's "tax matters partner."

---

[9] Rajaee testified that he relied on the 51/49 discussions contained in the February 2020 email exchange in entering into the LLC with Davis. That testimony was not credible because Rajaee entered into the Agreement three years before the February 2020 email exchange, and there was no evidence that Rajaee did anything to his detriment after February 2020. To the contrary, the evidence showed that since February 2020, millions of dollars have flowed out of the LLC to Rajaee and his companies (Mobile Monster, SpendHub and Remote Preneurs), including over $490,000 paid out to Rajaee in July 2021. *Exhibit 21.*

10

Rajaee also pointed to the fact that he was allocated 51% of the profits on the LLC's tax returns as proof of his 51% ownership stake in the LLC. The problem with Rajaee's position and testimony is that the evidence concerning the allocation of profits and losses to Rajaee was inconsistent. For example:

(1)    Rajaee's share of profit and loss at the beginning of 2017 was shown as "0.0000000%," but his profit and loss allocation at the end of 2017 was shown as "6.5383824%." *Davis Exhibit 8.*

(2)    Rajaee's share of profit at the beginning of 2018 was shown as "6.5383824%," but his profit allocation at the end of 2018 was shown as "51.0000000%." Rajaee's share of loss at the beginning of 2018 was shown as "6.5383824%," but his loss allocation at the end of 2018 was shown as "0.0000000%." *Davis Exhibit 9.*

(3)    Rajaee's share of profit at the beginning and end of 2019 was shown as "51.0000000%." Rajaee's share of loss at the beginning and end of 2019 was shown as "0.0000000%." *Davis Exhibit 10.*

(4)    Rajaee's share of profit at the beginning and end of 2020 was shown as "51.0000000%." Rajaee's share of loss at the beginning of 2020 was shown as "0.0000000%," but at the end of 2020 it was shown as "51.0000000%." *Davis Exhibit 11.*

The fact that Rajaee was allocated profits and losses of the LLC does not change the fact that (a) the Agreement required profits and losses to be allocated based upon members' capital account, *Davis Exhibit 2, ¶ 4.1,* and (b) Rajaee made only a small capital contribution in 2020, as discussed above. *Davis Exhibit 11.*

Rajaee himself testified that he never paid "attention to all of the details" in the LLC's tax returns and did not recall having any discussions with the accountant or Davis about the 2017 or 2018 changes in Rajaee's profit share allocation from 0% to 6.5% to 51%. *RT 89-93 and 193.* The suggested inference is that Rajaee's profit and loss allocations were changed without his knowledge or input, and that these changes were made by the accountants without the approval of the LLC's "tax matters partner." Without the testimony of the LLC's outside accountant who prepared the LLC's tax returns, there is insufficient evidence to support such an inference, and it has no bearing on whether Rajaee and Davis agreed to a capital structure other than as provided for in the Agreement.

In final analysis, the only evidence of a capital contribution by Rajaee to the LLC is the $38,760 he contributed in November 2020. Under the terms of the Agreement, Rajaee's Percentage Interest in the LLC is only 4.692% ($38,760 ÷ ($750,000 + $76,000) = .04692). As such, Davis holds the majority of Percentage Interests in the LLC and controls the vote of the Majority of Members. Accordingly, it is hereby determined that Davis owns 95.308% of the capital interest

11

in the LLC and is the Majority Member with regard to decisions that are subject to the vote of the Members or a "Majority of Members." Accordingly, Davis thus has the right, under paragraph 9.1 of the Agreement, to dissolve the LLC without Rajaee's consent and over his objection. That is the basis for the order set forth in Section 5. Davis also has the right to exercise all other voting rights given to the "Majority of Members," including removal of the Manager.

### B.   Even if Davis is not the Majority Member, protective dissolution would be in order because management of the LLC is deadlocked and subject to internal dissension.

Deadlock and internal dissension are grounds for dissolution under Corporations Code section 17707.03(b)(4). To obtain a decree of dissolution, the alleged dissension must be sufficient to prevent the further successful operation of the company to the advantage of its members. *Fuimaono v. Samoan Congregational Christian Church of Oceanside*, 66 Cal. App. 3d 80, 84 (1977); *see also BeUo v. Panorama Optics, Inc.*, 33. Cal. App. 4th 1096, 1105 (1995) (dissension evidenced by "completely different views as to the operation of the company"); *Buss v. J.O. Martin Co.*, 241 Cal. App. 2d 123, 136 (1966) (dissension shown where parties "hold contrary and opposing views on nearly all phases of the conduct of the business").

The irreparable deterioration of the relationship of Rajaee and Davis is evidenced by, among other things, (a) the aggressive claims and counterclaims that have been asserted in this arbitration and in the various companion court proceedings described in footnotes 3, 4, 5 and 6, (b) the fact that Rajaee and Davis have not spoken to each other since February 2021, and (c) the fact that Rajaee has instructed Davis to only speak to him through his attorney.

The dissension within the relationship of Rajaee and Davis as co-members of the LLC is evidenced by their completely different views as to what qualifies as an "ordinary course" business expense within Rajaee's sole decision making authority and discretion as the LLC's Manager and what types of decisions are subject to approval by Davis. *See, Footnote 2.* As evidenced by the expenditures made by Rajaee since February 2021, the delta on these differing views is several hundred thousand dollars flowing out of the LLC to companies owned by Rajaee. *Id.*

### 5.   Order

Based upon the foregoing, and for good cause shown, IT IS HEREBY ORDERED AS FOLLOWS:

1.   Davis owns 95.308% of the capital interest in the LLC, and thus owns the majority of the Percentage Interests in the LLC for voting purposes and has the right to elect to dissolve the LLC without the consent and over the objection of Rajaee.

12

2.      Protective dissolution of the LLC   under Corporations Code section 17707.03(b)(4) is in order because management of the LLC is deadlocked and subject to internal dissension.

3.      Based upon Davis' request that the LLC be dissolved and the finding of deadlock and internal dissension within the management of the LLC, the LLC shall be dissolved pursuant to paragraph 9.1 of the Agreement and Corporations Code sections 17707.01(a) and 17707.03(b)(4). In accordance with paragraph 9.2 of the Agreement, the LLC will engage in no further business other than that necessary to wind up the business and affairs of the LLC. Davis, and only Davis or his designee, shall be responsible for managing, overseeing, and completing the dissolution of the LLC, and only Davis, or his designee, shall have the authority to take those actions necessary to accomplish the dissolution of the LLC.

4.      In accordance with paragraph 9.2 of the Agreement, Davis, is the Member of the LLC responsible for winding up the affairs of the LLC, and will give notice of the commencement of winding up by mail to all known creditors and claimants of the LLC. After paying or adequately providing for the payment of all known debts of the LLC (except debts owing to members), the remaining assets of the LLC will be distributed or applied in the following order:

        (a)     To pay the expenses of liquidation;

        (b)     To the establishment of reasonable reserves for contingent liabilities or obligations of the LLC. On the determination that reserves are no longer necessary, they will be distributed as provided in this order and paragraph 9.2 of the Agreement;

        (c)     To repay outstanding loans to members, if any, which is among the issues to be determined in the accounting in this arbitration, in accordance with paragraph 9.2(c) of the Agreement; and

        (d)     To the members with positive capital account balances, as provided in Article IV, paragraph 4.16 of the Agreement.

5.      Davis and only Davis, or his designee, shall have authority to access, disburse funds from, open and close bank and other financial accounts belonging to or standing in the name of the LLC. If any such action requires the signature of Rajaee on a consent, certificate, filing or other document, Rajaee shall provide such signature within three (3) business days of being advised by Davis, or his designee, that such signature is required.

13

6.      Based upon Davis' request that Rajaee be removed as Manager of the LLC, Rajaee shall be removed as Manager of the LLC, and only Davis or his designee shall replace Rajaee as Manager of the LLC. If this removal and/or replacement requires the signature of Rajaee on a consent, certificate, filing or other document, Rajaee shall provide such signature within three (3) business days of being advised by Davis, or his designee, that such signature is required.

7.      Rajaee is hereby ordered to provide a full and complete accounting of the LLC's finances from the date of its inception in 2017 through the date of this order. That accounting needs to track every dollar in and every dollar out with backup, especially as pertains to (a) monies withdrawn, transferred or otherwise paid as expenses of the LLC, and (b) monies advanced or loaned to the LLC by Rajaee.

8.      Rajaee is ordered to turn over to Davis or his designee the original books and records of the LLC, including any electronically stored information and all and paper records such as invoices, contracts, receipts, checks, bank statements, etc.

9.      Rajaee is ordered to fully cooperate in providing access to Davis or his designee with respect to all of the books and records of the LLC maintained by or in the custody of Lavine, Lofgren, Morris & Engelberg LLP.

10.      From the date of this order forward, unless and until modified or instructed otherwise by a court of competent jurisdiction, Rajaee shall not make or cause to be made any disbursements, transfers or withdrawals from any accounts standing in the name of the LLC without the signature approval of Davis, or his designee. Specifically, Rajaee shall not incur any debt in the name of the LLC without the signature approval of Davis or his designee.

11.      From the date of this order forward, unless and until modified or instructed otherwise by a court of competent jurisdiction, Rajaee shall not make or enter into any contracts or commitments on behalf of or in the name of the LLC without the signature approval of Davis, or his designee.

12.      Rajaee is ordered to cooperate in collecting any outstanding receivables owed to the LLC, and is ordered to turnover any and all collections to Davis, or his designee, for deposit into an account maintained by and in the name of the LLC.

13.      This order is without prejudice to the right of Rajaee to seek to exercise his buy-out rights in accordance with the procedures specified in Corporations Code section 17707.03(c).

14

14.    A case management conference will be held in this matter on **Friday – January 21, 2022, at 10:00 a.m. Pacific Time,** for the purpose of reviewing with the parties' counsel (a) the status of the implementation of this order, and (b) the parties' readiness to proceed with the evidentiary hearing proceedings scheduled to commence on April 4, 2022. In advance of the case management conference, Davis's counsel is instructed to provide the Arbitrator with a status report and to do so no later than **Thursday – January 20, 2022.** The case management conference will be held via video conference. The following is the log-in information for the conference:

https://us02web.zoom.us/j/83580491031?pwd=NERNcC9RMWVqSmRzZWJhYTlKRVEzZz09

Meeting ID: 835 8049 1031
Passcode: 545721
One tap mobile
+16699006833,,83580491031#,,,,*545721# US (San Jose)
+13462487799,,83580491031#,,,,*545721# US (Houston)

IT IS SO ORDERED.

Dated:  6 January 2022

Rebecca Callahan, Arbitrator

15

ATTACHMENT 2

**EXHIBIT 1, Page 107**

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitral Tribunal

In the Matter of the Arbitration Between:

Ashkan Rajaee and TopDevz, LLC, a California Limited Liability Company,

Claimants and Counter-Respondents,

- vs -

Tyler Davis,

Respondent and Counter-Claimant

ICDR Case No. 01-21-0001-9983

## ORDER NO. 5 – ORDER ON RESPONDENT'S EMERGENCY MOTION
### TO ENFORCE ORDER NO. 4

A duly noticed hearing ("Hearing") on Respondent's emergency motion ("Motion") was convened via video conference at approximately 10:00 a.m. Pacific Time on Thursday – January 13, 2022, before Rebecca Callahan, Arbitrator. Scott R. Carpenter, of Cummins & White LLP, appeared on behalf of Respondent Tyler Davis ("Respondent" or "Davis"), and Jordan Matthews, of Weinberg Gonser LLP, appeared on behalf of Claimant Askhan Rajaee ("Claimant" or "Rajaee"). The hearing proceedings were recorded and transcribed by a certified court reporter. The transcript of the proceedings on the Motion is part of the record in this arbitration.

In his Motion, Davis took issue with Rajaee for taking certain actions for or on behalf of TopDevz LLC ("the LLC") after Order No. 4 – Order on Respondent's Petition for Decree of Dissolution ("Order No. 4") was issued, as well as Rajaee's refusal to cooperate in providing information to Davis and access to the LLC's books and records. While opposition was submitted to the Motion on behalf of Rajaee, that opposition did not address the substantive issues raised by the Motion: most notably, what happened to the $1,052,146 Rajaee caused to be transferred out of the LLC's bank account at Wells Fargo after Order No. 4 was issued? Significantly, Rajaee did not provide a declaration denying that he caused the aforementioned monies to be transferred out of

the LLC's bank account, and he did not appear at the Hearing to address, explain or otherwise respond to that circumstance. Additionally, according to Davis' counsel, Davis's efforts to obtain cooperation from Rajaee and the LLC's outside accounting firm with regard to turnover of the LLC's books and records and administrative access to its electronic records have been frustrated at every turn by the lack of response from anyone. Neither Rajaee nor his counsel denied or disputed the offer of proof made by Davis' counsel concerning the lack of turnover of the LLC's books and records to Davis or the lack of cooperation that has been forthcoming from Rajaee.

Having considered the papers the parties submitted with regard to the Motion, as well as the arguments made by the parties' respective counsel, and good cause appearing therefore, IT IS HEREBY ORDERED:

1.      Rajaee violated Order No. 4 when he transferred funds out of the LLC's account at Wells Fargo Bank, Account Number 1756821128, on January 6 and January 7, 2022, because Davis, and only Davis or his designee, had the authority to access, disburse funds from, open and close bank and other financial accounts belonging to or standing in the name of the LLC from approximately 2:00 p.m. on January 6, 2022, forward. Rajaee is hereby ordered to immediately return and/or replenish to the LLC, care of Davis, the $900,000.00 he transferred to himself at approximately 11:00 p.m. on January 6, 2022, as well as the $131,586.76, transferred out as an "international money transfer debit" on January 7, 2022.

2.      Rajaee's power and authority to act as the Manager and "tax matters partner" of the LLC ended as of approximately 2:00 p.m. on January 6, 2022. Only Davis or his designee has authority to act as Manager of the LLC, and may do so without Rajaee's consent and over his objection. Rajaee is hereby enjoined and restrained from accessing any LLC bank or financial accounts, transferring any funds from any LLC bank or financial accounts, or transacting business of any sort for or on behalf of the LLC without Davis's signature approval.

3.      Rajaee is hereby ordered to immediately return to the LLC, care of Davis, any and all documents, data, and/or tangible property removed or taken from the LLC since January 6, 2022, by Rajaee or any persons or entities under Rajaee's control who have acted on behalf of Rajaee. Rajaee, and his agents and representatives, are enjoined and restrained from accessing and/or removing any business records of the LLC without the signature consent of Davis or his designee, including but not limited to any electronically stored information and all and paper records such as invoices, contracts, receipts, checks, bank statements, and customer lists, customer data, vendor lists,

vendor data, contractor lists, contractor data, accounts receivable documents and accounts payable records.

4.    Nothing in this Order No. 5 is intended or shall be construed as superseding Order No. 4. Order No. 4 remains in full force and effect.

Dated: 13 January 2022.

Rebecca Callahan, Arbitrator

3

**EXHIBIT 1, Page 110**

Exhibit "2"



ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**08/15/2023** at 04:20:00 PM
Clerk of the Superior Court
By Mariejo Guyot, Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| TYLER B. DAVIS, an Individual, and TOPDEVZ, LLC, a California Limited Liability Company, | ) CASE NO.: 37-2022-00026691-CU-PA-CTL<br>)<br>) **JUDGMENT ON CONFIRMED**<br>) **ARBITRATION AWARD** |
| Petitioners, | ) |
| vs. | ) **DATE: July 20, 2023**<br>) **TIME: 9:00 a.m.** |
| ASHKAN RAJAEE, an Individual, | ) **DEPT: C-73**<br>) |
| Respondents. | ) ASSIGNED FOR ALL PURPOSES TO THE<br>) HONORABLE JOEL R. WOHLFEIL,<br>) DEPARTMENT C-73<br>)<br>) Petition Filed: July 7, 2022 |

    **IT IS HEREBY ADJUDGED** that the Final Arbitration Award issued by Arbitrator Rebecca Callahan, Esq. of the American Arbitration Association and dated May 12, 2023, having been confirmed by order of this Court on July 21, 2023, is hereby entered in its entirety as the Judgment of this Court, including that:

    a. Petitioner TYLER B. DAVIS recover from Respondent ASHKAN RAJAEE the sum of One Million Seven Hundred Four Thousand Four Hundred Fifteen Dollars and

-1-

|W383|2494792.DOCX;1|

EXHIBIT 2, Page 111

Sixty-Four Cents (US $1,704,415.64), together with prejudgment interest thereon at the rate of 10% (percent) per year from May 12, 2023, through the date of entry of the judgment.

b. Petitioner TOPDEVZ, LLC, recover from Respondent ASHKAN RAJAEE the sum of Seven Million Six Hundred Seventy Thousand One Hundred Fifty-One Dollars (US $7,670,151.00), together with prejudgment interest thereon at the rate of 10% (percent) per year from May 12, 2023, through the date of entry of the judgment.

c. Respondent ASHKAN RAJAEE'S claims against Petitioners TYLER B. DAVIS and TOPDEVZ, LLC are hereby denied in their entirety.

d. Petitioner TYLER B. DAVIS is the prevailing party in this proceeding and shall recover from Respondent ASHKAN RAJAEE attorneys' fees in this proceeding to be fixed by post-judgment attorneys' fees motion.

e. Petitioner TYLER B. DAVIS shall recover from Respondent ASHKAN RAJAEE costs in this proceeding to be determined by post-judgment cost bill.

A true and accurate copy of the confirmed Award is attached in its entirety hereto as Exhibit 1.

**IT IS SO ORDERED.**

Dated:  **08/15/2023**

_Joel R. Wohlfeil_

JOEL R. WOHLFEIL
JUDGE OF THE SUPERIOR COURT

-2-
JUDGMENT ON CONFIRMED ARBITRATION AWARD

[W383]2494792.DOCX;1]

**PROOF OF SERVICE**
**(Declaration)**
**(C.C.P. §§1013(a) and 2015.5)**

STATE OF CALIFORNIA )
          )  ss.
COUNTY OF ORANGE  )

  I, the undersigned, declare:

  I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 2424 S.E. Bristol Street, Suite 300, Newport Beach, CA 92660-0764.

  On August 1, 2023, I served the following document(s): **[proposed] JUDGMENT**  on the interested parties in this action by placing a true and correct copy of each document thereof, enclosed in a sealed envelope, addressed as follows:

***SEE ATTACHED SERVICE LIST***

☐ **By Mail:** I am readily familiar with Cummins & White, LLP's business practice for collection and processing of correspondence for mailing with the United States Postal Service.  I know that the correspondence is deposited with the United States Postal Service on the same day this declaration was executed in the ordinary course of business. I know that the envelope was sealed and, with postage thereon fully prepaid, placed for collection and mailing on this date, following ordinary business practices, in the United States mail at Newport Beach, California

☑ **By E-Mail:** I caused the above-referenced document(s) to be served via e-mail to the attached-named person(s) at his/her/their e-mail address(es) of record.  The transmission was reported as complete and without error.  Attached to this declaration is an "E-Mail Confirmation Report" confirming the date, time and status of transmission.

☐ **By Personal Service:** I caused the above document(s) to be hand delivered to the attached address(es).

☐ **By Overnight Courier:** I caused the above-referenced document(s) to be delivered to an overnight courier service ([Name of Courier] ) for delivery to the above address(es).

  Executed on August 1, 2023, at Newport Beach, California.

☑ **(State)** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Jessica Berlson

-1-
PROOF OF SERVICE

|W383|2494792.DOCX;1]

**EXHIBIT 2, Page 113**

**SERVICE LIST**

Emil Petrossian, Esq.
Marc L. Benezra, Esq.
Glaser, Weil, Fink, Howard, Avchen & Shapiro
501 West Broadway, 8th Floor
San Diego, CA 92101
Telephone  (619) 765-4380
Facsimile:  (619) 483.0646
epetrossian@glaserweil.com
mbenezra@glaserweil.com
agipson@glaserweil.com
ssegura@glaserweil.com
sriley@glaserweil.com
*Attorneys for Respondent Ashkan Rajaee*

J. Douglas Kirk, Esq.
Kirk & Toberty, Attorneys at Law
2201 Dupont Drive, Suite 820
Irvine, CA 92612
Telephone:  (949) 416-2215
Facsimile:  (949) 851-1250
jdkirk@kirkandtoberty.com
rflynn@kirkandtoberty.com
*Attorneys for Petitioner/Cross-Respondent TopDevz, LLC*

Joseph W. Scalia, Esq.
Law Offices of Joseph W. Scalia, APC
3017 Douglas Boulevard, Suite 300
PMB 30095
Roseville, CA 95661
joe@scalialawoffices.net
*Attorneys for Petitioner/Cross-Respondent Tyler B. Davis*

PROOF OF SERVICE

|W383|2494792.DOCX;1|

# EXHIBIT 1

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
### International Arbitral Tribunal

In the Matter of the Arbitration Between:

Ashkan Rajaee and TopDevz, LLC, a California Limited Liability Company,

$$\text{Claimants and Counter-Respondents,}$$

- vs -

Tyler B. Davis,

$$\text{Respondent and Counter-Claimant}$$

ICDR Case No. 01-21-0001-9983

FINAL AWARD

1

**Counsel for Claimant and Counter-**
**Respondent Ashkan Rajaee**
Jordan Matthews, Esq.
Weinberg Gonser LLP
10866 Wilshire Boulevard, Suite 1650
Los Angeles, CA 90024
*[February 2021 to Early January 2022]*

Connor Lynch, Esq.
4470 W. Sunset Boulevard, Box No. 90096
Los Angeles, CA 90027
*[January 2022]*

Ethan J. Brown, Esq.
Geoffrey Neri, Esq.
Tim G. Lamoureux, Esq.
Kete Barnes, Esq.
Brown Neri Smith & Khan LLP
11601 Wilshire Boulevard, Suite 2080
Los Angeles, CA 90025
*[January 2022 to September 2022]*

Ashkan Rajaee, self-represented
*[September 2022 Forward]*

**Counsel for Respondent and Counter-**
**Claimant Tyler Davis**
Scott R. Carpenter, Esq.
Cummins & White LLP
2424 S.E. Bristol Street, Suite 300
Newport Beach, CA 92660
*[Entire Case]*

**Counsel for Claimant and Counter-**
**Respondent TopDevz LLC**
Same as Ashkan Rajaee
*[August 2021 to September 2022]*

J. Douglas Kirk, Esq.
Kirk & Toberty
2201 Dupont Drive, Suite 820
Irvine, CA 92612
*[September 2022 Forward]*

**Dates of Arbitration Hearings:**

| Session One | Session Two | Session Three |
|---|---|---|
| December 1, 2021 | April 4, 2022 | March 20, 2023 |
| December 2, 2021 | April 5, 2022 | |
| December 13, 2021 | April 6, 2022 | |
| | April 7, 2022 | |
| | April 11, 2022 | |
| | April 12, 2022 | |
| | April 13, 2022 | |
| | April 14, 2022 | |
| | April 21, 2022 | |
| | April 22, 2022 | |

**Arbitrator:**
Rebecca Callahan
Callahan Dispute Resolution
5120 Campus Drive
Newport Beach, CA 92660

**EXHIBIT 2, Page 117**

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | Introductory Statement | 1 |
| 2. | Arbitral Jurisdiction | 4 |
| 3. | Background Facts Pertinent to the Award | 6 |
| 4. | Proceedings and Decision on the Petition for Dissolution [Evidentiary Hearing Proceedings Conducted December 1, 2 and 13, 2021, and Emergency Hearing Conducted January 13, 2022 – Order Nos. 4, 5 and 6 Incorporated Herein] | 12 |
|  | A. Introductory Statement | 12 |
|  | B. Ruling on the Petition and Factual Determinations Made With Respect to the Petition | 13 |
|  | (1) Davis has the right to dissolve the LLC because he holds a majority of the Percentage Interests in the LLC. | 13 |
|  | (2) Even if Davis is not the Majority Member, protective dissolution would be in order because management of the LLC is deadlocked and subject to internal dissension | 18 |
|  | (3) Order No. 4 | 19 |
|  | (4) Post-Script to Order No. 4 – Order No. 5 and Factual Determinations Made With Respect Thereto | 22 |
|  | (5) Post-Script to Order No. 4 – Order No. 6 | 24 |
| 5. | Proceedings and Decision on the Final Accounting for the LLC [Evidentiary Hearing Proceedings Conducted April 4 through 7, 2022, April 11 through 14, 2022, ad April 21 and 22, 2022 – Order No. 16 and Partial Final Award] | 25 |

|  | Page |
|---|---|
| A. Introductory Statement | 25 |
| B. Burden of Proof | 28 |
| C. Ruling on the Final Accounting for the LLC and Factual Determinations Made With Respect to the Final Accounting | 30 |
| (1) Rajaee's Failed Accounting | 30 |
| (2) Rajaee Failed to Substantiate that the Millions of Dollars Paid to Himself and His Companies Were for Legitimate Business Expenses of the LLC | 34 |
| (a) Introductory Statement | 34 |
| (b) The Evidence Showed that the Amount Rajaee Needed to Substantiate was $7,670,151 | 37 |
| (c) Rajaee Failed to Provide Sufficient Evidence that the Millions of Dollars Paid to or for the Benefit of Himself and His Companies Were for Legitimate Business Expenses of the LLC | 40 |
| (d) Rajaee Failed to Establish any Loan Indebtedness Owed to Him by the LLC | 46 |
| (3) Davis' Contributions, Distributions and Advances Were Not Disputed | 46 |
| (4) Davis' Final Accounting and Partial Final Award in Favor of the LLC Against Rajaee | 47 |

**EXHIBIT 2, Page 119**

|  |  | Page |
|---|---|---|
| 6. | Davis is Entitled to an Award of Compensatory Damages on His Breach of Fiduciary Duty and Fraud Counterclaims Against Rajaee | 51 |
|  | A. Introductory Statement | 51 |
|  | B. Breach of Fiduciary Duty Counterclaim (Second Claim for Relief) | 52 |
|  | C. Misrepresentation and Fraud Counterclaim (Third Claim for Relief) | 53 |
| 7. | Rajaee's Claims Against Davis Are Denied Because Rajaee Failed to Carry His Burden of Proof on Any of His Asserted Claims | 54 |
|  | A. Introductory Statement | 54 |
|  | B. Rajaee's Claim Against Davis for Defamation Per Se | 55 |
|  | C. Rajaee's Claim Against Davis for Civil Extortion | 56 |
|  | D. Rajaee's Claim Against Davis for Intentional Infliction of Emotional Distress | 56 |
|  | E. Rajaee's Claim Against Davis for Intentional Interference with Contract | 57 |
|  | F. Rajaee's Claim Against Davis for Intentional Interference with Prospective Business Advantage | 57 |
|  | G. Rajaee's Claim Against Davis for Breach of Fiduciary Duty | 58 |
|  | H. The LLC's Claim Against Davis for Breach of Fiduciary Duty | 58 |
| 8. | Davis is Entitled to an Award of His Attorney's Fees and Cost as the Prevailing Party in this Arbitration | 59 |
|  | A. Introductory Statement | 59 |

iii

| | | Page |
|---|---|---|
| | B. Davis is the Prevailing Party in this Arbitration and is Entitled to Reimbursement of His Attorney's Fees and Costs | 60 |
| | C. Davis is Entitled to an Award of $717,498.64 as Reasonable Attorney's Fees and Costs in this Arbitration | 61 |
| 9. | Final Award | 64 |
| | A. Dissolution of the LLC | 60 |
| | B. Compensatory Award in Favor of the LLC for Rajaee's Violation of Order Nos. 4 and 5 | 65 |
| | C. Final Accounting and Surcharge Liability Assessed Against Rajaee in Favor of the LLC | 65 |
| | D. Compensatory Damages Award in Favor of Davis on Davis's Tort Counterclaims | 67 |
| | E. Denial of Rajaee's Claims in Their Entirety for Lack of Evidence | 67 |
| | F. Award of Attorney's Fees and Costs to Davis as the Prevailing Party in this Arbitration | 67 |
| | G. Miscellaneous | 67 |

**EXHIBIT 2, Page 121**

The undersigned Arbitrator (the *"Arbitrator"*), having been designated in accordance with the Operating Agreement for TopDevz LLC, dated May 9, 2017, (*"Agreement"*),[1] having been duly sworn, and having examined and considered the submissions, proofs, allegations, evidence, and arguments of the parties, and having issued a Partial Final Award dated June 21, 2022, hereby finds, concludes and issues this Final Award (*"Award"*) as follows:

## 1.    Introductory Statement

The Arbitrator conducted fourteen (14) days of evidentiary hearing proceedings (the *"Hearing"*), as described in Order Nos. 4, 16 and 21. The Hearing was conducted via video conference using the Zoom.us platform. The first set of evidentiary hearing proceedings occurred in December 2021 with respect to the petition for dissolution (*"Petition"*) filed by respondent Tyler Davis (*"Davis"*) with respect to his first counterclaim for relief in this matter. The second set of evidentiary hearing proceedings occurred in April 2022 with respect to the final accounting aspects of the Petition and Davis' first counterclaim for relief. The third set of evidentiary hearing proceedings occurred in March 2023 with respect to the parties' tort claims and counterclaims and their respective claims for compensatory damages.[2]

When this matter was originally scheduled for evidentiary hearing, Davis' counterclaim for accounting was to be heard and decided in conjunction with the parties' respective tort claims and counterclaims for alleged breach of fiduciary duty, slander, extortion, etc. At that time, the agreed-upon hearing time estimate for all claims and counterclaims was eight (8) days, and was scheduled, by agreement of the parties, through their respective counsel, for April 4 to 7, 2022 and April 11 to 14, 2022. See *Order No. 2*.

---

[1] *Davis Exhibit 2.*

[2] When originally scheduled, the evidentiary hearing proceedings with respect to the Bifurcated Issues was reserved for four days – March 20 and 21, 2023, and March 27 and 28, 2023 - with the caveat that the evidence admitted during the prior proceedings conducted in December 2021 and April 2022, as well as the factual findings set forth in the Partial Final Award issued on June 21, 2023, was part of the evidentiary record.

1

Claimant Ashkan Rajaee (*"Rajaee"*) changed counsel in January 2022, and his new counsel requested a continuance in order to be able to prepare to present Rajaee's case in chief on his tort claims against Davis. Given the exigencies associated with (a) having ordered the dissolution of TopDevz LLC (*"the LLC"*) pursuant to Order No. 4, and (b) having been faced with Rajaee's violation of the dissolution order, his refusal to provide Davis with a final accounting for the LLC during his tenure as Managing Member, and his defalcation of approximately $1.1 million in LLC funds (as discussed in Order No. 5), the continuance request was granted with respect to the hearing on the parties' respective tort claims and counterclaims – to be scheduled for a later time. However, the evidentiary hearing with regard to the narrow financial issues raised with respect to the final accounting for the LLC (*"the Bifurcated Issues"*) remained in place. By agreement of the parties, through their respective counsel, the hearing time for the Bifurcated Issues was shortened to five (5) days (April 4 to 7, 2022 and April 11, 2022). *See Order No. 6.* Ultimately, due largely to Rajaee's late production of voluminous exhibits during the course of the Hearing and Rajaee's insistence on presenting evidence on a myriad of matters concerning (a) the transactions and events leading Rajaee and Davis to enter into a business relationship through the formation of the LLC, (b) Rajaee's operation of the LLC, (c) the transactions and events leading to the demise of the parties' relationship in February 2001, and (d) Rajaee's operation of the LLC after problems arose in his relationship with Davis, an additional five (5) days of hearing time was necessary to complete the parties' respective presentations of their evidence.[3] See *Order No. 16.*

During the Hearing, testimony was presented by multiple witnesses, thousands of pages of documentary evidence were introduced and admitted into evidence, and oral arguments by counsel were offered and received at the start and end of each set of hearing proceedings. Appearing at the Hearing for claimant and counter-respondent Rajaee were Jordan Matthews, of Weinberg Gonser LLP (December 1, 2 and 13, 2021), and Ethan J. Brown, Geoffrey Neri, Tim G. Lamoureux and Kete Barnes, of Brown Neri Smith & Khan LLP (April 4 to 7, April 11 to 14, and April 21 to 22, 2022), and Rajaee *in propria persona* (March 20, 2023).[4] Appearing at the Hearing for respondent and counter-claimant Davis was Scott R. Carpenter, of Cummins & White LLP. The LCC was

---

[3]  In other words, the Hearing with regard to the final accounting of the LLC morphed into evidence taking that was relevant and material to that parties' various tort claims and counterclaims.

[4]  Mr. Matthews withdrew from the case in early January 2022, and was replaced by Connor Lynch. Brown Neri Smith & Kahn LLP substituted in for Mr. Lynch on or about January 25, 2022.

2

EXHIBIT 2, Page 123

represented by the same counsel as Rajaee up until September 2022, at which time, J. Douglas Kirk, of Kirk & Toberty, appeared as counsel for the LLC.

All witnesses were duly sworn, and oral testimony and documentary evidence was presented, as described in Order No. 16 – Hearing Report and Order (*"Order No. 16"*) and Order No. 21 – Hearing Report and Order (*"Order No. 21"*).[5] The exhibits offered and admitted into evidence as of the conclusion of the Hearing are as set forth in Order Nos. 16 and 21.

At the conclusion of the evidentiary hearing proceedings described above, the parties and counsel represented to the Arbitrator that they had no further evidence to offer pertinent to the dissolution and final accounting of the LLC or the parties' respective tort claims and counterclaims.[6]

In addition to the evidence and argument presented at the Hearing, the parties submitted opening and closing briefs, which have been reviewed and considered by the Arbitrator.[7] The parties also submitted opening and closing oral arguments.[8] Having

---

[5]    In view of Rajaee's circumstance of being self-represented in the evidentiary hearing proceedings conducted with respect to the parties' respective tort claims and counterclaims, Rajaee was given the oath and then allowed to make statements during the course of the proceedings. As reflected in Order No. 21, Rajaee was allowed the opportunity to cross-examine Davis and his damages expert (Michael S. Hawes), and Davis's counsel opted to not cross-examine Rajaee concerning his statements. *See Order No. 21.*

[6]    On or about December 15, 2022, counsel for the LLC submitted and served a notice of dismissal with prejudice of the derivative claim for breach of fiduciary duty against Davis (Eighth Claim for Relief), which the LLC's counsel confirmed during the March 20, 2023, hearing proceedings. Additionally, on or about February 21, 2023, Davis submitted and served a withdrawal of his Fourth Claim for Relief seeking constructive trust and injunctive relief against Rajaee, as well as his request for punitive damages, which Davis's counsel confirmed during the March 20, 2023, hearing.

[7]    Rajaee did not submit an opening or closing brief in connection with the Hearing on the parties' respective tort claims and counterclaims conducted on March 10, 2023. However, Rajaee's prior counsel did submit extensive briefing on Rajaee's behalf in connection with the earlier evidentiary hearing proceedings.

[8]    In addition to submitting closing briefs with respect to the evidentiary hearing proceedings conducted regarding the Bifurcated Issues, the parties' counsel requested an opportunity to make oral closing arguments. That request was accommodated, and closing oral argument was conducted via video conference on Monday, May 9, 2022, at 2:30 p.m. Pacific Time. Ethan J. Brown, of Brown Neri Smith & Khan LLP, appeared on behalf of Rajaee and the LLC. Scott R. Carpenter, of Cummins & White LLP, appeared on behalf of Davis.

3

reviewed and analyzed the submitted evidence, applicable law, the arguments of the parties' counsel, and the arguments of Rajaee (appearing *in propria persona*) at the March 20, 2023 hearing, it is the Arbitrator's determination that the submitted claims, counterclaims and issues are ready for final determination.

This Award is based upon those facts found by the Arbitrator to be true and necessary to the determination of the claims, counterclaims, affirmative defenses and issues submitted in this matter, as well as the inferences drawn from the evidence presented by the parties. To the extent that this Award may differ from any party's argument or position, that is the result of determinations made by the Arbitrator with respect to witness credibility, burden of proof considerations, the weight given to the evidence, and the inferences drawn from the evidence. This Award refers to certain exhibits, testimony and argument, but does not and could not make reference to every item of evidence, every cited authority, or every argument advanced. Failure to mention other testimony, exhibits or arguments is not intended and should not be construed as a lack of consideration by the Arbitrator of such matters.

This Award represents the culmination of the Arbitrator's determinations on all claims, counterclaims, affirmative defenses and issues submitted in this matter after hearing all evidence that the parties had to offer, and after reviewing and considering the parties' evidence and arguments. This Award concludes the arbitration of the parties' respective claims, counterclaims and affirmative defenses as submitted for determination in this matter.

### 2.    Arbitral Jurisdiction

On May 9, 2017, Rajaee and Davis entered into the Agreement. It is undisputed that the Agreement governs the relationship between Rajaee and Davis as members of the LLC. The validity and enforceability of the Agreement were not disputed in this matter. To the contrary, both parties have relied on various provisions of the Agreement in support of their respective claims, counterclaims and arguments in this arbitration.

Included in the Agreement is a section providing for binding arbitration of disputes that might thereafter arise between the parties. Paragraph 11.2 of the Agreement provides as follows:

Any action to enforce or interpret this Agreement, or to resolve disputes with respect to this Agreement between the Company and a Member, or between or among the Members, will be settled by arbitration in accordance with the rules of the American Arbitration Association.

4

Arbitration will be the exclusive dispute resolution process in the state of California, but arbitration will be a nonexclusive process elsewhere. Any party may commence arbitration by sending a written demand for arbitration to the other parties. The demand will set forth the nature of the matter to be resolved by arbitration. The Manager will select the place of arbitration. The substantive law of the state of California will be applied by the arbitrator to the resolution of the dispute. The parties will share equally all initial costs of arbitration. The prevailing party will be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration. All decisions of the arbitrator will be final, binding, and conclusive on all parties. Judgment may be entered on any such decision in accordance with applicable law in any court having jurisdiction of it. The arbitrator (if permitted under applicable law) or the court may issue a writ of execution to enforce the arbitrator's decision.

*Davis Exhibit 2, ¶ 11.2.*

This matter concerned disputes between Rajaee and Davis regarding their respective rights and obligations under the Agreement and as members of the LLC. This matter also concerned a dispute between Rajaee and Davis concerning the dissolution and wind-up of the LLC, as well as the LLC's breach of fiduciary duty claim against Davis.

Rajaee voluntarily submitted his claims and disputes with Davis to arbitration by filing a demand for arbitration with the American Arbitration Association (*"the AAA"*) on or about February 23, 2021. Thereafter, Davis voluntarily appeared in the arbitration without objection, and filed an answering statement, with affirmative defenses, and a counterclaim, which included the first counterclaim for dissolution and final accounting of the LLC. The LLC voluntarily appeared in this arbitration, initially represented by the same counsel as Rajaee and later represented by independent counsel. Rajaee filed an answer to the counterclaim with denials and affirmative defenses, and did not contest the jurisdiction of this tribunal over any of the submitted disputes.

Under California law, arbitrators have authority to make orders which provide for equitable relief. *Mercuro v. Superior Court*, 96 Cal. App. 4th 167, 177-178 (2002). California case law has recognized that limited liability company dissolution disputes may be arbitrated. *See Malek Media Group LLC v. AXQG Corp.*, 58 Cal. App. 5th 817 (2020) (case involving irreconcilable differences between members and various breaches of the parties' operating agreement).

5

Based upon the foregoing, as well as the appearances and submissions made by Rajaee, Davis and the LLC parties during the course of the Hearing proceedings, and the matters submitted to the Arbitrator during the course of this arbitration, all without objection to the Arbitrator's jurisdiction until *after* she ruled on the Petition through Order No. 4, it is the Arbitrator's determination that the parties' respective claims, counterclaims, affirmative defenses and requests for relief, are subject to and were submitted voluntarily to binding arbitration before the undersigned Arbitrator.[9]

### 3.    Background Facts Pertinent to this Final Award

The background facts pertinent to this Final Award are as follows:

1.    When Rajaee and Davis decided to go into business together, they had limited experience working together through their respective relationships with a company called Surge. Rajaee provided services and consulting to Surge through Mobile Monster. Davis was an investor in Surge. They met through a Surge management meeting in 2016. Their common thread was that they both parted ways with Surge, and ended up suing Surge for different reasons, and being represented by the same attorney in those litigation matters. *2021 RT 410-420 and 423-424.*[10]

2.    When Rajaee and Davis decided to go into business together, they engaged an attorney to formalize their business relationship. *RT 428.* That relationship took the form of a limited liability company (the LLC) as the vehicle through which they would engage in a software development and consulting business, with a governing operating agreement that they both signed as co-members (the Agreement). *Davis Exhibit 2.*

---

[9]  In his opposition to the Petition, Rajaee did not object to the jurisdiction of this tribunal to decide the matter. To the contrary, Rajaee totally engaged on all issues and submitted both evidence, briefing and argument. Even after lodging his objection to the Arbitrator's jurisdiction – *post-issuance* of Order No. 4 – Rajaee participated full heartedly in the evidentiary proceedings on the Bifurcated Issues by (a) consuming more than half of the hearing time, (b) engaging an expert to offer her financial analysis and opinion regarding the even-up accounting between Rajaee and the LLC, and (c) offering dozens of exhibits into evidence. *See Order No. 16.*

[10]  There are two sets of reporter transcripts in this matter, both of which start with page 1. The reporter transcripts for the December 2021 hearing proceedings on the Petition will be referred to as "2021 RT." The reporter transcripts for the April 2022 hearing proceedings on the accounting will be referred to "2022 RT."

6

3.    The Agreement is an integrated agreement and expressly provides that its terms can only be modified or amended "by a written instrument executed by all of the parties." *Davis Exhibit 2, ¶¶ 13.1 and 13.11.* Both Rajaee and Davis testified that no such written instrument exists. *2021 RT 199-200 and 239.*

4.    With respect to Rajaee's and Davis's initial capital contributions and ownership interests in the LLC, the Agreement states that their respective capital contributions are "TBD", and Exhibit B to the Agreement was left blank. *Davis Exhibit 2.* However, absent an agreement to the contrary – which was not shown to exist in this case – the terms of the Agreement provide for voting rights and the allocation of profit and losses to follow the capital contributions of the LLC's members. *Davis Exhibit 2, ¶¶ 4.1, 5.2, 5.3, 5.4 and 7.1.*

5.    Rajaee testified that it was his requirement that Davis be responsible for capitalizing the LLC venture because he wanted to "de-risk" himself – i.e., he did not want to be at risk in the new venture. *2021 RT 421.* Rajaee and Davis agreed that the capital investment in the LLC would be $750,000. *Id.* Davis invested the initial $750,000 to start the LLC. *2021 RT 233-234.* That capital investment is recognized in the LLC's tax returns. *Davis Exhibits 8, 9, 10 and 11.* This was consistent with Rajaee's testimony that he expected Davis to contribute all of the capital because he did not want to be at risk in the new LLC venture. Additionally, Rajaee testified that he perceived himself as "bringing all the value to the company" through his knowledge about how to generate leads and close deals. *2021 RT 421-422.* Rajaee acknowledged that he was not going to be contributing uncompensated sweat equity to the LLC; that it was agreed at the outset that he would be paid a guaranteed salary of $200,000.00 per year. *2021 RT 422.* The LLC has paid Rajaee for his services, as reflected on the LLC's profit and loss statements, tax returns and bank statements. *Davis Exhibits 3, 4, 5, 6, 7, 8, 9, 10, 11 and 21.*

6.    A "capital call" for $76,000 was made by Rajaee in November 2020, and Rajaee and Davis contributed approximately $38,760 and $37,240, respectively, to the LLC. *Rajaee Exhibit 65, Davis Exhibits 11 and 21.* While these contributions were recognized on the LLC's 2020 tax return as capital contributions, there was no change to the capital structure of the LLC in terms of the K-1s for Davis and Rajaee. *Davis Exhibit 11.* Davis was still reported as having a 100% capital interest in the LLC, and Rajaee was still reported as having a 0% capital interest in the LLC. *Id.*

7

7.    For tax years 2017, 2018, 2019 and 2020, the LLC's tax returns, as filed with the IRS, have reported that Davis owns 100% of the capital in the LLC. *Davis Exhibits 8, 9 10 and 11.* Those returns were prepared by an accounting firm selected by Rajaee, and were prepared under his direction as the "tax matters partner."

8.    Rajaee testified that he never paid "attention to all of the details" in the tax returns; that he just looked at the line items for "how much revenue we did, how much expenses we had, how much taxes we have to pay," and that "[e]verything else is handled by [the accountant] in consulting with them." *2021 RT 93.* As pertains to how profits and losses were allocated between Rajaee and Davis, Rajaee testified that he has no understanding of why his profit share allocation went from 0% to 6.5% in 2017 and from 6.5% to 51% in 2018; that he does not recall having any discussions with the accountant or Davis about that; that he "put full trust in [the accountant] to account for everything," and simply "followed [the accountant's] advice on where the numbers landed." *2021 RT 81-90.* Davis testified that other than the email exchange in February 2020, discussed in Section 4(A), below, he never discussed the capital structure of the LLC with Rajaee or the LLC's accountant. *2021 RT 236-237.* No one from the LLC's accounting firm – Lavine, Lofgren, Morris & Engelberg LLP (*"the CPA Firm"*) – was called to testify in the proceedings on the Petition.

9.    Rajaee testified that he covered a number of the LLC's operating expenses through charges put on his personal American Express card and through monies paid to or for the benefit of the LLC. To the extent that such expenditures or contributions were in fact made and were not reimbursed, they were not treated as capital contributions according to the LLC's tax returns. *Davis Exhibits 8, 9, 10 and 11.* In this regard, the profit and loss statements and LLC bank statements show that large sums of money have routinely been transferred out of the LLC to Rajaee or Mobile Monster. *Davis Exhibits 3, 4, 5, 6, 7 and 21.* Rajaee contends that he has "loaned" money to the LLC for which he has not been repaid. Rajaee's testimony about the amount of the LLC's alleged loan indebtedness varied between $700,000 and $1,700,000. *RT 111-116.* Whether such loan indebtedness in fact exists is a matter to be decided at another time – the accounting. The only relevance here is that it shows that, consistent with Rajaee's stated initial position that he did not want to be at risk in the LLC venture, he has viewed any infusions of cash to help fund the LLC's operations as loans – not capital – and maintained that position in the proceedings on the Petition.

10.    The Agreement specifically recognizes Rajaee and Davis as the "Initial Members" of the LLC. *Davis Exhibit 2, ¶ 1.24.*

8

11.     The Agreement defines a "Membership Interest" as "a Member's entire interest and rights in the Company, collectively, including the Member's Economic Interest, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company." *Davis Exhibit 2, ¶ 1.34.*

12.     Under the terms of the Agreement, Rajaee was designated as the LLC's Manager. *Davis Exhibit 2. ¶ 2.9.* Rajaee has acted in the capacity of Manager and "tax matters partner" of the LLC since its inception, and is currently acting in those capacities with regard to the transactions he has entered into and decisions he has made for the LLC since the parties' disputes arose in February 2021.[11]

13.     The Agreement requires the Manager to maintain accurate books and records for the LLC. *Davis Exhibit 2, ¶ 6.3.*

14.     Rajaee testified that there have been lapses in the LLC's accounting as relates to the way expenses charged on Rajaee's personal American Express card or advanced by Mobile Monster have been booked in the LLC's records such that the LLC's accountants have told him that it is not possible to tell, by looking at the LLC's books and records, what the particular expenses of the LLC are; that the transactions are "all overlapping;" and that it is not possible to produce an accurate balance sheet based upon the data maintained in the LLC's accounting records. *2021 RT 121.* Moreover, a cursory review of the profit and loss statements in comparison to the LLC's bank statements suggests that the two do not tic-and-tie. For example, the "guaranteed" payments to Rajaee through October 2021 total approximately $671,000 according to the profit and loss statements, but the debits for withdrawals and transfers made to Rajaee, according to the LLC's bank statements, total approximately $2,800,000. *Davis Exhibits 3, 4, 5, 6, 7 and 21.* For another example, the LLC's bank statements for February 2021 shows a $447,723.80 transfer to Rajaee coded as "Loan Payoff Balance to AR," but Rajaee testified that he is unable to produce a balance sheet for the LLC; that

---

[11]  *E.g.,* having the LLC lease a jet purchased by Rajaee through his wholly-owned company (RemotePreneurs); having the LLC enter into a charge or debit card relationship with a company in which Rajaee has a 95% interest (SpendHub); and giving himself a $175,000 raise in guaranteed salary *after* Davis filed a lawsuit seeking to dissolve the LLC. *2021 RT 156, 160-164, and 170-171.* Whether such transactions and decision making constitute "self-dealing" and/or "mismanagement" of the LLC are matters to be decided at another time - the evidentiary hearing on the merits of the parties' respective damages claims and counterclaims. The only relevance here is that it explains the reason for the deep divide and discord that exists between Rajaee and Davis. Davis believes that the transactions were improper because they were done without his advance approval. Rajaee believes that the challenged actions / decisions qualify as "ordinary course" transactions. *2021 RT 191.*

9

he is only just now working with the LLC's accountants to try to create an accounting with regard to what monies he advanced to the LLC that have not been reimbursed; and that he believes he is still owed over $1,000,000. *2021 RT 115-121.*

15.     The Agreement requires that the books of the LLC "be closed and examined" at the end of each fiscal year, and that the LLC's certified public accountant issue an annual statement "reflecting the financial condition of the Company and its Profits or Losses." Such annual reports are to "be given to all Members," and are to include "[a] balance sheet and income statement, and a statement of changes in the financial position of the Company" and "[a] statement showing the Capital Account of each Member as of the close of the fiscal year and the distributions, if any, made to each Member during the fiscal year." *Davis Exhibit 2, ¶ 6.4.*

16.     While the LLC has engaged an outside accounting firm since its inception, the LLC does not maintain a balance sheet and no annual reports have ever been prepared or issued to the LLC's members. *2021 RT 117-118 and 191-192.*

17.     Article V of the Agreement sets forth the terms related to management of the LLC, and provides for the business to be managed by Rajaee as its designated / named Manager. *Davis Exhibit 2, ¶¶ 5.1 and 5.4.*

18.     Notwithstanding the Manager's broad authority to run the day-to-day affairs of the LLC, the Agreement prohibits the Manager from taking certain actions without the consent of a "Majority of Members." *Davis Exhibit 2, ¶ 5.4.* "Majority of Members" is defined as "a Member or Members whose Percentage Interests represent more than 50 percent of the Percentage Interests of all Members." *Davis Exhibit 2, ¶ 1.28.* "Percentage Interest" is defined as "a fraction, expressed as a percentage, the numerator of which is the total of a Member's Capital Account and denominator of which is the total of all Capital Accounts of all Members." *Davis Exhibit 2, ¶ 1.39.*

19.     The LLC is a staffing services business that generates revenue by providing software developers to work on software development projects for LLC clients. According to Rajaee, the main way in which the LLC finds its clients is through leads generated by Mobile Monster, Inc., a Canadian company owned 100% by Rajaee (*"Mobile Monster"*). *2021 RT 111, 134.* Mobile Monster also employs staff and several groups of contractors that work to service the LLC's customers. "All of that payroll, all of those contractor payments, all of the travel expenses, all of the client visits that we do or marketing gets captured inside of Mobile Monster, and then Mobile Monster gets reimbursed from [the LLC] for the expenses it is incurring." *Id.*

10

20.    Up until February 2021 – when the disputes arose between Rajaee and Davis – Rajaee generally consulted with Davis on all matters and the LLC operated on a consensus basis between the two members. *2021 RT 187-189.*

21.    After the "blow up" telephone conversation between Davis and Rajaee on February 8 or 9, 2021, Rajaee had Davis removed from the LLC's bank account and has not communicated with Davis, except through counsel. *2021 RT 208; Davis Exhibit 19.* In this regard, Rajaee testified that "any questions that I need to answer that relate to my communications with [Davis] I find kind of a waste of time, because I don't talk to him. I've only talked to him, if I had to, through counsel." *2021 RT 165.* Rajaee testified that he has not spoken to Davis since February 2021. *2021 RT 72.*

22.    Outside of this arbitration, at the time of the hearing on the Petition, there were four separate court proceedings pending that relate to the disputes in this arbitration: one initiated by Davis against Rajaee,[12] one initiated by Mobile Monster against Davis,[13] one initiated by Rajaee against a former employee of the LLC (Siarra Wood),[14] and one initiated by two former employees of the LLC against Rajaee.[15] *Order No. 2, ¶ 2.4; Davis Request for Judicial Notice.*

23.    After Order No. 4 was issued, several more lawsuits were threatened or initiated by Rajaee. For example, Jennifer Glaser testified that Rajaee has threatened to sue her and the CPA Firm. *2022 RT 660.* For another example, during the course of the proceedings in this arbitration, the Arbitrator has been made aware of (a) an action filed on behalf of Rajaee in the San Diego Superior Court, which is commonly referred to as *Rajaee v. Davis,* Case No. 37-2022-00001968, in which Rajaee has petitioned the court for an order vacating Order No. 4, and (b) a cross-action filed in the Sacramento Action, in which Rajaee has petitioned the court for an order enjoining this arbitration. For a final set of examples, Rajaee testified that he hired a law firm (Fox Rothschild) to send

---

[12] *Tyler Davis v. Ashkan Mirfakhr-Rajaee, et al.,* Superior Court of the State of California, County of Sacramento, Case No. 34-2021-00301817 (***"the Sacramento Action"***).

[13] *Mobile Monster v. Tyler Davis,* Superior Court of the State of California, County of Sacramento, Case No. 34-2021-00301817.

[14] *Ashkan Rajaee v. Siarra Wood,* Superior Court of the State of California, County of San Diego, Case No. 37-2021-00008947.

[15] *Sarah Blanchette and Siarra Wood v. Ashkan Rajaee,* Superior Court of Justice, Ontario (CANADA), Case No. CV-21-00086316-000.

11

letters to the LLC employees working with Davis on the windup of the LLC, *2022 RT 535-536*, and Davis testified that Joshua Lintz, the former CEO of the LLC who agreed to stay on and help with the windup, quit "after being threatened by [Rajaee] and his legal counsel." *2022 RT 55.*

    **4.**    **Proceedings and Decision on the Petition for Dissolution [Evidentiary Hearing Proceedings Conducted December 1, 2 and 13, 2021, and Emergency Hearing Conducted January 13, 2022 – Order Nos. 4 and 5 Incorporated Herein]**

        **A.**    **Introductory Statement**

Pursuant to the applicable Commercial Arbitration Rules of the AAA, amended and effective October 1, 2013, and by request and submission of the parties,[16] a hearing was held on December 1, 2 and 13, 2021 for the purpose of hearing and deciding a threshold issue: namely, whether grounds or cause existed for ordering dissolution of the LLC, as requested by Davis in his Petition. Appearing at the hearing on the Petition were Scott R. Carpenter, of Cummins & White LLP, appearing on behalf of Davis, and Jordan Mathews, of Weinberg Gonser LLP, appearing on behalf of Rajaee. Also present during the course of the hearing were Davis and Rajaee. The hearing proceedings were recorded and transcribed by a certified court reporter. By agreement of the parties, through their respective counsel, the transcript of the aforementioned proceedings is part of the record in this arbitration.

The parties agreed, through their respective counsel, to an evidentiary hearing where Davis and Rajaee would be allowed to testify in favor and against dissolution, respectively, and be subjected to cross-examination by the other side.

In advance of the Hearing, both Davis and Rajaee provided briefs on the issues to be addressed at the Hearing. Additionally, the parties submitted declarations with exhibits. At the Hearing, the parties submitted hearing exhibits in the form of documentary and electronic (video) evidence. The parties also submitted testimonial evidence from Rajaee, Davis and Michael S. Hawes (*"Hawes"*), a certified public accountant who provided opinion testimony on behalf of Davis. The parties' counsel made opening statements and closing arguments at the Hearing and then concluded the matter with closing briefs. The record of the proceedings concerning Davis's Petition was concluded on January 4, 2022, with the submission of the reporter's transcript for the third day of hearing (December 13, 2022).

---

[16]  See *Order No. 2, § I, ¶ 5.*

12

The issues raised by the Petition were essentially two-fold: 1. Does Davis have the right to dissolve the LLC without Rajaee's consent? 2. If not, do grounds exist to order an involuntary dissolution over Rajaee's objection? While the parties' respective underlying claims and counterclaims contain numerous recriminations, it was not necessary to reach the merits of those claims in order to decide the narrow issues raised by the Petition. Ultimately, on the underlying damages claims and counterclaims, one party will be declared "right" and the other declared "wrong," but in the meantime and thereafter must Rajaee and Davis continue to do business together in the LLC? For the reasons discussed below, the answer to that question is "no."

> **B.    Ruling on the Petition and Factual Determinations Made With Respect to the Petition**
>
> > **(1)    Davis has the right to dissolve the LLC because he holds a majority of the Percentage Interests in the LLC.**

The operating agreement of a limited liability company governs, among other things, (a) "[r]elations among the members as members and between the members and the limited liability company"; and (b) "[t]he rights and duties under [the Act] of a person in the capacity as manager." Cal. Corp. Code § 17701.10(a)(1), (a)(2). Dissolution is a remedy that is authorized by Corporations Code section 17707.01.

Under paragraph 9.1 of the Agreement, the LLC will be dissolved on "[t]he written agreement of a Majority of Members to dissolve the Company." Davis claims to have made the election / decision to dissolve the LLC through his filing of a complaint for dissolution in the Sacramento Superior Court ("the State Court Action") and through his counterclaim for dissolution in this arbitration, as well as his filing of the Petition. The question is whether or not Davis holds more than 50% of the Percentage Interests in the LLC, and has the right to dissolve the LLC without Rajaee's consent and over his objection. The evidence in this matter supports a determination of "yes." Davis has the right to dissolve the LLC without Rajaee's consent and over his objection because (a) Davis holds a majority of the Percentage Interests in the LLC, as defined by the Agreement, and (b) the Agreement provides that the LLC may be dissolved by agreement of the "Majority of Members."

While the LLC's record keeping appears to have been less than perfect, two things are clear: (1) only Davis contributed capital to the start-up of the LLC, and (2) the LLC's outside accountants have reported on capital structure of the LLC on the LLC's annual tax returns for 2017, 2018, 2019 and 2020, which returns were signed under

13

penalty of perjury by Rajaee in his capacity as the LLC's "tax matters partner." All of the returns, without exception, state that Davis has a 100% capital interest in the LLC.[17] Under the definition of "Majority of Members" as set forth in paragraph 1.28 of the Agreement, Davis alone qualifies as the majority member of the LLC, even if capital investment credit were given to Rajaee for the $38,760 he contributed to the LLC in November 2020.

With the exception of the $76,000 Rajaee and Davis put into the LLC in November 2020 pursuant to a "capital call" by Rajaee to cover the LLC's operating expenses, Rajaee has never described any of the monies he advanced or loaned to the LLC as capital investments.[18] In this regard, Rajaee testified that when the LLC was formed in 2017, it was his requirement that Davis be responsible for capitalizing the venture because he did not want to be at risk in the new venture. *2021 RT 421.* The profit and loss statements created by the LLC's outside accounting firm show that more than $5,000,000 has been paid in "Consultant Reimbursement Expenses," which supports the inference that any advances Rajaee (or Mobile Monster) may have made to or for the benefit of the LLC were intended and treated as advances to be repaid by the LLC and not as capital Rajaee invested in the LLC. Moreover, Rajaee's claim in these proceedings that he believes he advanced or loaned over $1,000,000 to the LLC that has not been repaid further confirms that Rajaee has never intended that any "contributions" he may have made to cover the LLC's operating expenses were to be treated as a capital investment.

Rajaee testified that he had an understanding with Davis from the outset that he would own 51% of the LLC and Davis would own 49% of the LLC, irrespective of their respective capital contributions, because that is what he needed to qualify for a visa to live and work in the United States. *RT 103.* Assuming for sake of argument that those discussions did in fact occur, the alleged agreement or understanding is inconsistent with the terms of the Agreement Rajaee and Davis signed to memorialize the terms of

---

[17]    Rajaee pointed to the fact that he was allocated 51% of the profits in three of the LLC's tax returns as somehow being proof of an agreement between himself and Davis to the effect that he would have an ownership interest in the LLC that did not match his capital contributions to the LLC. While such an agreement is certainly possible. There was no evidence of such an agreement being reached between Davis and Rajaee to modify Article IV of the Agreement in this regard.

[18]    Schedule M-2 of the 2020 tax return recognized the $76,000 contribution as a capital contribution, and the K-1's for Rajaee and Davis recognized their contributions of $38,760 and $37,240, respectively. However, the capital interest percentages did not change as reflected on the K-1's. *Davis Exhibit 11.*

14

their business relationship in creating the LLC, and both agree that the Agreement has never been modified by a writing signed by both of them. *2021 RT 199-200 and 239.*

Rajaee pointed to a February 24, 2020 email exchange that started with Rajaee's assistant – Vania Hernandez – writing to the LLC's accountant – Jennifer Glaser (*"Glaser"*) – stating that Rajaee was "in need of a document that states TopDevz length in business as well as his ownership percentage" and that "[t]he document needs to be in LLME letterhead with your signature on it." *Rajaee Exhibit 5.* When Glaser asked what the letter was going to be used for, Rajaee responded that he was "buying a house." Glaser wrote back and asked if there was an updated operating agreement showing him as a 51% owner because she did not have documentation to support that statement. Rajaee then looped Davis in on the email chain and asked him to confirm ownership in the LLC as 51% to him and 49% to Davis. Davis responded "This is correct." Id.

As between Rajaee and Davis, there was insufficient evidence from which an inference could be drawn that Davis and Rajaee intended the email to constitute a written instrument signed by both parties, modifying the Agreement so as to specify the parties' respective ownership percentages that were previously left blank on Exhibit B. This is due in part to the fact that approximately 18 months after the February 24, 2020, email exchange - on September 13, 2021 - Glaser and her firm prepared the LLC's tax return for 2020 with Rajaee signing as the "tax matters partner" for the LLC. Again, the LLC's tax return reported Davis as having a 100% of the capital interest in the LLC and Rajaee as having a 0% capital interest in the LLC. *Davis Exhibit 11.* Like all of the other tax returns for the LLC, Rajaee signed the LLC's 2020 tax return as its "tax matters partner." Id. The reasonable inference to be drawn from this evidence is that Davis's "confirmation" email (a) was a friendly accommodation to Rajaee made in the context of Rajaee's effort to purchase a home in the United States,[19] (b) does not rise to the level of constituting an agreement between Rajaee and Davis regarding the capital structure of the LLC, and (c) appears to have *not* been something that the LLC's accountant or Rajaee (as the LLC's tax matters partner) relied upon in reporting the LLC's capital structure to the IRS in 2021 for calendar year 2020 because the stated capital accounts of Rajaee and Davis remained the same as in prior years. *Davis Exhibit 11.* The preparation of the 2020 tax return, as well as all prior tax returns, was done under Rajaee's direction as the LLC's "tax matters partner."

---

[19] Rajaee testified that he relied on the 51/49 discussions contained in the February 2020 email exchange in entering into the LLC with Davis. That testimony was not credible because Rajaee entered into the Agreement three years before the February 2020 email exchange, and there was no evidence that Rajaee did anything to his detriment after February 2020. To the contrary, the evidence showed that since February 2020, millions of dollars have flowed *out* of the LLC to Rajaee and his companies (Mobile Monster, SpendHub and Remote Preneurs), including over $490,000 paid out to Rajaee in July 2021. *Davis Exhibit 21.*

15

Rajaee also pointed to the fact that he was allocated 51% of the profits on the LLC's tax returns as proof of his 51% ownership stake in the LLC. The problem with Rajaee's position and testimony is that the evidence concerning the allocation of profits and losses to Rajaee was inconsistent. For example:

(1)    Rajaee's share of profit and loss at the beginning of 2017 was shown as "0.0000000%," but his profit and loss allocation at the end of 2017 was shown as "6.5383824%." *Davis Exhibit 8.*

(2)    Rajaee's share of profit at the beginning of 2018 was shown as "6.5383824%," but his profit allocation at the end of 2018 was shown as "51.0000000%." Rajaee's share of loss at the beginning of 2018 was shown as "6.5383824%," but his loss allocation at the end of 2018 was shown as "0.0000000%." *Davis Exhibit 9.*

(3)    Rajaee's share of profit at the beginning and end of 2019 was shown as "51.0000000%." Rajaee's share of loss at the beginning and end of 2019 was shown as "0.0000000%." *Davis Exhibit 10.*

(4)    Rajaee's share of profit at the beginning and end of 2020 was shown as "51.0000000%." Rajaee's share of loss at the beginning of 2020 was shown as "0.0000000%," but at the end of 2020 it was shown as "51.0000000%." *Davis Exhibit 11.*

The fact that Rajaee was allocated profits and losses of the LLC does not change the fact that (a) the Agreement required profits and losses to be allocated based upon members' capital account, *Davis Exhibit 2, ¶ 4.1,* and (b) Rajaee made only a small capital contribution in 2020, as discussed above. *Davis Exhibit 11.* In both the December 2021 and April 2022 evidentiary hearing proceedings, Rajaee *argued* that he had a 51% stake in the LLC and was entitled to 51% of the LLC's ownership and profits. However, that issue was determined against him during the December 2021 proceedings, as set forth in paragraph 4 of Section 3(B), above. As was the case in December 2021, during the April 2022 proceedings, Rajaee did not produce evidence of an agreement signed on by himself and Davis, agreeing to vary the terms of the Agreement. The fact that Rajaee and Davis may have agreed to a 51 / 49 profit split for tax reporting purposes when they were dividing losses or minimal profits ($240) is not enough evidence from which it can be inferred that Rajaee and Davis were willing to split profits on a 51 / 49 basis if there had been millions of dollars in the bank at the end of the year, especially since it was and still is the factual determination in this matter that only Davis put

16

money into the LLC that actually stayed in the LLC, as discussed in Section 3(B), above, and Section 4(E), below.

Rajaee himself testified that he never paid "attention to all of the details" in the LLC's tax returns and did not recall having any discussions with the accountant or Davis about the 2017 or 2018 changes in Rajaee's profit share allocation from 0% to 6.5% to 51%. *RT 89-93 and 193*. The suggested inference was that Rajaee's profit and loss allocations were changed without his knowledge or input, and that these changes were made by the accountants without the approval of the LLC's "tax matters partner." The LLC's outside accountant who prepared the LLC's tax returns[20] did not testify during the December 2021 proceedings. Glaser did testify during the April 2022 proceedings, and did not corroborate Rajaee's testimony that the LLC's tax returns were prepared without his knowledge or input. To the contrary, concerning the amendment to the 2017 tax return, Glaser testified that she discussed it with Rajaee, *2022 RT 610*, and the evidence showed that Rajaee signed the e-file authorizations for the LLC's tax returns, all of which included the attestation that he had reviewed them and believed them to be accurate. *Exhibits 811, 812 and 813*.

In final analysis, the only evidence of a capital contribution by Rajaee to the LLC is the $38,760 he contributed in November 2020.[21] Under the terms of the Agreement, Rajaee's Percentage Interest in the LLC is only 4.692% ($38,760 ÷ ($750,000 + $76,000) = .04692). As such, Davis holds the majority of Percentage Interests in the LLC and controls the vote of the Majority of Members. Accordingly, it is hereby determined that Davis owns 95.308% of the capital interest in the LLC and is the Majority Member with

---

[20]    During the April 2022 proceedings, Glaser testified that she was "in close contact with [Attorney Jordan Matthews] in the latter part of 2021, and had been instructed (a) not to give information directly to Davis, and (b) to only communicate with Davis through Mr. Matthews. *2022 RT 650- 651*. Glaser also testified that in late 2021, she gave documents to Rajaee's counsel that she did not provide to Davis, and wrote a letter to Mr. Matthews on December 9, 2021, on topics he dictated concerning the LLC that was not shared with Davis until the April 2022 proceedings. *2022 RT 653-654; Exhibit 295*. It thus appears that Rajaee made a calculated decision to not call Glaser as a witness during the December 2021 proceedings in an effort to control the narrative concerning the LLC's financial affairs. When Glaser eventually testified during the April 2022 proceedings, she did not corroborate Rajaee's testimony that the LLC's tax returns were prepared without his knowledge or input. To the contrary, concerning the amendment to the 2017 tax return, Glaser testified that she discussed it with Rajaee, *2022 RT 610,* and the evidence showed that Rajaee signed the e-file authorizations for the LLC's tax returns, all of which included the attestation that he had reviewed them and believed them to be accurate. *Exhibits 811, 812 and 813*.

[21]    During the April 2022 proceedings, Glaser testified that she was not aware of any capital contributions to the LLC other than Davis' initial contribution of $750,000 and the small capital call in November 2020. *2022 RT 644*.

17

regard to decisions that are subject to the vote of the Members or a "Majority of Members." Accordingly, Davis thus has the right, under paragraph 9.1 of the Agreement, to dissolve the LLC without Rajaee's consent and over his objection. That was the basis for Order No. 4, as discussed in Section 4(B)(3) and as confirmed in Section 9, below. Davis also has the right to exercise all other voting rights given to the "Majority of Members," including removal of the Manager.

> **(2)    Even if Davis is not the Majority Member, protective dissolution would be in order because management of the LLC is deadlocked and subject to internal dissension.**

Deadlock and internal dissension are grounds for dissolution under Corporations Code section 17707.03(b)(4). To obtain a decree of dissolution, the alleged dissension must be sufficient to prevent the further successful operation of the company to the advantage of its members. *Fuimaono v. Samoan Congregational Christian Church of Oceanside*, 66 Cal. App. 3d 80, 84 (1977); *see also BeUo v. Panorama Optics, Inc.*, 33. Cal. App. 4th 1096, 1105 (1995) (dissension evidenced by "completely different views as to the operation of the company"); *Buss v. J.O. Martin Co.*, 241 Cal. App. 2d 123, 136 (1966) (dissension shown where parties "hold contrary and opposing views on nearly all phases of the conduct of the business").

The irreparable deterioration of the relationship of Rajaee and Davis is evidenced by, among other things, (a) the aggressive claims and counterclaims that have been asserted in this arbitration and in the various companion court proceedings described in footnotes 12, 13, 14 and 15, (b) the fact that Rajaee and Davis have not spoken to each other since February 2021, and (c) the fact that Rajaee has instructed Davis to only speak to him through his attorney.

The discord and dissension within the relationship of Rajaee and Davis as co-members of the LLC is evidenced by their completely different views as to what qualifies as an "ordinary course" business expense within Rajaee's sole decision making authority and discretion as the LLC's Manager and what types of decisions are subject to approval by Davis. See, *Footnote 11.* As evidenced by the expenditures made by Rajaee since February 2021, the delta on these differing views is several hundred thousand dollars flowing out of the LLC to companies owned by Rajaee. *Id.*

18

### (3)    Order No. 4

Based upon the determinations made with regard to the Petition, as set forth in Sections 3 and 4(B)(1) and (2), above, the Petition was granted and Order No. 4 was issued on January 6, 2022, for good cause shown. Order No. 4 provides, in pertinent part, as follows, and is incorporated into this Final Award by this reference:

"1.    Davis owns 95.308% of the capital interest in the LLC, and Rajaee owns 4.692% of the capital interest in the LLXC. Davis thus owns the majority of the Percentage Interests in the LLC for voting purposes and has the right to elect to dissolve the LLC without the consent and over the objection of Rajaee.

2.    Protective dissolution of the LLC under Corporations Code section 17707.03(b)(4) is in order because management of the LLC is deadlocked and subject to internal dissension.

3.    Based upon Davis' request that the LLC be dissolved and the finding of deadlock and internal dissension within the management of the LLC, the LLC shall be dissolved pursuant to paragraph 9.1 of the Agreement and Corporations Code sections 17707.01(a) and 17707.03(b)(4). In accordance with paragraph 9.2 of the Agreement, the LLC will engage in no further business other than that necessary to wind up the business and affairs of the LLC. Davis, and only Davis or his designee, shall be responsible for managing, overseeing, and completing the dissolution of the LLC, and only Davis, or his designee, shall have the authority to take those actions necessary to accomplish the dissolution of the LLC.

4.    In accordance with paragraph 9.2 of the Agreement, Davis, is the Member of the LLC responsible for winding up the affairs of the LLC, and will give notice of the commencement of winding up by mail to all known creditors and claimants of the LLC. After paying or adequately providing for the payment of all known debts of the LLC (except debts owing to members), the remaining assets of the LLC will be distributed or applied in the following order:

19

(a)    To pay the expenses of liquidation;

(b)    To the establishment of reasonable reserves for contingent liabilities or obligations of the LLC. On the determination that reserves are no longer necessary, they will be distributed as provided in this order and paragraph 9.2 of the Agreement;

(c)    To repay outstanding loans to members, if any, which is among the issues to be determined in the accounting in this arbitration, in accordance with paragraph 9.2(c) of the Agreement; and

(d)    To the members with positive capital account balances, as provided in Article IV, paragraph 4.16 of the Agreement.

5.    Davis and only Davis, or his designee, shall have authority to access, disburse funds from, open and close bank and other financial accounts belonging to or standing in the name of the LLC. If any such action requires the signature of Rajaee on a consent, certificate, filing or other document, Rajaee shall provide such signature within three (3) business days of being advised by Davis, or his designee, that such signature is required.

6.    Based upon Davis' request that Rajaee be removed as Manager of the LLC, Rajaee shall be removed as Manager of the LLC, and only Davis or his designee shall replace Rajaee as Manager of the LLC. If this removal and/or replacement requires the signature of Rajaee on a consent, certificate, filing or other document, Rajaee shall provide such signature within three (3) business days of being advised by Davis, or his designee, that such signature is required.

7.    Rajaee is hereby ordered to provide a full and complete accounting of the LLC's finances from the date of its inception in 2017 through the date of this order. That accounting needs to track every dollar in and every dollar out with backup, especially as pertains to (a) monies withdrawn, transferred or otherwise paid as expenses of the LLC, and (b) monies advanced or loaned to the LLC by Rajaee.

20

8.      Rajaee is ordered to turn over to Davis or his designee the original books and records of the LLC, including any electronically stored information and all and paper records such as invoices, contracts, receipts, checks, bank statements, etc.

9.      Rajaee is ordered to fully cooperate in providing access to Davis or his designee with respect to all of the books and records of the LLC maintained by or in the custody of Lavine, Lofgren, Morris & Engelberg LLP.

10.     From the date of this order forward, unless and until modified or instructed otherwise by a court of competent jurisdiction, Rajaee shall not make or cause to be made any disbursements, transfers or withdrawals from any accounts standing in the name of the LLC without the signature approval of Davis, or his designee. Specifically, Rajaee shall not incur any debt in the name of the LLC without the signature approval of Davis or his designee.

11.     From the date of this order forward, unless and until modified or instructed otherwise by a court of competent jurisdiction, Rajaee shall not make or enter into any contracts or commitments on behalf of or in the name of the LLC without the signature approval of Davis, or his designee.

12.     Rajaee is ordered to cooperate in collecting any outstanding receivables owed to the LLC, and is ordered to turnover any and all collections to Davis, or his designee, for deposit into an account maintained by and in the name of the LLC."

21

(4)     **Post-Script to Order No. 4 – Order No. 5 and Factual Determinations Made With Respect Thereto**

On or about January 10, 2021, the Arbitrator was presented with an emergency motion to enforce Order No. 4. The impetus for the emergency motion was the fact that within hours of issuing Order No. 4, Rajaee had caused $900,000 to be wired to himself from the LLC's bank account[22] and $131,586.76 to be wired to an international account,[23] thereby leaving the LLC with insufficient funds to make payroll for its W2 and 1099 employees or to pay the expenses associated with the winding up of the LLC's business and affairs. The total amount Rajaee took from the LLC's Wells Fargo Bank Account (Account No. 1756821128) in violation of the Arbitrator's Order No. 4 was $1,031,586.76.

"Opposition" was filed with regard to the emergency motion, but those papers did not address the issue of Rajaee's direct violation of Order No. 4. Rather, the opposition talked about a demand Weinberg Gonser had received from Davis for the return of funds transferred to it by the LCC as a retainer, and about the perceived need on the part of Weinberg Gonser to cease representing Rajaee if it could no longer concurrently represent the LLC. In any event, the violation of Order No. 4 through the emptying of the LLC's bank account was not disputed.

On or about January 13, 2022, a duly noticed hearing on Davis's emergency motion was convened via video conference. Scott R. Carpenter, of Cummins & White LLP, appeared on behalf of Davis, and Jordan Matthews, of Weinberg Gonser LLP, appeared on behalf of Rajaee. The hearing proceedings were recorded and transcribed by a certified court reporter. The transcript of the proceedings on the emergency motion is part of the record in this arbitration.

As noted above, while opposition was submitted in response to the emergency motion on behalf of Rajaee, that opposition did not address the substantive issues raised by the Motion: most notably, what happened to the monies Rajaee caused to be transferred out of the LLC's bank account at Wells Fargo after Order No. 4 was issued? Significantly, Rajaee did not provide a declaration denying that he caused the

---

[22]   During the April 2022 evidentiary proceedings, Rajaee admitted that he took these funds; that he transferred the funds into an account in Canada; and that the account into which the $900,000 was deposited is not one held in the name of the LLC. *2022 RT 480-481.*

[23]   During the April 2022 evidentiary proceedings, Rajaee admitted that he wired these funds to Mobile Monster. *2022 RT 482-483.*

22

aforementioned monies to be transferred out of the LLC's bank account, and he did not appear at the Hearing to address, explain or otherwise respond to that circumstance. Additionally, according to Davis' counsel, Davis' efforts to obtain cooperation from Rajaee and the LLC's outside accounting firm with regard to turnover of the LLC's books and records and administrative access to its electronic records were frustrated at every turn by the lack of response from anyone. Neither Rajaee nor his counsel denied or disputed the offer of proof made by Davis' counsel concerning the lack of turnover of the LLC's books and records to Davis or the lack of cooperation forthcoming from Rajaee. Significantly, no challenge or argument was raised by Rajaee disputing the Arbitrator's jurisdiction over the claims and issues submitted via the Petition.

Having considered the papers the parties submitted with regard to the emergency, as well as the arguments made by the parties' respective counsel at the January 13, 2022, hearing, emergency relief was granted and Order No. 5 – Order on Emergency Motion to Enforce Order No. 4 (*"Order No. 5"*) was issued for good cause shown. Order No. 5 was marked as *Exhibit 804* in the April 2022 hearing proceedings. Order No. 5 provides, in pertinent part, as follows, and is incorporated into this Final Award by this reference:

"1.    Rajaee violated Order No. 4 when he transferred funds out of the LLC's account at Wells Fargo Bank, Account Number 1756821128, on January 6 and January 7, 2022, because Davis, and only Davis or his designee, had the authority to access, disburse funds from, open and close bank and other financial accounts belonging to or standing in the name of the LLC from approximately 2:00 p.m. on January 6, 2022, forward. Rajaee is hereby ordered to immediately return and/or replenish to the LLC, care of Davis, the $900,000.00 he transferred to himself at approximately 11:00 p.m. on January 6, 2022, as well as the $131,586.76, transferred out as an "international money transfer debit" on January 7, 2022.

2.    Rajaee's power and authority to act as the Manager and "tax matters partner" of the LLC ended as of approximately 2:00 p.m. on January 6, 2022. Only Davis or his designee has authority to act as Manager of the LLC, and may do so without Rajaee's consent and over his objection. Rajaee is hereby enjoined and restrained from accessing any LLC bank or financial accounts, transferring any funds from any LLC bank or financial accounts, or transacting business of any sort for or on behalf of the LLC without Davis's signature approval.

23

3.    Rajaee is hereby ordered to immediately return to the LLC, care of Davis, any and all documents, data, and/or tangible property removed or taken from the LLC since January 6, 2022, by Rajaee or any persons or entities under Rajaee's control who have acted on behalf of Rajaee. Rajaee, and his agents and representatives, are enjoined and restrained from accessing and/or removing any business records of the LLC without the signature consent of Davis or his designee, including but not limited to any electronically stored information and all and paper records such as invoices, contracts, receipts, checks, bank statements, and customer lists, customer data, vendor lists, vendor data, contractor lists, contractor data, accounts receivable documents and accounts payable records.

4.    Nothing in this Order No. 5 is intended or shall be construed as superseding Order No. 4. Order No. 4 remains in full force and effect."

*See Order No. 5 [Exhibit 804].*

### (5)    Post-Script to Order No. 4 – Order No. 6

As ordered by Order No. 4, and as duly noticed, a case management conference was convened via video conference January 21, 2022. Participating in the hearing were Connor Lynch, of Lynch LLP, appearing on behalf of Rajaee,[24] and Scott R. Carpenter, of Cummins & White LLP, appearing on behalf of Davis. At the time of the case management conference, this matter was set for a two-week evidentiary hearing on the balance of the parties' respective claims, counterclaims and affirmative defenses starting April 4, 2022. The parties' claims and counterclaims were essentially damages claims based on alleged tortious wrongdoing by the other.[25]

---

[24]  On January 14, 2022, a Notice of Substitution of Counsel was submitted advising that Connor Lynch, of Lynch LLP, was substituting in place of Jordan Matthews, of Weinberg Gonser LLP, as attorneys for Claimant in this arbitration.

[25]  In his second amended demand dated August 4, 2021, Rajaee asserted eight claims for relief seeking compensatory and punitive damages from Davis: defamation per se (First Cause of Action), civil extortion (Second Cause of Action), intentional infliction of emotional distress (Third Cause of Action), intentional interference with contract (Fourth Cause of Action), intentional interference with prospective economic advantage (Fifth Cause of Action), negligent interference with prospective economic advantage (Sixth Cause of Action), breach of fiduciary duty of care (Seventh Cause of Action), and a derivative claim for the LLC for breach of fiduciary duty (Eighth Cause of Action).

In his response to Rajaee's second amended demand, described above, Davis submitted and served a counterclaim, dated August 18, 2021, in which he asserted claims seeking compensatory and

24

When the evidentiary hearing was originally scheduled, it was assumed that, if dissolution was ordered, the accounting proceedings would be conducted in tandem with the hearing on the merits of the parties' respective tort claims and counterclaims. However, without Rajaee's cooperation and compliance with Order Nos. 4 and 5, the Arbitrator determined that that was not feasible. Accordingly, in accordance with AAA Rule R-32, the Arbitrator determined that it would expedite the resolution of the disputes in this matter if the LLC's final accounting and the even-up of accounts between Rajaee and Davis, as members of the LLC, was completed before turning to the determination of the merits of the parties' respective tort claims and counterclaims.

Pursuant to AAA Rule R-32(b), the determination of the remaining issues raised by Davis' Petition and first counterclaim was ordered bifurcated for determination "through evidentiary proceedings to be conducted on April 4 through 7, 2022 and April 11, 2022 (if needed) ("the Bifurcated Proceedings")." *See Order No. 6 [Exhibit 642].* These hearing dates were among the dates previously ordered, by agreement of the parties and their counsel, for the merits hearing in this matter. *See Order No. 2.* Order No. 6 was marked as *Exhibit 642* during the April 2022 hearing proceedings and is incorporated herein by this reference.

By agreement of the parties, through their respective counsel, an evidentiary hearing on the balance of the parties' tort claims and counterclaims was set for August 15 to 18, 2022, and August 22, 2022. *See Order No. 6 [Exhibit 642].*

5.    **Proceedings and Decision on the Final Accounting for the LLC [Evidentiary Hearing Proceedings Conducted April 4 through 7, 2022, April 11 through 14, 2022, and April 21 and 22, 2022 – Partial Final Award]**

A.    **Introductory Statement**

On April 4, 2022, a duly noticed hearing on the final accounting for the LLC was convened via video conference and continued thereafter on April 5 through 7, 2022, April 11 through , 2022, and April 21 and 22, 2022. Scott R. Carpenter, of Cummins & White LLP, appeared on behalf of Davis, and Ethan Brown, Geoffrey Neri, Tim Lamoreux, and Kete Barnes, of Brown Neri Smith & Khan LLP, appeared on behalf of Rajaee. The

---

punitive damages, as well as the imposition of a constructive trust, as against Rajaee, in addition to his First Cause of Action seeking dissolution and accounting of the LLC, based on allegations of breach of fiduciary duty and fraud by Rajaee.

hearing proceedings were recorded and transcribed by a certified court reporter. By agreement of the parties, through their respective counsel, the transcript of the proceedings on the final accounting is part of the record in this arbitration.

The issues raised for determination were quite narrow and, pursuant to Order No. 6, were specified in paragraph 1.9 as follows:

"Among the matters to be determined through the Bifurcated Proceedings are:

(a)    the reconciliation and final accounting of financial affairs of the LLC relative to the matters set forth in paragraph 4 of Order No. 4,

(b)    to determine whether there are any outstanding loans owed by the LLC to Rajaee or Davis,

(c)    to determine whether any surcharges should be assessed against Davis or Rajaee, and

(d)    to determine what, if anything, Davis or Rajaee is owed by or owes back to the LLC based upon the final reconciliation of the LLC's books and records and their respective capital accounts."

*Exhibit 642, p. 5 (emphasis added).*

In addition to the defined matters for determination, described above, paragraph 1.11 of Order No. 6 instructed the parties to "focus particular attention on substantiating [documentation showing the specific business expenses of the LLC that were paid through the transfer] the purpose of the transfers / withdrawals / payments out of the LLC as reflected in the LLC's bank statements[26] .... – and specifically including substantiation / explanation – for any transfers from the LLC to the following:

---

[26]    Paragraph 1.11 referenced Exhibit 21 -- the bank statements for the LLC's operating account at Wells Fargo Bank – because that was the only bank account that had been identified as of the close of the December 2021 hearing proceedings on the Petition. Later, in connection with the April 2022 hearing proceedings, Rajaee produced documents related to two LLC bank accounts he opened in 2017 with Canadian banks. Davis testified that he was unaware of the existence of these accounts before the production of these hearing exhibits. *2022 RT 43.*

(a)    Tyler Davis,

(b)    Ashkan Rajaee,

(c)    Mobile Monster

(d)    SpendHub,

(e)    Remotepreneurs,

(f)    Lone Mountain Aircraft, and

(g)    Any transfer(s) to a person or entity not described above where the cumulative total is more than $50,000."

*Exhibit 642, pp. 5-6 (emphasis added).*

In advance of the start of the proceedings on the final accounting, the Arbitrator received extensive submissions from the parties, all of which she read in advance of the start of the evidentiary hearing proceedings. Those submissions included the following:

(a)    Expert report by Michael Hawes, CPA, forensic accountant designated by Davis.

(b)    Expert report by Becky O'Malley, certified fraud examiner, designated by Rajaee.

(c)    Opening brief submitted on behalf of Davis.

(d)    Opening brief submitted on behalf of Rajaee.

(e)    Pocket brief submitted on behalf of Davis with regard to legal authorities concerning the legal standard to be applied where records are unavailable or incomplete.

(f)    Pocket brief submitted on behalf of Rajaee with regard to legal authorities concerning the legal standard to be applied where records are unavailable or incomplete.

27

(g)    Reply pocket brief submitted on behalf of Davis with regard to legal authorities concerning the legal standard to be applied where records are unavailable or incomplete.

(h)    Reply pocket brief submitted on behalf of Rajaee with regard to legal authorities concerning the legal standard to be applied where records are unavailable or incomplete.

In advance of the proceedings on the final accounting, counsel for Rajaee also submitted declarations by Rajaee and Kete Barnes offered in support of Rajaee's opening brief. Since this was not a matter where the parties agreed to submit direct testimony via declaration, and since counsel for Davis objected, the declarations were not read or considered. Both witnesses appeared throughout the proceedings and were thus available to testify if they chose to do so. In this regard, counsel for Rajaee acknowledged that the declarations and exhibits attached to the declaration were "duplicative" of what would be covered during live testimony. *2022 RT 7.*

During the course of the proceedings on the final accounting, the parties were afforded extensive hearing time – April 4 through 7, 2022, April 11 through 14, 2022, April 21 and 22, 2022, and May 9, 2022 (for closing oral arguments) – during which they presented their respective testimonial and documentary evidence, as well as the oral opening statements and oral closing arguments of counsel. Additionally, the Arbitrator was provided with opening and closing briefs by both parties. All of the above evidence, argument, briefing and related materials were reviewed and considered by the Arbitrator.

### B.    Burden of Proof

The LLC is a member-managed limited liability company where, up until January 6, 2022, Rajaee was the Manager and Tax Matters Partner – roles / titles that were given to Rajaee under the terms of the Agreement, and ones that he accepted and performed from May 2017 through January 6, 2022.

In a member-managed limited liability company, the manager-member owes the company and the other members the duties of loyalty and care. *Cal. Corp. Code. § 17704.09(a), (b) and (c).*

28

Rajaee's duty to account flows from the duty of loyalty. The duty of loyalty requires the manager-member to account to the limited liability company and hold as trustee for it any property, profit, or benefit derived by the manager-member in the conduct and winding up of the activities of the company or derived from use of the company property. *Cal. Corp. Code. § 17704.09(b)(1).*

In his capacity as trustee of the limited liability company's property, the manager-member "is held to something stricter than the morals of the marketplace." *Feresi v. The Livery, LLC,* 232 Cal. App. 4th 419, 426 (2014). Like any other trustee, a manager-member is obligated to render an account of his dealings with the company's property by satisfactory evidence.[27] Any doubt arising from a trustee's failure to keep proper records to substantiate the bona fides of his self-dealing transactions must be resolved against the manager-member in his capacity as the trustee of the company's property. See, e.g., *Purdy v. Johnson,* 174 Cal. 521, 527 (1917) (Any transaction whereby the trustee receives a benefit from the trust is presumed to be improper and the burden is on the trustee to demonstrate the bona fides of the transaction.)

As set forth in Section 4(B)(3), above, Rajaee was ordered to provide an accounting of the LLC's finances through the end of his tenure as Manager of the LLC (January 6, 2022). *Order No. 4, ¶ 7* (as quoted in Section 4(B)(3), above). Rajaee's accounting obligation was twofold: 1. at a minimum, to produce a balance sheet and profit and loss statement for year-end 2021 with supporting backup and schedules, and 2. specifically, to substantiate that the millions of dollars paid out to or for the benefit of Rajaee or his companies were for legitimate business expenses of the LLC. The first point is discussed in Section 5(C), below. The second point is discussed in Section 5(D), below.

---

[27] This is at odds with Rajaee's view of his authority as the Manager of the LLC, as was made apparent during the December 2021 proceedings. As discussed in Section 4(B) and footnote 11, one of the points of departure and points of disagreement between Rajaee and Davis that led to this dispute is Rajaee's belief that if an expense can fit within the rubric of "marketing," "customer relations" or "pursuing new business," it qualifies as an ordinary business expense that is within his complete discretion regardless of amount. *2021 RT 191.*

29

### C. Ruling on the Final Accounting for the LLC and Factual Determinations Made With Respect to the Final Accounting

#### (1)    Rajaee's Failed Accounting

Rajaee did not offer any type of accounting or financial statements for the LLC. Whether his failure is the result of neglect or intent is a matter for another day when the balance of the parties' respective damages claims are heard. For now, the consequence of Rajaee's failure to account results in the inference that Rajaee cannot account because (a) he failed to keep proper records for the LLC, Mobile Monster, SpendHub or RemotePreneurs and himself, and (b) the finances of the LLC are so "overlapping" and intertwined with Rajaee's personal finances and the finances of Rajaee's companies, it is not possible to do so. Both inferences are consistent with Rajaee's prior testimony in December 2021. *2021 RT 121.*

Instead of providing an accounting for the LLC as of the end of his tenure as Manager of the LLC, Rajaee focused his attention and much of his evidence presentation time on seeking to *relitigate* the rulings and determinations made with respect to the Petition, as discussed in Section 3, above. During the December 2021 evidentiary hearing proceedings on the Petition, Rajaee testified under oath that he did not contribute anything to capitalize the LLC; that he was adverse to doing so because he was trying to "de-risk" himself; and that his deal with Davis was that Davis would capitalize the LLC with an initial cash contribution of $750,000. The evidence throughout the proceedings has been undisputed that Davis contributed $750,000 to the LLC, and did so as requested and in the manner requested by Rajaee. As noted in Section 3(B), this testimony is consistent with what Rajaee told the IRS on the tax returns he signed as the LLC's tax matters partner for 2017, 2018, 2019 and 2020. *Davis Exhibits 8, 9, 10 and 11 (2017, 2018, 2019 and 2020 LLC tax returns), and Exhibits 811, 812 and 813 (e-file signature authorizations for the LLC's 2018, 2019 and 2020 tax returns).*

During the April 2022 evidentiary hearing proceedings, Rajaee *changed his story completely,* and testified that he matched Davis' capital contributions to the LLC through alleged contributions made by Mobile Monster in October 2017. The parties' respective capital contributions were determined pursuant to Order No. 4. The undersigned Arbitrator did consider Rajaee's new evidence, but it did not ring true, especially when contrasted with Rajaee's prior testimony under oath.

30

As an *alternative* to receiving capital contribution credit, Rajaee argued that he should receive "offset credit" for Mobile Monster's alleged advances to the LLC in October 2017. As discussed hereinbelow, that argument is rejected because it is not supported by the evidence.

Rajaee's "proof" of Mobile Monster's advances to the LLC was offered primarily through O'Malley – Rajaee's forensics expert – who relied on (a) general ledger entries in the LLC's books showing receipt of three payments in October 2017 from Mobile Monster totaling $755,837, *Exhibit 201, p. 19,* and (b) a newly discovered bank statement for a bank account Rajaee opened for the LLC in Canada at BMO Harris (account ending in 8497). The statements for the 8497 account show receipt of two wire transfer payments (one in the amount of $249,985 and one in the amount of $214,985). *Exhibit 245, p. 12.*[28] Rajaee testified that the LLC had a second Canadian bank account at BMO Harris (account ending in 7970), for which he could not find or retrieve the bank statements, and that the third advance by Mobile Monster was deposited into that account. *2022 RT 1780-1781; Exhibit 666.* Rajaee also introduced into evidence the bank statements for two bank accounts Mobile Monster maintained at BMO Harris in Canada (accounts ending in 144 and 702) to show the three outgoing wire transfers from Mobile Monster's accounts in October 2017 (*Exhibits 213 and 214*[29]), as well as a wire transfer "confirmation of wires" letter, dated April 11, 2022, from BMO Wealth Management to Mobile Monster. *Exhibit 666.*

The conclusion that Mobile Monster advanced funds to the LLC for which it was not repaid can only be reached if one limits his or her review to October 2017. Such a limited review of the evidence is not in order in this case because the transactions and dealings between the LLC and Mobile Monster span a much broader time frame. A broader review of the evidence shows that while Mobile Monster may have transferred $755,837 into the LLC in October 2017, the money did not stay in the LLC. Between August 2017 and April 2019, according to Mobile Monster's bank statements (*Exhibits*

---

[28] *Exhibit 245* is a partial set of statements starting in May 2017 and ending with March 2018. This is significant because there are numerous wire transfer transactions into Mobile Monster's BMO Harris accounts from the LLC that occurred after March 2018.

[29] *Exhibits 213 and 214* are partial sets of statements starting in May 2017 and ending with March 2021. This is significant because there have been numerous payment transactions to Mobile Monster from the LLC's operating account at Wells Fargo since March 2021. Without the Mobile Monster bank statements for the balance of calendar year 2021, it is not possible to see if there is still another active LLC account besides the Wells Fargo account. Notably, these account statements are all in Rajaee's control.

31

*213 and 214)*, Mobile Monster received $1,173,626 in transfers <u>from</u> the LLC, meaning that whatever monies Mobile Monster may have transferred to the LLC in October 2017 were fully replenished by the incoming wire transfers from the LLC reflected in Mobile Monster's bank statements for the 144 and 702 accounts:

| Wire Transfer Date | Transfer Amount | BMO Account No. | Comment |
|---|---|---|---|
| Aug 29 2017 | 29,543.41 | 702 | No MM Invoice |
| Aug 25 2017 | 37,676.83 | 702 | MM Invoice Nos 194 ($12,734.70), 196 ($12,736.96) and 197 ($12,205.17) |
| Sep 1 2017 | 44,365.31[30] | 702 | MM Invoice No. 195 |
| Nov 7 2017 | 59,133.67 | 702 | MM Invoice Nos. 198 ($40,746.15) and 199 ($18,387.52) |
| Dec 1 2017 | 75,000.00 | 144 | MM Invoice No. 202 |
| Dec 8 2017 | 276,900.00 | 144 | MM Invoice No. 207 |
| Dec 29 2017 | 78,705.45 | 702 | No MM Invoice |
| Jan 19 2018 | 23,100 | 144 | MM Invoice No. 208 |
| Mar 26 2018 | 276,957.73[31] | 702 | MM Invoice No. 209 |
| Aug 7 2018 | 47,052.04 | 702 | MM Invoice No. 220 |
| Mar 29 2019 | 151,648.08 | 702 | MM Invoice No. 243 |
| Apr 12 2019 | 73,543.49 | 702 | MM Invoice No. 246 |
| **TOTAL** | **$1,173,626.01** | | |

*Exhibit 213, pp. 47, 49, 73, 79, 81, 85, 87 and 88, Exhibit 214, pp. 68 and 70, and Exhibit 224, Bates Number 4152, 4154, 4155, 4156, 4157, 4159, 4162, 4163, 4164, 4173, 4193 and 4196.*

---

[30]    An outgoing transfer in this amount is reflected in the LLC's BMO Account number 8497. *Exhibit 245, p. 10.*

[31]    An outgoing transfer in this amount is reflected in the LLC's BMO Account number 8497. *Exhibit 245, p. 26.* Rajaee acknowledged that this was an outgoing transfer to Mobile Monster. *2022 RT 930-931.*

Rajaee testified that the Mobile Monster deposits of $755,837 were "erroneously" booked as sales revenue on the LLC's books. Given the evidence and findings discussed above, this issue is a moot point, especially since Rajaee – as the LLC's Manager – was responsible for maintaining the LLC's books and records and the inferences being drawn against him in that regard. However, given that Rajaee was the only one involved in generating sales for the LLC in 2017, it begs credulity that Rajaee would not notice a $750,000 error when gross sales for the year were only about $890,000. *Davis Exhibits 3 and 8*. If the $755,837 had been backed out of the profit and loss statement and tax return for 2017, the LLC would have reported only about $140,000 in sales with over $1.3 million in expenses, and there would be unexplained issues concerning (a) the monies the flowed into the LLC's Canadian bank accounts at BMO Harris, and (b) the monies that flowed from the LLC to Mobile Monster from an account or accounts other than the Wells Fargo operating account. As the person responsible for generating the LLC's sales in 2017, it is not credible that Rajaee would not have known what the LLC's true sales figure was for 2017 and would not have noticed a high six-figure error, if indeed there was an error.

In final analysis, Rajaee's testimony about Mobile Monster putting money into the LLC as a capital contribution or as unreimbursed advances is not credible because it is dependent on believing Rajaee's new story, which is at odds with his prior testimony and the records he has produced. Rajaee is one of the least credible witnesses the undersigned Arbitrator has ever heard testify, not just because Rajaee gave inconsistent testimony, but because he did so without acknowledging the contradiction and his seeming indifference to the oath he took, promising to answer truthfully all questions posed to him in the arbitration. Instead, over the course of the December 2021 and April 2022 Hearing proceedings, Rajaee testified as if the truth was something that he could change from day to day depending on his then current need, objective, whim or state of mind.

33

(2)    **Rajaee Failed to Substantiate that the Millions of Dollars Paid to Himself and His Companies Were for Legitimate Business Expenses of the LLC**

(a)    **Introductory Statement**

The accounting concerns the monies paid by the LLC to or for the benefit of Davis, Rajaee and their respective companies. It does not concern an accounting of what the LLC paid directly to its W-2 employees and the software developer contractors, which accounts for roughly 70% of the LLC's annual expenses, on average, as reported in the profit and loss statements prepared under Rajaee's direction and given to Davis, because those transactions were not questioned by Davis. *Davis Exhibits 3, 4, 5, 6 and 7.*

| Year | Consultant Expense | Payroll Wages & Taxes | Gross Sales | Percentage of Gross Sales |
|------|-------------------|----------------------|-------------|--------------------------|
| 2017 | 894,374 | 129,571 | 897,253 | 114% |
| 2018 | 2,430,281 | 401,078 | 3,730,376 | 76% |
| 2019 | 5,178,822 | 339,941 | 7,880,396 | 70% |
| 2020 | 2,674,249 | 152,401 | 4,309,844 | 66% |
| 2021 | 6,311,178 | 440,380 | 9,988,447 | 68% |

*Id.*

The even-up accounting also does not concern the expenses the LLC paid directly to outside third parties for such things as business and health insurance, bank charges, accountant fees, etc., which totaled less than $1,000,000 for the 4-1/2 year period of May 2017 through December 2021, because those transactions were not questioned by Davis. *Exhibits 3, 4, 5, 6 and 7.*

The focus of the even-up accounting was on what happened to the other Ten Million in revenue. To the extent monies were paid to Davis, as discussed in Section 4(E), below, the evidence showed that those payments were modest ($250,000) and undisputed. To the extent that monies were paid to or for the benefit of Rajaee or his companies beyond the agreed upon guaranteed salary ($933,300.00)[32] and the July

---

[32]   This figure is based upon $200,000 per full calendar year in 2018, 2019, 2020 and 2021, and 6.6 months for calendar year 2017 (May to December). See *Exhibit 801.*

34

2019 distribution of $50,000, the questions to be answered were "What was the business purpose or need?" and "What records exist to substantiate the business nature and amount of each transfer out of the LLC's operating account at Wells Fargo to Rajaee or one of his companies?" Despite the blizzard of paper produced by Rajaee during the course of the April 2022 hearing proceedings, Rajaee did not produce any records that substantiated or explained:

    (a)    the approximate $2.6 million in non-itemized "expenses" billed to the LLC by Mobile Monster for "reimbursement,"[33]

    (b)    the approximate $1 million transferred to Mobile Monster that was not supported by any invoices or other documentation,[34]

---

[33] See, e.g., *Exhibit 224, pp. 004166, 004171, 004175, 004177, 004178, 004180, 004188, 004189, 004190, 004192, 004194, 004198, 004200, 004215, 004220, 004229, 004227, 004225, 004223, 004231, 004232, 004234, 004235, 004237, 004238, 004239, 004241, 004243, 004247, 004248, and 004250.* The foregoing invoices total a little over $2.6 million. The foregoing Mobile Monster invoice analysis does not include the Mobile Monster invoices that tie to wire transfers into Mobile Monster's accounts 702 and 144, reflected as coming from "TopDevz LLC" that are not reflected in the statements for the LLC's account at Wells Fargo. Those invoices total $991,833.66, and have not been included in the offset analysis or charges because the Mobile Monster invoices and bank statements only came to light during the course of the April 2022 proceedings and were not included in the forensic experts' opinions. See, e.g., *Exhibit 224, pp. 004152, 004154, 004155, 004153, 004156, 004157, 004159, 004162, 004163, 004164, 004173, and 004193,* and *Exhibits 213 and 214.*

[34] An analysis of *Exhibit 629* (the spreadsheet exhibit to the Hawes opinion report showing the transfers out of the Wells Fargo account to Davis, Rajaee or one of their companies) in comparison to *Exhibit 224 (*the Mobile Monster invoices) shows that there were 13 transfers out of the LLC's account to Mobile Monster that are not supported by a Mobile Monster invoice and were not otherwise addressed or explained by Rajaee. Those transfers total almost $1.1 million and are summarized below:

| Date | Amount | Transferee |
|---|---|---|
| 7-16-2019 | $148,648.55 | The Bank of Montreal / Bnf=Mobile Monster |
| 8-15-2019 | $87,544.00 | The Bank of Montreal / Bnf=Mobile Monster |
| 9-13-2019 | $105,551.61 | The Bank of Montreal / Bnf=Mobile Monster |
| 11-21-2019 | $215,250.00 | The Bank of Montreal / Bnf=Mobile Monster |
| 1-21-2020 | $142,412.00 | The Bank of Montreal / Bnf=Mobile Monster |
| 2-25-2020 | $141,654.71 | The Bank of Montreal / Bnf=Mobile Monster |
| 2-25-2020 | $8,351.26 | The Bank of Montreal / Bnf=Mobile Monster |
| 6-9-2020 | $52,110.29 | The Bank of Montreal / Bnf=Mobile Monster |
| 7-10-2020 | $71,789.29 | The Bank of Montreal / Bnf=Mobile Monster |
| 2-9-2021 | $2,429.53 | The Bank of Montreal / Bnf=Mobile Monster |
| 3-3-2021 | $40,429.00 | The Bank of Montreal / Bnf=Mobile Monster |
| 3-15-2021 | $50,000.00 | The Bank of Montreal / Bnf=Mobile Monster |
| TOTAL: | $1,066,170.24 | |

35

(c)    the approximate $2.9 million transferred to Rajaee beyond (a) his guaranteed salary of $933,300 for 4.6 years of work, and (b) the $50,000 distribution matching that paid to Davis,[35]

(d)    the almost $800,000 of "expenses" charged by Mobile Monster employees to the LLC's account with SpendHub, with $250,000 being charged during the five-month period of July through November 2021,[36] and

(e)    the business purpose and details for the almost $200,000 in jet travel expenses charged or passed through to the LLC by Remotepreneurs in 2021.[37]

---

[35]  As discussed in Section 5(C)(2)(b), below, Rajaee is entitled to offset credit in the amount of $983,300.00 for his guaranteed salary (footnote 39) and matching $50,000 distribution paid in July 2019 because the evidence showed that those payments were mutually agreed to by Davis and Rajaee.

[36]  O'Malley's spreadsheet analysis of the vendors to whom Mobile Monster employees were incurring charges on the LLC's SpendHub account included all sorts of food, apparel, hotel and airline charges. See, *Exhibit 201, pp. 261-275.* No receipts or expense reports were produced to substantiate the business need or purpose for charging any of these items to the LLC. The evidence showed that $250,000 was charged to the LLC's SpendHub account in five installments of $50,000 each during the last half of 2021, which is after the discord and dissension between Rajaee and Davis had escalated to the point of this arbitration and the parties speaking to each other only through attorneys. The questions for Rajaee to answer were: "Who was traveling and eating at the expense of the LLC during this five-month time period, and for what business purpose?" Neither Rajaee nor his expert (O'Malley) answered this question.

[37]  It was established during the December 2021 proceedings that, after this arbitration and the related court litigation matters were filed, Rajaee made the unilateral decision to have the LLC lease a jet for his use and passed through to the LLC the maintenance, fuel and operation expenses charged by Lone Mountain Aircraft for that aircraft. *2021 RT 156, 160-164 and 170-171.* No evidence was offered to show why a staffing company such as the LLC needed a private jet for its Manager or how such private jet travel inured to the benefit of the LLC. All that was offered in this regard was Rajaee's testimony that the expenses associated with his private jet travel tied to marketing because it promoted *him* and his "crazy" life and what he and his team did on a day-to-day basis as a way "to get content in front of an audience on LinkedIn, and the Google Ads" so that the content "would be entertaining to watch." *2022 RT 1330-1331.* According to Rajaee, the videos he produced were responsible for landing some significant accounts for the LLC "because [the customer] remembered the plane or the Bentley or the Zoom call where one of our developers was caught having sex on Zoom ... and that was all just part of the content." *2022 RT 1331.* Rajaee, however, failed to show that any account was the result of the "marketing" efforts that focused largely on Rajaee and his lifestyle. See, *Rajaee Exhibits 51A, 52A, 53A, 54A, 55A, 56A and 57A; 2021 RT 579-594.*

36

**EXHIBIT 2, Page 157**

         **(b)**    **The Evidence Showed that the Amount Rajaee**
                 **Needed to Substantiate was $7,670,151**

Hawes' analysis of payments made to or for the benefit of Rajaee or his companies was based on the information reflected in the bank statements for the LLC's operating account at Wells Fargo,[38] and covered the period of November 2017 through January 2022, which included the $131,586 and $900,000 paid out to Mobile Monster and Rajaee, respectively, on January 6, 2022. *Exhibits 801 and 629.* O'Malley's analysis of payments made to Rajaee or his companies covered the period of May 2017 through December 2021, and thus did <u>not</u> capture or include the aforementioned January 6, 2022, payments. *Exhibit 201, Table 3.* O'Malley's analysis also did not identify the source of her cash disbursement numbers, *Exhibit 201, p.7, ¶ 10,* which varied from Hawes' totals. For example, Hawes showed that total payments out to Mobile Monster were $3,704,625. *Exhibit 801, p. 006.* O'Malley showed that total payments out to Mobile Monster were $4,454,018. *Exhibit 201, p. 8.* For another example, Hawes showed that total payments out to SpendHub were $830,052. *Exhibit 801, p. 006.* O'Malley showed that total payments out to SpendHub were $839,703. *Exhibit, p. 8.*

Because Hawes' opinion analysis tied to the statements for the LLC's operating account at Wells Fargo and included the January 6, 2022, transfers to Rajaee and Mobile Monster, whereas O'Malley's opinion analysis did not, Hawes' opinion testimony was given greater weight in deciding the issue with regard to the amount Rajaee needed to substantiate as business expenses of the LLC. That amount is $7,670,151, as summarized below:

---

[38]    The even-up accounting considered only the transactions reflected in the LLC's operating account at Wells Fargo because (a) the existence of the LLC's Canadian accounts at BMO Harris was not known to Davis before the April 2022 proceedings, and (b) the records for the LLC's accounts at BMO Harris were incomplete.

    (a)    $2,913,460 paid to Rajaee.[39]

    (b)    $3,692,586 paid to Mobile Monster.[40]

    (c)    $780,655 paid to SpendHub.[41]

    (d)    $49,908 paid to Remotepreneurs in 2021 for the jet the LLC leased in July 2021. *Exhibit 801, p 6; Exhibit 629.*

    (e)    $148,140 paid to Lone Mountain for expenses related to the operation and maintenance of the jet owned by Remotepreneurs and leased to the LLC. *Exhibit 801, p 6; Exhibit 629.*

    (f)    $85,402 paid to Anil Khera, a Mobile Monster expense that the LLC paid. Both Hawes and O'Malley agreed that it should be charged to Rajaee. *Exhibit 801, p 6; Exhibit 629; 2022 RT 1506.*

Putting the $85,402 payment to Anil Khera aside - since the parties' respective experts agreed that it was not a legitimate business expense of the LLC and should thus be charged to Rajaee - the call of the question in reconciling Rajaee's account with the LLC is whether there is sufficient evidence to substantiate some or all of the above transfers as payment of legitimate business expenses of the LLC.

---

[39] In his opinion report, Hawes showed a total of $3,915,782 going to Rajaee. *Exhibit 801.* On cross-examination, Hawes was asked to double check the information in his backup schedule – marked as *Exhibit 629.* Hawes found a duplicate entry of $22,772, requiring a downward adjustment. Hawes also found that an entry booked at $50,000 should have been booked at $53,750, requiring an upward adjustment. *Exhibit 801, p 6; Exhibit 629; 2022 RT 792-796.* Hawes then credited Rajaee with $933,300 for the guaranteed salary of $200,000 per year, which Davis testified he approved, and the July 2019 member distribution of $50,000, which the evidence showed was mutually agreed to and received by both Davis and Rajaee.

[40] In his report, Hawes showed a total of $3,704,625 going to Mobile Monster. *Exhibit 801.* On cross-examination, Hawes was asked to double-check the information in his backup schedule – *Exhibit 629.* Hawes found a duplicate entry of $61,436, requiring a downward adjustment. Hawes also found a transfer out to Mobile Monster that was incorrectly booked to SpendHub in the amount of $49,397, requiring an upward adjustment. *Exhibit 801, p 6; Exhibit 629; 2022 RT 792-796.*

[41] In his report, Hawes showed a total of $830,052 going to SpendHub. *Exhibit 801.* On cross-examination, Hawes was asked to double-check the information in his backup schedule – *Exhibit 629.* Hawes found a transfer out of Mobile Monster that was incorrectly booked to SpendHub in the amount of $49,397, requiring a downward adjustment. *Exhibit 801, p 6; Exhibit 629; 2022 RT 792-796.*

Both parties' experts agreed that they were not provided with the documents and information they needed or had requested. For example, O'Malley stated in her report that the ZoHo Books accounting system has a feature that ties to accounts payable supporting documentation such as invoices, bills, and receipts, but that supporting documentation was not always available for the transactions she was reviewing – namely, the support for the Mobile Monster "lumpsum invoices" and the transfers to Rajaee beyond his guaranteed salary. *Exhibit 201, pp. 12-13.* O'Malley further stated that during the course of her work, she "requested but did not receive certain documents and information that [were] relevant to [her] forensic analysis, to the extent that they exist," and that she was told that "these documents [were] not readily available." *Id. at p. 12.* With regard to her analysis of the transfers made to Mobile Monster pursuant to its invoices, O'Malley stated that the invoices had "lumpsum charges for lead generation, staff and consulting support, and expense reimbursements," and that she was told "that there is limited supporting documentation pertaining to how the invoice amounts were calculated." *Id. at p. 13.*

Hawes testified that he agreed with O'Malley regarding the missing documentation. *2022 RT 814-820.* Hawes testified that after spreadsheeting the monies transferred out of the LLC to or for the benefit of Davis, Rajaee or their respective companies, he then looked at all of the documents provided through the O'Malley report and the Hearing exhibits – "everything provided to me" – looking for "substantiation for the money going out." *2022 RT 97.* Beyond the instances where the evidence showed that monies were paid out by mutual agreement between Davis and Rajaee – e.g., the July 2019 member distributions and Rajaee's guaranteed salary – Hawes found that the bulk of the transfers out to or for the benefit of Rajaee or his companies were "non-substantiated payments." *Id. at pp. 103-114.*

The parties' experts took very different approaches to dealing with the missing documentation circumstance. Hawes held Rajaee to the standards imposed by the IRS for substantiating business expense deductions because the transactions concerned insider transactions where significant sums of money were flowing out to or for the benefit of Rajaee or his companies. *Id.* O'Malley relied on the information she found in the general ledger, Mobile Monster invoices and credit card statements while, at the same time, qualifying her analysis by noting that she was not provided with all of the documents or information she requested. Hawes questioned the reliability of O'Malley's forensic analysis given that she, admittedly, was provided with only part of the information she requested. *2022 RT 819.* The undersigned Arbitrator agrees with and adopts Hawes' criticism of O'Malley's analysis, and gave Hawes' analysis and opinion greater weight because it took into consideration (a) the fiduciary standards imposed on

39

managing members of a limited liability company, (b) the IRS requirements for substantiating business expenses for purposes of deduction from gross revenue to determine taxable income, and (c) the evidence in the case. Notably, concerning the evidence in the case, O'Malley's analysis ended as of December 31, 2021,[42] and thus did not include looking for substantiation for the $900,000 transferred to Rajaee or the $131,586.76 transferred to Mobile Monster on January 6, 2022, both of which were acknowledged/admitted by Rajaee in his April 2022 testimony. *2022 RT 481-483.*

> ### (c)   Rajaee Failed to Provide Sufficient Evidence that the Millions of Dollars Paid to or for the Benefit of Himself and His Companies Were for Legitimate Business Expenses of the LLC

As discussed in Section 5(B), above, Rajaee had the burden of proof to show that the millions of dollars paid to or for the benefit of himself and his companies by the LLC were for legitimate business expenses of the LLC. This should have been a simple accounting exercise, but Rajaee failed to do it. The following are merely examples and not an all-inclusive list:

- On December 19, 2017, three wire transfers were made to Rajaee in the amounts of $50,000, $50,000 and $53,750. What were these transfers for? Where is the documentation showing that these were reimbursement for an LLC expense paid by Rajaee – e.g., an invoice from the vendor and proof of payment by Rajaee? Rajaee produced nothing to establish the bona fides of these transfer transactions.[43]

---

[42] *Exhibit 201, pp. 3-6, 8, 15, 16 and 25.*

[43] According to O'Malley's analysis, these payments were booked in ZoHo Books as reimbursement to Rajaee for the JetSmarter membership. *Exhibit 201, p. 279 (Schedule 6).* However, O'Malley's analysis shows a companion invoice transaction from Mobile Monster in the amount of $113,511 related to the JetSmarter membership. There is a Mobile Monster invoice (No. 0210), dated December 21, 2017, directed to the LLC for reimbursement of the "JetSmarter Membership." *Exhibit 224, p. 004165.* The LLC's 8497 account shows an outgoing wire transfer on December 21, 2021 (recipient unknown), in the amount of $113,511.00. *Exhibit 245, p. 18.* Nothing was produced by Rajaee to show the actual amount charged by JetSmarter for the membership, or to explain why the LLC simply did not pay for the membership directly. Nothing was produced to explain why both Mobile Monster and Rajaee were being reimbursed for the JetSmarter membership or the amounts of those "reimbursements." O'Malley's forensic analysis ignored the apparent duplicate payment, and simply assumed that the $153,000 transferred out to Rajaee was valid without requiring any backup invoices from JetSmarter and without reconciling (a) the odd entries in the LLC's general ledger showing invoicing by Mobile Monster for reimbursement of a JetSmarter expense in the amount of $113,511.00 and payment to Rajaee in the amount of $153,000.00, or (b) the fact that Mobile Monster invoiced the LLC

40

- In December 2020, Mobile Monster invoiced and was paid $126,214.60 for "expense" reimbursement and "lead generation." What "expenses" were paid by Mobile Monster on behalf of the LLC. Where is the documentation showing that the charges being reimbursed were LLC expenses paid by Mobile Monster? To the extent that the invoiced amount includes a fee for "lead generation," what was the amount of that fee and how was it computed? Again, Rajaee provided no substantiation to show the bona fides of this transfer transaction.

- On November 21, 2019, a wire transfer was made to Mobile Monster in the amount of $212,250 for which there is no corresponding invoice. What was the transfer for? If it was an expense reimbursement, where is the documentation showing that Mobile Monster incurred or paid business expenses of the LLC totaling this amount? If it was repayment of an advance by Mobile Monster, where is the documentation showing unreimbursed advances owed to Mobile Monster as of this date?[44] Again, Rajaee provided no substantiation to show the bona fides of this transfer transaction.

- On July 28, 2021, a wire transfer was made to Rajaee in the amount of $447,723.80. What was that transfer for? If for reimbursement of LLC expenses paid for by Rajaee, where is the documentation showing (a) the existence of LLC business expense obligations in this amount, and (b) Rajaee's payment of those expenses? One would expect that Rajaee would know what he got such a large amount of money for, but Rajaee again provided no explanation or substantiation for this transfer transaction.

---

and appears to have received payment from the LLC from one of its Canadian accounts at BMO Harris, as discussed above.

[44] As discussed in Section 5(C), the evidence concerning Mobile Monster's bank accounts at BMO Harris show that between August 2017 and April 2019, Mobile Monster received wire transfers from the LLC totaling in excess of $1.1 million from an account *other than* the LLC's operating account at Wells Fargo.

41

While Rajaee produced a blizzard of paper during the course of the April 2022 proceedings,[45] with the exception of the $900,000 wired to Rajaee on January 6, 2022, which Rajaee acknowledged he simply took,[46] neither Rajaee nor his forensic expert addressed, explained or in any way substantiated a single one of the other documented transfers out of the LLC's operating account at Wells Fargo to or for the benefit of Rajaee or his companies. Instead, what Rajaee did was offer the "reverse engineering" opinion testimony of O'Malley, discussed below.

O'Malley is not a certified public accountant and is not licensed to sign off on public accounting reports or to represent taxpayers before the IRS. *2022 RT 1433-1434*. O'Malley is a certified fraud examiner whose "primary forte" is looking through forensic data for the purpose of forming conclusions about where money went. *Id.* O'Malley acknowledged that she "didn't have all of the information that [she] felt [she] needed to prepare a final accounting" for the LLC, and, with regard to the opinion analysis she provided, O'Malley testified that she was "missing quite a bit of information" when she developed her opinion, and was still missing information and did not have a complete picture of the LLC's finances as of the April 2022 hearing. *2022 RT 1433-1435*. In an effort to come up with a number that would appease (or please) Rajaee, O'Malley "reverse engineered" a reconciliation that consisted of selecting certain data from ZoHo Books,[47] analyzing various bank statements and credit card statements, and

---

[45]    While not all exhibits were offered or admitted into evidence, Rajaee's counsel presented the undersigned Arbitrator with 16 4-inch binders of proposed exhibits, consisting of tens of thousands of pages of paper, six of which binders were offered midstream during the course of the April 2021 proceedings.

[46]    Rajaee testified that he wired $1,031,586 out of the LLC account on January 6, 2022, and that he deposited $900,000 of those funds into an account in Canada that he controls and that is not in the LLC's name. *2022 RT 480-481*.

[47]    O'Malley testified that the $3.4 million in payments to Mobile Monster were recorded as "consultant reimbursement expenses" in the LLC ZoHo Books accounting system. *2022 RT 1441; Exhibit 201, p. 4*. The term "consultant reimbursement expenses" is not O'Malley's term. Rather, that was the term used in the ZoHo Books accounting database. *2022 RT 1442*. O'Malley testified that she does not know what types of expenses qualified for coding in this category; that she simply accepted the term and incorporated it into her report and opinion "as it was recorded in the general ledger." *2022 RT 1444*. O'Malley also testified that she was not provided with any documents to verify that the amount was correct or that the expense being reimbursed qualified as a business expense of the LLC; that she was told that "there is limited supporting documentation pertaining to how the [Mobile Monster] invoice amounts were calculated." *Exhibit 201, p. 13*. While O'Malley accepted on faith that the information contained in the general ledger maintained in ZoHo Books was reliable, even in the absence of any supporting evidence to substantiate the amounts and business purpose for the millions of dollars paid

42

interviewing Rajaee for information to fill in the gaps. Based upon O'Malley's postulated reconstruction, O'Malley concluded that (a) the monies paid to Rajaee and his companies were for legitimate business expenses, and (b) the LLC owes money to Rajaee. *Exhibit 201, p. 9 (Table 4).*

While the undersigned Arbitrator appreciated the professionalism and candor of O'Malley, the simple fact of the matter is that O'Malley did not substantiate as an LLC business expense a single transfer out of the LLC's Wells Fargo bank account to or for the benefit of Rajaee or his companies. Rather, what O'Malley did was *postulate* and try to create a *possible* justification for all of the monies the flowed out of the LLC to Rajaee and his companies. The undersigned arbitrator was not persuaded by O'Malley's testimony because it lacked foundation in terms of any concrete evidence. O'Malley's testimony, for the most part, was conjecture based primarily on what Rajaee told her, which she acknowledged she could not corroborate because the documents she requested were not provided to her.

O'Malley reached her opinion based upon what she described as a "reverse engineering" exercise. *2022 RT 1378.* That exercise was predicated on a number of assumptions – starting with the flawed assumption that Rajaee deserved offset credit for the \$755,837 transferred into the LLC's Canadian bank accounts in October 2017.[48] It was also predicated on an "analysis" of Rajaee's credit card statements, where she treated charges as LLC expenses based purely upon what Rajaee told her or based on her research into the vendors and her subjective determination that the vendors offered the type of goods and services a software development company *might* use. - *2022 RT 1378-1385.* In this regard, O'Malley testified that she thought her approach was "better" than relying on spreadsheets prepared by Siarra Wood.[49] *2022 RT 1382.*

---

out to Rajaee and his companies in five- and six-figure transactions, the undersigned Arbitrator is not willing to take the same leap of faith.

[48]  *See* discussion in Section 5(C).

[49]    O'Malley's testimony is significant because throughout the course of the Hearing proceedings, Rajaee and his counsel repeatedly referred to Siarra Wood – a former employee of Mobile Monster who lives in Canada and left the company in early February 2021 – as the only one in the world who had the documents and information needed to substantiate and explain the amounts paid out to Rajaee and his companies. On its face, this testimony was not credible that a staff level employee of Mobile Monster would have greater access to or control over the LLC's information than that of Rajaee – the managing member and tax matters partner – even 15 months after that employee terminated her employment with Mobile Monster. Moreover, a review of the Wells Fargo bank statements and the chart analysis (*Exhibit 629*), by date, of the amounts transferred to Davis, Rajaee and their respective companies, shows that almost \$3 million of the transfers to Rajaee and his companies occurred after

43

With regard to the SpendHub charges, O'Malley simply *assumed* that whatever Mobile Monster's employees charged to the LLC's SpendHub account were for legitimate expenses of the LLC.[50] *2022 RT 1389-1392; Exhibit 201, pp. 260-274 (Schedules 3 and 3A)*. Again, O'Malley reached this conclusion without addressing in any way the five transfers of $50,000 each from the LLC to SpendHub during the five month period of July through November 2021. O'Malley included the transfers in her spreadsheet (Schedules 3 and 3A), but did not explain how or on what basis she determined that these payments to SpendHub were for LLC expenses, what those expenses were or why they were so high for this five-month period.

Overall, in her review and analysis, O'Malley did not adhere to any standard of accounting, nor did she hold Rajaee to any degree of accountability with respect to his position as the managing member and tax matters partners of the LLC. In final analysis, O'Malley's postulated reconstruction is nothing more than a fictionalized account of the LLC's financial dealings with Rajaee and his companies, and offered nothing in the way of substantiating a single one of the numerous, high-dollar transfers out of the LLC's Wells Fargo account to Rajaee and his companies.

Hawes – Davis' expert – is a certified public accountant who has had a 45-year career handling both international and domestic tax clients. *2022 RT 92*. Hawes testified that he represents hundreds of tax clients before the IRS each year. *Id.* Hawes took a very different approach from that of O'Malley. Because Rajaee was the tax matters partner for the LLC, as well as its Manager, Hawes started from the premise that (a) Rajaee was a fiduciary of the LLC and had an obligation to maintain adequate records, (b) the bare minimum record-keeping was that which would satisfy the IRS that the expense being reimbursed to Rajaee or his companies qualified as a business expense of the LLC for deduction purposes, and (c) substantiating documentation of some sort was required because the transactions all involved five- and six-figure expenditures being made to or for the benefit of an insider (Rajaee or his companies). Hawes opined that if Rajaee could not substantiate the business expenses he or his companies purportedly paid on behalf of the LLC, or the basis for any fee charged to the LLC for services by Mobile Monster or SpendHub, then the expenditure does not qualify

---

Ms. Wood's departure from Mobile Monster. See, *Exhibit 629*. Still, Rajaee was unable or unwilling to provide any backup documentation to substantiate the business purpose of any of those transfers.

[50]    Notably, O'Malley did not flag or require substantiation for the $250,000 the LLC paid to SpendHub between July and November 2021 in five installments of $50,000 each before validating / accepting them as legitimate LLC business expenses. *See Exhibit 629 and Exhibit 201, p. 260 (Schedule 3).*

44

as a business expense of the LLC from an IRS tax deduction perspective and should thus be charged as a distribution to Rajaee. *2022 RT 116.*

Hawes testified that he requested from Rajaee's team the work papers, schedules and documentation to support the amounts charged by Mobile Monster on its invoices to the LLC, as well as the amounts purportedly paid on the LLC's behalf through SpendHub, and was "informed that there is minimal supporting documentation or none at all." *Exhibit 801, p. 004.* After reviewing all of the records provided to him, as well as the O'Malley report and schedules, Hawes opined that there was inadequate documentation to show that the monies paid to or for the benefit of Rajaee or his companies were legitimate business expenses of the LLC, and that Rajaee should thus be charged with having received a distribution in the amount of the transfers, less credit for his guaranteed salary ($200,000 per year) and the mutually agreed upon $50,000 distribution paid in July 2019. *2022 RT 109; Exhibit 801, pp. 06-008 and 039.*

Hawes opined that that the sum of $7,670,151.00 was paid to or for the benefit of Rajaee or one of his companies, and that this amount should be charged to Rajaee as a distribution which would give him a very significant negative capital account in that amount. *2022 RT 118.* Hawes opined that Rajaee's negative capital account – and resulting surcharge liability to the LLC – was $7.9 million when consideration was given to Rajaee's negative capital account as reported on the LLC's tax returns and after making some adjustments. *Exhibit 801, p. 008; 2022 RT 118.* While it was undisputed that the LLC reported to the IRS that Rajaee had a negative capital account at all times,[51] Hawes did not explain what the negative capital account figure was that he used to calculate the $7.9 million surcharge liability. Accordingly, the determination in this matter is that Rajaee's negative capital account and surcharge liability to the LLC is equal to the sum total of the unsubstantiated transfers to or for the benefit of Rajaee or his companies in the amount of $7,670,151.00; that Rajaee has a negative capital account in said amount.

---

[51] *See* LLC 2017 tax return which reported Rajaee as having a negative capital account in the amount of -$27,961 (*Exhibit 8*); LLC 2018 tax return which reported Rajaee as having a negative capital account in the amount of -$27,961 (*Exhibit 9*); LLC 2019 tax return which reported Rajaee as having a negative capital account in the amount of -$83,722 (*Exhibit 10*); and LLC 2020 tax return which reported Rajaee as having a negative capital account in the amount of -$181,081 (*Exhibit 11*).

EXHIBIT 2, Page 166

It was Rajaee's burden of proof to demonstrate the bona fides of each payment made to or for the benefit of Rajaee or his companies as a proper business expense of the LLC. As discussed above, Rajaee failed to carry his burden of proof. The undersigned Arbitrator notes that even if the burden of proof was on Davis to establish Rajaee's self-dealing, Davis met that burden. Through the evidence presented, Davis showed that there were $7,670,151.00 in unsubstantiated transfers to or for the benefit of Rajaee or his companies. Order No. 4 (Attachment 1 hereto) required that Rajaee turn over to Davis all of the financial books and records of the LLC. Davis and his expert – Hawes – found no substantiation for the transfers in those record, and Hawes found no substantiation in the O'Malley report or any of the Hearing exhibits. The burden thus shifted back to Rajaee the burden to establish that the payments made to or for the benefit of himself or his companies were for legitimate business expenses of the LLC. If such records were not in the LLC's records, one would expect that Rajaee, Mobile Monster, SpendHub or RemotePreneurs would have the backup documentation explaining the business purpose of the expenses purportedly being paid or reimbursed to or on their behalves.

### (d)    Rajaee Failed to Establish any Loan Indebtedness Owed to Him by the LLC

Rajaee introduced into evidence a Loan Agreement between the LLC (as borrower) and Rajaee (as lender) with regard to an alleged loan in the amount of $586.081.21. *Exhibit 212.* Rajaee provided no evidence of transfers or advances by him to the LLC to support the making of any loans or advances by Rajaee to the LLC. Accordingly, the alleged loan indebtedness reflected in the aforementioned Loan Agreement is not an outstanding loan owed by the LLC to Rajaee.

### (3)    Davis's Contributions, Distributions and Advances and Were Not Disputed

The parties' experts agreed that Davis contributed $750,000 to the LLC. The parties' experts also agreed that in July 2019, the LLC made a distribution to Rajaee and Davis in the amount of $50,000 each. *Exhibit 801, p. 6, Exhibit 629, Exhibit 201, p. 21.* Rajaee testified that in December 2021, a $175,000 distribution was paid to Davis and himself in 2019, but was captured on the LLC's P&L as an expense so as to not report a profit for that year.[52] Both parties' experts agreed that Davis, through his company

---

[52] According to the Wells Fargo bank statement, Mobile Monster received a payment in the amount of $175,109, which amount ties to Mobile Monster Invoice No. 239, and Grigio (a company owned by Davis) received a payment in the amount of $175,000.

46

Grigio, received a $175,113 distribution in 2019 that was booked as an expense for "consulting services." *Exhibit 801, p. 6; Exhibit 629, Exhibit 201, p. 21.* Both parties' experts agreed that Davis, through his company Grigio, received a $25,000 distribution from the LLC in July 2020 that was booked as an expense payment for "consulting services." *Id.* Based upon the foregoing, it is hereby determined that the $250,113 Davis received in payments and distributions from the LLC, as discussed above, were authorized and thus legitimate because (a) Rajaee authorized and initiated the payments as Manager of the LLC, and (b) Davis received and accepted them. There is no surcharge liability resulting from these transfer transactions.

In connection with the winding up of the LLC's affairs after the issuance of Order No. 4, the evidence showed that Davis advanced $269,000 to cover the operating deficit caused by Rajaee's withdrawal of over $1 million from the LLC's operating account on January 6, 2022. The business need for that advance was established, and evidence was presented showing that the funds were actually deposited in the LLC's operating account at Wells Fargo and did not flow back out to Davis or his companies in any fashion. Davis is entitled to be repaid on this advanced in accordance with the provisions of paragraph 9.2(c) of the Agreement as an "outstanding loan[] to Member," and is entitled to accrue interest at the rate of 6% per annum in accordance with the terms of the promissory note signed by the LLC until the loan has been repaid in full. *Exhibits 803, 824, and 826.*

### (4)    Davis's Final Accounting and Partial Final Award in Favor of the LLC Against Rajaee

Davis testified that despite Rajaee's lack of cooperation and direct interference with the windup of the LLC's affairs, he was nevertheless able to gain control over the LLC's finances and affairs. With the help of Joshua Lintz, the former CEO of the LLC (hired by Rajaee in 2020), Davis was able to salvage relationships with the software developer staff and customers for purposes of finishing up work in progress and collecting on those accounts. *2022 RT 59-61.* With the help of Melissa Garcia, the LLC's bookkeeper who was working under Rajaee, Davis was able to migrate the LLC's financial data from ZoHo Books into QuickBooks. With the help of an outside accountant, Joshua Lance, Hawes and Melissa Garcia, Davis was able to get the LLC's books and records in order so as to be able to issue a balance sheet and profit and loss statement. *2022 RT 51-52; Exhibit 800 (March 15, 2022) and Exhibits 823 and 824 (March 31, 2022).* The LLC's accounting records, as migrated and updated through Davis' windup efforts, was reviewed by Hawes, who opined that they were "substantially" accurate and that the balance sheet provided by Davis was a "fair statement" of the LLC's assets and liabilities as of March 2022. *2022 RT 94-95.*

47

The LLC is not a brick-and-mortar business. It is a "virtual business" that largely exists and does business "in the cloud." There are no furniture, fixtures or equipment. The LLC is a specialized staffing company that connects software developers (who are independent contractors) with customers who have software development needs.[53] Its developers and employees all work remotely. The only real assets of the LLC are (a) cash in the bank, and (b) accounts receivable. Rajaee testified that the software developers are assets of the LLC and can be sold, *2022 RT 1800-1804,* but the fact of the matter is that the developers are not chattel and cannot be sold to / forced to work for another company. Rajaee also testified that the contracts with the staffing customers are assets, *2022 RT 1800-1804,* but the evidence showed that the companies who engaged staffing through the LLC did so on a <u>short-term</u> contract basis – i.e., for one or two week assignments. *2022 RT 62.*

The LLC has no hard assets to marshal or sell. It is a specialized staffing company that connects software developers (who are independent contractors) with LLC customers who have software development needs. Davis testified that creditors of the LLC were notified of the dissolution and winding up of the LLC, and that the only significant debts remaining to be paid are:

- the severance liability owed to Joshua Lintz pursuant to the employment contract he negotiated with Rajaee – approximately $1,044,523.87 as of March 31, 2022;

- the contingent liability of Siarra Wood related to her lawsuit against the LLC – approximately $82,812.50 per her last settlement demand;

- the contingent liability of Sara Blanchette related to her lawsuit against the LLC – approximately $44,687.50 per her last settlement demand;

- the legal fees associated with the defense of the lawsuits filed against the LLC by Siarra Wood and Sara Blanchette – approximately $53,117.58;

---

[53]   Rajaee apparently told the CPA Firm something different. Glaser testified that it was her understanding that the LLC was a *marketing company* and was the "U.S. arm of Mobile Monster," to whom Mobile Monster gave referrals. *2022 RT 572.*

48

- lease liability for the Mercedes Benz being driven by Rajaee, which is up in July 2022 - approximately $4,077, which Davis testified he intends to pay; and

- the ordinary course loans Davis made in January and February 2022, totaling $269,000, to cover payroll associated with the winding up of the LLC's affairs.

*Exhibit 824.*

In order to finish up the work that was in progress as of January 6, 2022, and to collect on the outstanding receivables owed by customers related to those projects, Davis contracted with TalentCrowd, a company started by Joshua Lintz after he left the LLC in early 2022.[54] For a monthly management fee of $2,500, TalentCrowd has supplied the developers to the LLC's remaining projects and has passed through the developers' fees at cost. The LLC has then invoiced the customer with a markup. Davis testified that the LLC's relationship with TalentCrowd is expected to come to an end with the last work being completed and billed by the end of May. It is estimated that the LLC will close its books with approximately $850,000.00 in receivables on its books, of which several customers have told Davis they will not pay their bills unless and until the disputes between Davis and Rajaee are resolved. *Exhibit 824; 2022 RT 1920.*

Based upon the foregoing, Davis's final accounting as set forth in Exhibits 823 and 824, and as testified to during the April 2022 Hearing proceedings, was approved, and a Partial Final Award on Davis' bifurcated First Counterclaim for dissolution and final account of the LLC was issued, which provided, in pertinent part, as follows, and is incorporated herein by this reference:

"5.2   Respondent   Tyler   B.   Davis'   final   accounting   and reconciliation of the financial affairs of TopDevz, LLC, based on the March 31, 2022, accounting – *Exhibits 823 and 824* – is hereby approved and affirmed, and TopDevz, LLC is ordered to be finally dissolved. Davis is

---

[54]  Joshua Lintz was the CEO of the LLC, hired by Rajaee pursuant to a written agreement that Rajaee negotiated and put into place. Under the terms of Mr. Lintz's contract with the LLC, he is entitled to a severance payment of equal to the sum of 12 months of his base salary, 12 months of medical benefits, past due incentive compensation and 12 months of incentive compensation, which Davis computed as an LLC liability in the amount of $1,374,523.87. *Exhibit 805, ¶ 6 and Exhibit 827.* Pursuant to the terms of Lintz's employment agreement, Lintz has no restrictions on his right to compete with or work for a competitor of the LLC should his employment be terminated. *Exhibit 805, ¶ 4.*

49

charged with both the responsibility and authority to continue with the wind-up of the LLC's affairs, including but not limited to the collection of receivables, the settlement and payment of contingent liabilities, the collection of the surcharge amount owed by Ashkan Rajaee, and making distributions of profits, if any, to members in accordance with the terms of the Agreement.

5.3     The only outstanding member loan owed by the LLC is the $269,000 loan by Tyler B. Davis. The LLC's loan indebtedness to Davis shall accrue interest at the rate of 6% per annum until paid in full.

5.4     There is no evidence of an outstanding loan owed by TopDevz, LLC to Ashkan. The validity and enforceability of the purported loan agreement between the TopDevz, LLC and Ashkan (*Exhibit 212*) is denied.

5.5     Ashkan Rajaee is hereby surcharged in the amount of Seven Million Six Hundred Seventy Thousand One Hundred Fifty-One Dollars ($7,670,151.00) for excess distributions paid to or for the benefit of Ashkan Rajaee or his companies, which sum Ashkan Rajaee is obligated and hereby ordered to pay to the TopDevz, LLC in order to bring his negative capital account to zero.

5.6     Ashkan Rajaee is hereby ordered to return to TopDevz, LLC, care of Tyler B. Davis, the $900,000.00 he is holding in a bank account in Canada.[55] Upon return of those funds, Ashkan Rajaee's surcharge liability shall be reduced by the dollar amount Ashkan Rajaee returns to the LLC.

5.7     In winding up the affairs of TopDevz, LLC, Tyler B. Davis is instructed to follow the terms of the Agreement. Distributions of profits, if any, shall be in accordance with the members' Percentage Interests, as determined by this Award in Section 3(C)(1).

---

[55]   According to testimony Rajaee gave on April 6, 2022, he "has not spent one cent of [the $900,000]." *2022 RT 503*.

50

5.8    Whether there is a prevailing party for purposes of making an award of reasonable attorney's fees and costs is reserved until the conclusion of this arbitration, and, if such an award is in order, such matters shall be included in the determination of the remaining damages claims, counterclaims and affirmative defenses.

5.9    Whether there is a prevailing party for purposes of making an award of the administrative fees of the International Centre for Dispute Resolution (ICDR) and the compensation and expenses of the arbitrator is reserved until the conclusion of this arbitration, and, if such an award is in order, shall matters shall be included in the determination of the remaining damages claims, counterclaims, and affirmative defenses.

5.10    The issuance of this Partial Final Award concludes the proceedings and determinations related to the dissolution and accounting *of the LLC, and fully and finally determines Davis' first counterclaim for* relief. Pursuant to California Code of Civil Procedure section 1283.4, this Partial Final Award includes a determination of all questions submitted by the parties to the Arbitrator concerning Davis' first counterclaim for dissolution and final accounting of the LLC, the decision of which was necessary in order to determine said controversies.

5.11    The Arbitrator expressly reserves jurisdiction to hear and determine the parties' remaining damages claims, counterclaims and affirmative defenses, which were bifurcated for later hearing and determination pursuant to Order No. 6."

## 6.    Davis is Entitled to an Award of Compensatory Damages on His Breach of Fiduciary Duty and Fraud Counterclaims Against Rajaee

### A.    Introductory Statement

In his counterclaim, Davis asserted four claims for relief: 1. Dissolution and final accounting, 2. breach of fiduciary duty, 3. misrepresentation and fraud, and 4. constructive trust and injunction.

Davis's counter-claim for dissolution and final accounting of the LLC was resolved through the proceedings discussed in Sections 4 and 5, above.

51

On February 21, 2023, Davis served a Notice of Withdrawal in which he withdrew his claim for constructive trust and injunction, as well as his request for punitive damages.

What was left for determination in connection with the March 2023 evidentiary proceedings were Davis's counterclaims for breach of fiduciary duty and fraud.

### B.    Breach of Fiduciary Duty Counterclaim (Second Claim for Relief)

The elements of a claim of breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) breach of a fiduciary duty, and (3) damage proximately cause by the breach. *Knox v. Dean*, 205 Cal. App. 4th 417, 432-33 (2012).

As discussed in Section 3, above, the evidence showed that under the terms of the Agreement, Rajaee was designated as the LLC's Manager. *See Section 3, ¶ 12.* The evidence also showed that Rajaee accepted the position as Manager of the LLC, and acted as the Manager and "tax matters partner" of the LLC from its inception through the date of the evidentiary hearing proceedings on Davis' Petition. *Id.*

As the manager of the LLC, Rajaee owed fiduciary duties to the LLC and to its Members. *Cal. Corp. Code § 17704.09(a), (b).* Among those duties was (a) the duty to maintain proper books and records for the LLC, (b) the duty to refrain from using the LLC's revenues and other assets for his personal benefit to the detriment of the LLC, (c) the duty to substantiate the bona fides of any self-interested transactions between the LLC, on the one hand, and Rajaee or his companies, on the other, and (d) the duty to render a final accounting to Davis for the LLC as of year-end 2021. As discussed in Section 4, above, Rajaee breached all of these duties.

The damage to the LLC is that, due to Rajaee's mismanagement of the LLC's affairs, the LLC's finances were inextricably intertwined with the personal finances of Rajaee and the finances of Rajaee's various companies, for which Rajaee has been surcharged $7,670,151 as a liability Rajaee owes to the LLC for unsubstantiated transfers made to or for the benefit of Rajaee or his companies. The additional damage to the LLC was caused when Rajaee (a) improperly invaded the LLC's Wells Fargo account after Order No. 4 was issued, and (b) refused, and continues to refuse, to return the $900,000 Rajaee testified his simply took and has been holding in a bank account in Canada. *2022 RT 480-481.* Both elements of damages were addressed in the prior orders, which are included in Section 9 of this Final Award.

52

The damage to Davis is that, as a result of Rajaee's (a) mismanagement of the LLC's affairs and (b) defalcation of the $1,031,586.76 Rajaee caused to be wired out of the LLC's Wells Fargo Bank Account (Number 1756821128) on January 6 and 7, 2022, a chain of events was put in motion that led to the dissolution and forced closure of the LLC and resulted in Davis losing his net capital investment in the LLC ($537,127)[56] and resulted in lost opportunity damages ($329,430),[57] for a total compensatory loss of $866,557. *Hawes Testimony, March 20, 2023.*

### C.    Misrepresentation and Fraud Counterclaim (Third Claim for Relief)

The gravamen of Rajaee's wrongdoing was his breach of the fiduciary duties he owed to the LLC and to Davis as the Manager and tax matters partner of the LLC. Included among those breaches were Rajaee's acts of concealment and misrepresentation concerning (a) the true state of affairs of the LLC's finances, and (b) his numerous self-dealing transactions. Those breaches have been extensively chronicled in Sections 3, 4 and 5, above. However, what bears noting in this section of the Final Award is the fact that Rajaee's fraud upon Davis was endemic to the relationship, and was put in motion from the very beginning – starting with the secret accounts Rajaee opened for the LLC in Canada and used to transfer monies between the LLC and Mobile Monster between August 2017 and April 2019, without Davis's knowledge or approval. These accounts and transfer transactions only first came to light during the course of the evidentiary hearing proceedings conducted in April 2022, and even at this late date of disclosure, Rajaee was unable or unwilling to (a) provide a complete set of bank statements, or (b) explain how these transactions – many of which were six figures - benefitted the LLC. *See Section 5(C)(1).* Davis testified that had he known of Rajaee's intentions to commingle the finances and affairs of the LLC with those of Rajaee and Mobile Monster, he never would have entered into the LLC relationship with Rajaee. Despite his many days of testimony, Rajaee had no plausible explanation for his actions or concealments.

---

[56] Davis's net capital investment in the LLC was calculated by Davis's expert – Michael S. Hawes, CPA – by adding Davis's total investments in the LLC ($787,240), minus the returns he received from the LLC in April 2019 ($175,113), July 2019 ($50,000) and July 2020 ($25,000.

[57] The lost opportunity loss was calculated by Davis's expert – Michael S. Hawes, CPA – using the Dow Jones Industrial Average to compute on a conservative basis what Davis's net capital investment in the LLC could have earned had they been invested in an investment which tracked the Dow Jones Industrial Average.

53

The damage to Davis is that he invested $787,240 in the LLC that he otherwise could have invested elsewhere. As a result of Rajaee's (a) mismanagement of the LLC's affairs and (b) defalcation of the $1,031,586.76 Rajaee caused to be wired out of the LLC's Wells Fargo Bank Account (Number 1756821128) on January 6 and 7, 2022, a chain of events was put in motion that led to the dissolution and forced closure of the LLC and resulted in Davis losing his net capital investment in the LLC ($537,127).[58] Davis is entitled to recover his net lost investment, plus lost opportunity damages ($329,430),[59] for a total compensatory loss of $866,557. *Hawes Testimony, March 20, 2023.*

This award is not in addition to the compensatory damages awarded on Davis's breach of fiduciary duty claim.

### 7.    Rajaee's Claims Against Davis Are Denied Because Rajaee Failed to Carry His Burden of Proof on Any of His Asserted Claims

#### A.    Introductory Statement

Rajaee's claims against Davis all sounded in tort and were set forth in his Amended Demand, dated August 4, 2021. The Amended Demand stated claims for defamation per se (first claim for relief), civil extortion (second claim for relief), intentional infliction of emotional distress (third claim for relief), intentional interference with contract (fourth claim for relief), intentional interference with prospective business advantage (fifth claim for relief), negligent interference with prospective business advantage (sixth claim for relief), and breach of fiduciary duty (seventh claim for relief).

Rajaee's Amended Demand also included an eighth claim for relief stated on behalf of the LLC against Davis for alleged breach of fiduciary duty. As discussed in Section 1, footnote 6, above, on or about December 15, 2022, counsel for the LLC submitted and served a notice of dismissal with prejudice of the Eighth Claim for Relief, and confirmed that dismissal during the March 20, 2023, hearing proceedings.

---

[58]    Davis's net capital investment in the LLC was calculated by Davis's expert – Michael S. Hawes, CPA – by adding Davis's total investments in the LLC ($787,240), minus the returns he received from the LLC in April 2019 ($175,113), July 2019 ($50,000) and July 2020 ($25,000.

[59]    The lost opportunity loss was calculated by Davis's expert – Michael S. Hawes, CPA – using the Dow Jones Industrial Average to compute on a conservative basis what Davis's net capital investment in the LLC could have earned had they been invested in an investment which tracked the Dow Jones Industrial Average.

This section of the Final Award addresses Rajaee's claims against Davis, all of which fail for lack of evidence. As discussed in Section 1, above, the evidentiary hearing proceedings conducted in April 2022 with respect to the final accounting on Davis' Petition for dissolution and final accounting, were significantly expanded, at Rajaee's request, to allow Rajaee to present evidence on a broad array of subjects, including (a) the transactions and events leading Rajaee and Davis to enter into a business relationship through the formation of the LLC, (b) Rajaee's operation of the LLC, (c) the transactions and events leading to the demise of the parties' relationship in February 2001, and (d) Rajaee's operation of the LLC after problems arose in his relationship with Davis. Despite the breadth of that evidence-taking and the opportunity to present additional evidence at the March 2023 evidentiary hearing proceedings, Rajaee failed to present any evidence supporting his tort claims against Davis. Rather, Rajaee's offerings were singularly focused on voicing his objections to the proceedings conducted in this arbitration.

### B.   Rajaee's Claim Against Davis for Defamation Per Se

Defamation per se occurs when a false statement is made to someone other than the plaintiff that is so inherently damaging to one's reputation, that the plaintiff need not prove that he or she suffered actual damages as a result of the statement. Statements that "tend to expose the plaintiff to public hatred, contempt, ridicule, aversion, or disgrace, and to induce an evil opinion of him in the minds of right-thinking persons and deprive him of their friendly intercourse or society" are the type of statement needed to establish a claim for defamation per se. *Jimeno v. Commonwealth Home Builders*, 47 Cal. App. 660 (1920); Cal. Civ. Code § 45; CACI No. 1702.

No where in his evidence did Rajaee identify any false statements purportedly made by Davis, nor did Rajaee identify any person(s) to whom Davis purportedly made false statements about Rajaee. The only evidence Rajaee offered about statements Davis made to others concerned Davis's efforts to marshal and administer the affairs of the LLC after dissolution was ordered pursuant to Order No. 4, and Davis's sharing of findings made in Order Nos. 4 and 5. Those statements were privileged under California Civil Code section 47. To the extent Davis may have repeated the contents of Order Nos. 4 and/or 5 to customers, vendors and/or employees of the LLC, those acts were likewise privileged. They were also necessary to countermand the actions taken by Rajaee to resist and frustrate Davis's implementation of the dissolution order, as discussed in Sections 4 and 5, above.

Rajaee's defamation claim is denied for lack of evidence.

55

### C. Rajaee's Claim Against Davis for Civil Extortion

The lynch pin of a civil extortion claim is fear induced by the use of force or threat that results in the plaintiff giving up property to the defendant that he or she otherwise would not have parted with. *Flatley v. Mauro*, 39 Cal. App. 4th 299, 305 (2006); *Stenehjem v. Sareen*, 226 Cal. App. 4th 1404, 1414-1415 (2014); Cal. Pen. Code §§ 518-519.

During the course of the evidentiary proceedings conducted in this arbitration, there was no evidence that Davis used force or threats to obtain anything from Rajaee. To the contrary, the evidence showed that once Davis and Rajaee found themselves in disagreement about the management and affairs of the LLC in or about February 2001, Rajaee's response was to (a) lock Davis out of the LLC, (b) refuse to have any contact or communication with Davis except through attorneys, and (c) continue to use LLC monies to fund his lifestyle, including having the LLC rent a jet that was purchased by Rajaee through his wholly-owned company (RemotePreneurs) and giving himself a $175,000 raise in guaranteed salary after Davis filed the Sacramento Action seeking to dissolve the LLC.

The facts and circumstances concerning the relationship between Davis and Rajaee, as established by the evidence discussed in Sections 3, 4 and 5, above, simply do not support Rajaee's claim of extortion. Accordingly, Rajaee's extortion claim is denied for lack of evidence.

### D. Rajaee's Claim Against Davis for Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress, the complaining party must prove (1) extreme or outrageous conduct by the defendant, (2) intent by the defendant to cause harm by his or her extreme or outrageous conduct, (3) emotional distress suffered by the plaintiff, and (4) a causal connection between defendant's conduct and plaintiff's emotional distress. *Hughes v. Pair*, 46 Cal.4th 1035, 1050-1051 (2009); CACI No. 1600.

Rajaee failed to present evidence establishing *any* of the elements for a claim of intentional infliction of emotional distress, starting with the first required element: namely, extreme or outrageous conduct by Davis. There was no evidence of such conduct by Davis. In late 2020, early 2021, Davis and Rajaee had disagreements about how Rajaee was spending the LLC's money and managing the LLC's affairs. As discussed

56

in Section 6(C), above, once Davis and Rajaee found themselves in this disagreement, Davis told Rajaee that he wanted to part ways in or about February 2001. Rajaee's response was to (a) lock Davis out of the LLC, and (b) refuse to have any contact or communication with Davis except through attorneys. Rajaee presented no evidence of any extreme or outrageous conduct by Davis directed towards him. In fact, throughout the course of the parties' relationship through the LLC, there was very little evidence of any direct dealings between the two beyond short texts and emails, none of which contained extreme or outrageous messages.

Rajaee's emotional distress claim is denied for lack of evidence.

### E. Rajaee's Claim Against Davis for Intentional Interference with Contract

To establish a claim for intentional infliction of emotional distress, the complaining party must prove (1) the existence of a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pacific Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990).

Rajaee failed to present evidence establishing *any* of the elements for a claim of intentional interference with contract, starting with the first required element: namely, the existence of a valid contract between Rajaee and a third party that was allegedly disrupted by Davis.

Rajaee's contract interference claim is denied for lack of evidence.

### F. Rajaee's Claim Against Davis for Intentional Interference with Prospective Business Advantage

To establish a claim for intentional interference with prospective business advantage, the complaining party must prove (1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action." *Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.*, 2 Cal.5th 505, 512 (2017).

57

Rajaee failed to present evidence establishing *any* of the elements for a claim of intentional interference with contract, starting with the first required element: namely, the existence of an economic relationship between Rajaee and a third party that had the probability of producing future economic benefit to Rajaee.

Rajaee's interference with prospective business advantage claim is denied for lack of evidence.

### G.    Rajaee's Claim Against Davis for Breach of Fiduciary Duty

To establish a claim for breach of fiduciary duty, the complaining party must prove (1) the existence of a fiduciary relationship, (2) breach of a fiduciary duty, and (3) damage proximately caused by the breach. *Knox v. Dean,* 2 Cal. App. 4th 417, 432-433 (2012); CACI 4100; Cal. Civ. Code § 1573.

The parties do not dispute that, through their relationship as members of the LLC, they stood in a fiduciary relationship with one another. As discussed above, it was Rajaee – not Davis – who failed to fulfill his fiduciary duties. Rajaee failed to provide evidence of any sort of breach of duty by Davis.

Rajaee's breach of fiduciary duty claim is denied for lack of evidence.

### H.    The LLC's Claim Against Davis for Breach of Fiduciary Duty

As discussed above, the LLC voluntarily dismissed its claim against Davis for breach of fiduciary duty. However, during the course of the March 2023 evidentiary hearing proceedings and in its closing brief, the LLC requested that the turnover order directed to Rajaee concerning the $1,031,586 Rajaee caused to be wired out of the LLC's account at Wells Fargo Bank, Account Number 1756821128, on January 6 and January 7, 2022, into accounts maintained or controlled by Rajaee in Canada, be confirmed as an award in this Final Award. The LLC also requested that the surcharge liability assessed against Rajaee in the amount of $7,670,151.00 for excess distributions paid to or for the benefit of Rajaee or his companies be confirmed as a compensatory award against Rajaee in this Final Award.

58

8.  **Davis is Entitled to an Award of His Attorney's Fees and Costs as the Prevailing Party in this Arbitration**

A.  **Introductory Statement**

While California follows what is commonly referred to as "the American Rule," which provides that each party to a lawsuit must ordinarily pay its own attorney's fees and costs, *Trope v. Katz*, 11 Cal. 4th 274, 278 (1995), a prevailing party is entitled to recover its attorney's fees and costs when authorized by statute or contract." *Bear Creek Planning Committee v. Ferwerda*, 193 Cal. App. 4th 1178, 1185 (2011); *Cal. Civ. Code § 1717.*

Pursuant to California Code of Civil Procedure section 1021, where parties agree to the allocation of attorney's fees and/or costs, the measure and mode of such "compensation" – or cost shifting – is as provided in the parties' agreement. Case law construing section 1021 has held that parties to a contract may validly agree that the prevailing party may be awarded attorney's fees and/or costs in litigation between themselves, whether sounding in contract or tort. *Xureb v. Marcus & Millichap, Inc.*, 3 Cal. App. 4th 1338, 1342 (1992).

The Agreement governing Davis's and Rajaee's business relationship as members of the LLC contains a broadly stated arbitration clause requiring arbitration of "[a]ny action to enforce or interpret this Agreement, or to resolve disputes with respect to this Agreement between the Company and a Member, or between or among the Members." *Davis Exhibit 2, ¶ 11.2.* The Agreement goes on to provide that "[t]he parties will share equally all initial costs of arbitration, and that "[t]he prevailing party will be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration." *Id.*

Based upon the wording of the parties' arbitration agreement, the award of attorney's fees and costs is mandatory – not discretionary – if there is a prevailing party.

An award of attorney's fees and costs to the prevailing party is also in order because, at the outset of this arbitration, the parties agreed at the scheduling conference conducted on September 8, 2023, that they both were seeking an award of their attorney's fees and costs in this matter if they were the prevailing party, even though their respective claims and counterclaims sounded primarily in tort. *See* Order No. 2, § I, ¶ 2.3.

59

### B.    Davis is the Prevailing Party in this Arbitration and is Entitled to Reimbursement of His Attorney's Fees and Costs

Davis is the prevailing party in this arbitration because he prevailed on all of his counterclaims and defeated all of Rajaee's claims, as discussed in Sections 3, 4, 5, and 7, above. As such, this Final Award thus represents a "simple, unqualified win" for Davis.

Davis was represented primarily by two counsel in this matter: Scott Carpenter, of Cummins & White, and Joseph W. Scalia. *See Exhibits 838 and 839.* According to his declaration (*Exhibit 838),* Mr. Carpenter was assisted by another attorney at his firm (Edward Farrell) and a paralegal (Shannon Thompson). In connection with the evidentiary hearing proceedings scheduled for March 2023, Davis included in his hearing exhibits declarations by Messrs. Carpenter and Scalia setting forth their respective firms' attorney's fees and costs as charged to Davis in this arbitration. *Exhibits 838 and 839.* Davis has thus submitted ample evidence through the declarations of Messrs. Carpenter and Scalia, and through the invoices attached thereto, to support Davis's contention that he incurred $785,845 in attorney's fees[60] and $14,440.55 in costs[61] in successfully prevailing in this arbitration. At the March 20, 2023, hearing, Davis testified that he has paid all of the law firms' invoices in full, and the invoices attached to the declarations corroborate such payments as having been made.

The only objection raised by Rajaee to the attorney's fees and costs set forth in the declarations of Messrs. Carpenter and Scalia was his concern/objection that those charges included legal services rendered in connection with proceedings in one or more of the related state court actions. In response to Mr. Rajaee's objection, the Arbitrator ordered Messrs. Carpenter and Scalia to submit and serve supplemental declarations detailing and culling out any time charges or costs related to the state court proceedings. Such declarations were submitted and served on or about March 31, 2023, and show the following:

---

[60]    This figure is the sum of the attorney's fees requested by Mr. Carpenter's firm ($501,311.50) and the attorney's fees requested by Mr. Scalia's firm ($284,533.50). *Exhibit 838 and 839.*

[61]    This figure is the sum of the costs requested by Mr. Carpenter's firm ($13,970.55) and the costs requested by Mr. Scalia's firm ($470). *Exhibit 838 and 839.*

a.    Mr. Carpenter's firm's invoices attached to his original declaration included $68,548.50 in time charges and $1,849.41 in costs related to legal services rendered in connection with one or more of the related state court actions.

b.    Mr. Scalia's firm's invoices attached to his original declaration included $11,919 in time charges and $470 in costs related to legal services rendered in connection with one or more of the related state court actions.

Mr. Rajaee's objection to the inclusion of time charges and costs for legal services rendered to Davis in connection with the related state court proceedings is sustained. Accordingly, the time charges and costs discussed in the March 31, 2023, declarations of Mr. Carpenter and Mr. Scalia are not eligible for reimbursement as attorney's fees and costs incurred in connection with this arbitration.

### C.    Davis is Entitled to an Award of $717,498.64 as Reasonable Attorney's Fees and Costs in this Arbitration

The generally accepted manner for determining what qualifies as "reasonable" attorney's fees is the "lodestar" method. *Ketchum v. Moses*, 24 Cal. 4th 1122, 1131-1132 (2001). This is a method whereby a determination is made with regard to (a) what constitutes a reasonable number of hours for those activities found to be compensable, and (b) what constitutes a reasonable hourly rate.[62] The reasonable number of hours is then multiplied by the reasonable hourly rate to yield the amount of the attorney's fees to be awarded. *Id.; Lunada Biomedical v. Nunez*, 230 Cal. App. 4th 459, 486 (2014). What constitutes a reasonable attorney's fees award in a particular case is a fact-specific inquiry. In this regard, the California Supreme Court has identified a number of factors that may be considered. *PLCM Grp. v. Drexler*, 22 Cal. 4th 1084 (2000). Those factors include:

---

[62]    According to the declarations of Messrs. Carpenter and Scalia, their hourly rates are $480 to $545, for Mr. Carpenter during the life of this matter, and $435, for Mr. Scalia. Mr. Carpenter and Mr. Scalia have over 20 years of business litigation experience. The Arbitrator is familiar with the rates being charged by experienced business litigators in Southern California. Those rates range between $400 per hour and $1,000 per hour. Accordingly, the rates charged by Messrs. Carpenter and Scalia for their services in this arbitration are within range at the low end of the rate spectrum, and thus reasonable. The same is true for the attorney (Edward Farrell, class of 2008) and the paralegal (Shannon Thompson, 20+ years of experience). Mr. Farrell billed at the rate of $495 per hour and Ms. Thompson billed at the rate of $290 per hour. Both are within range of the rate spectrum for such support services.

a.      the nature of the litigation

b.      the difficulty / complexity of the case

c.      the amount in controversy

d.      the skill required to handle the case

e.      the skill actually employed in the case

f.      the attention given to the case

g.      the success or failure of the attorneys' efforts

*Id.* at 1096.

All of the above factors were in play in this arbitration:

a.      The nature of the litigation was that it involved disputes between members of a limited liability company concerning financial affairs of the company where (a) one member (Davis) had no access to the LLC's books and records, and (b) one member (Rajaee) had total control over the LLC's books and records and either reported inaccurately or failed or refused to report at all concerning the company's financial affairs and dealings. As such, the nature of the dispute was that it was essentially a forensic accounting dispute between the LLC's members.

b.      The subject matter of the dispute was difficult / challenging because it required the parties' counsel (and the Arbitrator) to delve into several areas, including the customs and practices of a software development company, the relationships between the LLC and Rajaee's various companies, and the legal and tax requirements for tracking legitimate business expenses.

c.      As discussed in Sections 4 and 5, the amounts in controversy were significant and involved tracing the millions of dollars that flowed out of the LLC to Rajaee or one of his companies.

62

**EXHIBIT 2, Page 183**

d.      The skill required to handle the case (on both sides of the dispute) was high with regard to legal knowledge and trial experience.

e.      The skill actually employed in the case was high on both sides of the dispute in terms of the legal knowledge and trial experience of the members of each side's legal team.

f.      The attention given to the case was significant due in part to the expedited nature of the bifurcated proceedings concerning Davis's Petition and the exigencies created when Rajaee violated Order No. 4 and refused to cooperate in the final accounting.

g.      The efforts of Davis's legal team were successful.

Based on the foregoing, Davis is entitled to recover from Rajaee his reasonable attorney's fees and costs in the amount of $717,498.64, which figure is the sum of the difference between:

a.      the original attorney's fees requested by Mr. Carpenter of $501,311.50, less the $68,548.50 in time charges related to legal services rendered in connection with one or more of the related state court actions;

b.      the original attorney's fees requested by Mr. Scalia of $284,533.50, less the $11,919 in time charges related to legal services rendered in connection with one or more of the related state court actions;

c.      the original costs requested by Mr. Carpenter of $13,970.55, less the $1,849.41 in costs related to legal services rendered in connection with one or more of the related state court actions; and

d.      the original costs requested by Mr. Scalia of $470, less the $470 in costs related to legal services rendered in connection with one or more of the related state court actions.

63

9.    **Final Award**

A.    **Dissolution of the LLC**

1.    Davis owns 95.308% of the capital interest in the LLC, and Rajaee owns 4.692% of the capital interest in the LLXC. Davis thus owns the majority of the Percentage Interests in the LLC for voting purposes and has the right to elect to dissolve the LLC without the consent and over the objection of Rajaee. Through his filing of the Petition, Davis exercised his right to dissolve the LLC, and dissolution of the LLC is ordered / awarded, effective as of January 6, 2022.

2.    Alternatively, protective dissolution of the LLC under Corporations Code section 17707.03(b)(4) is appropriate because it was demonstrated that management of the LLC was deadlocked. Based upon Davis' request that the LLC be dissolved and the finding of deadlock and internal dissension within the management of the LLC, dissolution of the LLC is ordered / awarded, effective as of January 6, 2022, pursuant to paragraph 9.1 of the Agreement and Corporations Code sections 17707.01(a) and 17707.03(b)(4).

3.    In accordance with paragraph 9.2 of the Agreement, the LLC is not to engage in any further business other than that necessary to wind up the business and affairs of the LLC.

4.    Davis, and only Davis or his designee, shall be responsible for managing, overseeing, and completing the dissolution of the LLC from January 6, 2022, forward, and only Davis, or his designee, shall have the authority to take those actions necessary to accomplish the dissolution of the LLC in accordance with the provisions of Order No. 4, attached hereto as Attachment 1 and incorporated into this Final Award by this reference.

5.    Rajaee is ordered removed as Manager of the LLC, effective as of January 6, 2022, and only Davis or his designee shall replace Rajaee as Manager of the LLC.

64

### B.    Compensatory Award in Favor of the LLC for Rajaee's Violation of Order Nos. 4 and 5

1.    Rajaee violated Order No. 4 when he wrongfully and without authority transferred the sum of $1,031,586 out of the LLC's account at Wells Fargo Bank, Account Number 1756821128, on January 6 and January 7, 2022, into accounts maintained or controlled by Rajaee in Canada. Only Davis or his designee, had the authority to access, disburse funds from, open and close bank and other financial accounts belonging to or standing in the name of the LLC from approximately 2:00 p.m. on January 6, 2022, forward.

2.    Pursuant to Order No. 5, attached hereto as Attachment 2 and incorporated into this Final Award by this reference, Rajaee was ordered to immediately return and/or replenish to the LLC, care of Davis, the $900,000.00 he transferred to himself at approximately 11:00 p.m. on January 6, 2022, as well as the $131,586.76, transferred out as an "international money transfer debit" on January 7, 2022, which Rajaee admitted was wired to his company (Mobile Monster).

3.    Rajaee has failed and refused to return the sum of $1,031,586 to the LLC, as ordered. Accordingly, TopDevz LLC is entitled to a compensatory damages award against Ashkan Rajaee in the amount of $1,031,586.

### C.    Final Accounting and Surcharge Liability Assessed Against Rajaee in Favor of the LLC

1.    Respondent Tyler B. Davis' final accounting and reconciliation of the financial affairs of TopDevz, LLC, based on the March 31, 2022, accounting – *Exhibits 823 and 824* – is hereby approved and affirmed, and TopDevz, LLC is ordered to be finally dissolved.

2.    Davis is charged with both the responsibility and authority to continue with the wind-up of the LLC's affairs, including but not limited to the collection of receivables, the settlement and payment of contingent liabilities, the collection of the surcharge amount owed by Ashkan Rajaee, and making distributions of profits, if any, to members in accordance with the terms of the Agreement.

65

3.      The only outstanding member loan owed by TopDevz LLC is the $269,000 loan it received from Tyler B. Davis 2022. The LLC's loan indebtedness to Davis shall accrue interest at the rate of 6% per annum until paid in full.

4.      There is no evidence of an outstanding loan owed by TopDevz, LLC to Ashkan Rajaee. The validity and enforceability of the purported loan agreement between the TopDevz, LLC and Ashkan Rajaee (*Exhibit 212*) is denied for lack of evidence of a consideration having flowed from Ashkan Rajaee to TopDevz LLC.

5.      Ashkan Rajaee is hereby surcharged in the amount of Seven Million Six Hundred Seventy Thousand One Hundred Fifty-One Dollars (US $7,670,151.00) for excess distributions paid to or for the benefit of Ashkan Rajaee or his companies, which sum Ashkan Rajaee is obligated and hereby ordered to pay to the TopDevz, LLC in order to bring his negative capital account to zero.

6.      Ashkan Rajaee is hereby ordered to return to TopDevz, LLC, care of Tyler B. Davis, the $900,000.00 he is holding in a bank account in Canada.[63] Upon return of those funds, Ashkan Rajaee's surcharge liability shall be reduced by the dollar amount Ashkan Rajaee returns to the LLC.

7.      In winding up the affairs of TopDevz, LLC, Tyler B. Davis is instructed to follow the terms of the Agreement, as well as the orders issued in this arbitration and this Final Award. Distributions of profits, if any, shall be in accordance with the members' Percentage Interests, as determined by this Final Award.

---

[63] According to testimony Rajaee gave on April 6, 2022, he "has not spent one cent of [the $900,000]." *2022 RT 503.*

66

### D.    Compensatory Damages Award In Favor of Davis on Davis's Tort Counterclaims

Davis is the prevailing party on his breach of fiduciary duty and misrepresentation / fraud claims against Rajaee. As such, Davis is entitled to an award of compensatory damages in the amount of Eight Hundred Sixty-Six Thousand Five Hundred Fifty-Seven Dollars (US $866,567.00).

### E.    Denial of Rajaee's Claims in Their Entirety for Lack of Evidence

Rajaee's counterclaims for defamation per se (first claim for relief), civil extortion (second claim for relief), intentional infliction of emotional distress (third claim for relief), intentional interference with contract (fourth claim for relief), intentional interference with prospective business advantage (fifth claim for relief), negligent interference with prospective business advantage (sixth claim for relief), and breach of fiduciary duty (seventh claim for relief) are denied in their entirety.

### F.    Award of Attorney's Fees and Costs to Davis as the Prevailing Party in this Arbitration

1.    Davis is the prevailing party on his counterclaims against Rajaee and on Rajaee's claims against Davis. Accordingly, Davis is entitled to an award of attorney's fees and costs in the amount of Seven Hundred Seventeen Thousand Four Hundred Ninety-Eight Dollars and Sixty-Four Cents (US $717,498.64).

2.    Additionally, the administrative fees of the International Centre for Dispute Resolution totaling US $37,950.00, and the compensation of the Arbitrator totaling US $109,625.00 shall be borne by Rajaee. Therefore, Rajaee shall reimburse Davis the sum of US $119,350.00, representing that portion of said fees in excess of the apportioned cost previously incurred by Davis.

### G.    Miscellaneous

1.    Within thirty (30) days from the date of transmittal of this Final Award to the parties, Rajaee shall pay:

a.    to the LLC, the sum of Seven Million Six Hundred Seventy Thousand One Hundred Fifty-One Dollars (US $7,670,151.00); and

67

    b.    to Davis, the sum of One Million Seven Hundred Four Thousand Four Hundred Fifteen Dollars and Sixty-Four Cents (US $1,704,415.64), which represents US $866,567.00 in compensatory damages, US $717,498.64 in attorney's fees and costs, and US $119,350.00 in arbitration administration fees and arbitration compensation.

    2.    This Final Award is in full settlement of all claims, counterclaims and requests for relief submitted in this arbitration. All claims, counterclaims and requests for relief not specifically addressed above are hereby denied in their entirety.

    3.    The issuance of this Final Award concludes the proceedings in this arbitration.

I hereby certify that, for the purpose of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in the City of San Diego, State of California, United States of America.

Dated: 12 May 2023.

Rebecca Callahan, Arbitrator

I, the undersigned Arbitrator, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

Dated: 12 May 2023.

Rebecca Callahan, Arbitrator

68

**EXHIBIT 2, Page 189**

ATTACHMENT 1

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitral Tribunal

In the Matter of the Arbitration Between:

Ashkan Rajaee and TopDevz, LLC, a California Limited Liability Company,

Claimants and Counter-Respondents,

- vs -

Tyler Davis,

Respondent and Counter-Claimant

ICDR Case No. 01-21-0001-9983

ORDER NO. 4 – ORDER ON RESPONDENT'S PETITION FOR DECREE OF DISSOLUTION

### 1.   Introduction

Pursuant to the Commercial Arbitration Rules of the American Arbitration Association (AAA), as amended and effective October 1, 2013 (the "Commercial Rules"), and by request and submission of the parties, a hearing was held on December 1, 2 and 13, 2021 for the purpose of hearing and deciding a threshold issue: namely, whether grounds or cause exist for ordering dissolution of the California limited liability company known as TopDevz LLC ("the LLC"), as requested by Respondent Tyler Davis ("Davis" or "Respondent") in his petition for dissolution ("the Petition"). Appearing at the hearing on the Petition were Scott R. Carpenter, of Cummins & White LLP, appearing on behalf of Respondent, and Jordan Mathews, of Weinberg Gonser LLP, appearing on behalf of Claimant Ashkan Rajaee ("Rajaee" or "Claimant"). Also present during the course of the hearing were Davis and Rajaee. The hearing proceedings were recorded and transcribed by a certified court reporter. The transcript of those proceedings is part of the record in this arbitration.

The parties agreed, through their respective counsel, to an evidentiary hearing where Messrs. Davis and Rajaee would be allowed to testify in favor and against dissolution, respectively, and be subjected to cross-examination by the other side.

In advance of the hearing, both Davis and Rajaee provided briefs on the issues to be addressed at the hearing. Additionally, the parties submitted declarations with exhibits. At the hearing, the parties submitted hearing exhibits in the form of documentary and electronic (video) evidence. The parties also submitted testimonial evidence from Rajaee, Davis and Michael S. Hawes ("Hawes"), a certified public accountant who provided opinion testimony on

behalf of Davis. The parties' counsel made opening statements and closing arguments at the hearing and then concluded the matter with closing briefs. The record of the proceedings concerning Davis's Petition was concluded on January 4, 2022, with the submission of the reporter's transcript for the third day of hearing (December 13, 2022).

The issues raised by the Petition are essentially two-fold: 1. Does Davis have the right to dissolve the LLC without Rajaee's consent? 2. If not, do grounds exist to order an involuntary dissolution over Rajaee's objection? While the parties' respective underlying claims and counterclaims contain numerous recriminations, it is not necessary to reach the merits of those claims in order to decide the narrow issues raised by the Petition. Ultimately, on the underlying claims and counterclaims, one party will be declared "right" and the other declared "wrong," but in the meantime and thereafter must Rajaee and Davis continue to do business together in the LLC?

## 2.    Arbitral Jurisdiction

On May 9, 2017, Rajaee and Davis entered into an Operating Agreement for TopDevz, LLC ("Agreement"). It is undisputed that the Agreement governs the relationship between Rajaee and Davis as members of TopDevz, LLC ("the LLC"). The validity and enforceability of the Agreement were not disputed in this matter. To the contrary, both parties have relied on various provisions of the Agreement in support of their respective claims and counterclaims, as well as their arguments concerning the Petition.

Included in the Agreement is a section providing for binding arbitration of disputes that might thereafter arise between the parties. Paragraph 11.2 of the Agreement provides as follows:

> Any action to enforce or interpret this Agreement, or to resolve disputes with respect to this Agreement between the Company and a Member, or between or among the Members, will be settled by arbitration in accordance with the rules of the American Arbitration Association. Arbitration will be the exclusive dispute resolution process in the state of California, but arbitration will be a nonexclusive process elsewhere. Any party may commence arbitration by sending a written demand for arbitration to the other parties. The demand will set forth the nature of the matter to be resolved by arbitration. The Manager will select the place of arbitration. The substantive law of the state of California will be applied by the arbitrator to the resolution of the dispute. The parties will share equally all initial costs of arbitration. The prevailing party will be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration. All decisions of the arbitrator will be final, binding, and conclusive on all parties. Judgment may be entered on any such decision in accordance with applicable law in any court having jurisdiction of it. The arbitrator (if permitted under applicable law) or the court may issue a writ of execution to enforce the arbitrator's decision.

2

*Davis Exhibit 2, ¶ 11.2.*

This matter concerns disputes between Rajaee and Davis regarding their respective rights and obligations under the Agreement and as members of the LLC. But for the Agreement and their relationship as co-members of the LLC, they would owe no duties to each other, and may not have otherwise had any dealings or interactions with one another after their respective litigation cases with Surge, described in Section 3(1), below.

Rajaee and the LLC voluntarily submitted their claims and disputes with Davis to arbitration by filing a demand for arbitration with the American Arbitration Association ("the AAA") on or about February 24, 2021. Thereafter, Davis voluntarily appeared in the arbitration without objection, and filed an answering statement, with affirmative defenses, and a counterclaim. Rajaee filed an answer to the counterclaim with affirmative defenses. Thereafter, Davis filed the Petition, and the hearing on the Petition was scheduled in coordination with and by agreement of the parties, through their respective counsel.

Under California law, arbitrators have authority to make orders which provide for equitable relief. *Mercuro v. Superior Court*, 96 Cal. App. 4th 167, 177-178 (2002). California case law has recognized that limited liability company dissolution disputes may be arbitrated. *See, Malek Media Group LLC v. AXQG Corp.*, 58 Cal. App. 5th 817 (2020) (case involving irreconcilable differences between members and various breaches of the parties' operating agreement).

Based upon the foregoing, as well as the appearances and submissions made by the parties during the course of the hearing on the Petition, the proceedings leading up to the hearing on the Petition, and the matters submitted to the Arbitrator during the course of this arbitration, all without objection to the Arbitrator's jurisdiction, it is the Arbitrator's determination that the parties' respective claims, defenses and requests for relief, including the relief requested by Davis in his Petition, and Rajaee's opposition thereto, are subject to and were submitted voluntarily to binding arbitration before the undersigned arbitrator.

### 3.   Facts Pertinent to the Decision on the Petition

The facts pertinent to the decision on the Petition are as follows:

1.   When Rajaee and Davis decided to go into business together, they had limited experience working together through their respective relationships with a company called Surge. Rajaee provided services and consulting to Surge through Mobile Monster. Davis was an investor in Surge. They met through a Surge management meeting in 2016. Their common thread was that they both parted ways with Surge, and ended up suing Surge for different reasons, and being represented by the same attorney in those litigation matters. *RT 410-420 and 423-424.*

3

2.      When Rajaee and Davis decided to go into business together, they engaged an attorney to formalize their business relationship. *RT 428.* That relationship took the form of a limited liability company (the LLC) as the vehicle through which they would engage in a software development and consulting business, with a governing operating agreement that they both signed as co-members (the Agreement). *Davis Exhibit 2.*

3.      The Agreement is an integrated agreement and expressly provides that its terms can only be modified or amended "by a written instrument executed by all of the parties." *Davis Exhibit 2, ¶¶ 13.1 and 13.11.* Both Rajaee and Davis testified that no such written instrument exists. *RT 199-200 and 239.*

4.      With respect to Rajaee's and Davis's initial capital contributions and ownership interests in the LLC, the Agreement states that their respective capital contributions are "TBD", and Exhibit B to the Agreement was left blank. *Davis Exhibit 2.* However, absent an agreement to the contrary – which was not shown to exist in this case – the terms of the Agreement provide for voting rights and the allocation of profit and losses to follow the capital contributions of the LLC's members. *Davis Exhibit 2, ¶¶ 4.1, 5.2, 5.3, 5.4 and 7.1.*

5.      Rajaee testified that it was his requirement that Davis be responsible for capitalizing the LLC venture because he wanted to "de-risk" himself – i.e., he did not want to be at risk in the new venture. *RT 421.* Rajaee and Davis agreed that the capital investment in the LLC would be $750,000. *Id.* Davis invested the initial $750,000 to start the LLC. *RT 233-234.* That capital investment is recognized in the LLC's tax returns. *Davis Exhibits 8, 9, 10 and 11.* This was consistent with Rajaee's testimony that he expected Davis to contribute all of the capital because he did not want to be at risk in the new LLC venture. Additionally, Rajaee testified that he perceived himself as "bringing all the value to the company" through his knowledge about how to generate leads and close deals. *RT 421-422.* Rajaee acknowledged that he was not going to be contributing uncompensated sweat equity to the LLC; that it was agreed at the outset that he would be paid a guaranteed salary of $200,000.00 per year. *RT 422.* The LLC has paid Rajaee for his services, as reflected on the LLC's profit and loss statements, tax returns and bank statements. *Davis Exhibits 3, 4, 5, 6, 7, 8, 9, 10, 11 and 21.*

6.      A "capital call" for $76,000 was made by Rajaee in November 2020, and Rajaee and Davis contributed approximately $38,760 and $37,240, respectively, to the LLC. *Rajaee Exhibit 65, Davis Exhibits 11 and 21.* While these contributions were recognized on the LLC's 2020 tax return as capital contributions, there was no change to the capital structure of the LLC in terms of the K-1s for Davis and Rajaee. *Davis Exhibit 11.* Davis was still reported as having a 100% capital interest in the LLC, and Rajaee was still reported as having a 0% capital interest in the LLC. *Id.*

7.      For tax years 2017, 2018, 2019 and 2020, the LLC's tax returns, as filed with the IRS, have reported that Davis owns 100% of the capital in the LLC. *Davis Exhibits 8, 9 10 and 11.* Those returns were prepared by an accounting firm selected by Rajaee, and were prepared under his direction as the "tax matters partner."

4

8.    Rajaee testified that he never paid "attention to all of the details" in the tax returns; that he just looked at the line items for "how much revenue we did, how much expenses we had, how much taxes we have to pay," and that "[e]verything else is handled by [the accountant] in consulting with them." *RT 93.* As pertains to how profits and losses were allocated between Rajaee and Davis, Rajaee testified that he has no understanding of why his profit share allocation went from 0% to 6.5% in 2017 and from 6.5% to 51% in 2018; that he does not recall having any discussions with the accountant or Davis about that; that he "put full trust in [the accountant] to account for everything," and simply "followed [the accountant's] advice on where the numbers landed." *RT 81-90.* Davis testified that other than the email exchange in February 2020, discussed in Section 4(A), below, he never discussed the capital structure of the LLC with Rajaee or the LLC's accountant. *RT 236-237.* No one from the LLC's accounting firm – Lavine, Lofgren, Morris & Engelberg LLP – was called to testify in the proceedings on the Petition.

8.    Rajaee testified that he covered a number of the LLC's operating expenses through charges put on his personal American Express card and through monies paid to or for the benefit of the LLC. To the extent that such expenditures or contributions were in fact made and were not reimbursed, they were not treated as capital contributions according to the LLC's tax returns. *Davis Exhibits 8, 9, 10 and 11.* In this regard, the profit and loss statements and LLC bank statements show that large sums of money have routinely been transferred out of the LLC to Rajaee or Mobile Monster. *Davis Exhibits 3, 4, 5, 6, 7 and 21.* The bona fides of these transfers and withdrawals are matters to be decided at another time – the evidentiary hearing on the merits of the parties' respective claims and counterclaims - and do not need to be decided in making a decision on the Petition.[1]

9.    The Agreement specifically recognizes Rajaee and Davis as the "Initial Members" of the LLC. *Davis Exhibit 2, ¶ 1.24.*

10.    The Agreement defines a "Membership Interest" as "a Member's entire interest and rights in the Company, collectively, including the Member's Economic Interest, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company." *Davis Exhibit 2, ¶ 1.34.*

---

[1]    Rajaee contends that he has "loaned" money to the LLC for which he has not been repaid. Rajaee's testimony about the amount of the LLC's alleged loan indebtedness varied between $700,000 and $1,700,000. *RT 111-116.* Whether such loan indebtedness in fact exists is a matter to be decided at another time - the evidentiary hearing on the merits of the parties' respective claims and counterclaims. The only relevance here is that it shows that, consistent with Rajaee's stated initial position that he did not want to be at risk in the LLC venture, he has viewed his infusions of cash to help fund the LLC's operations as loans – not capital – and has maintained that position in these proceedings on the Petition.

5

11.    Under the terms of the Agreement, Rajaee was designated as the LLC's Manager. *Davis Exhibit 2. ¶ 2.9.* Rajaee has acted in the capacity of Manager and "tax matters partner" of the LLC since its inception, and is currently acting in those capacities with regard to the transactions he has entered into and decisions he has made for the LLC since the parties' disputes arose in February 2021.[2]

12.    The Agreement requires the Manager to maintain accurate books and records for the LLC. *Davis Exhibit 2, ¶ 6.3.*

13.    Rajaee testified that there have been lapses in the LLC's accounting as relates to the way expenses charged on Rajaee's personal American Express card or advanced by Mobile Monster have been booked in the LLC's records such that the LLC's accountants have told him that it is not possible to tell, by looking at the LLC's books and records, what the particular expenses of the LLC are; that the transactions are "all overlapping;" and that it is not possible to produce an accurate balance sheet based upon the data maintained in the LLC's accounting records. *RT 121.* Moreover, a cursory review of the profit and loss statements in comparison to the LLC's bank statements suggests that the two do not tic-and-tie. For example, the "guaranteed" payments to Rajaee through October 2021 total approximately $671,000 according to the profit and loss statements, but the debits for withdrawals and transfers made to Rajaee, according to the LLC's bank statements, total approximately $2,800,000. *Davis Exhibits 3, 4, 5, 6, 7 and 21.* For another example, the LLC's bank statements for February 2021 shows a $447,723.80 transfer to Rajaee coded as "Loan Payoff Balance to AR," but Rajaee testified that he is unable to produce a balance sheet for the LLC; that he is only just now working with the LLC's accountants to try to create an accounting with regard to what monies he advanced to the LLC that have not been reimbursed; and that he believes he is still owed over $1,000,000. *RT 115-121.*

14.    The Agreement requires that the books of the LLC "be closed and examined" at the end of each fiscal year, and that the LLC's certified public accountant issue an annual statement "reflecting the financial condition of the Company and its Profits or Losses." Such annual reports are to "be given to all Members," and are to include "[a] balance sheet and income statement, and a statement of changes in the financial position of the Company" and

---

[2]    E.g., having the LLC lease a jet purchased by Rajaee through his wholly-owned company (Remote Preneurs); having the LLC enter into a charge or debit card relationship with a company in which Rajaee has a 95% interest (SpendHub); giving himself a raise in guaranteed salary; and having the LLC enter into an office lease near his home. *RT 156, 160-164, and 170-171.* Whether such transactions and decision making constitute "self-dealing" and/or "mismanagement" of the LLC are matters to be decided at another time - the evidentiary hearing on the merits of the parties' respective claims and counterclaims. The only relevance here is that it explains the reason for the deep divide and discord that exists between Rajaee and Davis. Davis believes that the transactions were improper because they were done without his advance approval. Rajaee believes that the challenged actions / decisions qualify as "ordinary course" transactions because they were part of his marketing campaign to generate leads, close deals and build relationships for the LLC. *RT 191.*

6

"[a] statement showing the Capital Account of each Member as of the close of the fiscal year and the distributions, if any, made to each Member during the fiscal year." *Davis Exhibit 2, ¶ 6.4.*

15.     While the LLC has engaged an outside accounting firm since its inception, the LLC does not maintain a balance sheet and no annual reports have ever been prepared or issued to the LLC's members. *RT 117-118 and 191-192.*

16.     Article V of the Agreement sets forth the terms related to management of the LLC, and provides for the business to be managed by Rajaee as its designated / named Manager. *Davis Exhibit 2, ¶¶ 5.1 and 5.4.*

17.     Notwithstanding the Manager's broad authority to run the day-to-day affairs of the LLC, the Agreement prohibits the Manager from taking certain actions without the consent of a "Majority of Members." *Davis Exhibit 2, ¶ 5.4.* "Majority of Members" is defined as "a Member or Members whose Percentage Interests represent more than 50 percent of the Percentage Interests of all Members." *Davis Exhibit 2, ¶ 1.28.* "Percentage Interest" is defined as "a fraction, expressed as a percentage, the numerator of which is the total of a Member's Capital Account and denominator of which is the total of all Capital Accounts of all Members." *Davis Exhibit 2, ¶ 1.39.*

18.     The LLC is a services business that generates revenue through services provided by software developer consultants hired by the LLC to work on projects for clients. The main way in which the LLC finds its clients is through leads generated by Mobile Monster, Inc., a Canadian company owned 100% by Rajaee ("Mobile Monster"). *RT 111.* Mobile Monster also employs staff and several groups of contractors that work to service the LLC's customers. "All of that payroll, all of those contractor payments, all of the travel expenses, all of the client visits that we do or marketing gets captured inside of Mobile Monster, and then Mobile Monster gets reimbursed from [the LLC] for the expenses it is incurring." *Id.*

19.     Up until February 2021 – when the disputes arose between Rajaee and Davis – Rajaee generally consulted with Davis on all matters and the LLC operated on a consensus basis between the two members. *RT 187-189.*

20.     After the "blow up" telephone conversation between Davis and Rajaee on February 8 or 9, 2021, Rajaee had Davis removed from the LLC's bank account and has not communicated with Davis, except through counsel. *RT 208; Davis Exhibit 19.* In this regard, Rajaee testified that "any questions that I need to answer that relate to my communications with [Davis] I find kind of a waste of time, because I don't talk to him. I've only talked to him, if I had to, through counsel." *RT 165.* Rajaee testified that he has not spoken to Davis since February 2021. *RT 72.*

7

21.    In this arbitration, Rajaee and Davis are both pursuing claims against the other based on various allegations of wrongdoing – not just breach of the Agreement. In stating their respective claims, they have used such terms as "fraud," "self-dealing," "extortion," "reckless," "criminal conduct," "embezzlement," "defamation," etc. It is not necessary to resolve or reach the merits of the parties' respective claims and counterclaims in deciding the narrow issues raised by the Petition. Those claims and issues are for determination at another time: namely, the evidentiary hearing on the merits of the parties' respective claims and counterclaims.

22.    Outside of this arbitration, there are four separate court proceedings pending that relate to the disputes in this arbitration: one initiated by Davis against Rajaee,[3] one initiated by Mobile Monster against Davis,[4] one initiated by Rajaee against a former employee of the LLC (Siarra Wood),[5] and one initiated by two former employees of the LLC against Rajaee.[6] *Order No. 2, ¶ 2.4; Davis Request for Judicial Notice.*

4.    **Rulings on the Petition**

A.    **Davis has the right to dissolve the LLC because he holds a majority of the Percentage Interests in the LLC.**

The operating agreement of a limited liability company governs, among other things, (a) "[r]elations among the members as members and between the members and the limited liability company"; and (b) "[t]he rights and duties under [the Act] of a person in the capacity as manager." Cal. Corp. Code § 17701.10(a)(1), (a)(2). Dissolution is a remedy that is authorized by Corporations Code section 17707.01.

Under paragraph 9.1 of the Agreement, the LLC will be dissolved on "[t]he written agreement of a Majority of Members to dissolve the Company." Davis claims to have made the election / decision to dissolve the LLC through his filing of a complaint for dissolution in the Sacramento Superior Court ("the State Court Action") and through his counterclaim for dissolution in this arbitration, as well as his filing of the Petition. The question is whether or not Davis holds more than 50% of the Percentage Interests in the LLC, and has the right to dissolve the LLC without Rajaee's consent and over his objection. The evidence in this matter supports a determination of "yes." Davis has the right to dissolve the LLC without Rajaee's consent and

---

[3]    *Tyler Davis v. Ashkan Mirfakhr-Rajaee, et al.*, Superior Court of the State of California, County of Sacramento, Case No. 34-2021-00301817.

[4]    *Mobile Monster v. Tyler Davis*, Superior Court of the State of California, County of Sacramento, Case No. 34-2021-00301817.

[5]    *Ashkan Rajaee v. Siarra Wood*, Superior Court of the State of California, County of San Diego, Case No. 37-2021-00008947.

[6]    *Sarah Blanchette and Siarra Wood v. Ashkan Rajaee*, Superior Court of Justice, Ontario (CANADA), Case No. CV-21-00086316-000.

8

over his objection because (a) Davis holds a majority of the Percentage Interests in the LLC, as defined by the Agreement, and (b) the Agreement provides that the LLC may be dissolved by agreement of the "Majority of Members."

While the LLC's record keeping appears to have been less than perfect, two things are clear: (1) only Davis contributed capital to the start-up of the LLC, and (2) the LLC's *outside* accountants have reported on capital structure of the LLC on the LLC's annual tax returns for 2017, 2018, 2019 and 2020, which returns were signed under penalty of perjury by Rajaee in his capacity as the LLC's "tax matters partner." All of the returns, without exception, state that Davis has a 100% capital interest in the LLC.[7] Under the definition of "Majority of Members" as set forth in paragraph 1.28 of the Agreement, Davis alone qualifies as the majority member of the LLC, even if capital investment credit were given to Rajaee for the $38,760 he contributed to the LLC in November 2020.

With the exception of the $76,000 Rajaee and Davis put into the LLC in November 2020 pursuant to a "capital call" by Rajaee to cover the LLC's operating expenses, Rajaee has never described any of the monies he advanced or loaned to the LLC as capital investments.[8] In this regard, Rajaee testified that when the LLC was formed in 2017, it was his requirement that Davis be responsible for capitalizing the venture because he did not want to be at risk in the new venture. *RT 421*. The profit and loss statements created by the LLC's outside accounting firm show that more than $5,000,000 has been paid in "Consultant Reimbursement Expenses," which supports the inference that any advances Rajaee (or Mobile Monster) may have made to or for the benefit of the LLC were intended and treated as advances to be repaid by the LLC and not as capital Rajaee invested in the LLC. Moreover, Rajaee's claim in these proceedings that he believes he advanced or loaned over $1,000,000 to the LLC that has not been repaid further confirms that Rajaee has never intended that any "contributions" he may have made to cover the LLC's operating expenses were to be treated as a capital investment.

Rajaee testified that he had an understanding with Davis from the outset that he would own 51% of the LLC and Davis would own 49% of the LLC, irrespective of their respective capital contributions, because that is what he needed to qualify for a visa to live and work in the United States. *RT 103*. Assuming for sake of argument that those discussions did in fact occur, the alleged agreement or understanding is inconsistent with the terms of the Agreement

---

[7]   Rajaee pointed to the fact that he was allocated 51% of the profits in three of the LLC's tax returns as somehow being proof of an agreement between himself and Davis to the effect that he would have an ownership interest in the LLC that did not match his capital contributions to the LLC. While such an agreement is certainly possible. There was no evidence of such an agreement being reached between Davis and Rajaee to modify Article IV of the Agreement in this regard.

[8]   Schedule M-2 of the 2020 tax return recognized the $76,000 contribution as a capital contribution, and the K-1's for Rajaee and Davis recognized their contributions of $38,760 and $37,240, respectively. However, the capital interest percentages did not change as reflected on the K-1's. *Davis Exhibit 11.*

9

Rajaee and Davis signed to memorialize the terms of their business relationship in creating the LLC, and both agree that the Agreement has never been modified by a writing signed by both of them. *RT 199-200 and 239.*

Rajaee pointed to a February 24, 2020 email exchange that started with Rajaee's assistant – Vania Hernandez – writing to the LLC's accountant – Jennifer Glaser ("Glaser") – stating that Rajaee was "in need of a document that states TopDevz length in business as well as his ownership percentage" and that "[t]he document needs to be in LLME letterhead with your signature on it." *Rajaee Exhibit 5.* When Glaser asked what the letter was going to be used for, Rajaee responded that he was "buying a house." Glaser wrote back and asked if there was an updated operating agreement showing him as a 51% owner because she did not have documentation to support that statement. Rajaee then looped Davis in on the email chain and asked him to confirm ownership in the LLC as 51% to him and 49% to Davis. Davis responded "This is correct." *Id.*

As between Rajaee and Davis, there was insufficient evidence from which an inference could be drawn that Davis and Rajaee intended the email to constitute a written instrument signed by both parties, modifying the Agreement so as to specify the parties' respective ownership percentages that were previously left blank on Exhibit B. This is due in part to the fact that approximately 18 months after the February 24, 2020, email exchange - on September 13, 2021 - Glaser and her firm prepared the LLC's tax return for 2020 with Rajaee signing as the "tax matters partner" for the LLC. Again, the LLC's tax return reported Davis as having a 100% of the capital interest in the LLC and Rajaee as having a 0% capital interest in the LLC. *Exhibit 11.* Like all of the other tax returns for the LLC, Rajaee signed the LLC's 2020 tax return as its "tax matters partner." *Id.* The reasonable inference to be drawn from this evidence is that Davis's "confirmation" email (a) was a friendly accommodation to Rajaee made in the context of Rajaee's effort to purchase a home in the United States,[9] (b) does not rise to the level of constituting an agreement between Rajaee and Davis regarding the capital structure of the LLC, and (c) appears to have *not* been something that the LLC's accountant or Rajaee (as the LLC's tax matters partner) relied upon in reporting the LLC's capital structure to the IRS in 2021 for calendar year 2020 because the stated capital accounts of Rajaee and Davis remained the same as in prior years. *Davis Exhibit 11.* The preparation of the 2020 tax return, as well as all prior tax returns, was done under Rajaee's direction as the LLC's "tax matters partner."

---

[9]   Rajaee testified that he relied on the 51/49 discussions contained in the February 2020 email exchange in entering into the LLC with Davis. That testimony was not credible because Rajaee entered into the Agreement three years before the February 2020 email exchange, and there was no evidence that Rajaee did anything to his detriment after February 2020. To the contrary, the evidence showed that since February 2020, millions of dollars have flowed out of the LLC to Rajaee and his companies (Mobile Monster, SpendHub and Remote Preneurs), including over $490,000 paid out to Rajaee in July 2021. *Exhibit 21.*

10

Rajaee also pointed to the fact that he was allocated 51% of the profits on the LLC's tax returns as proof of his 51% ownership stake in the LLC. The problem with Rajaee's position and testimony is that the evidence concerning the allocation of profits and losses to Rajaee was inconsistent. For example:

(1)    Rajaee's share of profit and loss at the beginning of 2017 was shown as "0.0000000%," but his profit and loss allocation at the end of 2017 was shown as "6.5383824%." *Davis Exhibit 8.*

(2)    Rajaee's share of profit at the beginning of 2018 was shown as "6.5383824%," but his profit allocation at the end of 2018 was shown as "51.0000000%." Rajaee's share of loss at the beginning of 2018 was shown as "6.5383824%," but his loss allocation at the end of 2018 was shown as "0.0000000%." *Davis Exhibit 9.*

(3)    Rajaee's share of profit at the beginning and end of 2019 was shown as "51.0000000%." Rajaee's share of loss at the beginning and end of 2019 was shown as "0.0000000%." *Davis Exhibit 10.*

(4)    Rajaee's share of profit at the beginning and end of 2020 was shown as "51.0000000%." Rajaee's share of loss at the beginning of 2020 was shown as "0.0000000%," but at the end of 2020 it was shown as "51.0000000%." *Davis Exhibit 11.*

The fact that Rajaee was allocated profits and losses of the LLC does not change the fact that (a) the Agreement required profits and losses to be allocated based upon members' capital account, *Davis Exhibit 2, ¶ 4.1,* and (b) Rajaee made only a small capital contribution in 2020, as discussed above. *Davis Exhibit 11.*

Rajaee himself testified that he never paid "attention to all of the details" in the LLC's tax returns and did not recall having any discussions with the accountant or Davis about the 2017 or 2018 changes in Rajaee's profit share allocation from 0% to 6.5% to 51%. *RT 89-93 and 193.* The suggested inference is that Rajaee's profit and loss allocations were changed without his knowledge or input, and that these changes were made by the accountants without the approval of the LLC's "tax matters partner." Without the testimony of the LLC's outside accountant who prepared the LLC's tax returns, there is insufficient evidence to support such an inference, and it has no bearing on whether Rajaee and Davis agreed to a capital structure other than as provided for in the Agreement.

In final analysis, the only evidence of a capital contribution by Rajaee to the LLC is the $38,760 he contributed in November 2020. Under the terms of the Agreement, Rajaee's Percentage Interest in the LLC is only 4.692% ($38,760 ÷ ($750,000 + $76,000) = .04692). As such, Davis holds the majority of Percentage Interests in the LLC and controls the vote of the Majority of Members. Accordingly, it is hereby determined that Davis owns 95.308% of the capital interest

11

in the LLC and is the Majority Member with regard to decisions that are subject to the vote of the Members or a "Majority of Members." Accordingly, Davis thus has the right, under paragraph 9.1 of the Agreement, to dissolve the LLC without Rajaee's consent and over his objection. That is the basis for the order set forth in Section 5. Davis also has the right to exercise all other voting rights given to the "Majority of Members," including removal of the Manager.

**B.    Even if Davis is not the Majority Member, protective dissolution would be in order because management of the LLC is deadlocked and subject to internal dissension.**

Deadlock and internal dissension are grounds for dissolution under Corporations Code section 17707.03(b)(4). To obtain a decree of dissolution, the alleged dissension must be sufficient to prevent the further successful operation of the company to the advantage of its members. *Fuimaono v. Samoan Congregational Christian Church of Oceanside*, 66 Cal. App. 3d 80, 84 (1977); *see also BeUo v. Panorama Optics, Inc.*, 33. Cal. App. 4th 1096, 1105 (1995) (dissension evidenced by "completely different views as to the operation of the company"); *Buss v. J.O. Martin Co.*, 241 Cal. App. 2d 123, 136 (1966) (dissension shown where parties "hold contrary and opposing views on nearly all phases of the conduct of the business").

The irreparable deterioration of the relationship of Rajaee and Davis is evidenced by, among other things, (a) the aggressive claims and counterclaims that have been asserted in this arbitration and in the various companion court proceedings described in footnotes 3, 4, 5 and 6, (b) the fact that Rajaee and Davis have not spoken to each other since February 2021, and (c) the fact that Rajaee has instructed Davis to only speak to him through his attorney.

The dissension within the relationship of Rajaee and Davis as co-members of the LLC is evidenced by their completely different views as to what qualifies as an "ordinary course" business expense within Rajaee's sole decision making authority and discretion as the LLC's Manager and what types of decisions are subject to approval by Davis. *See, Footnote 2*. As evidenced by the expenditures made by Rajaee since February 2021, the delta on these differing views is several hundred thousand dollars flowing out of the LLC to companies owned by Rajaee. *Id.*

**5.    Order**

Based upon the foregoing, and for good cause shown, IT IS HEREBY ORDERED AS FOLLOWS:

1.    Davis owns 95.308% of the capital interest in the LLC, and thus owns the majority of the Percentage Interests in the LLC for voting purposes and has the right to elect to dissolve the LLC without the consent and over the objection of Rajaee.

12

**EXHIBIT 2, Page 202**

2.      Protective dissolution of the LLC   under Corporations Code section 17707.03(b)(4) is in order because management of the LLC is deadlocked and subject to internal dissension.

3.      Based upon Davis' request that the LLC be dissolved and the finding of deadlock and internal dissension within the management of the LLC, the LLC shall be dissolved pursuant to paragraph 9.1 of the Agreement and Corporations Code sections 17707.01(a) and 17707.03(b)(4). In accordance with paragraph 9.2 of the Agreement, the LLC will engage in no further business other than that necessary to wind up the business and affairs of the LLC. Davis, and only Davis or his designee, shall be responsible for managing, overseeing, and completing the dissolution of the LLC, and only Davis, or his designee, shall have the authority to take those actions necessary to accomplish the dissolution of the LLC.

4.      In accordance with paragraph 9.2 of the Agreement, Davis, is the Member of the LLC responsible for winding up the affairs of the LLC, and will give notice of the commencement of winding up by mail to all known creditors and claimants of the LLC. After paying or adequately providing for the payment of all known debts of the LLC (except debts owing to members), the remaining assets of the LLC will be distributed or applied in the following order:

        (a)     To pay the expenses of liquidation;

        (b)     To the establishment of reasonable reserves for contingent liabilities or obligations of the LLC. On the determination that reserves are no longer necessary, they will be distributed as provided in this order and paragraph 9.2 of the Agreement;

        (c)     To repay outstanding loans to members, if any, which is among the issues to be determined in the accounting in this arbitration, in accordance with paragraph 9.2(c) of the Agreement; and

        (d)     To the members with positive capital account balances, as provided in Article IV, paragraph 4.16 of the Agreement.

5.      Davis and only Davis, or his designee, shall have authority to access, disburse funds from, open and close bank and other financial accounts belonging to or standing in the name of the LLC. If any such action requires the signature of Rajaee on a consent, certificate, filing or other document, Rajaee shall provide such signature within three (3) business days of being advised by Davis, or his designee, that such signature is required.

13

6.     Based upon Davis' request that Rajaee be removed as Manager of the LLC, Rajaee shall be removed as Manager of the LLC, and only Davis or his designee shall replace Rajaee as Manager of the LLC. If this removal and/or replacement requires the signature of Rajaee on a consent, certificate, filing or other document, Rajaee shall provide such signature within three (3) business days of being advised by Davis, or his designee, that such signature is required.

7.     Rajaee is hereby ordered to provide a full and complete accounting of the LLC's finances from the date of its inception in 2017 through the date of this order. That accounting needs to track every dollar in and every dollar out with backup, especially as pertains to (a) monies withdrawn, transferred or otherwise paid as expenses of the LLC, and (b) monies advanced or loaned to the LLC by Rajaee.

8.     Rajaee is ordered to turn over to Davis or his designee the original books and records of the LLC, including any electronically stored information and all and paper records such as invoices, contracts, receipts, checks, bank statements, etc.

9.     Rajaee is ordered to fully cooperate in providing access to Davis or his designee with respect to all of the books and records of the LLC maintained by or in the custody of Lavine, Lofgren, Morris & Engelberg LLP.

10.     From the date of this order forward, unless and until modified or instructed otherwise by a court of competent jurisdiction, Rajaee shall not make or cause to be made any disbursements, transfers or withdrawals from any accounts standing in the name of the LLC without the signature approval of Davis, or his designee. Specifically, Rajaee shall not incur any debt in the name of the LLC without the signature approval of Davis or his designee.

11.     From the date of this order forward, unless and until modified or instructed otherwise by a court of competent jurisdiction, Rajaee shall not make or enter into any contracts or commitments on behalf of or in the name of the LLC without the signature approval of Davis, or his designee.

12.     Rajaee is ordered to cooperate in collecting any outstanding receivables owed to the LLC, and is ordered to turnover any and all collections to Davis, or his designee, for deposit into an account maintained by and in the name of the LLC.

13.     This order is without prejudice to the right of Rajaee to seek to exercise his buy-out rights in accordance with the procedures specified in Corporations Code section 17707.03(c).

14

14.     A case management conference will be held in this matter on **Friday – January 21, 2022, at 10:00 a.m. Pacific Time,** for the purpose of reviewing with the parties' counsel (a) the status of the implementation of this order, and (b) the parties' readiness to proceed with the evidentiary hearing proceedings scheduled to commence on April 4, 2022. In advance of the case management conference, Davis's counsel is instructed to provide the Arbitrator with a status report and to do so no later than **Thursday – January 20, 2022.** The case management conference will be held via video conference. The following is the log-in information for the conference:

https://us02web.zoom.us/j/83580491031?pwd=NERNcC9RMWVqSmRzZWJhYTlKRVEzZz 09

Meeting ID: 835 8049 1031
Passcode: 545721
One tap mobile
+16699006833,,83580491031#,,,,*545721# US (San Jose)
+13462487799,,83580491031#,,,,*545721# US (Houston)

IT IS SO ORDERED.

Dated:  6 January 2022

Rebecca Callahan, Arbitrator

15

ATTACHMENT 2

**EXHIBIT 2, Page 206**

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitral Tribunal

In the Matter of the Arbitration Between:

Ashkan Rajaee and TopDevz, LLC, a California Limited Liability Company,

Claimants and Counter-Respondents,

- vs -

Tyler Davis,

Respondent and Counter-Claimant

ICDR Case No. 01-21-0001-9983

ORDER NO. 5 – ORDER ON RESPONDENT'S EMERGENCY MOTION
TO ENFORCE ORDER NO. 4

A duly noticed hearing ("Hearing") on Respondent's emergency motion ("Motion") was convened via video conference at approximately 10:00 a.m. Pacific Time on Thursday – January 13, 2022, before Rebecca Callahan, Arbitrator. Scott R. Carpenter, of Cummins & White LLP, appeared on behalf of Respondent Tyler Davis ("Respondent" or "Davis"), and Jordan Matthews, of Weinberg Gonser LLP, appeared on behalf of Claimant Askhan Rajaee ("Claimant" or "Rajaee"). The hearing proceedings were recorded and transcribed by a certified court reporter. The transcript of the proceedings on the Motion is part of the record in this arbitration.

In his Motion, Davis took issue with Rajaee for taking certain actions for or on behalf of TopDevz LLC ("the LLC") after Order No. 4 – Order on Respondent's Petition for Decree of Dissolution ("Order No. 4") was issued, as well as Rajaee's refusal to cooperate in providing information to Davis and access to the LLC's books and records. While opposition was submitted to the Motion on behalf of Rajaee, that opposition did not address the substantive issues raised by the Motion: most notably, what happened to the $1,052,146 Rajaee caused to be transferred out of the LLC's bank account at Wells Fargo after Order No. 4 was issued? Significantly, Rajaee did not provide a declaration denying that he caused the aforementioned monies to be transferred out of

the LLC's bank account, and he did not appear at the Hearing to address, explain or otherwise respond to that circumstance. Additionally, according to Davis' counsel, Davis's efforts to obtain cooperation from Rajaee and the LLC's outside accounting firm with regard to turnover of the LLC's books and records and administrative access to its electronic records have been frustrated at every turn by the lack of response from anyone. Neither Rajaee nor his counsel denied or disputed the offer of proof made by Davis' counsel concerning the lack of turnover of the LLC's books and records to Davis or the lack of cooperation that has been forthcoming from Rajaee.

Having considered the papers the parties submitted with regard to the Motion, as well as the arguments made by the parties' respective counsel, and good cause appearing therefore, IT IS HEREBY ORDERED:

1.    Rajaee violated Order No. 4 when he transferred funds out of the LLC's account at Wells Fargo Bank, Account Number 1756821128, on January 6 and January 7, 2022, because Davis, and only Davis or his designee, had the authority to access, disburse funds from, open and close bank and other financial accounts belonging to or standing in the name of the LLC from approximately 2:00 p.m. on January 6, 2022, forward. Rajaee is hereby ordered to immediately return and/or replenish to the LLC, care of Davis, the $900,000.00 he transferred to himself at approximately 11:00 p.m. on January 6, 2022, as well as the $131,586.76, transferred out as an "international money transfer debit" on January 7, 2022.

2.    Rajaee's power and authority to act as the Manager and "tax matters partner" of the LLC ended as of approximately 2:00 p.m. on January 6, 2022. Only Davis or his designee has authority to act as Manager of the LLC, and may do so without Rajaee's consent and over his objection. Rajaee is hereby enjoined and restrained from accessing any LLC bank or financial accounts, transferring any funds from any LLC bank or financial accounts, or transacting business of any sort for or on behalf of the LLC without Davis's signature approval.

3.    Rajaee is hereby ordered to immediately return to the LLC, care of Davis, any and all documents, data, and/or tangible property removed or taken from the LLC since January 6, 2022, by Rajaee or any persons or entities under Rajaee's control who have acted on behalf of Rajaee. Rajaee, and his agents and representatives, are enjoined and restrained from accessing and/or removing any business records of the LLC without the signature consent of Davis or his designee, including but not limited to any electronically stored information and all and paper records such as invoices, contracts, receipts, checks, bank statements, and customer lists, customer data, vendor lists,

2

**EXHIBIT 2, Page 208**

vendor data, contractor lists, contractor data, accounts receivable documents and accounts payable records.

4.    Nothing in this Order No. 5 is intended or shall be construed as superseding Order No. 4. Order No. 4 remains in full force and effect.

Dated:  13 January 2022.

Rebecca Callahan, Arbitrator

3

**EXHIBIT 2, Page 209**